Thomas Amodio, Bar No. 8511142
REEVES AMODIO LLC
500 L Street, Suite 300
Anchorage, AK 99501
Telephone: (907) 222-7100
Facsimile: (907) 222-7199
*tom@reevesamodio.com*

Roger W. Yoerges (*pro hac vice* motion pending)
Timothy A. Work (*pro hac vice* motion pending)
Mark Murphy (*pro hac vice* motion pending)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
*ryoerges@steptoe.com*
*twork@steptoe.com*
*mmurphy@steptoe.com*

Anthony A. Onorato (*pro hac vice* motion pending)
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900
Facsimile: (212) 506-3950
*tonorato@steptoe.com*

*Attorneys for Plaintiff Pebble Limited Partnership*

# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF ALASKA

| | |
|---|---|
| PEBBLE LIMITED PARTNERSHIP,<br><br>      Plaintiff,<br><br>vs.<br><br>ENVIRONMENTAL PROTECTION AGENCY and GINA MCCARTHY, in her official capacity as Administrator of the Environmental Protection Agency,<br><br>      Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br>**(5 U.S.C. App. II § 1** *et seq.***, 5 U.S.C.**<br>**§ 551** *et seq.***)**<br><br>**CIVIL ACTION NO.**<br>_____ |

## **TABLE OF CONTENTS**

NATURE OF THE CASE ........................................................................................................1

    The "Anti-Mine Coalition" FAC ....................................................................................3

    The "Anti-Mine Scientists" FAC ....................................................................................6

    The "Anti-Mine Assessment Team" FAC .......................................................................7

JURISDICTION ................................................................................................................10

THE PARTIES ..................................................................................................................10

STATUTORY BACKGROUND OF PLAINTIFF'S CLAIMS.........................................11

    Federal Advisory Committee Act and the APA ...........................................................11

    Clean Water Act Section 404 and the Permit Application Process .............................13

FACTUAL ALLEGATIONS .............................................................................................14

    A.    EPA's Responses To Plaintiff's FOIA Requests For Information Concerning, *Inter Alia*, The Advice And Recommendations Received By EPA From Anti-Pebble Mine Groups.................................................................................................14

    B.    Chronology of EPA's Establishment And Utilization Of The Anti-Mine Coalition, Anti-Mine Scientists, and Anti-Mine Assessment Team FACs .....................................17

        1.    EPA's Collaboration With Pebble Mine Opponents:  2008 .....................17

        2.    EPA's Collaboration With Pebble Mine Opponents:  2009 .....................21

        3.    EPA's Collaboration With Pebble Mine Opponents:  2010 .....................27

        4.    EPA's Collaboration With Pebble Mine Opponents:  2011 .....................60

        5.    EPA's Collaboration With Pebble Mine Opponents:  2012 .....................86

        6.    EPA's Collaboration With Pebble Mine Opponents:  2013 ...................105

        7.    EPA's Collaboration With Pebble Mine Opponents:  2014 ...................113

    C.    EPA Froze Out Pebble Mine Supporters And PLP's CEO John Shively.......................117

    D.    The Peer Reviewers Heavily Criticized The Major Flaws In The BBWA Notwithstanding EPA's Efforts To Manipulate The Peer Review Process....................119

CLAIMS FOR RELIEF ...................................................................................................126

    COUNT ONE:  Violation of FACA and APA:  Anti-Mine Coalition FAC............................126

    COUNT TWO:  Violation of FACA and APA:  Anti-Mine Scientists FAC ............................130

    COUNT THREE:  Violation of FACA and APA:  Anti-Mine Assessment Team FAC .............132

    COUNT FOUR:  Injunctive Relief for Violation of FACA and APA .........................................135

PRAYER FOR RELIEF ...................................................................................................135

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page i

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 2 of 138

Plaintiff Pebble Limited Partnership ("Plaintiff," "Pebble Partnership" or "PLP") seeks declaratory and injunctive relief against Defendants United States Environmental Protection Agency and Gina McCarthy, its Administrator (collectively, "Defendants," "EPA," or "Agency"), for violating federal law, and alleges as follows:

## NATURE OF THE CASE

1.      This is an action against EPA for its violations of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. II § 1 *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*.

2.      As alleged further herein, EPA established and utilized three groups that, by operation of law, constituted Federal Advisory Committees ("FACs"). These FACs assisted, and, on information and belief, continue to assist EPA in developing and implementing an unprecedented plan to assert EPA's purported authority under Section 404(c) of the federal Clean Water Act ("Section 404(c)") in a manner that, if successful, will effectively preempt Plaintiff, which holds the mining rights to the minerals in the Pebble Deposit, from ever exercising its right to extract minerals from that deposit. The Pebble Deposit, located in Southwest Alaska, is a mineral-rich area that contains one of the world's largest deposits of copper and gold.

3.      When Alaska was granted statehood in 1958, the land that constitutes the Pebble Deposit, along with all associated mineral rights, was part of the vast land grant made by the United States.

4.      Many years later in 2002, Alaska leased the rights to the minerals found in the Pebble Deposit to Plaintiff, and, until Defendants hatched their unlawful plan to veto any effort to mine the Pebble Deposit, Plaintiff had intended to obtain the federal and state permits needed

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 1

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 3 of 138

to conduct mining activities on the leased properties.  One of those permits falls under Section 404 of the federal Clean Water Act.

5.  Section 404 authorizes the United States, through the U.S. Army Corps of Engineers ("USACE" or "Corps"), to issue permits for dredge and fill activities in waters of the United States.  If the proposed mining involves dredge and fill activities, as would be the case with the Pebble Deposit, the owner-operator must first obtain a permit from the Corps under Section 404 before mining may begin.  To obtain a Section 404 permit, applicants must show that the discharge of dredged or fill material would not significantly degrade the nation's waters and that there are no practicable alternatives less damaging to the aquatic environment. Applicants also must describe steps that they will take to minimize the impact to water bodies and wetlands, and they must describe appropriate and practicable mitigation steps, such as restoring or creating wetlands, for any remaining, unavoidable impacts.

6.  Under Section 404(c), EPA may "veto" a decision by the Corps to permit the discharge of dredged or fill material where the Agency expressly finds that the activity will have unacceptable, adverse effects on municipal water supplies, shellfish beds and fishery areas, wildlife, or recreational areas.  In addition, EPA may "prohibit the specification . . . of any defined area as a disposal site" or may "deny or restrict the use of any defined area for specification . . . as a disposal site."

7.  In every case since the Clean Water Act was passed, EPA has exercised its authority under Section 404(c) only *after* an applicant has submitted its application or a proposed development plan to the Corps for a Section 404 permit.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 2

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 4 of 138

8.      EPA's use of Section 404(c) in this case to prohibit a major mining project *before* any application has been submitted is the first time in history that Section 404(c) has been used in this manner.

9.      As alleged in detail herein, EPA's unprecedented strategy to use Section 404(c) preemptively was developed by the Agency with the substantial assistance from three *de facto* FACs that EPA furtively and unlawfully established and utilized to provide it with advice and recommendations on the development of EPA's unprecedented strategy. These FACs are identified herein as (i) the Anti-Mine Coalition FAC; (ii) the Anti-Mine Scientists FAC; and (iii) the Anti-Mine Assessment Team FAC. Each of these groups was composed in whole or in part of non-government, outside advisors who were opposed to any mining of the Pebble Deposit from the outset and, as such, each played a critical role in collaborating with like-minded EPA personnel – from management on down – in the development and implementation of EPA's unlawful scheme to use Section 404(c) preemptively to prohibit mining of the Pebble Deposit.

### The "Anti-Mine Coalition" FAC

10.     The Anti-Mine Coalition FAC consisted of members of Environmental Non-Governmental Organizations ("ENGOs"), as well as anti-mine activists, lawyers, lobbyists, and Alaska Native Tribal representatives, who, starting as early as 2008, began to coordinate amongst themselves and to collaborate privately with employees of EPA to provide factual and legal support to EPA that, in the Agency's view, was needed for it to proceed under Section 404(c).

11.     EPA established and utilized the Anti-Mine Coalition essentially as an auxiliary EPA. The Anti-Mine Coalition performed critical functions in support of, at the behest of, and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 3

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 5 of 138

effectively on behalf of, EPA, including driving decision-making on policy issues that, under federal law, should only have been undertaken by the Agency.

12.     The Anti-Mine Coalition FAC was a group that included, but likely was not limited to, Geoffrey ("Jeff") Parker, counsel to six of the anti-mine Alaska Native Tribes and to Robert Gillam, who provided funding to the Anti-Mine Coalition; Shoren Brown and other representatives of Trout Unlimited ("TU"); Bob Waldrop, formerly of the Bristol Bay Regional Seafood Development Association ("BBRSDA"); Rick Halford, former state legislator and anti-mine activist; David Chambers and other representatives of the Center for Science in Public Participation ("CSP2"); Wayne Nastri, former EPA official turned lobbyist; Jason Metrokin, Peter Van Tuyn, and other representatives of the Bristol Bay Native Corporation ("BBNC"); Tim Troll and other representatives of The Nature Conservancy ("TNC"); Jan Goldman-Carter and other representatives of the National Wildlife Federation ("NWF"); Susan Flensburg and other representatives of the Bristol Bay Native Association ("BBNA"); representatives of Bristol Bay United ("BBU"), a group composed of Metrokin, Brown, Waldrop, Van Tuyn and others; Lydia Olympic and other representatives of The Wilderness Society ("TWS"); Sam Snyder and other representatives of the Alaska Conservation Foundation ("ACF"); and Alaska Native Tribal members such as Tom Tilden, Bobby Andrew, and Luki Akelkok.

13.     The Anti-Mine Coalition secretly advised EPA on how the Agency should develop its strategy under Section 404(c), including making critical recommendations on who EPA officials should recruit, how the Agency could best leverage the Alaska Native Tribes, and how to formulate EPA's messaging in a way that would minimize anti-federal government backlash among Alaskans.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 4

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 6 of 138

14. EPA reciprocated by connecting the members of the Anti-Mine Coalition with the key points of contact on Pebble Mine issues within the agency including John Pavitt, EPA's Pebble Mine Project Leader, and Richard Parkin, head of the Environmental Justice Unit and later the leader of the Bristol Bay Watershed Assessment Team, as well as arranging for access to and regular meetings and briefings with top EPA management, including then-Administrator Lisa Jackson; Region 10 Administrator Bob McLerran; Bob Sussman, Senior Policy Counsel to the Administrator; Nancy Stoner, Deputy Assistant Administrator for Water; Bill Dunbar, Senior Policy Advisor; and Denise Keehner, Director of EPA's Office of Water, Oceans, and Wetlands.

15. Further, the Anti-Mine Coalition secretly provided advice and recommendations on the substance, timing, and implementation of EPA's Section 404(c) scheme with regard to Pebble Mine. Coalition members counseled EPA on the purported advantages of preemptive action and coordinated resources on the ground in Alaska and in Washington, DC, to provide EPA with the support needed to accelerate the Section 404(c) process in a way meant to restrict public involvement to the greatest degree possible. Coalition members drafted numerous white papers, memos, and presentations for EPA to assist it in building a sufficient case for taking action under Section 404(c) action, and, in multiple instances, EPA personnel co-drafted the memos with the Anti-Mine Coalition members. EPA also shared government strategy documents with Anti-Mine Coalition members to solicit their feedback.

16. The Anti-Mine Coalition also provided legal advice directly to EPA attorneys and staff on the propriety of a preemptive Section 404(c) action under federal law, on what findings by EPA would be necessary to substantiate the Section 404(c) action, and on how the Agency should pursue Section 404(c) to insulate it from a potential "takings" claim.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 5

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 7 of 138

17.    In addition, the Anti-Mine Coalition, through its ties to the Anti-Mine Scientists, provided EPA with the tailor-made "science" that the Agency was seeking.  Many times, the Anti-Mine Coalition provided EPA with data and analyses, all of which was directed to only one purpose:  to give EPA what it purportedly needed to justify a veto under Section 404(c).  The Anti-Mine Coalition connected EPA with anti-mining scientists and arranged for numerous briefings at the Agency's request to provide it with scientific advice that meshed with EPA's predetermined conclusions about the allegedly adverse impact of mining activities.

18.    The critical role that the Anti-Mine Coalition played in providing advice and recommendations in formulating and supporting EPA's Section 404(c) strategy, while shielded from public scrutiny, is precisely the kind of back-room influence peddling that FACA was enacted more than forty years ago to prevent.

19.    EPA could not have achieved its unlawful ends without establishing or utilizing the Anti-Mine Coalition FAC.

### The "Anti-Mine Scientists" FAC

20.    The Anti-Mine Scientists FAC consisted of individuals and affiliated organizations that EPA utilized to provide it with scientific analysis, data, and drafting assistance in connection with the Section 404(c) strategy, which included, most importantly, assisting with EPA's assessment of the effects of mining on an area known as the Bristol Bay Watershed. EPA's unlawful establishment and utilization of the Anti-Mine Scientists FAC culminated after nearly five years in a report entitled "*An Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay, Alaska*" (EPA 910-R-14-001A; Jan. 2014) (referred to herein as the "Bristol Bay Watershed Assessment" or the "BBWA") that was the backbone of EPA's Section 404(c) scheme.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 6

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 8 of 138

21.     The Anti-Mine Scientists FAC included, but likely was not limited to, David Chambers (CSP2); Kendra Zamzow (CSP2); Stu Levit (CSP2); Bretwood Higman (CSP2/Ground Truth Trekking); Carol Ann Woody (Fisheries Research and Consulting); Sarah O'Neal (Fisheries Research and Consulting); Ann Maest (Stratus Consulting), Cameron Wobus (Stratus Consulting); Thomas Quinn (University of Washington/The Nature Conservancy); Alan Boraas (Kenai Peninsula College); Daniel Rinella (University of Alaska Anchorage); Michael Wiedmer (University of Washington/The Nature Conservancy); David Albert (The Nature Conservancy); Marcus Geist (The Nature Conservancy); David Athons (Kenai River Center); Jim Kuipers; William Riley (former EPA scientist); and Thomas Yocom (former EPA scientist).

22.     Beginning in late 2010 or early 2011 and continuing, on information and belief, to the present, the Anti-Mine Scientists FAC regularly briefed EPA officials and provided scientific papers, presentations, research, data, and overall strategy advice and recommendations – the lifeblood to validating EPA's scheme.  Members of this FAC were fixtures at EPA's private meetings.  Several of the Anti-Mine Scientists overtly and expressly made clear to EPA their bias regarding the certainty of "catastrophic" outcomes from hypothetical mining activities at the Pebble Deposit, and, for this reason, EPA relied on them to research and as critical authority for significant portions of the Bristol Bay Watershed Assessment.  In some instances, members of the Anti-Mine Scientists FAC were also members of the Anti-Mine Assessment FAC.

23.     The critical role that the Anti-Mine Scientists FAC played in formulating and preparing EPA's Bristol Bay Watershed Assessment and advancing EPA's anti-mining scheme under Section 404(c), while shielded from public scrutiny, is precisely the kind of back-room influence peddling that FACA was enacted more than forty years ago to prevent.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 7

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 9 of 138

24.     EPA could not have achieved its unlawful ends without establishing or utilizing the Anti-Mine Scientists FAC.

### The "Anti-Mine Assessment Team" FAC

25.     The Anti-Mine Assessment Team FAC consisted of members of the EPA Bristol Bay Assessment Team, including individuals who are not employed by the federal government, who, beginning in or about 2010, provided advice and recommendations to EPA, developed the direction of the Bristol Bay Watershed Assessment, and contributed to, and drafted, the BBWA and its Appendices.

26.     The Anti-Mine Assessment Team FAC was established in or around the beginning of 2011. Over the course of 2011, the Anti-Mine Assessment Team FAC, in collaboration with the Anti-Mine Coalition FAC and the Anti-Mine Scientists FAC, helped craft the strategic guidance that would shape the Watershed Assessment's patently anti-mining bias. From 2012 to at least 2014, the Anti-Mine Assessment Team was responsible for drafting the three iterations of the BBWA and for responding to criticisms by peer-reviewers and others of those deeply flawed and outcome-driven environmental studies.

27.     The Anti-Mine Assessment Team FAC included, but likely was not limited to, Greg Blair, Ralph Grismala, Jim Rice, Steve Seville and other representatives of ICF International; Daniel Rinella; Michael Wiedmer; David Athons; Alan Boraas; John Duffield; Christopher Frissell; Chris Neher; David Patterson; Catherine Knott; Rebecca Shaftel; Jeff Parker; and members of the Intergovernmental Technical Team.

28.     The critical role that the Anti-Mine Assessment Team FAC played in formulating and preparing EPA's Bristol Bay Watershed Assessment and advancing EPA's anti-mining

scheme under Section 404(c), while shielded from public scrutiny, is precisely the kind of back-room influence peddling that FACA was enacted more than forty years ago to prevent.

29.     EPA could not have achieved its unlawful ends without establishing or utilizing the Anti-Mine Assessment Team FAC.

30.     When, as EPA has done in this case, a federal agency establishes or uses outside advisory committees to conduct research, develop data, and make recommendations to the agency regarding the formulation of governmental policy and strategy, the Federal Advisory Committee Act mandates, among other things, that those committees be fair and balanced and that their work be open to the public.

31.     In this case, EPA wanted to kill the Pebble Mine before it ever got off the ground. It thus set out to develop a scheme that would prohibit mining activities before any application had even been filed, rather than to follow normal permitting procedures that would have involved open, objective, and public review by all interested parties.  Instrumental to this scheme was EPA's clandestine use of the *de facto* advisory committees – made up of individuals and groups who have been vehemently opposed to any mining of the Pebble Deposit – to help the agency plan and then implement unprecedented steps designed to guarantee that no mining of the Pebble Deposit would ever take place.

32.     Relying heavily on the substantial input, advice, and recommendations from these unlawfully established advisory committees, EPA prepared a patently biased, anti-mine assessment of hypothetical mining activities in the Bristol Bay Watershed and then used that flawed assessment to commence administrative proceedings under the federal Clean Water Act that, if allowed to stand, will effectively put an end to mining before the permitting process ever gets off the ground.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 9

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 11 of 138

33.     Whether and under what conditions minerals can be extracted from the Pebble Deposit consistently with all of the competing concerns should indisputably be subject to objective, even-handed scrutiny and sound scientific information.  That is what the state and federal mining application process historically has provided.

34.     EPA's attempt to preempt that process in this case not only flies in the face of good government, but it also violates FACA, a federal law that Congress enacted to prohibit precisely this kind of closed-door, back-room decision- and policy-making.

35.     Plaintiff files this case to compel EPA to act in accordance with federal law.

## JURISDICTION

36.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States) and 5 U.S.C. § 702 (APA).

37.     This Court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 701-706 (judicial review of agency action under APA), for EPA's violations of FACA, 5 U.S.C. App. II § 1 *et seq*., and of the APA, including 5 U.S.C. § 706(2)(A) and/or (D).

38.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claim occurred in Alaska and the Pebble Limited Partnership resides in Anchorage, Alaska.  Venue is also proper pursuant to 5 U.S.C. § 703.

## THE PARTIES

39.     Plaintiff Pebble Limited Partnership is an Alaska partnership, based in Anchorage, Alaska.

40.     Defendant the Environmental Protection Agency is an Executive Branch Agency.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 10

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 12 of 138

41.     Defendant Gina McCarthy is the Administrator of the Environmental Protection Agency and is ultimately responsible for all decision-making regarding, *inter alia*, EPA's compliance with FACA.

## STATUTORY BACKGROUND TO PLAINTIFF'S CLAIMS

### Federal Advisory Committee Act and the APA

42.     Congress enacted FACA in 1972, finding, *inter alia*, that Federal Advisory Committees are useful to providing "diverse opinions" to the Federal Government. 5 U.S.C. App. II § 2(a). Congress also found that "the Congress and the public should be kept informed with respect to the number, purpose, membership, activities, and cost of advisory committees; and the function of advisory committees should be advisory only, and that all matters under their consideration should be determined, in accordance with law, by the official, agency, or officer involved." *Id.* § 2(b)(5), (6).

43.     FACA imposes requirements on agencies when they establish or utilize any "advisory committee."

44.     An advisory committee is any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof, which is established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for one or more agencies or officers of the Federal Government, except that such term excludes any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government. *Id.* § 3(2).

45.     No advisory committee shall be established unless such establishment is determined as a matter of formal record, by the head of the agency involved after consultation with the Administrator, with timely notice published in the Federal Register, to be in the public

interest in connection with the performance of duties imposed on that agency by law. *Id.*
§ 9(a)(2).

46.     Advisory committees shall be utilized solely for advisory functions.
Determinations of action to be taken and policy to be expressed with respect to matters upon
which an advisory committee reports or makes recommendations shall be made solely by an
officer of the Federal Government. *Id.* § 9(b).  No advisory committee shall meet or take any
action until an advisory committee charter has been filed with the head of the agency to whom
any advisory committee reports and with the standing committees of the Senate and of the House
of Representatives having legislative jurisdiction of such agency.  Such charter shall contain,
*inter alia*:  the committee's objectives and the scope of its activity; the period of time necessary
for the committee to carry out its purposes; a description of the duties for which the committee is
responsible; the estimated annual operating costs in dollars and man-years for such committee;
and the estimated number and frequency of committee meetings. *Id.* § 9(c).

47.     In addition, the membership of the advisory committee must be fairly balanced in
terms of the points of view represented and the functions to be performed by the advisory
committee, and the advice and recommendations of the advisory committee must not be
inappropriately influenced by the appointing authority or by any special interest, but are instead
the result of the advisory committee's independent judgment. *Id.* § 5(b)(2), (3).

48.     Once an advisory committee is operating, the federal agency also must comply
with requirements designed to ensure public access and participation.  Among other
requirements, an advisory committee must provide adequate public notice of, and conduct, open
meetings, and must make transcripts of meetings available to the public. *Id.* §§ 10(a), (b) and
11(a).  In addition, all documents made available to, or prepared by, an advisory committee must

be publicly accessible. *Id.* § 10(b). A federal employee must chair, or attend, each advisory committee meeting. *Id.* § 10(e).

49. The APA requires that agency action not be arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and/or without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D). Failure to comply with FACA, including but not limited to the statutory provisions in Paragraphs 45-48, also constitutes a violation of the APA.

### Clean Water Act Section 404 and the Permit Application Process

50. Clean Water Act Section 404 establishes a program to regulate the discharge of dredged and fill material into waters of the United States, including wetlands. Responsibility for administering and enforcing Section 404 is shared by the U.S. Army Corps of Engineers and EPA. Section 404 authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue permits, after notice and opportunity for public hearing, for the discharge of dredged or fill material into the waters of the United States at specified disposal sites.

51. USACE administers the day-to-day program, including individual permit decisions and jurisdictional determinations; develops policy and guidance; and enforces Section 404 provisions. EPA develops and interprets environmental criteria used in evaluating permit applications, identifies activities that are exempt from permitting, reviews and comments on individual permit applications, enforces Section 404 provisions, and has authority to veto USACE permit decisions.

52. The comprehensive USACE permitting process includes submission of detailed plans by the applicant, as well as, potentially, surveys, project design details, compensatory mitigation plans, studies, alternatives analysis, memoranda of agreements, and resolution of concerns. In addition, the Corps must review the impacts of the proposed project under the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 13

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 15 of 138

National Environmental Policy Act ("NEPA") and issue findings of project effects in its

Environmental Impact Statement ("EIS"). The applicant must satisfy this rigorous process as

well as address all other pertinent laws and regulations.

## FACTUAL ALLEGATIONS

A.     **EPA's Responses To Plaintiff's FOIA Requests For Information Concerning,**
    ***Inter Alia*, The Advice And Recommendations Received By EPA From Anti-**
    **Pebble Mine Groups**

53.     Plaintiff submitted FOIA requests to EPA on February 17, 2011, April 27, 2011,

March 2, 2012, August 28, 2012, January 22, 2014, and June 13, 2014. Plaintiff also submitted a

FOIA request to the United States Fish & Wildlife Service ("FWS") on April 12, 2012. Plaintiff

submitted these requests because communications were not open and transparent between EPA

and the groups advising it and in an effort to understand EPA's decision-making processes and

the relationships between EPA and the anti-Pebble Mine groups concerning Bristol Bay, Section

404(c), the scientific basis for its Watershed Assessment. EPA has yet to produce documents in

response to Plaintiff's most recent FOIA request and EPA is still negotiating its response to

Plaintiff's January 2014 FOIA request.

54.     EPA's FOIA response to Plaintiff is characterized by large groupings of

documents apparently withheld and over-redaction of documents invoking the "deliberative

process" exemption to FOIA. Portions of text, as well as the identities of the persons

communicating with the Agency and within the Agency were routinely redacted.

55.     The documents show EPA "blind copying" persons outside the Agency. For

example, an email from on or about July 16, 2010, shows EPA's Tami Fordham sending a "blind

copy" to Jeff Parker. Parker is one of the most active Anti-Mine Coalition collaborators with

EPA. Parker is counsel to the Alaska Native Tribes that petitioned EPA to use Section 404(c) in

2010 (the "Tribes' Section 404(c) petition") to block the Pebble Mine before any mining

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 14

application had even been submitted. Parker also represents Robert Gillam, a key financial backer for the anti-Pebble Mine campaign.

56. One of the central figures in the coordination of the Anti-Mine Coalition and a catalyst for EPA pursuing a Section 404(c) action was Phil North. North was an ecologist in the Aquatic Resources Unit ("ARU") in the Office of Ecosystems, Tribal and Public Affairs at EPA Region 10. North was a central figure in recruiting, organizing, collaborating with, directing, and soliciting policy and legal advice and data from anti-mine ENGOs, activists, lawyers, lobbyists, Native Tribes, and others. North was also one of the coordinators, principal authors, and editors of the BBWA.

57. What is known of the history of North's activities is hampered by EPA's FOIA redactions and withholding of documents on "deliberative privilege" exemption grounds.

58. Moreover, the record of North's communications concerning Section 404(c), Pebble Mine, and the development of the BBWA is incomplete. According to EPA statements, multiple years' worth of North's emails were "lost" when his computer hard drive apparently "crashed." On or about June 24, 2014, EPA's John Ellis sent a letter to Paul Wester, Jr. of the National Archives and Records Administration ("NARA") informing him that "when searching for Mr. North's Bristol Bay related documents in response to a July 29, 2013, request from the House Committee on Oversight and Government Reform, EPA identified a period of time between April 2007 and May 2009 where electronic documents related to the Bristol Bay matter were not found in Mr. North's email files." In addition, on June 25, 2014, EPA Administrator Gina McCarthy testified before the House Oversight Committee regarding the loss of North's emails owing to his hard drive allegedly crashing in 2010. McCarthy stated that there is a "challenge getting access to the data on [North's hard drive]."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 15

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 17 of 138

59.     Further information about North's surreptitious activities in meeting with and

coordinating the Section 404(c) advocates is also unavailable because North has left the country.

On information and belief, the House Oversight Committee several times requested that North

appear voluntarily to testify regarding the "loss" of his emails.  On information and belief, each

time North agreed to appear then later backed out through counsel.  North later left the country.

His whereabouts are presently unknown, although public reports note that he might be in New

Zealand.

60.     In addition, EPA personnel, including management, apparently used home email

addresses and text messaging with the effect of keeping communications out of the official

channels.  On information and belief, at least some home emails and texts have not been

preserved in the regular course of Agency practice.

61.     For example, in currently ongoing litigation, former EPA Administrator Lisa

Jackson stated in deposition that she used text messaging with "people in the environmental

movement" and that "environmental organizations had her personal email address."  *See* Pl.'s

Mem. in Support of Mot. for Spoliation Sanctions at 23, *Landmark Legal Found. v. EPA*, Case

No. 1:12-cv-01726 (RCL) (D.D.C. July 24, 2014) (quoting Jackson Dep. Mar. 27, 2014).

Jackson stated that her texts were never preserved.  *Id.*  She also stated that she used an email

alias for government communications and that she "would just mass delete emails" from her

personal account.  *Id.* at 23-24; *see also* Aug. 14, 2013 Mem. Op. at 13-14 (Lamberth, J.) (stating

"The possibility that unsearched personal email accounts [including at least former EPA

Administrators Jackson and Perciasepe] may have been used for official business raises the

possibility that leaders in the EPA may have purposefully attempted to skirt disclosure under the

FOIA.").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 16

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 18 of 138

62.     Likewise, as alleged below, North used his personal email account to communicate with Anti-Mine Coalition members and others, and those emails have never been produced.

63.     Based on EPA's limited FOIA production to date, total direct contacts, meetings, briefings, calls, conferences, webinars, etc., between EPA and the FACs totaled well over 500 from 2008 to 2014. For instance, based only on the limited documents produced to date, between 2009 and 2014, Shoren Brown, a representative of Anti-Mine Coalition member Trout Unlimited, was in contact with EPA officials regarding Pebble in well over 200 instances, an average of once every week for four years, and Jeff Parker, counsel to the petitioning Tribes, was in contact with EPA officials over 100 times, including in numerous face-to-face meetings. On information and belief, the number of contacts will be shown to be significantly greater as more documents are produced in response to Plaintiff's FOIA requests.

**B.      Chronology of EPA's Establishment And Utilization Of The Anti-Mine Coalition, Anti-Mine Scientists, and Anti-Mine Assessment Team FACs**

**1.      EPA's Collaboration With Pebble Mine Opponents:  2008**

64.     The chronology that follows in Sections B.1.-7., contains the facts identified to date that show how EPA established and utilized the three anti-mine FACs at issue in this action. Based on the FOIA production, EPA engaged with anti-Pebble Mine groups as far back as 2008, and began laying the groundwork for the Agency's audacious plan to block Pebble Mine before the Mine's specifications had been proposed, and before even conducting the requisite alternative analyses and environmental assessment.

65.     On or about June 3, 2008, EPA's Katherine Brown emailed EPA's Tami Fordham regarding a 2008 visit to the Bristol Bay Watershed by the prior Region 10 Regional Administrator, Elin Miller, in order to identify which Alaska Native Tribes were pro- or anti-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 17

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 19 of 138

Pebble Mine: "You are almost certain to see representatives from Nondalton (fearfully opposed to Pebble), Newhalen (pro-Pebble for economic benefit), Kokhanonk [sic] (mixed take), and Iliamna (stance unknown to me)."

66.    The Anti-Mine Coalition began working with EPA in 2008, in conjunction with North's already ongoing efforts to organize support to use Section 404(c) to block the Pebble Mine.

67.    On or about June 16, 2008, North emailed Jane Zodrow, with the Anti-Mine Coalition group CSP2, and asked her to review a report on copper toxicity to salmon. North stated: "It has bearing on my 404 review." North's email to Zodrow was copied to John Pavitt in EPA's Office of Compliance and Enforcement in Anchorage. Pavitt was EPA's Pebble Mine Project Manager in Alaska.

68.    The copper toxicity report North referenced had been cited in a 2008 law review article written by Anti-Mine Coalition member Jeff Parker and Anti-Mine Scientist Carol Ann Woody entitled, "Pebble Mine: Fish, Minerals and Testing the Limits of Alaska's Large Mine Permitting Process." North had received Parker and Woody's law review article that day from EPA Region 10 Mining Coordinator Patricia McGrath.

69.    North was working on his "404 review" nearly two years before the Tribes petitioned EPA on May 21, 2010, to use Section 404(c), and two and a half years before EPA announced plans for the BBWA on February 7, 2011.

70.    On or about August 26, 2008, North emailed McGrath and asked if a mining retreat was planned to discuss Pebble Mine issues. North stated that he would like to discuss Pebble Mine issues "in collaboration with the other Regional experts involved . . . to identify areas where we are confident in our position, or at least direction, and areas where we are not . . .

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 18

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 20 of 138

."  North concluded:  "The 404 program has a major role.  I would like the benefit of hearing what other EPA folks are thinking."

71.    During this time in 2008, Trout Unlimited's "Save Bristol Bay" website and other anti-Pebble Mine groups were promoting an anti-mining film called "Red Gold."  On or about November 4, 2008, Mike Gearheard, EPA Region 10, emailed that showing "Red Gold" at the EPA executive team meeting "could give the appearance that Region 10 is not remaining objective and unbiased in our important permitting role."

72.    On or about November 7, 2008, McGrath emailed colleagues concerned that "Save Bristol Bay" was sponsoring the film.  McGrath suggested ways to get around the appearance of bias.  She stated:  "One option might be to view this film as a brown bag event.  Another option would be to present, at the ET meeting, materials that describe other points of view."  Later, on or about February 12, 2009, EPA went with the "brown bag" option so that it could show "Red Gold" without having to describe other points of view.

73.    On or about November 24, 2008, Phil Brna, an FWS biologist, emailed North and others to set up an "agency only meeting to discuss identifying and organizing agency objectives/informational needs regarding the Pebble Project."

74.    Brna and North collaborated closely over the years, working together to coordinate the Anti-Mine Coalition's support of EPA and FWS.

75.    Brna was one of two FWS officials who worked on the BBWA and was listed as a Contributor, along with FWS's Lori Verbrugge.

76.    Brna and his FWS colleagues, Frances Mann, Ann Rappoport, and John DeLapp, had been involved with reviewing Pebble Mine since at least 2004:

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 19

a.    Notes from a June 29, 2004 meeting ("Pebble Mine Meeting Notes" by Bob Winfree of the National Park Service) state with regard to Pebble Mine: "An EIS would be required for federal permits. The Corps of Engineers or EPA are expected as lead federal agencies because of their wetlands/404 and Clean Water/NPDS regulatory responsibilities respectively. FWS will participate for T&E and other wildlife and fisheries issues."

b.    Thereafter, Brna emailed with Mann, Rappoport, DeLapp and others regarding the 2004-era baseline studies being conducted by Northern Dynasty Minerals, then the entity proposing the Pebble Mine project. For example, on July 21, 2004, Brna emailed Mann and Rappoport, and stated, *inter alia*: "FYI this project is huge!", and on August 31, 2004, Brna emailed regarding "Pebble Gold Technical Review Meetings" to remark regarding engaging on the Pebble Mine project: "Who wants to play?"

c.    On or about December 9, 2004, Carol Ann Woody, one of central the Anti-Mine Scientists, then a Fisheries Research Scientist with the U.S. Geological Survey, wrote to Brna: "Comments regarding fisheries and aquatic resource baseline study by Northern Dynasty . . . . There are some rather huge red flags in the current preferred alternative relative to long term health and productivity of fishery resources, at least as I understand the current NDM plan. . . . That is all I can provide at this time but look forward to helping you out in the future."

d.    And, by 2005, EPA's North, too, would appear at the Pebble Mine meetings, including a November 15-17, 2005, Pebble Mine Agency Meeting. The notes from that meeting show North asking about studying the Upper Talarik area with regard to the potential mine plan.

77.    On or about December 31, 2008, North emailed EPA's Pavitt to again propose a retreat to discuss the "major role" of the "404 program."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 20

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 22 of 138

78.     The Environmental Justice Unit at Region 10 was led by Richard Parkin.  In 2008,

Parkin's office wrote an Action Plan for the Environmental Justice Unit for fiscal year 2009.

The Action Plan identified three examples of long-term successful results, including:

"understanding and addressing the impacts of copper and gold mining in the headwaters of

Bristol Bay."  This, too, indicates that by 2008, EPA already planned to target Pebble Mine.

79.     Parkin would later be named the Bristol Bay Watershed Assessment Team

Leader, heading up the BBWA effort.

## 2.     EPA's Collaboration With Pebble Mine Opponents:  2009

80.     The influx of advice and recommendations from the Anti-Mine Coalition and

Anti-Mine Scientists to EPA picked up in volume and frequency in 2009, as did the coordination

between EPA and FWS to develop and implement EPA's Section 404(c) strategy.

81.     On or about January 8, 2009, Ted Otis of the Alaska Department of Fish and

Game emailed FWS's Brna and expressed his concern regarding the potential for a tailings dam

failure and the effect that it would have on Bristol Bay.  Otis erroneously alleged that PLP did

not seem interested in going beyond the minimum in terms of testing.  Brna forwarded that email

to persons at EPA, including North.

82.     On or about January 8, 2009, North responded to Brna and stated:  "Over time the

likelihood of catastrophic failure [of the tailings dam] becomes a certainty."  North also stated

that the agencies should expand the scope of their Section 404(c) assessment efforts:  "We

probably ought to start big (North Pacific) then work back to a consensus on what the extent of

effects are likely to be."

83.     On or about May 13, 2009, Brna emailed his "first draft of a briefing paper for the

RD briefing on May 20."  The "Pebble Mine Briefing" PowerPoint for "USFWS and NPS

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 21

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 23 of 138

Regional Directors" dated May 20, 2009, included statements such as: "'I can't imagine a worse location for a mine of this type unless it was in my kitchen' Former Governor Jay Hammond"; "Pebble mine has a high potential to generate acid mine drainage (AMD)"; "Permitting large scale surface mining in sulfide-hosted rock with the expectation that no degradation of surface water will result due to acid generation imparts a substantial and unquantifiable risk to water quality and fisheries and is not realistic"; and "Cumulative Effects is a Big Concern – Development of Pebble will result in development of other mines, roads and power supply in the region."

84.     The conclusions regarding adverse impacts presented by Brna were reached without any mine proposal or impact assessment, confirming that before the BBWA was even started, the outcome within EPA/FWS circles was predetermined.

85.     On or about June 30, 2009, Jeff Parker met with EPA Region 10 officials in Anchorage, including Christine Psyk, Marcia Combes, Mike Bussell, and Edward Kowalski. Parker sought to become involved with EPA and the Army Corps of Engineers in a future Environmental Impact Statement for the Pebble Mine. At this time, Parker was already representing the six Tribes that would petition EPA in 2010 to use Section 404(c) in a challenge to the State of Alaska's 2005 Bristol Bay Area Plan.

86.     On or about August 17, 2009, North again proposed a retreat to discuss Pebble Mine and EPA's Section 404(c) strategy. North emailed Marcia Combes, EPA Alaska Chief, and Michael Szerlog, EPA Region 10 ARU Manager, proposing the Section 404(c) discussion as part of an EPA Region 10 retreat in Seattle. North included an outline of the agenda for a September 16, 2009, mining retreat to include "404 Issues – Phil", *i.e.*, that he would address. He also stated that the meeting should include "Discussion on EPA position" as to Section

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 22

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 24 of 138

404(c) and "appropriate action in response to our position . . . . As you know, I feel that both of these projects [Chuitna and Pebble] merit consideration of a 404C veto. We should discuss this from a technical perspective and staff perspective at these meetings."

87.     On or about August 24, 2009, EPA's Hahn Shaw emailed EPA's North, Lorraine Edmond, Jean Zodrow, McGrath, Pavitt, Cindi Godsey, Combes, Keith Cohon, Fordham, Michael Lidgard, and Szerlog. Shaw confirmed that the agenda for the September 16, 2009, retreat would include North presenting on Section 404(c) issues with discussions of EPA's position, action in response to the position and timelines, schedules, and next steps. There was also to be discussion "about the appropriate communication to the developer and affected State/Federal Agencies." On information and belief, EPA has not produced the agenda, presentation or discussion relating to this meeting in response to Plaintiff's FOIA requests.

88.     On or about September 14, 2009, Tim Troll of The Nature Conservancy emailed FWS personnel and several outsiders to invite them to a meeting to hear a presentation from Mike Wiedmer from the University of Washington concerning his salmon habitat-modeling project. Troll stated: "A successful application of his work could be important for use in the strategic plan we have been charged to develop. The model could allow the partnership to target funding it may receive in the future for documenting fish distribution in SW Alaska. Following the presentation Carol Ann Woody and I can provide a preliminary briefing of the results of the fish distribution surveys and other investigations we recently completed in the Pebble Prospect area that was supported in part by funds received through the partnership."

89.     On or about September 15, 2009, FWS's John DeLapp forwarded Troll's email to FWS colleagues, including Steve Klosiewski, Deputy Assistant Regional Director of Fisheries and Ecological Services. Klosiewski responded to DeLapp and stated: "I hope that we haven't

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 23

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 25 of 138

been providing funds to Carol Woody." On information and belief, FWS did not produce correspondence related to this email in response to Plaintiff's FOIA.

90. On or about September 16, 2009, North's retreat was held. The retreat featured a PowerPoint presentation by North on Section 404(c) issues with discussions of EPA's position, action in response to the position and timelines, schedules, and next steps. On information and belief, the presentation was not produced by EPA in response to Plaintiff's FOIA request.

91. On or about September 28, 2009, North emailed EPA's Pavitt and McGrath. He referred to his PowerPoint presentation on Section 404(c) and also passed along information from the ENGO Skytruth, which was the source of the Pebble Mine footprint that North used in his presentation.

92. On or about September 16, 2009, Jeff Parker emailed EPA officials with whom he met on June 30, 2009 (Psyk, Combes, Bussell, and Kowalski) to follow up on the meeting and further coordination efforts. He stated: "You may recall that at our meeting on June 30 in Anchorage, I said that I represent six Tribes that are suing the State of Alaska and its Department of Natural Resources to overturn the current 2005 Bristol Bay Area Plan. As I said, they are likely to want to commence initial discussions with EPA and the Corps of Engineers about possibly being cooperating agencies on a future EIS on Pebble Mine. . . . I am attaching a copy of the Amended Complaint so that you can start to know the issues. Regardless of the outcome of the litigation, they are likely to affect the context and content of the EIS process."

93. EPA's Bussell replied and directed Parker to Pavitt, EPA's Pebble Mine Project Manager, as the point of contact to coordinate with. Bussell copied Pavitt on the email in order to connect Parker and Pavitt.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 24

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 26 of 138

94.     On or about October 5, 2009, McGrath emailed North to inform him that Shoren Brown's Trout Unlimited, one of the most active anti-mine groups, would be "meeting with HQ water office in a couple weeks."

95.     On or about October 13, 2009, North set up a "Management Level Briefing & Discussion about Pebble" to be chaired by EPA's Richard Parkin and including Pavitt. The briefing was scheduled for November 12, 2009, and was slated for two hours.

96.     On or about October 28, 2009, David Chambers of CSP2 emailed EPA's McGrath and asked "Patty" who was the primary EPA contact for the Pebble Mine. McGrath copied Pavitt on her response email in order to connect Chambers with Pavitt.

97.     On or about October 30, 2009, Pavitt emailed Chambers, copying McGrath, and stated: "Dave, thank you for your follow up phone call this morning. I'll look forward to meeting you in EPA's Anchorage office on Monday 12/17."

98.     On or about November 4, 2009, TU's Shoren Brown emailed EPA officials to state that he had met with EPA headquarters personnel and wanted to meet with Region 10 officials. Szerlog responded to set up the meeting and McGrath forwarded the email to Pavitt, EPA's Pebble Mine Project Manager, stating: "I really hope you can participate."

99.     On information and belief, on or about November 12, 2009, North's "Management Level Briefing & Discussion about Pebble" was held at EPA.

100.    On or about November 12, 2009, CSP2's Chambers emailed EPA's Pavitt and stated: "I have been in contact with Dave Casey of USACE attempting to set up a meeting with him on the Pebble mine. He has offered to come to Anchorage from Kenai to meet on December 7. Do you think it would be appropriate to invite Dave to our meeting since the topics will be quite similar?" Pavitt responded: "That's fine with me. To help me be prepared, can you please

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 25

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 27 of 138

send me a brief description of your position, the purpose of the meeting, and the folks who will be accompanying you?"

101.    On or about November 16, 2009, Chambers emailed Pavitt and stated: "I work with a number of NGOs to look at the technical aspects (geochemistry, hydrology, mining and processing, fisheries) of the Pebble mine. Ultimately we will be commenting on the EIS for the mine. The issues we would like to discuss with you include: 1. What is the likelihood there will be an EIS on the Pebble Project if EPA no longer issues NPDES permits in Alaska? 2. What will EPA's role be in evaluating the EIS if it is no longer issuing an NPDES permit for the mine? 3. How will EPA, or a sister agency, evaluate the potential threat to fish related to the mine, road, and other likely development related to the Pebble Project? 4. How will tribal consultation work when EPA no longer has NPDES primacy in Alaska? What is the role of the Army Corps role in tribal consultation? This list of attendees for the meeting is still somewhat tentative, but at this time appears to be: David Chambers, Ph.D., Center for Science in Public Participation, (mining and acid mine drainage issues)[;] Kendra Zamzow, Ph.D., Center for Science in Public Participation, (geochemistry and water quality issues)[;] Carol Ann Woody, Ph.D. (fisheries biologist)[;] Luki Akelkok Sr. (Ekwok, AK)[;] Bobby Andrew (Aleknagik, AK)[;] Jeffrey Parker, attorney (tribal consultation issues)."

102.    Woody and Zamzow are fisheries biologists with Fisheries Research and Consulting, both worked for Anti-Mine Coalition members, and both are members of the Anti-Mine Scientists FAC. Parker and Woody were co-authors of the 2008 law review article against the Pebble Mine, the same article that North sent to EPA toxicologist Jean Zodrow in July 2008 for what he called "my 404 review." Anti-Mine Coalition members Akelkok and Andrew both serve as directors of the ENGOs Nunamta Aukulestai and Bristol Bay Heritage Land Trust.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 26

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 28 of 138

Akelkok is President of Ekwok Village Council, one of the six Tribes represented by Parker in the Section 404(c) petition. Akelkok chaired the 2008 Clean Water Initiative, a campaign funded in large part by Robert Gillam and intended to prevent development of the Pebble Mine. Andrew is Treasurer of the Renewable Resources Foundation, which was founded by Gillam and, along with Gillam, is a principal financial backer of the latest anti-Pebble ballot initiative, "Bristol Bay Forever."

103.    Thus was established the coordination between Pavitt, EPA's Pebble Mine Project Manager, and Anti-Mine Coalition leaders Brown and Chambers, and key scientists Woody and Zamzow, and key Tribal activists Akelkok and Andrew. Pavitt and other EPA officials would utilize Brown, Chambers, and the others for their research, advice, and support going forward.

104.    At the same time, North and others at EPA were establishing their connections within the Anti-Mine Coalition to use their resources to support the Section 404(c) initiative, already more than a year in progress, and to move the Section 404(c) initiative to the very top level of EPA management.

### 3.    EPA's Collaboration With Pebble Mine Opponents: 2010

105.    By 2010, private meetings between EPA and the Anti-Mine Coalition to discuss the development of the Section 404(c) strategy were frequent and routine, including in the months leading up to the Tribes' Section 404(c) petition in May 2010.

106.    In addition, EPA's Section 404(c) strategy was briefed in detail to top levels of management in January and February 2010, including to Administrator Jackson and Susan Bromm, Director of EPA's Office of Federal Activities, which coordinates review of all federal Environmental Impact Statements.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 27

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 29 of 138

107. On or about January 13, 2010 – more than five months *before* EPA received the Tribes' petition to preemptively veto Pebble Mine under Section 404(c) – EPA Region 10 prepared a 39-page presentation specifically to brief EPA Administrator Jackson about Pebble Mine. Twice the briefing refers to the Section 404(c) "veto power": "The EPA can veto under 404(c)" and with regard to "Future Options" the presentation states: "Project-specific options to influence project: 404(c) veto either pre-emptive, during EIS [Environmental Impact Statement], or after EIS."

108. EPA had never before preemptively used a Section 404(c) veto of a major development project in the 43-year history of the Clean Water Act.

109. On or about January 26, 2010, EPA's Bromm requested a briefing from McGrath. McGrath responded that she would provide a more detailed version of the presentation she gave to EPA Administrator Jackson.

110. On or about February 2, 2010, McGrath briefed Bromm. As with Jackson's January 13, 2010, briefing, this briefing highlighted the 404(c) veto option. The presentation identified the same "Future Options" for the Pebble Mine: "404(c) veto either pre-emptive, during EIS, or after EIS."

111. On or about March 24, 2010, Shoren Brown of Trout Unlimited emailed EPA's Szerlog and stated: "I would like to catch up with you on a number of CWA issues at Pebble." Szerlog and Brown agreed to confer on March 26, 2010.

112. On or about April 1, 2010, Brown emailed Szerlog, copying North, about meeting on April 6, 2010.

113. On or about April 13-14, 2010 – more than a month before the Tribes submitted their Section 404(c) petition – Brown and North exchanged several emails. Brown first wrote:

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 28

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 30 of 138

"Phil – I think the meetings went pretty well in Seattle last week – definitely making progress. I [am] working on the other issue we discussed and will get back to you soon." North responded: "From what I hear the meetings went well also." Brown responded: "I had a very good meeting with [EPA's] Mike Bussell and a team of folks who work on enforcement . . . . At the end of that meeting, I gave him some background on the 404c ask and let him know we would be coming to town soon with that ask. [Bussell] seemed receptive and reiterated that the Pebble issue in general is a priority for Lisa Jackson and they look forward to hearing more from us soon about what they can do to help." Brown listed the people who want to "travel south to follow up on the 404c letter – likely two tribal representatives, a commercial fisherman, sport fisherman, attorney and me." North responded: "No technical people?" Brown indicated that Chambers from CSP2 would also be there and that he was also meeting with Nancy Stoner of EPA to get her "up to speed."

114.    On or about April 14, 2010, Brown emailed North with the subject "circling back …", and stated: "Sorry - long day - Dave Chambers from CSP2 as well. I'll drop a line as soon as plans are set and get your feedback on what we are thinking. Parker said there is a NOAA study of some kind in the works – I'd love to hear more about that when you get a chance."

115.    On or about April 16, 2010, EPA's Chris Hunter and Stacie Craddock arranged to meet with Brown in Washington, DC, to discuss the Pebble Mine issues.

116.    On or about May 7, 2010, Parker wrote an 8-page letter to Region 10 Administrator Dennis McLerran, copying EPA Administrator Jackson and North. The letter focused on Section 404(c), its definition of "unacceptable adverse effect," and how development of the Pebble Mine would result in unacceptable adverse effects for the sport fishing economy and subsistence fishing. Parker's letter was accompanied by the Tribes' Section 404(c) petition.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA*, et al., Case No. _____
Page 29

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 31 of 138

117.    As stated therein, the Tribes' Section 404(c) petition was written with the assistance of counsel, *i.e.*, Parker.

118.    On or about May 12, 2010, North emailed Parker, and stated: "Hi Jeff. The PLP [Pebble Limited Partnership] web site lists the following Bristol Bay tribes as having passed resolutions favoring the mine. Do you know otherwise?" Those Tribes were identified as Togiak Tribal Council, South Naknek Village Council, Newhalen Tribal Council, Naknek Native Village Council, King Salmon Tribe, and the Aleknagik Traditional Council.

119.    On or about May 24, 2010, Parker emailed the Tribes' Section 404(c) petition to EPA attorney Cara Steiner-Riley.

120.    On or about May 25, 2010, Steiner-Riley forwarded the Tribes' Section 404(c) petition to North and several others.

121.    On or about May 25, 2010, McLerran emailed EPA's Bob Sussman, Senior Policy Counsel to the Administrator, Parkin, Pavitt, and others at EPA, stating that he had just received a letter from the six Tribes asking EPA to initiate a Section 404(c) action to protect against the Pebble Mine. McLerran stated: "Wanted to give you a heads up that today we received a letter (addressed to me and Administrator Jackson) from six Bristol Bay-area tribes requesting that we 'initiate a public process under Section 404(c) of the Clean Water Act to protect waters, wetlands, fish, wildlife, fisheries, subsistence and public uses in the Kvichak and Nushagak drainages and Bristol Bay of Southwest Alaska from metallic sulfide mining including a potential Pebble mine.' We received a separate letter from an attorney representing those same six tribes and Trout Unlimited requesting to meet w/EPA and the Corps regarding being cooperating agencies or possibly joint-lead agencies on any EIS for a potential Pebble Mine."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 30

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 32 of 138

122.     In the months following the Tribes' Section 404(c) petition, North actively

encouraged Tribal involvement and coordinated other Anti-Mine Coalition members to provide

EPA with policy, legal, scientific, and political support for the Section 404(c) action.

123.     On or about June 3, 2010, North emailed Kathryn Allison Murphy at the

University of Washington seeking information for a presentation to McLerran. North stated: "I

am hoping you can help me out with a presentation I am giving to the EPA Regional

Administrator next week. I am going to be telling him about the resources at risk from the

Pebble Copper Mine."

124.     On or about June 8, 2010, North briefed McLerran with the "Key Message" that

"EPA will be heavily involved in this project" through "NEPA review, 404 oversight and

NPDES oversight." And, as in the earlier briefings prior to the Tribes' Section 404(c) petition,

North highlighted as an action to "influence the [Pebble Mine] project": "404(c) veto either pre-

emptive, during EIS, or after EIS."

125.     On or about June 8, 2010, Jeff Parker emailed EPA attorney Steiner-Riley and

stated: "I have the Fed. Reg. pages from 1979 that address the issue of using 404(c) before

applications are filed. . . . They appear to me to favor use before applications over waiting for

applications." Steiner-Riley responded by providing her fax number and saying "Thanks!"

126.     On or about June 9, 2010, North emailed Parker to thank him for sending him

information concerning Kennecott Mining planning to conduct aerial-magnetic surveying at

Groundhog Mountain, on the northeast edge of the Pebble Deposit area. North stated that this

presented a: "strong argument for a broad approach to 404(c)."

127.     This again illustrates North's predetermination to block all potential mining in the

area, regardless of the nature of the proposal, results of environmental impact studies, etc.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 31

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 33 of 138

128. On or about June 11, 2010, Brown asked North for "a time to talk so I can update you on upcoming events." North responded by inviting Brown to join him in the field: "Would you like to come into the field for some research training. We are starting a research project on wetland hydrology. The graduate student who will do most of the work is training a couple of us on collecting data. That will take all day. Otherwise, could we get together in the evening?" Brown then contacted Kendra Tyler, McLerran's assistant, to set up another Trout Unlimited briefing with EPA.

129. On or about June 11, 2010, North briefed Brown on his June 8, 2010, briefing of McLerran: "We briefed Dennis [McLerran] this past Tuesday . . . . It seemed to go well. I think they understand at least the resource issues."

130. On or about June 11, 2010, Parker sent a letter on his law office letterhead to Sally Thomas and Linda Anderson-Carnahan of EPA indicating that he had communicated with North about the Section 404(c) process. Parker stated: "I understand from Phil North, of EPA in Alaska, that either of you might be responding to a letter, dated April 14, 2010 and attached, by which Mr. Luki Akelkok, President, Ekwok Village Council, invites Mr. McLerran to visit the Bristol Bay drainages of Alaska this summer, and volunteers to assist in coordinating with other Tribes and interests in the area. I told Mr. North and Ms. Holsman that I would forward to EPA my list of contact information, attached, for the six Tribes which recently sent a letter to Mr. McLerran and to Ms. Jackson requesting that EPA to commence a 404(c) process with respect to certain lands in the Kvichak and Nushagak drainages of Southwest Alaska, and for AIFMA Cooperative (a cooperative of commercial fishers) and Trout Unlimited, both of which have communicated to EPA their support for the Tribes' 404(c) request. Mr. Akelkok has suggested

that Ekwok's Tribal Administrator, Richard King, can assist you coordinating for all eight of my clients on matters related to Mr. Akelkok's invitation."

131.    On or about June 14, 2010, Brown emailed a "404c summary" to North, saying: "Phil- this is still in draft form but I thought you might find it informative. I'll make sure and send the final when it's complete." The summary, called "Projects Vetoed Updated" was, on information and belief, not included in the FOIA record. The email indicates "[attachment "Projects Vetoed updated.pdf" deleted by Phil North/R10/USEPA/US]." North responded: "Thanks Shoren. I will look it over. It looks like you will meet with staff in the morning for technical discussions and Dennis in the afternoon. I am hoping to be on the phone for the Tuesday morning technical discussions."

132.    One of the leading ENGOs in the EPA Anti-Mine Coalition was the Natural Resources Defense Council. NRDC had an inside connection and ally at EPA headquarters, Nancy Stoner, Deputy Assistant Administrator for Water. Prior to EPA, from 1999-2010, Stoner was Co-Director of the Water Program and Senior Attorney at NRDC.

133.    Once Stoner moved to EPA headquarters in the summer of 2010, EPA actively engaged with NRDC to utilize its resources in advancing its position regarding Section 404(c). Moreover, Stoner appeared to circumvent a ban on meeting with her prior employer by adding others to the EPA-NRDC meetings.

134.    For example, on or about June 14, 2010, NRDC attorney Joel Reynolds asked Stoner for a meeting with a "coalition of groups (including NRDC)" regarding the Tribes' Section 404(c) petition. Stoner replied: "I passed along your request to others here. I am not supposed to set up meetings with NRDC staff, but can attend such a meeting if there are enough others in attendance. I am well and miss everyone at NRDC." Reynolds replied: "Thanks

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 33

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 35 of 138

Nancy for your quick response. I look forward to hearing from your colleague(s) and hope you will be able to join the meeting."

135.    Thereafter, as alleged below, Stoner was one of the key figures at EPA in coordinating meetings with Brown as the point person, and with others at NRDC and the other Anti-Mine Coalition members.

136.    On June 20, 2010, Anti-Mine Coalition member Robert Waldrop wrote EPA Administrators Jackson and McLerran asking that EPA use its Section 404(c) authority to intervene to stop the mine without waiting for PLP's mine development plans. Waldrop attached a 7-page memo entitled, "The Justification for Preemptive Use of CWA 404(e) to Protect Alaska's Bristol Bay Watershed." He acknowledged that "EPA may need more information," but still argued for action based on the potential for unacceptable adverse impact. Waldrop stated: "We are committed to working with USEPA as it moves forward in the Pebble Mine 404(c) process."

137.    Waldrop was then Executive Director of the BBRSDA, representing commercial driftnet fishermen. Until October 2013, Waldrop also served as Vice President and board member of the environmental law firm Trustees for Alaska, which represents the ENGO Nunamta Aukulestai in suits to halt the Pebble Mine project. And until January 2014, Waldrop was President of the Trustees for Alaska Endowment Fund. Waldrop currently serves as Treasurer and was President of another ENGO called Alaska Salmon Initiative. He also works with an entity called the Bristol Bay Working Group.

138.    Waldrop was a key player in the EPA-Anti-Mine Coalition effort, meeting with EPA officials in Alaska and Washington, DC, and working with Trout Unlimited's Shoren Brown to persuade FWS to support EPA's Section 404(c) veto. EPA itself encouraged that

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 34

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 36 of 138

effort to recruit FWS by connecting Waldrop and Brown with FWS officials, including FWS's Brna, Verbrugge, and Rappoport.

139.    On or about June 22, 2010, Parker emailed EPA attorney Steiner-Riley to ask her brief him on how her meeting went with Trout Unlimited and David Chambers of CSP2. In her email response, Steiner-Riley agreed to brief Parker.

140.    On or about June 22, 2010, EPA Region 10 officials briefed TU's Brown at EPA regional headquarters, along with several other Anti-Mine Coalition members, including: Chambers from CSP2; Lydia Olympic from The Wilderness Society; Bob Waldrop from BBRSDA; and Tim Bristol from TU. On information and belief, EPA's McLerran participated in the briefing.

141.    On or about June 25, 2010, North emailed Richard King, administrator of the Ekwok Tribal Council (one of the six Tribal 404(c) petitioners), copying Parker, and encouraged King to use his Anti-Mine Coalition Native Tribal contacts to pressure EPA on Section 404(c). North wrote: "I was assigned to work on the Pebble mine about five years ago. I have been spending a lot of my time on it. It is my group ARU that has the authority under Clean Water Act 404(c). It is my group that is doing the technical evaluation. Tribes have a special role in Pebble issues because of government-to-government relations. EPA takes that very seriously. I encourage you to develop that relationship as much as you can. I look forward to talking with you more in the future."

142.    On or about June 28, 2010, Parker, after being briefed by EPA attorney Steiner-Riley, emailed Steiner-Riley, copying North, to provide legal and strategy advice and recommendations on the Section 404(c) plan: "One option that EPA might consider is to commence a 404(c) process based on the 2006 applications." On information and belief, Parker

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 35

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 37 of 138

was referring to the Pebble NDM Water Rights applications to the Alaska Department of Natural Resources. Parker further stated: "EPA could ask PLP for any updated designs (even though they presumably might not be final), and proceed based on the 2006 applications and whatever PLP provides in the way of additional designs, if any. This has advantages. It is similar to Bayou Aux Carps, where there had been designs but no application was then pending. And it has advantages in the event that PLP challenges any 404(c)."

143.    On or about June 30, 2010, TU's Brown sent to North Chambers' presentation from CSP2's June 22, 2010, briefing by EPA at Region 10 headquarters. On information and belief, EPA did not produce this document in response to Plaintiff's FOIA. The email indicates that the attachment was deleted by North ("[attachment 'EPA Seattle Presentation - Jun10.ppt' deleted by Phil North/R10/USEPA/US]").

144.    On or about July 1, 2010, Carol Ann Woody emailed Anti-Mine Scientist Frances Solomon to connect her with EPA and FWS in order to have her hired to lecture on metal toxicity in Alaska. Woody copied North, Brna, Kendra Zamzow (CSP2), Chambers (CSP2), Tim Troll (TNC), and other government and ENGO recipients. Brna responded to inquire how much Solomon charged ($1,500 per day of teaching).

145.    On or about July 8, 2010, Brna emailed TNC's Troll and stated: "Tim, we have year-end funding and we are looking at ways to use it for the most 'good.' If we provided you with funding would bringing Frances [Solomon ] up for a class be something you are interested in pursuing? Maybe we could modify one of the existing agreements with TNC."

146.    On or about July 13, 2010, FWS's Rappoport emailed her colleagues and stated: "Phil Brna has now partnered with The Nature Conservancy so that we are giving them some CPA end of year funds in a cooperative agreement to put on a metals toxicity course for fed and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 36

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 38 of 138

state agencies and some other partners, late this fall sometime.  Check out the CV of the instructor and course outline.  Do any of you know of her?  Carol Ann Woody is the contact who brought her to our attention.  All of you would be good candidates to attend this!"  The presentation was scheduled for November 30-December 2, 2010.

147.    Included on many 2010 EPA emails with local government and Alaska Native Tribal officials in the Bristol Bay region was Lydia Olympic of The Wilderness Society. Olympic was among a handful of people regularly included on emails from EPA's Tami Fordham, such as the July 13, 2010, email with the subject line:  "EPA Administrator Lisa Jackson Visit to Dillingham - Let's Plan this Together."

148.    In The Wilderness Society's 2010 Annual Report, Olympic is credited as part of the Anti-Mine Coalition effort to push a watershed assessment which would, in turn, support a Section 404(c) action:  "Lydia Olympic is leading our effort and is building strong public opposition.  In response, EPA decided to conduct a watershed analysis to determine the mine's potential impacts."  The Annual Report also describes Olympic as:  "such a fervent opponent of the [Pebble] mine that she became known as 'the Pebble Rebel with a Cause.'"

149.    On or about July 15, 2010, after Parker learned that Administrators Jackson and McLerran were leading an EPA visit to Alaska, he advised EPA on the strategy and messaging for the meetings, counseling EPA's Fordham:  "I understand that if EPA acts under 404(c), then EPA may do so from a 'positive' point of view - i.e., to protect the Kvichak and Nushagak drainages (or the Bristol Bay drainages) from unacceptable adverse effects such as those posed by Pebble mine – rather than from a negative point of view - i.e., to stop Pebble Mine per se. You might want to title the listening session to prompt a positive discussion of protecting the drainages from effects such as those potentially posed by a Pebble mine."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 37

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 39 of 138

150.     The approach espoused by Parker to EPA is the same tact taken by EPA in the later-developed BBWA..

151.     On or about July 16, 2010, Parker emailed to get assurances from EPA that all six petitioning Tribes would be invited to the Jackson-McLerran-EPA meetings, and stated: "I understand that this meeting is precipitated, at least in substantial part, by the 404(c) letter that these six tribal governments sent to Mr. McLerran and Ms. Jackson, the letter of Mr. Akelkok that invites Mr. McLerran and follow-up efforts of Mr. King, and efforts of EPA officials involved in responding to the Tribes' 404(c) letter."

152.     On or about July 16, 2010, Parker again emailed, copying North and several other EPA officials, to advise EPA to include other Pebble Mine opponents at the Jackson-McLerran-EPA meetings: "I also recommend that you include AIFMA [Alaska Independent Fishermen's Marketing Association] and TU, both of which have supported the tribes on 404(c), and have recommended that EPA coordinate with those six tribes."

153.     On information and belief, Parker's suggestion to invite other Anti-Mine Coalition members was adopted by EPA.  A subsequent email from EPA with an update on the visit has a long list of addressees, but the entire addressee block is redacted so it cannot be determined who EPA invited to this meeting.

154.     On or about July 16, 2010, TU's Brown emailed EPA's Szerlog, copying North, and advised with regard to the EPA visit to Alaska: "There are some negative rumors circulating within the tribes and other interest groups working on pebble about the upcoming EPA trip to Alaska.  I am happy to help out and circulate the correct information for you to these stakeholders if you would like.  Quite frankly - I am worried that some people may go public and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 38

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 40 of 138

damage TU's ongoing efforts and the productive relationships that have been established to date."

155.    On or about July 17, 2010, Parker distributed a map of mining claims he received from Anti-Mine Coalition scientist Carol Ann Woody. It apparently went to EPA's distribution list for the Jackson visit, as well as to EPA attorney Steiner-Riley.

156.    On or about July 18, 2010, Parker reported that Woody's map was prepared by Anti-Mine Coalition member The Nature Conservancy.

157.    On or about July 18, 2010, Parker emailed McGrath, copying Steiner-Riley, to provide his and his Tribal clients' legal rationale for "doing 404(c) before permit applications are submitted[.]" The subject of the email is "RE: Pebble Meeting Concerning Potential NEPA Roles for Tribes."

158.    On or about July 21, 2010, EPA's Stoner invited Jan Goldman-Carter, Wetlands and Water Resources Counsel at the National Wildlife Federation, to set up a meeting with the subject "Pebble Mine": "I wanted to tell you that I got a request today from TU to meet on Pebble Mine. I think you had requested a meeting on the same topic at some point. I have yet to meet with you on it, so wanted to mention this in case you want to get together."

159.    Stoner and NWF's Goldman-Carter had a close working relationship on Section 404(c). For example, on or about August 3, 2010, Stoner emailed Goldman-Carter regarding the introduction of Section 404(c)-related legislation, and stated: "while I am thinking about you – fyi."

160.    On or about July 22, 2010, EPA made TU's Brown privy to EPA's plans for the EPA trip, as evidenced by the email Brown sent, which appears to be to Tami Fordham (the addressee is redacted), and in which he stated: "Thanks for the update. Things are looking good

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 39

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 41 of 138

from our end. I got your message re media. We are working to keep quiet honestly but if we do find out the press is coming - I will pass on who and when they plan to arrive."

161. On or about July 23, 2010, EPA's Stoner was scheduled to meet with TU's Brown regarding Pebble Mine (meeting invitations had been accepted). Also "Required" to attend according to the invite were EPA's Denise Keehner, the Director of the Office of Water, Oceans, and Wetlands ("OWOW"), and Staci Gelb.

162. On or about July 23, 2010, BBRSDA's Waldrop wrote to EPA's Michelle DePass, Assistant Administrator for Tribal and International Affairs, and stated: "Recently, I was with a small group that met with EPA Regional Administrator, Dennis McLerran, and his staff to discuss possible 404c action concerning proposed mining development in the headwaters of two major salmon rivers in the area."

163. On or about July 28, 2010, EPA's Jackson, DePass, McLerran, Fordham, McGrath, and Combes met in Dillingham with local representatives.

164. On or about July 29, 2010, Brown emailed Stoner: "Nancy - thanks again for taking the time to meet last week about Pebble. I thought you might find this radio story interesting - coverage from the administrator's visit to AK. More to come."

165. On or about July 29, 2010, Dorothy Larson of the Section 404(c) petitioning Curyung Tribe emailed a group of undisclosed recipients, copying EPA's Fordham, and stated: "What a great 'get together' we had with the EPA representatives yesterday. Thanks to all for its' [sic] success! Tami Fordham requested that we provide her with the power point presentations and posters displayed. I have included her email address in the "cc" above. Kim Williams was going to forward Tami the power point presentations; do you have all of them, Kim? (BBC Todd Radenbaugh, Nunamta Kim Williams, BBNA EPA/IGAP Sue Flensburg, Rick

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 40

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 42 of 138

Halford, City of Dillingham Planning Department Jody Seitz)[.] If you would get back to me with any power points you do not have, we will attempt to get them. Sue, can you please get all of the posters you, staff, and the Bristol Bay Campus assisted with to Tami?"

166. On or about July 30, 2010, Parker emailed McGrath and DePass, who were accompanying Jackson on her visit to Bristol Bay, including to the town of Dillingham, where events were scheduled. Parker warned EPA: "I learned this morning that a reporter, Kim Murphy, at the LA Times, is doing a Pebble-related update. She had already learned of the Dillingham meeting and the 404(c) matter."

167. Parker's warning email to EPA about the *Los Angeles Times* story and the imminent disclosure of the Tribes' Section 404(c) petition provided talking points for EPA, including: "Number 1: Tribes have used their government-to-government relationship with the United States to ask EPA to consider commencing a 404(c) public process," and that the Section 404(c) process was "highly deliberative." DePass then forwarded the talking points to EPA management, including Sussman, McLerran and Bussell.

168. Critically, the Tribes' Section 404(c) petition had not yet been publicly disclosed. Whereas private meetings between EPA and the Anti-Mine Coalition members to discuss the development of the Section 404(c) policy were frequent and routine, the Pebble Partnership was kept completely in the dark even about the Tribes' Section 404(c) petition for more than nine weeks after Parker submitted it.

169. On August 3, 2010, the *Los Angeles Times* published an article entitled, "Battle over Pebble Mine shifts to EPA." The article quoted Parker and his talking points, and included a link to the Tribes' letter to EPA. That is how Plaintiff discovered the existence of the Tribes' Section 404(c) petition filed by the Tribes in May – not from EPA. Even when EPA officials,

including Administrator Jackson, met with PLP on July 28, 2010 in Alaska, they did not disclose the Tribes' Section 404(c) petition.

170.    On or about August 3, 2010, EPA's Gregory Peck, the Office of Water Chief of Staff, emailed EPA's Stoner and others about a bill introduced in Congress to strip EPA of its Section 404(c) powers.  Stoner forwarded the email to The Wilderness Society's Goldman-Carter, who asked Stoner whether this was related to Pebble.  On information and belief, no further discussion was produced by EPA in response to Plaintiff's FOIA requests.

171.    On or about August 5, 2010, Jon Devine, the NRDC lawyer in Stoner's former position at NRDC, contacted top EPA officials Peck, Keehner and Sussman about meeting. Sussman replied:  "Happy to set this up, Jon."

172.    On or about August 11, 2010, Parker set up a meeting with EPA and the USACE for August 13, 2010.  Both before and during the meeting, Parker indicated that the Tribes wanted to be hired to perform environmental work for the federal government in connection with the Pebble project.  The Tribes even asked "[w]hat sort of funding sources exist for work done by Tribes where the work product may be of assistance to a NEPA process."

173.    On or about August 11, 2010, EPA's McGrath emailed Parker to say she would be in Anchorage for meetings and to ask Parker if he was planning to bring any of the Tribal leaders in for the meeting.  Parker responded to McGrath, Steiner-Riley, Fordham, and other EPA officials, and added the petitioning Curyung Tribe leaders to the email, to identify the issues that his six Tribal clients wanted to pursue with EPA:  "I understand that central questions from the Tribes point of view are: (1) Is there funding to cover whatever the federal agencies would want the Tribes to do; (2) What is the time commitment for such tasks, and (3) What are the tasks the federal agencies would want the Tribes to perform?"

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 42

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 44 of 138

174.     On or about August 12, 2010, FWS's Brna explained to FWS's Philip Johnson the timing of the scheduling of Frances Solomon's presentation on metal toxicity (set up July 1, 2010) as designed to conflict with a forum being held to discuss alternative views on Pebble Mine: "This has been scheduled to coincide with the initiation of the Pebble meetings being held by [PLP consultant] Keystone on Dec. 3. We hope to get people from the villages here."

175.     On or about August 12, 2010, BBNC submitted its own Section 404(c) petition to EPA. BBNC lawyer Peter Van Tuyn sent the petition directly to North with a message indicating that he was coordinating with North: "I look forward to catching up with you in the coming days."

176.     On or about August 12, 2010, North responded to Van Tuyn, and stated: "We have been discussing 404(c) quite a bit internally at all levels of EPA. This letter will certainly stoke the fire. I look forward to talking with you in the near future."

177.     On or about August 13, 2010, EPA's North, Fordham, Steiner-Riley, McGrath, and Mark Jen met with Parker, Thomas Tilden of the Curyung Tribal Council, and the USACE. Notes from the meeting state: "Send to Jeff Parker – PowerPoints for mining info," "Jeff Parker – send him APDES information," and that EPA's Fordham had indicated at the meeting that Parker and/or his Native Tribal clients "want consultation on 404(c)."

178.     On or about August 18, 2010, Brna emailed FWS colleagues and stated: "EPA has been asked by a number of Alaska Native villages to begin a process under 404(c) of the Clean Water Act which would declare the area around Pebble unsuitable for the discharge of dredged or fill material. This would preclude the Corps from issuing any permits."

179.     This again illustrates EPA's predetermined conclusions, reached without a supporting environmental assessment, and that EPA's clear intent was to block Pebble Mine.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 43

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 45 of 138

180. On or about August 23, 2010, Parker sent a "memo on 404(c)" to EPA attorney Steiner-Riley stating: "In the preamble that accompanies adoption of 40 CFR Part 231, which implements Section 404(c), EPA expressed its preference for comprehensive advance prohibition whenever appropriate. I am attaching a memo. It asserts that, based on this preference and a host of other reasons, EPA has a responsibility to propose such a comprehensive approach with respect to metallic sulfide mining in the Kvichak and Nushagak drainages of southwest Alaska." Steiner-Riley followed up with Parker to arrange a call about the issue.

181. At this same time, Wayne Nastri, who was EPA Region 9 Administrator until 2009, was collaborating with several mine opponents and taking a lead role in coordinating EPA with what he called his "coalition" of anti-mine activists who were seeking a preemptive Section 404(c) veto. This group included Anti-Mine Coalition members Brown, Waldrop, Halford, Parker and his Native Tribes, NRDC's Joel Reynolds, and others.

182. Nastri used his former EPA status to connect EPA with Anti-Mine Coalition members. For example, on September 3, 2010, Nastri emailed McLerran stating: "As you know the broad-based coalition [Nastri's clients] concerned about Pebble mine will be in Washington, DC Sept. 21-23 and is hoping to meet with several people at USEPA including Pete Silva, Michelle DePass, Bob Sussman, Scott Fulton, and Bob Perciasepe." McLerran replied: "Wayne: thanks for the heads up on this. Your timing on this is good. We are very actively discussing this issue at the moment so talking to headquarters folks is very timely."

183. On or about September 7, 2010, Parker emailed a redacted recipient (likely Steiner-Riley) to provide legal analysis on a potential takings claim Parker had apparently been discussing with the recipient, noting that the forwarded article "contains statements that I would use as admissions to rebut any takings claim" that might be brought by PLP.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 44

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 46 of 138

184.    On or about September 8, 2010, Nastri emailed EPA's Sussman, Senior Policy

Counsel to the Administrator, and stated: "I am working with a broad-based coalition that is

seeking a pre-emptive CWA 404(c) action with regard to the proposed Pebble Mine near Bristol

Bay, AK. Some members of the coalition have met with Administrator Jackson during her

earlier trip to Alaska and many have met with Dennis McLerran and discussed their desire for

the 404(c) action. Several members of the coalition will be in Washington DC September 21-23

and would like to meet with you and talk about their views on this requested action. I have

explained to them the challenges they face (with regard to a pre-emptive action) and that you

would not be able to make any promises and that you need to be concerned with the appearance

of any pre-decisional action." Nastri further stated: "Specific members of the coalition that

would participate in the meeting are: [Halford, Waldrop, Brown, Tilden, Bryce Edgmond (state

legislator), Lindsey Bloom (United Fishermen of Alaska), and "someone from the Bristol Bay

Native Corporation"]." Nastri included "some information that may be useful in advance of the

meeting" – a memo from Trout Unlimited. On information and belief, EPA did not produce this

document in response to Plaintiff's FOIA. The email indicates the document was deleted by

Sussman ([attachment "TUMeetingRequestEPA09032010.pdf deleted by Bob

Sussman/DC/USEPA/US"]).

185.    On or about September 8, 2010, Sussman responded and took the initiative to

arrange for others to join the meeting in order to coordinate them with the Anti-Mine Coalition,

stating: "Hi Wayne. Of course, I remember you from your RA days. We would be happy to

meet with the coalition. I'd like to line up representatives of OW and OGC to join the meeting

and to have R10 participation by phone."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 45

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 47 of 138

186.     On or about September 8, 2010, EPA produced a "Bristol Bay 404(c) Discussion Matrix" for "HQ Briefing 9/08/2010." In the Matrix, EPA outlines the "Pros" and "Cons" of the Section 404(c) action – not whether Section 404(c) should be used, but rather, the "Timing" (either during the permitting process or before) and the "Process" of the Section 404(c) action.

187.     With regard to "Timing," the Matrix identifies "Cons" with using Section 404(c) proactively before the permit applications, including: "Litigation risk." One of the "Pros" identified is that a preemptive veto "can serve as a model of proactive watershed planning for sustainability."

188.     The "Process" "Cons" for "Regulatory decision making mode" included: "1. There is no real public discussion - public involvement is to comment then sue if they have the resources (NEPA, 404 permit, 404(c))," and "2. EPA would have less control of the 'spin' and political debate."

189.     The "Process" "Cons" for "Inclusive public discussion" included: "1. Possible FACA complications, however, process could be structured to alleviate those concerns," "2. Longer timeframe than just starting the 404(c) process," and "3. More resources."

190.     Two weeks later, FWS's Brna confirmed that EPA's strategy was to take the fastest path to the Section 404(c) determination. As stated in Paragraph 204, Brna told his FWS colleagues that he had been told by EPA's North: "DC is opposed to [North's] plan to do a year of outreach before they [EPA] make a decision. [North] thinks they are just going to do this in accordance with the regs and as quickly as they can."

191.     On information and belief, another reason EPA elected to pursue Section 404(c) through EPA's own regulatory process was in order to skirt having to undertake an Environmental Impact Statement (EIS) under NEPA. NEPA requires that agencies adhere to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 46

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 48 of 138

several restrictions EPA sought to avoid, including: NEPA's requirement of independent, objective, scientific review; requirements prohibiting conflicts of interest; requirements concerning disclosure of information sources; and provisions that would require EPA to independently evaluate the applicant's data.

192.    Specifically, NEPA is meant to "ensure the objectivity of the environmental review process." Final CEQ NEPA Regulations, 43 Fed. Reg. 55978, 55987 (November 29, 1979). Had EPA initiated an EIS under NEPA, it would have had to use an independent third-party contractor in the preparation of the EIS. For an EIS, the consultant must "execute a disclosure statement . . . specifying that [it has] no financial or other interest in the outcome of the project." 40 CFR § 1506.5(c). CEQ regulations also require full disclosure concerning the sources of information that appears in any NEPA compliance documentation and require that the agency independently evaluate information if an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement. *Id.* § 1506.5(a).

193.    USACE NEPA Guidance also provides that the Corps district "is responsible for ensuring that the information provided by the contractor is consistent with Corps statutory requirements to take a hard, objective look at the public interest and environmental factors." Corps Regulatory Guidance Letter No. 05-08 (December 7, 2005), "Environmental Impact Statements – Third Party Contracting." The Corps district is also required to independently evaluate the information to ensure that it is technically adequate and not biased. *Id.*

194.    Moreover, in practice, *ex parte* contacts between the contractor preparing the EIS and proponents or opponents of the project are strictly circumscribed by the Corps of Engineers Project Manager – another undesirable restriction from EPA's perspective.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 47

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 49 of 138

195.    Accordingly, by utilizing Section 404(c) and avoiding NEPA, EPA was able to avoid restrictions that would have prevented EPA from controlling the assessment process, requirements which would have precluded the Anti-Mine Coalition's and Anti-Mine Scientists' participation in formulating the EIS, and requirements that EPA independently consider – rather than ignore or seek to disparage – Plaintiff's scientific data.

196.    On or about September 14, 2010, North wrote one of the most revealing descriptions of the Section 404(c) approach EPA developed through its coordination with, and receipt of data from, the Anti-Mine Coalition. In an email to EPA's Parkin and Szerlog, North stated: "I hope everyone at this point has gotten their minds around the idea that our focus is on the resource and not on any particular project. To that end, here are some thoughts about how I might approach a 404(c) action. The landscape area that supports the resource we are discussing is the Bristol Bay watershed. So initially it seems that area should be the target of our 404(c) action. During the process of developing our proposed determination we would refine our target area based on the need for protection."

197.    Particularly noteworthy are the issues North raised next in his September 14, 2010, email – an approach to the Section 404(c) action developed in conjunction with the Anti-Mine Coalition parties feeding EPA data, policy, and legal advice. North stated: "So far there are two types of development that have been identified in State of Alaska planning documents that could have significant adverse effects on aquatic resources. The first is what drew our attention here, mining. The second is road building . . . . So a 404c that targets the primary habitat of the resource we are trying to protect, salmon, is a logical approach. First at the specific habitat level by prohibiting discharge in stream channels and the riparian (or adjacent)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 48

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 50 of 138

wetlands that most directly support them. Second by initially addressing Bristol Bay as a whole then narrowing to those watersheds that are at risk."

198. North's September 14, 2010, email has the subject line: "Thoughts for the Bristol Bay discussion tomorrow." On information and belief, EPA did not produce any agenda, follow-up email, or other communication about this discussion of "our 404(c) action" in response to Plaintiff's FOIA.

199. On September 14, 2010, the same day that North sent this critical internal Section 404(c) veto-strategy email to EPA managers Parkin and Szerlog, he forwarded that email outside the Agency to Parker.

200. While North stated that EPA's focus "is on the resource and not on any particular project," as he would later make clear in an April 6, 2011, email to James McGoodwin at the University of Colorado, using "404(c) authority to prevent, in advance of any permit review, the mining of sulfide ore bodies in the watershed. . . . Of course that would include Pebble . . . ."

201. On or about September 16, 2010, Tony Turrini, an attorney with NWF, emailed EPA's Stoner, Sussman, Keehner, Peck, and Evans, copying Goldman-Carter, and stated: "I am an attorney with National Wildlife Federation and have been working with my colleague Jan Goldman-Carter on the waste treatment system exclusion and fill rule as they relate to the discharge of mine wastes, particularly with respect to the Pebble Mine. . . . I've attached a short white paper on the WTS exclusion which may be useful as EPA considers actions to address the growing threat of mine discharges to water quality and aquatic ecosystems."

202. On or about September 20, 2010, TU's Brown sent North and Szerlog a letter that Tiffany & Co. wrote to EPA opposing the Pebble Mine. Brown wrote: "Just wanted to make sure it crossed your desks." Tiffany & Co. later gave Trout Unlimited's Bristol Bay Protection

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 49

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 51 of 138

Campaign, which Brown directs, a $350,000 grant. Tiffany also funded the study that Trout Unlimited gave exclusively under embargo to EPA on November 23, 2011, until it was finally publically released months later.

203. On September 23, 2010, Stoner and other top EPA officials, including Sussman, Perciasepe, DePass, Silva and Fulton, met with Nastri, Brown, Waldrop, Halford and others to discuss "pre-emptive CWA 404(c) action near Bristol Bay." After the meeting, Brown met with Stoner "to discuss upcoming activities we are planning."

204. North's role as a Section 404(c) advocate went to upper management in EPA and also to other federal agencies, including the U.S. Fish & Wildlife Service. On or about September 23, 2010, FWS's Brna emailed FWS colleagues regarding "Pebble and 404c," and stated: "I spoke with Phil North. He has now briefed people in EPA all the way up to the assistant administrator. He believes EPA leaders have decided to proceed and they are just deciding when. They say in the next 'couple of weeks' but it will probably be after the November election. Trout Unlimited has been talking with many congress people and agency folks at the DC level about this as well. He is sending me contact info for the TU person so we can talk with them. I want to find out who they are talking with at the Service and DOI. Also, Bristol bay commercial fisherman have sent a letter to over 150 fishing groups in the lower 48 and they are getting support to push 404c and oppose pebble. . . . Phil says DC is opposed to his plan to do a year of outreach before they make a decision. He thinks they are just going to do this in accordance with the regs and as quickly as they can. He thinks it is important we proceed with getting regional support. If we get that, Jeff should be talking with Rowan and the group in DC. Let's go ahead and schedule a short briefing for John, Steve, Jenifer and maybe Laverne if we can. If they support going to Jeff, we then need to call Marcia Coombs and ask for a briefing

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 50

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 52 of 138

by Phil [North]. We should ask her to come and we definitely want NPS (and maybe Pamela Bergmann) there. . . . We should think about asking other [Regional Directors] like BLM and USGS to participate in the briefing. . . ."

205. Brna concluded his September 23, 2010 email: "This is going to happen and it's going to get bloody. I am looking forward to it!"

206. On or about September 27, 2010, TU's Brown emailed EPA's Stoner regarding "Pebble Mine discussion follow up," and stated: "we really appreciated your time last week. I wanted to say thank you and also request a little time for a quick follow up on the phone in the near future. Specifically, I would like to discuss a number of upcoming activities we are planning." Stoner responded that she was copying her assistant to find time on her calendar. They scheduled to meet in Stoner's office on October 25, 2010 with EPA's Peck as well.

207. On or about September 28, 2010, EPA's Hough and TU's Brown coordinated on EPA's response to a letter from Alaska Governor Parnell asking that EPA refrain from using Section 404(c) preemptively. Brown thanked Hough for sending the letter and then stated "if you guys are looking for a point by point on why the arguments contained in the letter are either not appropriate or not factually correct – a number of groups are working on response letters that they plan to send to Lisa Jackson's office. I will be sure to pass those along when they go out."

208. On or about September 29, 2010, Nastri asked McLerran if McLerran had time to talk so that Nastri could debrief McLerran on Nastri's meeting with Sussman on September 21-23, 2010. McLerran responded to say that he would make time for a discussion.

209. On or about September 30, 2010, Brown emailed EPA's Hough and Julia McCarthy, and stated that his Anti-Mine Coalition colleagues would keep their complaints "out

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 51

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 53 of 138

of the press as much as possible since" in his estimation, given the nature of Alaskans, "we believe it will only fuel anti-federal sentiments" against EPA.

210. On or about October 1, 2010 – more than four months before EPA's public announcement of the Watershed Assessment – the Anchorage Fish and Wildlife Field Office ("AFWFO") produced a paper stating that EPA had enlisted the support of the FWS Region 7 (Alaska) and had decided to launch the Section 404(c) process: "EPA to Seek Service Support When They Use Section 404(c) of the Clean Water Act." The paper states: "The U.S. Environmental Protection Agency (EPA) is seeking Service support as they initiate a formal process to issue a determination that the waters of the U.S., including wetlands, within the potential pebble Mine action are unsuitable for the placement of fill material. This action would be conducted under the authority of Section 404(c) of the Clean Water Act (CWA), and would effectively prevent the project from receiving the necessary federal permits to develop a mine in the Nushagak and Kvichak watersheds."

211. The "RECOMMENDATIONS FROM AFWFO" were: "Invite Phil North, EPA lead for Pebble to brief RD Geoff Haskett and NPS RD Sue Masica; Fully support EPA in this endeavor by allowing EPA to publicly indicate our support for their proposed determination; Provide biological information, technical assistance and recommendations when appropriate; Brief the WO/CPA staff and AD Brian Arroyo. They may have already been contacted by Trout Unlimited Washington staff."

212. On or about October 15, 2010, FWS's Brna emailed Brown, regarding "404(c)," and stated: "I briefed Geoff Haskett, the USFWS Alaska Regional Director yesterday about the potential 404(c) action in Bristol Bay. Geoff would like to meet with the Alaska Native delegation who are asking EPA to pursue this. Can you help me set that up?" In response,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 52

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 54 of 138

Brown stated: "No problem at all. I'll put the word out to tribal leaders and BBNC." Further, Brown stated with respect to the meeting: "Off the top of my head I'm thinking a few tribal leaders and a delegation from BBNC including their lawyer who is very talented and gets the details on 404c." Brna responded: "ok. It does not have to be a big group. I think we will stand up and support EPA and he just wants to hear from some of the local people who are asking for this. He also will let the Director in DC know about this. Who is the lawyer?" Brown responded: "Peter Van Tuyn is working for BBNC on this, I'll put a solid group together for you and let you know Monday, I'm also attaching all the resolutions and letters that have been sent to EPA so far - I assume Phil [North] shared these but just in case."

213. On or about October 15, 2010, Brna forwarded Brown's materials to his FWS colleagues and stated: "Here is a bit more information (see the forwarded attachments) regarding tribes and businesses from Bristol Bay who petitioned EPA for a 404(c) action."

214. On or about October 18, 2010, Brna consulted with North, who requested up to two hours for EPA to brief the FWS regional director. FWS Deputy Assistant Regional Director Steve Klosiewski told Brna and other FWS officials: "We need a short concise briefing that allows time for meaningful discussion. No need to talk about how bad the mine would be because everyone understands this. We need to focus on FWS role and authorities and what EPA wants from us. We should know this before the meeting and discuss beforehand."

215. This again shows that within the EPA/FWS circles that were coordinating with the anti-mine FACs, a predetermined conclusion on adverse impacts had been reached – without any environmental assessment – three and a half years before the final BBWA.

216. On or about October 20, 2010, FWS's Frances Mann, Regional Coordinator for Conservation Planning Assistance, confirmed that EPA was moving forward on a Section 404(c)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 53

action even before it began its Watershed Assessment. Mann stated: "The briefing describes the EPA criteria for taking the 404(c) action. Pebble and other mines are mentioned as significant threats to the area . . . . The briefing would be essentially the same one that has been given to EPA's Regional Administrator in Seattle, as well as the Deputy Administrator (in Wash DC). According to Phil North, those briefings/discussions took about 1.5 hours. . . . The EPA will be looking for a statement of support from Geoff and Sue as to the merits of the 404(c) action."

217.    On October 20, 2010, BBRSDA's Waldrop emailed EPA (name redacted) with the subject line: "Bristol Bay Commercial Fishing request to initiate 404c of CWA." Attached to the email was an official request from BBRSDA and AIFMA that EPA initiate Section 404(c) proceedings. The EPA recipient is unidentified in the document produced by EPA in response to Plaintiff's FOIA.

218.    On or about October 20, 2010, EPA's Peck emailed EPA's Stoner, and stated that he was setting up a call to discuss Pebble with National Wildlife Federation lawyer Tony Turrini, who asked "to hear more about EPA's strategy for dealing with hard rock mining discharges and to discuss ways in which we can support effort."

219.    On or about October 22, 2010, TU's Brown sent North and Hough The Nature Conservancy's draft "Pebble ecological risk assessment." The assessment used a 2006 Water Rights Application from Pebble Mine project proponent Northern Dynasty Minerals, Ltd. as a basis for analyzing the Pebble Mine. Brown offered to set up a call with the report's authors for EPA. North stated that Brown also should send the assessment to EPA's Szerlog.

220.    On or about October 25, 2010, EPA's Stoner chaired a phone meeting with Trout Unlimited's Brown and EPA's Peck to "discuss Pebble Mine Discussion Follow-Up."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 54

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 56 of 138

221. On or about October 28, 2010, FWS's Brna forwarded to FWS's Verbrugge and others an email from Carol Ann Woody, which had been sent to Brna and EPA's North. The email included scientific papers by Anti-Mine Scientists Ann Maest and by Woody and Zamzow.

222. On or about October 30, 2010, North invited TU's Brown "and his scientist" to come to Soldotna to meet with him. North also requested that Brown connect him with TNC to discuss their "Pebble ecological risk assessment."

223. On or about November 1, 2010, Brown emailed EPA recipients (names redacted) seeking to discredit an Alaska Native corporation because it had a contract to conduct scientific studies for Pebble Mine, stating: "APC's subsidiary has financial ties to PLP." APC is a consolidated village corporation for South Naknek, Port Heiden, Ugashik, Kokhanok and Newhalen. The item from APC's June 2008 newsletter, which Brown quoted in the email, reads: "APC continues to work at the Pebble site conducting hydrology, water quality and trout telemetry studies. During the month of May, APCS, including APC shareholders conducted hydrology studies and fish capture work in support of telemetry studies to learn the life cycles of trout that spawn in Upper Talarik."

224. On or about November 4, 2010, EPA's Hough emailed Brown to arrange a meeting of Anti-Mine Coalition members with staff of EPA's OWOW on December 16 and 17, 2010. Hough requested that The Nature Conservancy "walk us through its October 2010 BB [Bristol Bay] Risk Assessment" and provide "any literature compilations that your coalition is working on."

225. In or about December 2010, North conducted the briefing described in Paragraphs 214 and 216 for the FWS and NPS regional directors. On information and belief, North's presentation has not been produced by EPA or FWS in response to Plaintiff's FOIA requests.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 55

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 57 of 138

226.     On or about December 9, 2010, North sent an email with the subject "A new development" to Daniel Rinella, a professor at the University of Alaska Anchorage, copying EPA's Heather Dean. North stated: "TNC [The Nature Conservancy] will be presenting their risk assessment to EPA. We are tentatively looking at 11:00am on 12/16, just before my proposed time to meet to discuss our own risk assessment. Will this set of times work for you?"

227.     Anti-Mine Scientist and Anti-Mine Assessment Team member Rinella would continue to collaborate with EPA and would later be one of the listed Authors of the BBWA. Rinella was also a "Project Leader" representing the University and the Alaska Natural Heritage Program, for Appendix G to the BBWA: "Foreseeable Environmental Impact of Potential Road and Pipeline Development on Water Quality and Freshwater Fishery Resources of Bristol Bay, Alaska." Rinella is also a cited authority in Appendix G, including, *e.g.*, "(Rinella 2011, personal communication, and Shaftel [Rebecca Shaftel of University Alaska Anchorage] 2011, personal communication)" and "(Woody and O'Neal 2010, and Daniel Rinella, University of Alaska, Anchorage, AK, unpublished data)." BBWA App. G at 5 & notes 2 and 4. He is also cited with Shaftel in support of "Chapter 9 – Tailings Dam Failure," which was a primary focal point for North's research for the BBWA. Chapter 9 of the BBWA also cites as authority "Personal Communications Rinella, D. J. University of Alaska, Anchorage. Unpublished data."

228.     On or about December 10, 2010, Rinella responded: "Yeah, Phil, that's just fine. Whenever we're finished with TNC we can start our own discussion. Will we be meeting at their office downtown?" North responded to Hough, Brown, and Rinella, and stated: "It looks like, Thursday, 12/16 at 11 AKST, 12 PST and 3 EST will work. We need to figure out the logistics. I am also fine with meeting at the TNC office in Anchorage if that works best for everyone." Brown responded: "I am available and TNC can make it work either day."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 56

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 58 of 138

229.    On or about December 12, 2010, Hough responded:  "Wonderful.  So that will be 1 PM ET on Friday right?" to which North responded to Hough, Brown, Rinella, Dean, and added in EPA's Julia McCarthy and Ross Geredien, to say "Yes."  That meeting, to receive TNC's Bristol Bay Risk Assessment, and for EPA to share its risk assessment with, at least, Rinella, was set for December 17, 2010.

230.    On or about December 14, 2010, Brown emailed EPA's North, Hough, Dean, McCarthy, Geredien and Gary Sonnevil, Anti-Mine Scientists Rinella, Dave Athons (Kenai River Center), David Albert (TNC), and Erin Dovichin (TNC), with the subject "Pebble Risk Assessment Briefing."  Brown stated that he would send a link to the slide show presentation in a separate email, but, on information and belief, that presentation was not produced by EPA through FOIA.  The agenda included:  "2. A Science-based Framework for Conservation of Salmon in Bristol Bay, David Albert, Director of Conservation Science (15 minutes)," and "3. Overview of The Nature Conservancy's Research and Field Studies in Bristol Bay, Erin Dovichin, Associate State Director (20 minutes)," including "Ecological Risk Assessment, Fish Distribution Surveys, Water quality sampling, Hydrologic and hydrogeologic studies, and Macroinvertebrates and diatom sampling."

231.    On or about December 17, 2010, EPA's Marcia Combes emailed FWS's Geoff Hackett and stated:  "Good to see you today, and thank you for your perspectives and comments on the potential Bristol Bay/Pebble 404(c) action--we've got a long ways to go, it will be interesting."

232.    On or about December 18, 2010, Brown coordinated with EPA's North and Hough to arrange more Trout Unlimited briefings for early 2011.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 57

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 59 of 138

233.    On or about December 20, 2010, FWS's Hackett forwarded Combes's December 18, 2010, email regarding the Section 404(c) action to FWS's LaVerne Smith, Jenifer Kohout, Lisa Toussaint, and Steve Klosiewski.

234.    On or about December 20, 2010, Chambers (CSP2) emailed North in response to an earlier request from North for names of mining experts.  Chambers provided two names, Johnnie Moore and David Dzombak.  In response, North emailed: "Thanks Dave.  We had a meeting last Thursday with the UAA subcontractors to NatureServe.  We talked about the details and made work assignments.  The time frame is short so the pressure in [sic] on to get something done.  But I am excited to be moving on this.  Thanks for your help."

235.    On or about December 29, 2010, Anti-Mine Coalition member Wayne Nastri emailed McLerran regarding "Happy Holidays and Request for Meeting to provide an Update on Request for CWA 404c regarding area near Bristol Bay, AK."  Nastri stated:  "When we met earlier this year regarding the requested CWA 404(c) action, I noted that there were a number of considerations that needed to be addressed as the EPA moved forward in its deliberative process.  Key to the Agency's consideration was whether or not the 404(c) criteria were satisfied that triggered action.  Since that earlier meeting, a number of stakeholders have met with OWOW and with senior EPA officials in DC on this matter.  There is a desire to meet again with OWOW and senior officials to discuss recent technical reports and data regarding risks, however, believe it would be prudent to meet with you first and to present and discuss the findings thus far.  I'm hoping that you are available sometime during the weeks of January 10 or 17.  We would meet at whatever time works within your schedule.  I believe we would need about an hour of your time.  Attending would be myself, Shoren Brown of Trout Unlimited and a representative of The Nature Conservancy."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 58

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 60 of 138

236.    By the end of 2010, EPA had established and been utilizing the Anti-Mine

Coalition members for advice and recommendations on policy, strategic and legal matters, and

scientific studies, analyses and briefings on data, for approximately two years.  At this point, the

Anti-Mine Coalition and the Anti-Mine Scientists were providing EPA with "technical reports

and data regarding risks," briefings on their tailor-made reports, and meetings between

stakeholders and "senior EPA officials" – all aimed at making certain, as Nastri told McLerran

on December 29, 2010, that the Agency's 404(c) criteria were satisfied.

237.    Also by the end of 2010, EPA's Region 10 was requesting funds to initiate the

Section 404(c) veto, despite admittedly not yet having undertaken the evaluation of the *potential*

harm or the *proposed* mine.  Although the assessment of the Bristol Bay Watershed would not

begin for several months, according to the FY 2011 budget for "Bristol Bay 404(c)," EPA

budgeted to "Initiate the process and publish a CWA 404(c) "veto" action for the proposed

permit for the Pebble gold mine in Bristol Bay, AK."  The budget stated:  "EPA is on the fast

track to evaluate the potential harm of a proposed gold mine to the natural resources of Bristol

Bay, AK," and stated:  "While resorting to exercising EPA's 404(c) authority is rare (only 12

actions since 1981), the Bristol Bay case represents a clear and important need to do so given the

nature and extent of the adverse impacts coupled with the immense quality and vulnerability of

the fisheries resource."

238.    This again shows that EPA had already determined it would exercise its Section

404(c) authority and that its conclusions regarding adverse impacts were predetermined and

reached without an environmental assessment, which assessment, in the form of the BBWA,

would not be final for more than three years hence.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 59

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 61 of 138

## 4. EPA's Collaboration With Pebble Mine Opponents: 2011

239. On or about January 3, 2011, EPA's McLerran responded to Nastri, copying EPA management including Sussman, Parkin, Bussell and several others, and stated: "I will ask my scheduler to see what we can arrange for a meeting. He told me this morning that I'm booked out until February 23rd at last check, but I'm sure we can find something that can be moved to accommodate this. I look forward to seeing you and discussing where we are at with respect to the 404(c) requests."

240. On or about January 4, 2011, EPA's Parkin emailed Larry Hartig, Alaska Commissioner of the Department of Environmental Conservation, with the subject: "Confidential - Draft Outline of a Bristol Bay Process to inform EPA's decision whether to invoke 404(c) - please don't distribute."

241. On or about January 4, 2011, David O'Brien from Fisheries and Oceans Canada emailed other outside resources, copying North, and stated: "I received a phone call today from Phil North, US EPA Alaska, requesting information regarding the salmon returns to the Fraser in 2010. Although I didn't ask for much detail, Mr. North was interested in information about both return strength and which systems/tribs returns were attributed. Perhaps one of you would be able to assist with this request. I've cc'd Mr. North so he can elaborate."

242. On or about January 6, 2011, Anti-Mine Coalition member John Holman wrote a letter to EPA Administrators Jackson and McLerran intended to discredit Lake and Peninsula Borough Mayor Glen Alsworth, who on December 4, 2010, had written Administrator Jackson to urge that EPA not preemptively use 404(c) because such a move "would disrespect science and could provide a death blow to our villages." Holman claimed that Alsworth was the subject of an investigation by the Alaska Public Offices Commission. However, what Holman omitted to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 60

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 62 of 138

tell Jackson and McLerran was that Holman himself was the complainant against Alsworth, and one of Robert Gillam's lawyers (Gillam being one of the main funding sources for the anti-Pebble Mine effort) had filed the complaint. In March 2011, APOC dismissed the complaint against Alsworth in its entirety.

243. On or about January 13, 2011, TU's Brown emailed EPA's Hough to inform him of upcoming meetings scheduled for January 27-28, 2011, with DOI agencies. Brown stated he was bringing the team of Anti-Mine Coalition members and Anti-Mine Scientists, including: Ann Maest (Stratus Consulting), Thomas Quinn (University of Washington), David Chambers (CSP2), David Albert (TNC), and Sarah O'Neal (Fisheries Research and Consulting). Brown stated: "We are very much looking forward to our discussion." EPA's Hough responded: "We are looking forward to hearing from you and your group. Did TU and other stakeholders have an event yesterday in Bristol Bay?" Brown responded: "It ended up being postponed. We will keep you posted."

244. Maest, Quinn, Chambers, Albert, and O'Neal were all authors, reviewers, and/or cited authorities in the BBWA, and/or provided scientific studies, data, and briefings to EPA in the lead up to the BBWA.

245. On or about January 14, 2011, Jeff Parker replied to an email sent by EPA (name redacted) concerning a legal analysis of the Supreme Court's decision in the *Rapanos* case, which interpreted the Clean Water Act's definition of "waters of the United States."

246. On or about January 16, 2011, Parker emailed EPA attorney Steiner-Riley, and stated: "I meet with the Tribes on Wed and Thurs. Do you have a few minutes on Tues to brief me on the status of the Tribes' 404(c) request."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 61

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 63 of 138

247.    On or about January 26, 2011, EPA's Hough emailed 22 EPA colleagues he called the "Bristol Bay Team" – which apparently had already been formed even though EPA would not announce for another two weeks that it was launching the Watershed Assessment – to inform them of "two upcoming briefings on Bristol Bay at EPA HQ." Hough stated: "there are two upcoming briefings on BB here in DC for OWOW Director Denise Keehner. 1) The first is set for 1/27 from 2-4 pm ET. It was organized at the request of TU [Trout Unlimited] and will include a team of scientists who plan to present current science regarding potential impacts of large-scale mining on the BB. 2) The second will likely be 2/15,16 or 17 (I will let you know as soon as it has been set). It is being organized at the request of BBNA [Bristol Bay Native Association] as a follow-up to their request that EPA initiate an advance 404(c) action in BB."

248.    On or about January 26, 2011, Brown sent EPA's Hough the Anti-Mine Scientists' presentations for the Bristol Bay briefing planned for the next day for OWOW and DOI, including: "Water Quality and Hydrologic Issues related to the Pebble Project, Alaska" by Maest, Wobus, and Connie Travers from Stratus Consulting; "An Assessment of Ecological Risk to wild salmon from large-scale mining in the Nushagak and Kvichak Watersheds of Bristol Bay, Alaska" by David Albert from TNC; "Salmon, and the linked aquatic and human systems in Bristol Bay" by Thomas Quinn from University of Washington; and "Bibliography supporting 404(c) action" by O'Neal and Woody from Fisheries Research and Consulting.

249.    On or about January 27, 2011, EPA hosted a "Bristol Bay Briefing" for OWOW Director Keehner "provided by TU" regarding the use of Section 404(c). The briefing featured presentations from Anti-Mine Scientists Quinn, Maest, O'Neal, and Albert, and included Chambers, Nastri, Brown, Steve Moyer, TU's VP for Government Affairs, and Taryn Keiko from NRDC.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 62

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 64 of 138

250.     Following the briefing, EPA's Hough emailed EPA's North, Parkin, McGrath, Szerlog, David Evans and Brian Frazer regarding the briefing that day, and stated: "It was a very interesting briefing and we would definitely like an opportunity to get your perspective on the talk given by Ann Maest. I sent all the powerpoints to Michael Szerlog and Phil. Perhaps after looking this one over we could have some further discussion with you regarding the Maest talk in particular."

251.     On February 7, 2011, EPA officially announced its plan to conduct a "scientific assessment of Bristol Bay watershed." EPA stated that it "initiated this assessment in response to concerns from federally-recognized tribes and others who petitioned the agency in 2010 to assess any potential risks to the watershed."

252.     The announcement of the "scientific assessment of Bristol Bay watershed" was the launch of the BBWA initiative, but just as the Bristol Bay Team had already been selected at EPA, the result of the Watershed Assessment had already been determined as well. In essence the BBWA was a very expensive, pre-ordained fig leaf for EPA's true motivation – the Section 404(c) veto.

253.     On or about February 7, 2011, after EPA announced its plans for the Watershed Assessment, BBRSDA's Waldrop emailed an EPA recipient (name redacted): "Thanks for your role in crafting and getting this issue to front and center." Waldrop also noted how EPA's actions are "an improvement over the standard 404c process."

254.     On or about February 7, 2011, EPA's McLerran notified Nastri, among others, by email of the Bristol Bay Watershed Assessment, sending along the press release and an outline for the assessment.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 63

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 65 of 138

255.    On or about February 10, 2011, Andrew Jensen, a journalist for the Alaska Journal, emailed EPA's Holsman for a story he was writing.  Jensen noted: "Also, in the release, EPA stated this action is in response to petitions received during 2010.  I found an FY 2009 Action Plan for the Region 10 Environmental Justice division that listed 'understanding and addressing the impacts of copper and gold mining in the headwaters of Bristol Bay' as an example of long-term measures of successful results for the EJ division.  Because [the Bristol Bay Watershed Assessment] was assigned to Environmental Justice, and not to the division that regulates the 404c permits petitioned about in 2010, doesn't the EPA's plan to conduct this assessment actually go back as far as 2008?"  Holsman indicated that EPA was working on answers to Jensen's questions.

256.    On or about February 14, 2011, EPA and Nastri arranged two science briefings. Nastri, Brown, and Waldrop attended both.

257.    On or about February 14, 2011, North emailed a DOJ and EPA official and stated: "You probably saw some of the press about EPA's announcement regarding Bristol Bay.  I am the lead of the technical team for Bristol Bay.  It has me hopping."

258.    On or about February 15, 2011, EPA's Holsman responded to Jensen concerning the story he was writing and made no mention of Jensen's question about the genesis in 2008 of EPA's Section 404(c) strategy.  Holsman stated that EPA's Parkin would be leading the Bristol Bay Watershed Assessment Team.

259.    On February 17, 2011, EPA's Hough sent an email to a dozen of his EPA colleagues, saying:  "Folks: FYI, in case you have not heard March will be a big communications month for the coalition calling for a 404(c) action in Bristol Bay."  He then highlighted some of the events taking place to promote these initiatives in order to make certain the combined EPA-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 64

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 66 of 138

Anti-Mine Coalition coordinated message was disseminated through the Agency's contacts and its Anti-Mine Coalition partners.

260.    On or about February 22, 2011, Nastri emailed EPA's Bill Dunbar, copying McLerran, to identify participants for a February 24-25, 2011, meeting with EPA. Participants at the February 24 "scientific" meeting included Anti-Mine Coalition scientists Chambers, Maest, Wobus, Quinn, O'Neal, and Albert, as well as Nastri, Brown, and Waldrop. The February 25 "political" meeting included Anti-Mine Coalition members Metrokin, Tiel Smith, Van Tuyn, Tyler Edgar, Waldrop, and Brown, as well as EPA's McLerran.

261.    On or about February 22, 2011, EPA's Dunbar emailed Parkin, Holsman, Steiner-Riley, Allnutt, Psyk, Hough, North, Fordham, McGrath, Szerlog, and Smith, and stated: "Gang - Please see attachments below from Wayne Nastri in preparation for the science briefing Thursday afternoon. Judy- from 2-5 Thursday, TU will be providing us with the science overview they've provided to HQ." Nastri's email read: "Attached please find the presentations that were used with OWOW and that we will be using next week in our meetings on Thursday and Friday. I will also provide you with additional information early next week." On information and belief, EPA has not produced these documents in response to Plaintiff's FOIA. The email indicates that the attachments were deleted by EPA's Fordham: "[attachment "BB EPA MEMO.w.SCIENCE.02182011final.pdf" deleted by Tami Fordham/R10/USEPA/US] [attachment "404(c)_Bibliography_Excel_2007_PC.xls" deleted by Tami Fordham/R10/USEPA/US]."

262.    On or about February 24, 2011, FWS arranged a meeting with Trout Unlimited at FWS headquarters to discuss "the use of CWA Section 404c to protect the watershed from the mine proposal." When FWS headquarters notified FWS's Frances Mann, Regional Coordinator

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 65

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 67 of 138

for Conservation Planning Assistance, about the Trout Unlimited meeting, her response was: "wow!  Great news!  What do you need from us?"

263.    On or about February 25, 2011, FWS's Rappoport asked Brna for the presentation North had given to FWS in December 2010, stating:  "What I did not see in either background doc I attached or news report Phil attached, was more info on the salmon resources at stake.  I believe there were some good facts in Phil North's presentation last Dec. to FWS and NPS Regional Director's."

264.    On or about February 26, 2011, BBRSDA's Waldrop emailed Parkin, who had been named as EPA's Watershed Assessment Team Leader, to thank him for "all the time . . . spent with us on Friday," and to ask about comments Parkin had shared with the Anti-Mine Coalition concerning the direction the BBWA would take, including that it "would also include economics."  Waldrop further stated:  "I realize specific elements of the Assessment are still gelling.  But when possible, I'd like to know more about your thoughts on the economic component."

265.    On or about February 28, 2011, Anti-Mine Scientist Quinn emailed EPA's Parkin, copying TU's Brown, to apologize for being rude in response to pro-mining arguments and to make clear that he was firmly anti-Pebble Mine in his views.  Quinn stated:  "Thank you for the time spent with us on Friday discussing fisheries and other aquatic resources in Bristol Bay and the issue of large-scale mining. . . . I fear, also, that I may have seemed rude at the end in response to some of the arguments or counter- arguments posed by proponents of mining activities.  I am normally quite restrained and polite and I sincerely apologize if my remarks were out of line."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 66

266.    Further, Quinn made clear that his approach to the Watershed Assessment assumed "severe degradation" would occur: "the fact that there are also salmon elsewhere seems quite irrelevant to the law as I understand it, and an illogical argument for permitting severe degradation of water supplies and aquatic resources. . . . [The Bristol Bay fishermen] cannot go [to Kodiak] to get their drinking water, their subsistence hunting for caribou, their commercial fishing, . . . or any other of the many benefits that they derive from living in Pedro Bay or other communities whose environments would be degraded by proposed activities." Finally, he noted: "OK - I guess you can tell that I feel strongly about this."

267.    Quinn was a named author or co-author of 17 studies cited in the BBWA.

268.    In March 2011, FWS officials engaged with Anti-Mine Coalition members to strategize about how to elevate the 404(c) cause to the Secretary of the Interior level.

269.    At this point, the EPA-Anti-Mine Coalition collaborated to shape the form, strategy, direction, and work product of the BBWA drafting team and Intergovernmental Technical Team ("IGTT").

270.    Trout Unlimited started sending weekly media reports to EPA officials making sure virtually every anti-Pebble Mine article, press release, and announcement landed on EPA desks, including, for example, the April 5, 2011, "Bristol Bay Media Round Up" to EPA's Stoner; on November 8, 2011, to EPA attorney Steiner-Riley; on November 14, 2011, to EPA's DePass; on November 21, 2011, to EPA's Szerlog; and on December 20, 2011, to EPA's North. These emails also went to EPA's Sussman, Hough, McCarthy, Dunbar and other top EPA officials.

271.    On or about March 3, 2011, FWS's Larry Bright, Chief of the Branch of Conservation Planning Assistance, emailed FWS's Brna, Mann, Dave Stout, and Jason Miller,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 67

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 69 of 138

and stated: "[W]e met with a prestigious group yesterday, led by Trout Unlimited, on the issue of Peeble [sic] Mine. Dave, Jason and I were present. Two staffers with TU were there (Shoren Brown, Steve Moyer) with a number of Alaskans, most notably Rick Halford (yes, of Alaska Legislature fame). They had a total of 7 in their party, with others representing Alaskan hunting and fishing groups, particularly in the Bristol Bay area. As you know, these folks have bonified [sic] conservative credentials. Rick Halford walked us through some slides and did an excellent job of describing the devastating nature of this proposal. Rick was well prepared and well versed in the subject and the technology. Overall, the meeting went extremely well. We learned a lot, and we came out of it with a commitment to educate our directorate. The main thing that you need to know is that we told these folks that they have to get in front of Geoff Haskett, and convince him of the importance of providing assistance to EPA. They committed to do just that, and will likely bring Native and fishermen reps as well. I wouldn't worry much about briefing Geoff beforehand, they do a great job of that. They will be asking for R7 assistance on the Assessment that EPA is beginning. Coming to and asking for federal help is new to all of these folks (except for TU). They would not be doing it if they had any faith in Alaska State government to do the right thing. According to them, there's already considerable impacts accruing up there and the State simply turns a blind eye. So, we are going to talk to some of our EPA counterparts and see what we can do to have some EPA-DOI discussions take place on this topic, particularly the topic of assistance and collaboration." Brna forwarded the email to FWS's Rappoport and Michael Buntier.

272. On or about March 18, 2011, Parker, who represented the six petitioning Tribes, emailed EPA's North and Parkin urging that EPA put four Tribal representatives, rather than three, on the IGTT.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 68

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 70 of 138

273. On or about March 19, 2011, Parker emailed North research regarding the corporate holdings of Pebble proponents – "Shively [PLP CEO], Leoffer [sic], Jade North, Lake & Pen Borough." On or about March 21, 2011, North forwarded the research to EPA attorney Steiner-Riley.

274. On or about March 29, 2011, EPA's Stoner was the chair of a meeting with BBNC lawyer Van Tuyn and other EPA officials to discuss the legal analyses sent by Van Tuyn to EPA concerning "Clean Water Act 404(c) process to prohibit certain lands from use as a disposal site for dredged or fill material."

275. On or about March 30, 2011, EPA's Kader emailed McLerran and others with talking points for a Q&A with a *60 Minutes* reporter researching a story on Pebble Mine. Among the public relations messages drafted for McLerran: "This is [] a collaborative undertaking. We are relying on tribal consultation, traditional ecological knowledge, federal agencies, state agencies, public comments and industry input to make a cohesive, fully-informed decision," and "Is EPA invoking Clean Water Act section 404(c) with regard to the potential Pebble Mine? Not at this time. EPA is not taking a preemptive action on the potential Pebble Mine or preparing a position on any future action."

276. On or about March 30, 2011, EPA Administrator Jackson attended an anti-Pebble Mine fundraiser at the Supreme Court.

277. On or about April 6, 2011, EPA's Parkin emailed Parker, copying North, Steiner-Riley, Szerlog, Fordham, Smith, and Holsman regarding Tribal representatives on the IGTT.

278. On or about April 7, 2011, North emailed James McGoodwin at the University of Colorado regarding research on water quality and fisheries. In that email, he stated: "If no mines are developed the price of Bristol Bay salmon may be buoyed by the regions image. It is

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 69

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 71 of 138

the last place in North America with historic levels of wild salmon with no hatchery influences. I am sure that can be marketed. Another unique feature of the bay is that it may be the world's last strong hold of 'salmon people'. . . . So even though other Alaska Native people may identify with salmon (Kena'itze, Alutiiq, Eyak, Tlingit, Haida), their existence is more intertwined with western culture so as to make them not dependent on salmon in the same way as Bristol Bay people. This is a significant consideration for us."

279. On or about April 11, 2011, Jonas Kron of Trillium Asset Management Corp. emailed EPA's Dunbar, and stated: "Please find attached a letter from investors representing over $170 billion in assets urging EPA to initiate a 404(c) review of the proposed Pebble Mine in Bristol Bay, Alaska. We will be delivering the letter to Administrator Jackson tomorrow and issuing a press release as well." Dunbar then forwarded the letter to EPA's Parkin, Steiner-Riley, McLerran, Eckman, and Smith, and stated: "Rick – let's talk about scheduling this call with these folks." McLerran then forwarded the email to EPA's Sussman, Stoner, and Seth Oster. Stoner then forwarded the email to EPA's Keehner and Peck.

280. On or about April 13, 2011, Parker forwarded Parkin's email regarding nominations for Tribal representatives to the IGTT, copying Parkin, to Bobby Andrew, one of the Anti-Mine Coalition activists, to say that he understood that Luki Akelkok, another Anti-Mine Coalition activist, would nominate Andrew for the IGTT. Also identified in the email is the fact that the nomination to the IGTT of anti-mine activist Jack Hobson also appears to have been arranged for by Parker. Andrew said that he looked forward to working with Hobson.

281. On or about April 14, 2011, Andrew emailed EPA's Parkin, copying Anti-Mine Coalition activists Akelkok and Richard King regarding his nomination. Parkin responded to thank Andrew for his willingness to assist with the Watershed Assessment. Parkin stated that

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 70

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 72 of 138

EPA had quite a number of nominees and that Parkin would work with Fordham to notify the selected nominees. Andrew became a member of the IGTT, along with Hobson.

282. On or about April 16, 2011, North emailed EPA's Frithsen, and provided his "Draft Outline for Bristol Bay Watershed Assessment meetings" slated for early May. This would serve as the guide for the constitution of the BBWA drafting team and serve as the agenda for the discussions on the direction of the Watershed Assessment, as well as the IGTT. The copy produced by EPA is redacted in its entirety.

283. On or about April 18, 2011, Frithsen sent the draft outline to EPA's Kate Schofield and Glenn Suter, who would serve as the principal editors of the BBWA, for the "kick off meeting" in Anchorage. The copy produced by EPA is redacted in its entirety.

284. On or about April 18, 2011, North emailed Frithsen, Parkin and Hough a draft agenda for the May 17, 18 and 19, 2011, kick off meetings. The copy produced by EPA is redacted in its entirety.

285. On or about April 19, 2011, Frithsen emailed EPA's Schofield, Suter, Wigington, Smilak, and Fontaine the "Bristol Bay Assessment: Draft agenda for May 17, 18 and 19 meeting in Anchorage." The copy produced by EPA is redacted in its entirety.

286. On or about May 3, 2011, EPA's Fordham emailed Anti-Mine Coalition Tribal activists Andrew, King, Akelkok, and Kimberly Williams to inform them of the plans for the upcoming June 3, 2011, meetings with EPA leaders to be held in Alaska. Fordham indicated that she was withholding information, apparently to ensure that only informed Anti-Mine Coalition members would be able to attend to meet with EPA leaders: "I wanted to let you know about the plans for Friday. EPA and ADNR will be holding the Mining Information session on Friday June 3rd at the BBNA Head Start building (830-5). Friday morning the EPA folks will be

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 71

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 73 of 138

stopping in Dillingham for a short time slot on our Mining Information session. They will have from 1030AM-12PM to hold a listening session on the Bristol Bay Watershed Assessment. So, whoever plans on being at the Mining Information session with Patty, ADNR, and myself will have an opportunity to meet with the EPA leaders. . . . I wanted to make sure you knew of their plans. I am getting together and [sic] email with a flyer that I want to make sure gets around. We have an ad that is going in the Bristol Bay times, however I left out the piece of information about the 1030AM meeting with the EPA leaders, only because I am worried about space and you just never know what the weather might do to keep the folks in Koliganek. ;) [emoticon] So, if you know of any tribal leaders who will be in town on Friday June 3rd who would want to come to the mining information session and/or stop by for the session on the Watershed Assessment with the EPA leaders please let them know."

287. On or about May 6, 2011, Fordham forwarded her May 3, 2011, email to Susan Flensburg, Environmental Program Manager for BBNA, and stated: "Just FYI - so you know the plan for Thursday. Please don't share." Flensburg responded: "Roger on that (silence mode)."

288. On or about May 10-11, 2011, David Allnutt, Acting Directing of EPA's Alaska Operations Office and a supervising attorney in the Region 10 office, presented, along with Fordham, to a meeting sponsored by the ENGO River Management Society on "EPA's Bristol Bay Watershed Assessment and Tribal Outreach Efforts."

289. On or about May 20, 2011, Chambers (CSP2) emailed North with the Subject "PLP Water Quality Data Assessment." The message stated that the included scientific analysis ("Critique of PLP water quality data_Zamzow_20110520.pdf") was "a report done by Kendra Zamzow assessing the water quality data made public by PLP." North responded: "Is all the Pebble data included somewhere in this document?" Chambers responded: "No – that will be in

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 72

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 74 of 138

a separate document, and it's not quite ready yet." North responded: "OK. Thanks for Kendra's paper. I sent it to [DOI's] Bob Seal, [and EPA's] Jeff Frithsen, Patty [McGrath] and a few others."

290.    On or about May 25, 2011, North emailed Tom Crafford of the Alaska Department of Natural Resources, and stated: "Your question about contractors was forwarded to me. We are contracting with NatureServe. They are out of Virginia. They have an arrangement with the Heritage Programs around the country for subcontracting. The Alaska Natural Heritage Program, at UAA, decided to pass this subcontract off to ENRI, also at UAA, because they have more fish and stream ecology expertise. ENRI is also engaging anthropologists (Alan Boraas and Katherine KNott [sic]) at the Kenai River Campus and Kachemak Bay Campus, and maybe Gunnar Knapp at ISER. There are also a couple of people outside of UAA who have particular expertise that are acting as consultants. I believe they are Mike Wiedmer, a retired ADFG employee who is currently studying non-salmon freshwater fish of Bristol Bay, and Chris Frissell, who is an expert on the interaction of roads and streams. Chris works at the Pacific Rivers Council."

291.    Boraas authored Appendix D to the BBWA; Wiedmer was an Author of the BBWA; and Knott, Knapp, and Frissell were Contributors to the BBWA.

292.    On or about May 26, 2011, North emailed CSP2's Chambers and asked whether Chambers knew of any mines in the United States which use a concentrate slurry pipeline so that North could research the CERCLA database for spill information he could use.

293.    On or about May 27, 2011, North emailed the group of Tribal Government Representatives selected to the IGTT to inform them that EPA was ready to convene that team.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 73

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 75 of 138

North stated: "I am EPA's lead for the technical portion of the Bristol Bay Watershed Assessment."

294.    On or about May 31, 2011, Anti-Mine Coalition member Nastri prepped EPA's McLerran for a trip to Bristol Bay, stating: "I know you will be well-briefed and prepared to answer many questions. Here are some questions though that you may be asked in your meetings." Nastri's questions included: "How long would it take to reach a 404(c) decision once the watershed assessment is complete, assuming that the assessment concludes that a 404 action is warrantable." Nastri closed by stating: "As always, please feel free to call me if I can be of any assistance. Wish I could be there with you!" McLerran responded: "Thanks Wayne. This is helpful for our presentation."

295.    On or about June 14, 2011, EPA's David Evans emailed EPA's Peck, Hough, Stoner, and others to report on that day's briefing of staff from the Senate Appropriations Committee on Section 404, including historical use cases of Section 404(c).

296.    On or about July 15, 2011, Allison Granell emailed EPA's Parkin to follow up on a July 14, 2011, meeting and ask Parkin about a map he had provided. Granell stated: "It was nice to meet you yesterday, and thanks again for providing the map of where EPA will be conducting their assessment. . . . I want to make sure our map is as accurate as possible before we publish the newsletter." Granell publishes the "Pebble Watch" newsletter, which is the newsletter from BBNC – one of the Anti-Mine Coalition groups represented by Peter Van Tuyn.

297.    Embedded in that July 15, 2011, email from Granell is an email from EPA Regional Director McLerran, stating: "Bob, Nancy and Denise: I thought you would like to take a look at the PDF of the newsletter from the Bristol Bay Native Corporation. It is very well

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 74

done." That email touting the BBNC newsletter appears to have been directed to either Bob Sussman or Perciasepe, Nancy Stoner, and Denise Keehner, Director of OWOW.

298. On or about July 18, 2011, Anti-Mine Scientist David Albert emailed North, Frithsen, Suter, Hough, and Robert Seal of DOI/U.S. Geological Survey, to provide TNC's "Water Quality Report and Appendices." Albert stated: "Hi Phil and team, I am pleased to submit this TNC report 'Investigations of Surface Water Quality in the Nushagak, Kvichak and Chulitna watersheds in Southwest Alaska' for your review and to support EPA's ongoing effort in the Bristol Bay Watershed Assessment."

299. On or about August 1, 2011, BBNA's Susan Flensburg emailed North to send "all but two of the subsistence studies . . . you're looking for."

300. On or about August 9-10, 2011, EPA's Bristol Bay Watershed Assessment IGTT met in Anchorage, Alaska to discuss the planned BBWA. According to the agenda, EPA's Parkin, Eckman, Smith, Fordham, Frithsen, and Schofield ran the meetings. In addition, the "Overview of key assessment topics – EPA Technical Team" was presented by core Anti-Mine Coalition members and Anti-Mine Scientists, including: "Fisheries – Dan Rinella; Traditional Ecological Knowledge/Culture – Catherine Knott; Economics – Gunnar Knapp; Wildlife – Ann Rappoport; Potential Development – Phil North; and Overview of Conceptual Diagrams and Assessment Effort – Jeff Frithsen, technical team."

301. According to the declaration of Lisa Reimers, a resident of the Village of Iliamna and a member of the IGTT, which declaration was submitted in the ongoing case of *Pebble Limited Partnership v. EPA*, Case No. 3:14-cv-00097-HRH (D. Ak.), the IGTT meeting included "mostly anti-Pebble participants," and during that meeting, "EPA described the worst-possible mining scenarios."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 75

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 77 of 138

302.     On or about August 12, 2011, North emailed 12 of the 14 EPA Authors of the BBWA and six of the 13 EPA Contributors to the BBWA.  North stated in the clearest possible terms what had been the pre-ordained intention of the EPA-Anti-Mine Coalition all along, and what the BBWA, through its Authors, was supposed to achieve:  "Bristol Bay was identified in ANILCA [Alaska National Interest Lands Conservation Act] as being worth specific mention and negotiation between the state and federal governments for conservation 'to conserve the fish and wildlife and other natural and cultural resources within the region'.  I bring this to your attention to demonstrate that there has been exceptional effort (legislation passed) to achieve these ends in the past.  The intention of a 404(c) is not without precedent."

303.     North's statement to the BBWA Authors came at the same time that the Draft assessment approach and conceptual models were being finalized to guide the BBWA drafting, and a full two and a half years before the January 2014 final BBWA and February 2014 issuance of EPA's *Notice of Intent to Issue a 404(c) Determination.*

304.     On or about August 16, 2011, North emailed BBNA's Flensburg and stated that he would forward to Anti-Mine Scientists and Anti-Mine Assessment Team members Dave Athons and Alan Boraas the subsistence studies that she had provided at North's request.  In response, Flensburg thanked North for letting her stay at North's house.

305.     Athons and Boraas authored Appendix A to the BBWA and are both listed as Contributors to the overall BBWA report.

306.     On or about August 16, 2011, "billy@curyungtribe.com" (likely, Billy Maines) responded to EPA's Fordham, and stated:  "I wanted to follow up on our phone conversations.  I told you that Curyung [one of the petitioning Tribes] was very interested in participating in the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 76

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 78 of 138

TEK interviews and you mentioned that you would forward our interests on to Alan Boraas & Catherine Knott." Fordham then emailed Boraas, copying North and Knott.

307. On or about August 17, 2011, BBRSDA's Waldrop sent North an article on "Lifespan of Tailings Dam." North responded: "Thanks Bob. This is timely."

308. On or about August 17, 2011, Parker emailed North with a link to an article on "Long-Term Stability of Closed Mine Tailings Piles: How So At Pebble?" North responded: "Bob [Waldrop] sent it. I am requesting the article he cited from the R10 library."

309. On or about August 17, 2011, Allison Granell emailed EPA's Parkin and stated: "I wanted to touch base with you and say thanks again for your help with my questions regarding a map of the area EPA is focusing for the watershed assessment. Attached is the [BBNC] Pebble Watch newsletter that came out in July. All of our newsletters are available on www.PebbleWatch.com."

310. On or about August 18, 2011, Parkin forwarded the BBNC newsletter and email to EPA's Judy Smith, Eckman, Holsman, North, Dunbar, Szerlog, Fordham, McLerran, Kate Kelly and Michelle Pirzadeh – four Authors and one Contributor to the BBWA.

311. Within minutes, McLerran forwarded the newsletter and email to EPA's Sussman, Stoner and Keehner, copying Parkin.

312. On or about August 22, 2011, Trefon Angasan of the South Naknek Tribal Council, emailed EPA's Smith and Eckman with comments on the presentations made at the August 9-10, 2011, IGTT meeting. Angasan's conclusions based on his attendance at the meetings included:

      a.    "It is my firm belief that the presentations by the EPA clearly intended to depict the Pebble Prospect as a direct threat to the salmon in Bristol Bay. They drew conclusions

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 77

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 79 of 138

about the impact that mining had on water without any regard for the safeguards that the Pebble

Partnership may use to protect the environment."

        b.      "[EPA] recognized that although the Pebble application was not yet

submitted for permitting, they noted that all mines had the same characteristics and that they had

a good idea about the level of impact."

        c.      "During the one and one half day planning session conducted by the EPA,

it became very obvious that the EPA intended to steer the BBA to achieve a certain outcome."

        d.      "The charts used by the EPA team listed the entire BB Watershed and its

production of salmon intended to depict the Pebble Prospect as a threat to the entire Bristol Bay

salmon population."

        e.      "EPA intends to have an unbiased scientific peer review panel of their

report before it goes to public comment in the fall of 2012. They stated that the panelists will be

selected by an independent party but they will retain the right to preempt any of the nominees to

the peer review panel. I have two concerns about this: a) if the independent panel is selected by

the EPA, then it is a certainty that the panelists will have the same zero tolerance for

development in the wetland areas as they do and b) the EPA intends to retain the right to preempt

any nominee that is presented by the 'independent review panel', this assures that the EPA will

steer the panelists to achieve the EPA objective to have no development in Bristol Bay."

      313.    On or about August 23, 2011, Parker emailed North regarding "Intergovernmental

Technical Team – Pathway Charts" and stated: "I don't see dust from open pit mining in the

charts. I believe there would be about 50,000 explosions per year. I'd check out the dust

containment provisions [sic] either the NDM feasibility report of a few months ago, or the 2006

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 78

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 80 of 138

applications or similar sources." Parker then forwarded this email to EPA's Parkin in response to an email with the subject "Comment on IGTT Charts."

314. On or about August 23, 2011, Parker emailed North regarding "economic power point to IGTT," and stated: "The portion of the economic power point that focuses on commercial fisheries focuses on the Kvichak and Nushagak. I understand why. But in doing so, it might be useful to address, in some manner, the potential impacts that might occur on other (mixed stock) BB commercial fisheries if a stock in the Kvichak or Nushagak gets listed under the ESA." Parker then forwarded this email to Parkin.

315. North and Parkin were thus passing government strategy documents designed to guide the Draft Assessment to Parker for review, and consulting on scientific issues to inform their analysis of the Pathway Charts, and, ultimately, the BBWA.

316. On or about August 31, 2011, Anti-Mine Scientist and former EPA scientist Yocom emailed to EPA's Hough a January 31, 2011 document – Plaintiff's Findings of Fact – from the *Nunamta Aukulestai v. Alaska Dept. of Natural Resources and Pebble Limited Partnership* litigation. Given what Yocom says in his email – "Here you go." – it is clear Hough had requested these "findings" regarding alleged adverse effects.

317. BBRSDA's Waldrop was counsel to ENGO Nunamta Aukulestai in suits to halt Pebble Mine, and Anti-Mine Coalition Tribal activists Bobby Andrews and Luki Akelkok both served as directors on that ENGO.

318. In August 2011, according to EPA's website, the "Draft assessment approach and conceptual models" were presented to the IGTT.

319. On or about September 11, 2011, Parker sent a memo to EPA's North and Hough following up on their solicitation of his views on implementing 404(c). The memo was entitled

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 79

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 81 of 138

"Assuming that EPA makes a 404(c) determination regarding the Kvichak and Nushagak drainages, what can make it stable under future federal administrations?" Parker stated: "Thank you for asking for my thoughts on what might help a 404(c) determination to be relatively stable over subsequent administrations." The memo indicates that the question EPA raised to Parker was not whether to veto the Pebble project, but how to bind future administrations that might have different views about the Section 404(c) veto.

320. Parker proposed governmental purchase of the mining claims as a permanent solution, and recommended seven steps for EPA to take. EPA in fact has pursued several of them, including incorporating "traditional ecological knowledge," and obtaining "strong statements of support by NPS, FWS, NMFS, and other federal agencies." Parker also recommended steps by EPA that could come later, including "prohibiting perpetual care" and "asserting that 'high standards' are necessary." Parker had previously recommended to EPA that it address "potential impacts on subsistence . . . ." Parker concluded his memo by re-emphasizing the need for the Section 404(c) veto to last until "government eventually purchases the mining claims." He concluded: "Otherwise, as long as there is a need for these minerals, and if they can be economically developed, then a modification or rescission of a 404(c) determination seems inevitable at some point, in the near to distant future, to let Pebble and similar proposed metallic sulfide mines to proceed to permitting. In that event, the development of the claims will likely be permitted."

321. On September 22, 2011, Parker sent an email to EPA's Hough with two memos attached: Parker's draft "History of Conservation and Land Use Planning Efforts in the Kvichak and Nushagak Drainages," and what appears to be a September 12, 2011, revision of his legal memo "Assuming that EPA makes a 404(c) determination regarding the Kvichak and Nushagak

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 80

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 82 of 138

drainages, what can make it stable under future federal administrations?", in which he outlined "Nine actions that EPA or other federal agencies might take that could enhance stability of a 404(c) determination."

322. With regard to Parker's draft "History," this document was clearly written in collaboration with EPA. Parker stated: "Draft of history needs work where there is yellow highlighting. I'll put cited records on PDF as attachments." In the document, Parker put comments for Hough and North concerning technical issues ("(I assume EPA can map by township and range . . .)") as well as legal issues ("I have yet to find a record that expressly states the purpose of this classification and segregation order.").

323. Parker's email to Hough with the in-progress draft of the "History" and the legal memo ("Memo to Hough, North re stability suggestions") was a forwarded message that Parker had earlier sent, on September 21, 2011, to "Phil and Amanda [North's wife]" at North's home email address.

324. Using North's home email address to communicate privately kept the communication out of official government channels and out of the documents that, by law, the Agency must preserve with the National Archives and Records Administration. Were it not for the fact that the email was forwarded to Hough, this evidence of coordination with the Anti-Mine Coalition in developing EPA policy, ultimately espoused in the BBWA, would not have been uncovered. EPA has not produced North's home email address emails in response to Plaintiff's FOIA.

325. On or about October 4, 2011, EPA's Sussman was the chair of a meeting with other EPA officials and Mike Kowalski, CEO of Tiffany & Co., Jason Metrokin, CEO of BBNC, Chris Wood, CEO of TU, Jonas Kron, Vice President of Trillium Asset Management, Nastri, and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 81

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 83 of 138

two others from Nastri's company. The rationale for the meeting was: "These CEOs are working with EPA, DOI and other federal agencies to protect the Bristol Bay fisheries and its people through preemptive use of Clean Water Act Section 404(c) authority."

326. On or about October 6, 2011, EPA's Parkin emailed Marcus Geist of The Nature Conservancy and stated: "I work for EPA Region 10 in Seattle. I am the Management lead for our Bristol Bay Watershed Assessment. I am trying to track down information on the Humble and Big Chunk Prospects. Mike Wiedmer gave me your name and cc'd you on his recent message to me. Information is scarce on the Web. I do have a call into DNR but that may take a while. Do you have information that you can easily share? We are interested in the exact location, any maps showing the streams in the area, access to water use permits and exploration permits (and applications), geology, size of the claims, etc. If you would like to discuss this give me a call at the number below or I will be happy to call you if you send me your number." Geist responded: "It was good to speak with you earlier today. Here are some maps showing mining claims and temporary water use permits which are two of our best indicators of potential mining activity and actual exploration (water for the drill rigs). As I mentioned on the telephone I will send you a DVD with these data compiled as an ArcReader project."

327. On or about October 11, 2011, Parkin forwarded Geist's TNC materials to six people: four EPA Authors of the BBWA – North, Suter, Eckman, and Frithsen – and two EPA Contributors – Smith and Hough.

328. On or about October 20, 2011, Rebecca Shaftel of University Alaska Anchorage emailed Chambers (CSP2), copying North, with the subject "Pebble Tailings Dam Volumes." She stated: "I am working with Phil North on EPA's watershed assessment for Bristol Bay. We have been using GIS to estimate volumes for tailings ponds near the mine site that could hold the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 82

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 84 of 138

published tons of ore . . . . Do you have any suggestions given our methodology? It would be especially helpful if you might direct us to a better estimate for the ore density from one of Pebble's published documents."

329.    On or about November 1, 2011, Chambers responded to Shaftel, copying North, and stated: "I don't place much confidence in the development schemes put forward in [PLP's] Wardrop report," and instead steered her to his own analysis to use as the basis for their scientific conclusions: "We did this estimate (see attached file "Mine Area Calculations – Sky Truth Sep10) before the Wardrop report was available." On information and belief, EPA did not produce the document Chambers sent in response to Plaintiff's FOIA.

330.    On or about November 3, 2011, Shaftel emailed Chambers, copying North, and stated: "Thank you for providing me with such a thorough answer. Phil or I will be in touch if we have questions."

331.    On or about November 17, 2011, Anti-Mine Scientist and Anti-Mine Assessment Team member Cameron Wobus of Stratus Consulting presented a paper on "Hydrologic Issues Related to the Pebble Project, Alaska" at EPA Headquarters to OWOW. The presentation stated: "Models such as MODFLOW may not simulate coupled SW-GW [surface water-ground water] interactions realistically / Need to evaluate mine impacts in a fully coupled system." The presentation concluded: "Site geology is very 'leaky' . . . Difficult to contain mining wastes."

332.    Wobus is one of the scientists whose work was relied on in the 1st and 2nd external drafts of the BBWA. The references to his work were ultimately removed from the final version because it was co-authored with Ann Maest, whose employer – also Stratus Consulting – disavowed her work when she admitted to taking part in preparing a falsified report concerning

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 83

Case 3:14-cv-00171-HRH    Document 1    Filed 09/03/14    Page 85 of 138

environmental damages in a case against Chevron. However, the conclusion from Wobus's work – *i.e.*, "leaky" geology at the Pebble Mine area – remained in the BBWA.

333.    On or about November 23, 2011, EPA's Hough emailed EPA's Butler, Dunbar, Steiner-Riley, North, Allnutt, Hunter, Suter, Kader, Dean, Karp, Frithsen, Thomas, Wigington, McCarthy, Schofield, Holsman, Thiesing, Szerlog, Fertik, Parkin, Eckman, Fordham, and Anti-Mine Scientist/Anti-Mine Assessment Team member Athons. The email, with the subject "Advance copy of TU/WSC bristol bay report for your review," stated: "BB Team: Trout Unlimited and the Wild Salmon Center have prepared a report entitled: Bristol Bay's Wild Salmon Ecosystem and the Pebble Mine: Key Considerations for a Large-scale Mine Proposal. They will be formally releasing this report in the coming weeks but have shared the attached advance embargoed copy of the report with EPA." The report was not released to the public until February 8, 2012.

334.    The "embargoed" report concludes: "Pebble Mine—and the regional mining district it promotes—presents a serious and potentially catastrophic threat to the continued health of Bristol Bay's aquatic and terrestrial habitats and to the region's world-class salmon fisheries."

335.    EPA's Hough, a listed Contributor to the BBWA, sent the secret report to 25 people – 21 of whom were specifically identified in the BBWA: 10 listed Authors, three listed Contributors, two listed Reviewers of Internal Review Drafts, five who were acknowledged "for their efforts in developing, completing, and releasing this assessment," and Athons, a listed Contributor and also an author of an Appendix to the BBWA.

336.    On or about November 28, 2011, TU's Brown emailed EPA's Hough regarding the embargoed TU/WSC report, and stated: "I would like to share a copy of this report with you

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 84

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 86 of 138

and your team. The report is final but we plan to release it to the public at a later date so we ask that you not discuss it with members of the press until that time."

337. On or about December 6, 2011, BBNC's Jason Metrokin emailed EPA's Fordham and Parkin a copy of a letter from Alaska Federation of Natives President, Julie Kitka, sent to President Obama pertaining to subsistence resources.

338. On or about December 7, 2011, EPA's Parkin forwarded the Kitka letter to North, Frithsen, Hough, Eckman, Suter, Fordham, Smith, and Anti-Mine Scientist/Anti-Mine Assessment Team member Alan Boraas, who would later write an Appendix to the BBWA.

339. On or about December 7, 2011, Hough emailed numerous people at EPA, including substantially all of the EPA and outside BBWA Authors, to coordinate the logistics for a December 9, 2011 "Q&A with authors of Wild Salmon Center/Trout Unlimited (TU) Bristol Bay report." This was the secret embargoed report provided by TU to EPA. The agenda states that following an oral overview of the report, it would be opened up to questions from "EPA's Bristol Bay team." On hand to answer the questions were: Brown, Nastri, Chambers, Woody, Mark Trenholm (Wild Salmon Center) and Robert Hughes (Oregon State University).

340. By the end of 2011, the Anti-Mine Coalition FAC and the Anti-Mine Scientists FAC were both firmly entrenched at EPA, providing advice and recommendations on a regular basis on Section 404(c) strategy and implementation, science, and the direction of the BBWA.

341. In addition, by this point, EPA had established the Anti-Mine Assessment Team FAC to draft the BBWA, the document necessary to EPA's realization of its Section 404(c) strategy.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 85

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 87 of 138

### 5. EPA's Collaboration With Pebble Mine Opponents: 2012

342.    On or about January 5, 2012, Parkin emailed North, Hough, Szerlog, Thiesing, Frithsen, Dean, Eckman, Suter, and McLerran with the subject "Mining the Pebble Deposit by Bill Riley and Tom Yocom," and stated: "We received this document in paper format yesterday from TU, BBNC and Wayne Nastri. I had it scanned and attach it below for your review. It is very pertinent to discussions about use of 404(c)." Parkin attached Riley and Yocom's report "Mining the Pebble Deposit: Issues of 404 compliance and unacceptable environmental impact." Anti-Mine Scientists Riley and Yocom were former EPA scientists.

343.    On or about January 10, 2012, FWS's Mari Reeves emailed FWS's Brna, Verbrugge, Rappoport and others regarding the Pebble Project Environmental Baseline Studies Agency Meetings, at which PLP's scientists would be providing their analysis of data concerning the Pebble Mine project. Reeves stated: "Hi Phil - I think it could be useful to have a contaminants person at these meetings. The [PLP meetings] I've been to before were quite a dog and pony show with no small amount of obfuscation on the water quality front - which is really where the rubber meets the road with the Pebble Project."

344.    Verbrugge, along with Brna, were the two FWS Contributors to the BBWA.

345.    On or about January 13, 2012, the Bristol Bay Watershed Assessment Team's IGTT presented its update. The PowerPoint presentation stated that the "Purpose of the Assessment [is] [t]o inform a decision on whether to initiate an Advance 404(c) action or take other actions," and stated that "To initiate an Advance 404(c) EPA's assessment would need to provide: Evidence supporting determination of unacceptable adverse effects ('significant loss of or damage to fisheries')."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 86

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 88 of 138

346.    EPA's Frithsen presented the section of the IGTT report on what the Watershed Assessment would include:

a.    "Generalized plausible mining scenario used to identify sources and stressors for assessment";

b.    "Assessment will consider local-scale impacts of hypothetical mine footprint and larger-scale impacts (cumulative impacts) of mining operations and associated development";

c.    "Assessment will include qualitative discussion of how endpoints of interest are vulnerable to large scale mining development";

d.    "Large-scale development will destroy streams, and therefore salmon habitat, covered by the footprint of mining operations";

e.    "Cumulative impacts: More mines, means larger cumulative footprint, means more stream miles/area eliminated";

f.    "Review of historical impacts of mining suggests that large-scale mining is unlikely to have no environmental impacts. Assessment of historical impacts limited due to paucity of monitoring data"; and,

g.    "Large-scale mining development potentially will have one or more of the following impacts: Reduction in subsistence foods and/or access to these foods; Increased outmigration; Increased reliance on public assistance; Decreased cultural cohesion; Decreased nutrition and increased health effects; Perception that critical resource is contaminated."

h.    EPA's North also presented a section and asserted about the nature of the Watershed Assessment:  "What it is not:  A description of any specific mine."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 87

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 89 of 138

347. North's statement about what the BBWA was allegedly *not* was made by him notwithstanding the numerous times he has said that the BBWA *is* "of course" about Pebble.

348. Notwithstanding that the BBWA is based entirely on a hypothetical mine employing, in EPA's estimation, a "generalized, plausible mining scenario," EPA has relied on it to veto, specifically, Pebble Mine.

349. So sure was EPA of being able to railroad the BBWA, especially given the utilization of the resources of the Anti-Mine Coalition/Scientists/Assessment Team, and so hurried was EPA to complete the Watershed Assessment in order to then launch the Section 404(c) action, while affording the absolute minimum of time for opponents to respond, the IGTT presentation concluded with a timetable that would prove to be more than two years too ambitious: "Late January 2012 Public nomination of Scientific Peer Reviewers / Late April 2012 Draft Assessment Released / May – June 2012 Public Comment Period and community meetings / August 2012 Scientific Peer Review Panel Meeting / Fall 2012 Final Watershed Assessment Released."

350. At this same time, EPA coordination with the three FACs ramped up to make sure that EPA had the "science" it needed in the BBWA to support the Agency's predetermined result.

351. On or about January 20, 2012, Nastri emailed Bill Dunbar, EPA Region 10 Policy Advisor, to set up a technical briefing with EPA, BBNC, and TU on February 2 or 3, 2012, for "staff involved with the Bristol Bay Watershed Assessment and to answer questions about the Riley/Yocom [TU] report: Mining the Pebble Deposit: Issues of 404 compliance and unacceptable environmental impacts. . . ." Nastri stated: "Attending on behalf of BBNC and TU would be Tiel Smith, Peter Van Tuyn, Shoren Brown and myself. Bill Reilly [sic] would also

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 88

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 90 of 138

perform the actual technical briefing in combination with Tom Yocom. We anticipate one hour

to perform the briefing and answer technical questions. We would then request a smaller

meeting with yourself and Dennis McLerran to discuss our upcoming efforts and activities

related to completion of the Watershed Assessment."

352. EPA's Parkin and Dunbar then exchanged emails about scheduling, with Parkin

stating "I will make it work for my schedule."

353. On or about January 22, 2012, Rebecca Bernard, an attorney with Peter Van

Tuyn's firm, which represents BBNC, emailed EPA attorney Steiner-Riley to provide legal

analysis. The paper was entitled: "Must the Public Pay Miners Not To Pollute? A Takings

Analysis of a Proactive 404(c) Action in Bristol Bay, Alaska." The paper states: "Bessenyey &

Van Tuyn provides legal counsel to Bristol Bay Native Corporation on matters related to

responsible development in Bristol Bay." Bernard stated: "I am attaching (in PDF format) the

latest draft of a paper I've written that analyzes the potential takings implications of a proactive

(advance) 404(c) action in Bristol Bay. I hope that you will have a chance to review this

sometime in the near future, and that we can try again to connect by phone to discuss this issue."

354. Bernard's work is cited multiple times as authority in support of Appendix J to the

final BBWA.

355. On or about January 27, 2012, FWS's Reeves emailed Verbrugge again regarding

the Pebble Project Environmental Baseline Studies Agency Meetings. She stated: "The sulfide

ores and acid generation potential there are a big deal. You will be onto them, but no one else

there probably will be, because no one who is not working for Pebble has the chemistry

background to interpret the data and their eyes glaze over when they start showing graphs about

acid neutralization potential and all that . . . . And they are working it as a snow job, because no-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 89

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 91 of 138

one understands what they are talking about when they present the data. . . . I feel like that

consciousness raising is our role here."

356.    On or about January 30, 2012, EPA's Dunbar emailed Parkin regarding the

BBNC/TU briefings, and stated: "I . . . don't think it's necessary to hold up a briefing of the

team for Dennis's schedule . . . in other words, let's get the team briefed by Riley and Yokum

[sic], and we'll find time for Dennis to get a briefing that week if it works."

357.    On or about February 1, 2012, Carol Ann Woody emailed North, Brna and Dan

Young of the National Park Service to discuss "PLP water flow section" and assumptions in the

data regarding water flow.

358.    On or about February 2, 2012, Woody emailed North, Brna, Dan Young, and Tim

Baker of the Alaska Department of Fish and Game, and attached a research paper critiquing the

Physical Habitat Simulation Model entitled: "Comparison of Mesohabsim With Two

Microhabitat Models (PHABSIM and HARPHA)."

359.    On or about February 2, 2012, EPA's Matthew Magorrian emailed Dunbar and

Parkin and stated: "To just wrap this email up - I have Feb 14 at 9am held for a meeting with

Wayne Nastri and crew and the RA." Parkin then forwarded the meeting to EPA's Frithsen who

sent an email "to the assessment team" to set up its meeting with Anti-Mine Scientists Riley and

Yocom on February 14, 2012.

360.    On or about February 2, 2012, Nastri emailed EPA's Parkin, copying Dunbar, and

stated: "Bill Dunbar suggested I contact you directly concerning arranging a technical briefing

for your Watershed Assessment team by Bill Reilly [sic] and Tom Yocom. I understand that

your team is available February 14th at 9:00 am. I also understand that Dennis McLerran could

participate for a portion of that meeting. We hope that our technical team can provide a brief

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 90

Case 3:14-cv-00171-HRH    Document 1    Filed 09/03/14    Page 92 of 138

presentation of their report (15-20 minutes) and then answer questions and engage in a discussion with the team. Attending the meeting on our behalf will be Bill Reilly [sic] and Tom Yocom. In addition, Tiel Smith of BBNC, Shoren Brown of TU, and Peter Van Tuyn, outside counsel to BBNC will also participate."

361. On or about February 2, 2012, Yocom emailed EPA's McLerran, copying Brown, Nastri, and Tiel Smith, and stated: "Thank you for the opportunity last week for Bill Riley and I to brief you and your staff about our December 2011 report assessing whether mining the Pebble ore deposit in the Bristol Bay watershed would comply with Clean Water Act Section 404 regulations or result in unacceptable impacts on fish and wildlife resources. We did our best to share our collective views on these Questions based on our decades of work at EPA on these very issues. . . . During the briefing we were asked about the geographic scope of our recommended restriction on 404 discharges of Pebble deposit mine waste . . . . We believe the restrictions on Pebble deposit mine waste should apply to such habitat throughout the Bristol Bay watershed. As you may know, our report defined the 'Pebble deposit' as the proposed Pebble Project ore body as well as the much larger surrounding region of adjacent claims."

362. On information and belief, EPA adopted Riley and Yocom's advice and recommendation on the geographic scope of Section 404(c) restrictions.

363. On or about February 6, 2012, FWS's Verbrugge emailed Anti-Mine Scientist Zamzow regarding the Pebble Project Environmental Baseline Studies Agency Meetings, and stated: "I was at the Pebble meetings last week, and can give you an update when you have time."

364. On or about February 8, 2012, Trout Unlimited released its "Bristol Bay's Wild Salmon Ecosystem and the Pebble Mine: Key Considerations for a Large-scale Mine Proposal"

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 91

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 93 of 138

report – two and a half months after giving EPA exclusive, embargoed access. This delay allowed TU and Wild Salmon Center time to coordinate with EPA on the conclusion that Pebble Mine "presents a serious and potentially catastrophic threat" without any public scrutiny, transparency, or opportunity for counter-response. The agreement between EPA and TU/WSC to keep the data secret came to light only because of Plaintiff's FOIA request.

365. On or about February 9, 2012, FWS's Mark Lisac emailed FWS's Verbrugge, forwarding the TU/WSC report. Lisac then also forwarded five scientific papers to Verbrugge.

366. On or about February 14, 2012, Parker emailed EPA's Hough, Parkin, and North advising on "how to speed up the current process for the watershed assessment and any 404(c) determination." Hough wrote back: "We appreciate your thoughts regarding the schedule for our watershed assessment and any potential future actions. We will take these under advisement."

367. On or about February 14, 2012, the Riley-Yocom report was presented to key EPA personnel who were drafting the BBWA. The report entitled "Mining the Pebble Deposit: Issues of 404 compliance and unacceptable environmental impacts" stated: "The Bristol Bay Native Corporation and Trout Unlimited asked the authors of this report to assess the potential threats posed by mining the Pebble deposit, the largest known ore body in those headwaters, and to assess applicability of CWA authorities to reduce or eliminate those potential threats to Bristol Bay fisheries and associated resources. . . . [We conclude] that existing plans could not be permitted because of impacts to salmon habitat, likely toxicity to aquatic life and the likely need to treat in perpetuity seepage and runoff from mine-related dredged and/or fill material. We conclude that from a regulatory standpoint these impacts should be considered environmentally unacceptable, particularly when compared with the impacts that have led EPA to initiate 404(c)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 92

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 94 of 138

actions in the past. . . . [We then propose restrictions that are] rooted in well-established precedents and long-standing practices and policies within the CWA 404 program . . . . Asserting these restrictions proactively furthers the goals of the Clean Water Act . . . ."

368.    On or about February 17, 2012, Parker emailed Hough to coordinate on the timing of the Section 404(c) proceeding, and stated: "I'd like to discuss what I sent and what EPA feels it has committed to in terms of schedule."

369.    On February 24, 2012, EPA posted a request for nominations for qualified experts to be considered for the external peer review panel to review the forthcoming drafts of the BBWA.

370.    On or about March 8, 2012, EPA's Sussman, Senior Advisor to the Administrator, chaired a meeting at EPA Headquarters of Deputy Administrator Bob Perciasepe, Assistant Administrator Michelle DePass, Acting Assistant Administrator Nancy Stoner, and Pirzadeh, along with Anti-Mine Coalition members, Bobby Andrew, Chair, Ekwok Tribal Council, Jason Metrokin (CEO, BBNC), Tiel Smith (BBNC), Brown (TU), Peter Van Tuyn (counsel to BBNC), and Nastri.  The agenda included an "Overview of 2010-2012 actions related to Bristol Bay and EPA, including Congressional Outreach, Executive Branch Outreach, Stakeholder Mobilization (sportsmen, faith and natives)" and "Technical Support."  Also included was "Timing Issues associated with completion of the Watershed Assessment" and "Next Steps."  On information and belief, EPA has not produced the documents referenced in the agenda in response to Plaintiff's FOIA.

371.    The rationale, as stated in the agenda for this meeting, sums up the culmination of efforts by the EPA collaboration with the three FACs to bring the BBWA and Section 404(c) proceeding to fruition:  "BBNC and TU have [] commissioned technical experts to provide

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 93

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 95 of 138

scientific data and expert opinions to EPA in preparation of the Bristol Bay Watershed Assessment. EPA's watershed assessment is nearing completion and timing for any subsequent actions will be critical."

372.    On or about March 9, 2012, Nastri emailed Sussman again confirming that EPA was utilizing the Anti-Mine Coalition as a FAC, stating: "Thank you for taking the time to meet with representatives of the Bristol Bay Native Association, Bristol Bay Native Corporation and Trout Unlimited yesterday afternoon. . . . We will continue to work to support the Agency's effort by providing technical information, where possible and appropriate, and through our continued outreach to local state and federal stakeholders. We will also continue to keep you apprised of our efforts." Sussman affirmed, stating: "Wayne. Pleasure to work with you on this."

373.    On or about April 2, 2012, TNC's Marcus Geist sent EPA's North, Suter, Schofield, and Eckman – all BBWA Authors and, in the case of North, Suter and Schofield, also editors of the BBWA – links to the "Integrated database from The Nature Conservancy." This appears to be the data promised by TNC's Geist on October 6, 2011, or additional data following that exchange.

374.    On or about April 10, 2012, Parker sent North, Steiner-Riley, and Hough a Parker's new law review article: "I hope you and others in EPA will find the attached law review article helpful. It is titled: 'Section 404(c) of the Clean Water Act and the History of State and Federal Efforts to Conserve the Kvichak and Nushagak Drainages of Alaska.' I am the author. Please feel free to copy, distribute or use as you and others see fit." Steiner-Riley responded: "Thanks, Jeff!"

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 94

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 96 of 138

375.    EPA officials themselves distributed announcements for Trout Unlimited and other ENGOs.  For example, on April 12, 2012, Hough emailed a long list of EPA officials with an "Updated letter from Sportsmen for Bristol Bay" supporting the Section 404(c) action.

376.    On or about April 13, 2012, EPA's Judy Smith emailed all or virtually all of the EPA BBWA Authors and numerous Contributors, as well as numerous outside Anti-Mine Coalition members, to announce the Alaska Conservation Foundation ("ACF") briefing on April 18, 2012.  The topic was a "Discussion about coordinated science research related to fisheries of Bristol Bay and their relation to the [Bristol Bay Assessment]."  The briefing featured Anti-Mine Coalition members and Anti-Mine Scientists Brown (TU), Peter Van Tuyn (counsel to BBNC), Sam Snyder (ACF), Nastri (consultant to TU and BBNC), Zamzow (CSP2), Maest (Stratus Consulting), Wobus (Stratus Consulting), Chambers (CSP2), Higman (CSP2/Ground Truth Trekking), Woody (Fisheries Research and Consulting), and Sarah O'Neal (Fisheries Research and Consulting).

377.    On or about April 13, 2012, EPA's Smith emailed Mariah Oxford of Bristol Industries LLC, the publisher of BBNC's "Pebble Watch" newsletter, and stated:  "Have I missed the Pebble Watch deadline?"  Oxford had asked Smith for information on the release date of the draft BBWA.  Smith responded to tip off Oxford to the timing of the release:  "Unfortunately I won't have a firm release date for the assessment until Tuesday afternoon.  If you are going to publication before then, the safest way to say it is 'early May.'  (If I was a betting person, I would say May 7, but it isn't a sure thing yet)," as well as to dates for upcoming EPA meetings in Alaska.  Oxford responded to say that they would hold off on printing to await confirmation and that:  "We discussed the importance of having those dates in print directly to the shareholders, especially for those who don't go online - so please let me know tomorrow if

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA*, *et al.*, Case No. _____
Page 95
Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 97 of 138

you think they won't be solidified."  Smith responded: "Unfortunately, I don't have the confirmation yet to go ahead and put specific meeting dates and locations down in print."  Thus EPA was giving advance notice to an Anti-Mine Coalition publication of inside EPA information.  By contrast, EPA withheld information from Plaintiff, including regarding the Tribes' Section 404(c) petition.

378.    On or about April 16, 2012, Scott Fraser of EPA's Office of Public Engagement thanked EPA officials for participation in an ENGO event that day and told EPA headquarters staff: "Tomorrow, the sportsmen are hosting a reception at the Hart Senate Office Building (Room 902) and you are welcome to attend (no RSVP is required.)"  As an April 10, 2012, email from Brown had made clear, this was an anti-Pebble Mine event to "talk with prominent Bristol Bay stakeholders from across the country as you learn about the fight to protect Bristol Bay, Alaska and America's hunting and fishing legacy."

379.    On or about April 16, 2012, EPA's Hough emailed the "Bristol Bay Team" – North, Parkin, Eckman, Suter, Schofield, Frithsen, Fordham, Stoner, Steiner-Riley, Szerlog, *et al*. – to report glowingly on yet another one-sided event featuring EPA's Anti-Mine Coalition partners, as well as, this time, Administrator Lisa Jackson.  Hough stated: "Bristol Bay Team: This morning over 40 reps from sporting groups and businesses from AK and the rest of the country . . . met with Administrator Jackson to discuss the value of Bristol Bay's fishery, particularly its sport fishery, and their desire that EPA take steps to protect this resource from the potential adverse impacts of large-scale mining proposed for the region (i.e., Pebble Mine).  Speakers included: Chris Wood, President and CEO of Trout Unlimited (TU); Michael Gehrke, VP, The Benenson Group; Jason Metrokin, President and CEO of Bristol Bay Native

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 96

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 98 of 138

Corporation (BBNC); and Whit Fosburgh, President and CEO of the Theodore Roosevelt Conservation Partnership."

380. Hough went on to cite highlighted anti-mine polling data presented by BBNC and BBNA, which data and press releases he circulated to the group. Hough concluded: "The Administrator thanked the group for its support for EPA's ongoing BB assessment, for highlighting the value of the Bristol Bay fishery, and for highlighting that protecting this fishery is an issue of great importance not only to Alaskans but to folks all across the country."

381. On or about April 18, 2012, the Alaska Conservation Foundation briefing announced by EPA's Judy Smith on April 13, 2012, took place with EPA and FWS.

382. On May 25, 2012, EPA publicly released the 1st external review Draft of the BBWA – "*An Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay, Alaska.*"

383. On or about May 31, 2012, EPA's Frithsen emailed North, outside scientist Rinella, and others to identify the 12 Peer Review Panel members assessing the BBWA.

384. On or about June 2, 2012, North forwarded Frithsen's email to North's home "Phil and Amanda" e-mail address – an address from which emails have not been produced by EPA in response to Plaintiff's FOIA requests.

385. On or about June 5, 2012, EPA's Kader sent the EPA announcement of the peer review panel to the "EPA Bristol Bay" mailing list. Parker responded back to Kader, Parkin, McLerran, Steiner-Riley and North to point out a certain apparent typo: "Oops. See 3rd Paragraph: 'absence of an appearance of a lack of impartiality'."

386. On or about June 26, 2012, ACF's Snyder emailed EPA's Hough with the subject "More EBD Review White Papers." Snyder stated: "I hope this email finds you doing well. I

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 97

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 99 of 138

have attached two more EBD review white papers: seismic and hydrology. These got a bit delayed due to Watershed Assessment review work. We have two more on the way: Water Quality, Fisheries Escapement and PHABSIM. I should have the first two to you by the end of the week." Hough then forwarded the white papers to all or virtually all of the BBWA authors, including outside Author and Contributor Dave Athons. Hough stated: "Attached are two more white papers prepared by the AK Conservation Foundation regarding the PLP EBD. These two papers deal with seismic and hydrology issues."

387.    On or about June 27, 2012, North emailed Anti-Mine Scientist Higman (CSP2/Ground Truth Trekking ) to point out seismicity data for review. Higman advised: "Really the EPA should rely on Koehler's 2011 pub where he clearly states we don't know what the situation is in this area." He then counseled: "The review of the braid-scarp doesn't need to come in here at all. This is one tiny spot in a huge landscape, and it's not a fault (and was never reported to be a fault, though I did write a preliminary report identifying it as a possible fault)."

388.    Higman then followed up further to North and stated: "In the short term (before the comment deadline), I could produce an extremely short 'preliminary field report' that summarized my primary lines of evidence. I could reference that in my comments, and include the report as well. Given this report would not have gone through formal peer-review, would it be of any use to the EPA?" North responded: "We have used some information that was not peer reviewed, including something from you and Dave Chambers, as well as PLP and NDM. We would consider it in the particular context that we might want to use it and make a decision. Then we would qualify our use of the material. So please attach it so that we can at least consider the information."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 98

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 100 of 138

389. On or about August 6, 2012, TU sent more anti-mine news to unidentified individuals at EPA.

390. On or about August 7-9, 2012, a 3-day External Peer Review Meeting for the 1st Draft of the BBWA was held in Anchorage, Alaska. The first day of the meeting was spent hearing testimony from members of the public. Peer reviewers deliberated on the second and third days of the meeting. Out of that meeting, Peer Reviewer Charles Slaughter stated that "statistical probabilities that were assigned to various [EPA mine] scenarios" were "hogwash," and Peer Reviewer Dirk van Zyl stated: "it is impossible to know whether the hypothetical mine scenario is realistic" and, therefore, it is "not sufficient for the assessment."

391. Public speakers at the August 7, 2012, meeting included Anti-Mine Scientists and cited authorities in the BBWA Maest, Chambers, Albert, O'Neal, Zamzow, Woody, and Anti-Mine Coalition members Parker, Tilden, Troll, William Riley (BBNC), Joseph Chythlook (BBNC), Seth Kruse (BBNC), and Nelli Williams (TU).

392. On or about September 14, 2012, Clara Trefon, Administrator of the Nondalton Tribal Council, one of the six Section 404(c) petitioning Tribes, forwarded to North a letter she had sent to John Shively, PLP CEO. North then forwarded the letter to EPA's Parkin, Eckman, and Dianne Soderlund.

393. On or about September 17, 2012, the external Peer Reviewers submitted their written comments to EPA in their Final Peer Review Meeting Summary Report for the May 2012 1st external draft of the BBWA. Peer reviewers stated: "the Assessment does not support such an action [404(c)] and that EPA should defer any regulatory decision until a permit application for a specific mine project has been submitted and a thorough study of potential

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 99

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 101 of 138

impacts has been completed, as part of an Environmental Impact Statement required under the National Environmental Policy Act."

394.    On or about September 20-21, 2012, EPA's Watershed Assessment Mining Workgroup met.  The Workgroup was a subgroup of EPA's Bristol Bay Assessment Team working on the BBWA.  On September 27, 2012, EPA's Frithsen circulated the notes from that meeting to the "Bristol Bay Assessment Team," including its six outside BBWA Authors:  Blair (ICF International), Grismala (ICF International), Rice (ICF International), Seville (ICF International), Rinella (University of Alaska Anchorage), and Wiedmer (Malma Consulting), as well as Chip McConnaha of ICF International.  The copy of the six pages of notes from the meeting produced by EPA in response to Plaintiff's FOIA requests are redacted in their entirety.

395.    On or about October 18, 2012, Frithsen emailed the full BBWA Assessment Team, including the six outside members, regarding the project schedule and deadlines.  He stated that the schedule to complete the report was "challenging; however, we have assembled a great team" and "have the full and complete backing of our management[.]"

396.    On or about October 18, 2012, North emailed Frithsen and stated:  "I would like to be on the editorial team to review the document for consistency throughout between 11/9 and 12/5."  Frithsen responded, copying Suter and Schofield, and stated:  "OK – you're on. However, Glenn [Suter] and Kate [Schofield] has [sic] the lead[.]"  North responded:  "Yes, I was expecting that any edits I did would go to Glenn and Kate for their discretion."

397.    On or about October 24, 2012, North emailed EPA's Szerlog, and stated:  "I will be here working on revisions to the BBA . . . .  The great majority of my time is spent on the BBA.  I am co-lead (with Barb [Butler]) for revising the old Chapter 4 and writing the new Chapter 6.  I am also responsible for keeping the mine scenario team on task and for managing

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 100

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 102 of 138

responses the the [sic] 400+ public comments that relate to the mine scenario. I will be a final editor once the whole thing is put together, though Glenn and Kate are the principle [sic] editors."

398.    Chapter 6 of the BBWA is critical section of the report in which the hypothetical mine scenarios devised by North are set out to "benchmark potential risks resulting from this type of development, to provide decision makers with a better understanding of potential risks associated with any specific action proposed in the future." BBWA at 6-1.

399.    On or about October 25, 2012, North emailed EPA's Schofield and Hough to provide a link to CSP2 reports for their use in drafting and editing of the BBWA. North stated: "All of these can be found on the CSP2 site: http://www.csp2.org/reports.htm. Chambers and Higman. 2011. Long term risk of tailings dam failure. Levit and Cahmbers [sic]. 2012. Comparison of the Pebble Mine with other Alaska large hard rock mines. Steve Blodgett, M.S. and James R. Kuipers, P.E. 2002. Technical Report on Underground Hard-Rock Mining: Subsidence and Hydrologic Environmental Impacts." Schofield, one of the principal editors of the BBWA, responded: "Hi Phil - I couldn't find the Levit & Chambers on the CSP2 site. Could you email it to me? Thanks!"

400.    On or about October 25, 2012, Bonnie Gestring of Earthworks emailed EPA's Hough and Schofield with the subject "two presentations that might be of use in Pebble analysis." Gestring stated: "I thought these two presentations might be of interest to you as you consider the potential for various failure modes at Pebble. . . . Both have excellent photos and make excellent points about the inadequacy of industry norms in relation to climate change. Things to keep in mind when thinking of storing billions of tons of mine waste in watershed." Hough forwarded the reports to Schofield, Frithsen and Aicher – three BBWA Authors, stating:

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 101

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 103 of 138

"These are interesting presentations. Can you share them with the right folks on the team." Frithsen forwarded the reports to Suter, North and outside Author and Anti-Mine Assessment Team member Grismala.

401.    On or about October 25, 2012, EPA's Hough emailed all or virtually all of the BBWA Authors, and stated: "BB Team: The Center for Science in Public Participation [CSP2] has just posted some new documents to its website that the team may find of interest. These three documents provide a critique of PLP White Papers 1, 2 and 3 (listed below) that were submitted by PLP to EPA during the draft BBA comment period. These critiques of the PLP white papers were provided to the peer review committee organized by Keystone. The critiques can be found at: http://www.csp2.org/reports.htm."

402.    Thus, EPA was relying on Anti-Mine Scientists CSP2's patently biased "critiques" of PLP's data in drafting the BBWA.

403.    On or about November 13, 2012, North emailed Anti-Mine Scientist Jim Kuipers and stated: "This is a reminder to see if you have a means for me (or you if you prefer) to contact Steven Vick for the paper he gave at the Tailings Conference in Keystone, CO, last month. According to Jack Caldwell's blog the paper was about the inevitability of failures at tailings dams. As you might guess such a paper is of interest to me as we consider whether to take an action in Bristol Bay. Any help is appreciated."

404.    Kuipers is one of the scientists whose work was relied on in the 1st and 2nd external drafts of the BBWA. The references to his work were ultimately removed from the final version because it was co-authored with Ann Maest, whose employer, Stratus Consulting, disavowed her work when she admitted to taking part in preparing a falsified report concerning environmental damages in a case against Chevron.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 102

405.     On or about November 16, 2012, North emailed Kuipers again about the Steven Vick paper.

406.     On or about November 25, 2012, Kuipers responded to North to make his anti-Pebble Mine bias clear: "What Steve has always tried to get folks to understand is that accidents aren't entirely preventable, particularly when you look at things from a statistical probability standpoint (even with the best of practice and intent, failures can still happen because we can't predict nor build for all potential events). One way to prevent adverse consequences is simply to not build high risk structures (e.g. tailings dams) in places where the consequences of a total failure cannot be tolerated (e.g. Bristol Bay). I have huge respect for him - he's one of the very few industry stalwarts who calls a spade a spade and doesn't accept industry's usual BS excuses."

407.     On or about November 26, 2012, North responded confirming Kuipers's bias and looking for scientific work product to fit EPA's pre-ordained outcome. North stated: "I know scepticism [sic] exists in the industry concerning tailings dams, but little of it seems to be published in the industry or scientific literature. Jack Caldwell is a critic, as are you and Steven Vick. I cited Vick's book on subjective probability (which you suggested that I read) in the Bristol Bay assessment. It would be helpful to get more citable information discussing the risks associated with dams."

408.     On or about December 21, 2012, EPA's Hough forwarded an email ACF's Snyder to all or virtually all of the BBWA authors, and stated: "The AK Conservation Foundation had a number of scientists review and provide comments on the Sept Peer Review Report. Attached below are the comments provided by these scientists." The attached reports "reviewing" the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 103

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 105 of 138

external, independent peer reviews conducted by the expert panel of the draft BBWA were from: Maest, O'Neal, Zamzow, Chambers, and Wobus.

409.    Thus, EPA was relying on Anti-Mine Scientists ACF's patently biased "critiques" of the external independent Peer Reviewers in drafting the BBWA.

410.    The Anti-Mine Scientists' reviews provided advice and recommendations for revision to the BBWA.  For example, Maest's review from Stratus Consulting stated: "Catastrophic failures.  Two catastrophic failures are described in Sections 6.1 (tailings dam failure) and 6.2 (pipeline failure) of the draft Watershed Assessment.  Those descriptions could be moved into the new section describing catastrophic failures in the final report."

411.    Also, Chambers' review from CSP2 stated:  "Although the release mechanisms for the Clark Fork and Coeur d'Alene Rivers are different than for a tailings dam failure, the issue at hand is not the release mechanism, but: (1) how the material released affected aquatic organisms in the river; and, (2) how difficult, and whether, a cleanup of this released material was possible.  The examples utilized in the Watershed Assessment address these critical issues, and to ignore the lessons available from these examples, even though the release mechanism is different, would be irresponsible."

412.    Less than four months later, Maest would file a declaration in which she admitted to taking part in preparing a falsified environmental damages assessment used by the plaintiffs in the Chevron case referenced above.  Maest confirmed that she and Stratus Consulting ghost wrote a report used by plaintiffs and that the report did not account for remediation that she was aware of.  Maest stated:  "For all of my reports and testimony, I based my opinions and conclusions on a series of assumptions and data provided to me by [plaintiffs' counsel and plaintiffs] that I do not know to be true.  In addition, I now believe that the damages assessment

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 104

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 106 of 138

in the [expert's reports] is tainted. . . . I deeply regret that I allowed myself to be used in the Lago Agrio Litigation in the way that I was . . . ."

**6.    EPA's Collaboration With Pebble Mine Opponents:  2013**

413.    On or about February 7, 2013, EPA's Eckman emailed North, Hough, Frithsen, Dean, Fordham, Parkin, Steiner-Riley and the outside BBWA Authors to identify chapter leads for the BBWA.  Not only were North, Parkin, and Frithsen authors of the BBWA, but chapter leads as well.

414.    Other members of the Anti-Mine Coalition/Anti-Mine Scientists/Anti-Mine Assessment Team FACs who were BBWA Authors and/or Contributors included:  Rinella (Appendix A and Team Leader for Appendix G); Athons (Appendix A); Rebecca Shaftel (Appendix A and cited in Chapter 9); Wiedmer (Appendix B); and Alan Boraas (Appendix D); as well as FWS's Brna (Appendix C).

415.    Appendices A, B, C, D, G, and J relied on the work, *inter alia*, of Carol Ann Woody.  In 2009, Steve Klosiewski, Deputy Assistant Regional Director for Fisheries and Ecological Services at FWS, told FWS's John DeLapp:  "I hope that we haven't been providing funds to Carol Woody."

416.    Since at least December 2010, Rinella had been collaborating with North.

417.    Since at least September 14, 2009, Wiedmer had been collaborating with EPA/FWS, including presenting to FWS officials while sponsored by The Nature Conservancy.

418.    Since at least 2009, Brna had been collaborating with North and making statements such as "This is going to happen and it's going to get bloody.  I am looking forward to it!"

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 105

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 107 of 138

419. Since at least April 2007, Boraas had been an active opponent of the Pebble Mine project, when he was described as "a frequent op-ed contributor to the Anchorage Daily News. One of his targets for criticism is the Pebble copper project in southwest Alaska." He also presented work he undertook for the Watershed Assessment at various anti-Pebble Mine forums.

420. The CSP2 website poignantly summed up the role of the anti-mine FACs collaborating with EPA on the BBWA as part of its Section 404(c) strategy: "Since 2007, CSP2 has been providing technical support to a loose coalition of groups opposed to the proposed [Pebble] mine. Dave Chambers, (general mining), Kendra Zamzow, (geochemistry), and Stu Levit, (reclamation and regulatory), have provided support from CSP2. CSP2 also utilized consultants Carol Ann Woody, Ph.D., and Sarah O'Neal, M.S., from Fisheries Research and Consulting to provide support on fisheries biology, and Ann Maest, Ph.D., and Cam Wobus, Ph.D., from Stratus Consulting to provide technical support on geochemistry and hydrology. Bretwood Higman, Ph.D., from Ground Truth Trekking provided fault and seismic research. . . . EPA released its Draft 'Bristol Bay Watershed Assessment' in May, 2012. This is a significant scientific effort to evaluate the potential impacts of the Pebble mine on the Bristol Bay ecosystem. Dave Chambers and Kendra Zamzow provided technical critiques of the Draft to EPA with recommendations for improvement. CSP2 is also working with the Bristol Bay Native Corporation [Peter Van Tuyn, *et al.*] in its effort to convince EPA to invoke its power under section 404(c) of the Clean Water Act to veto the Pebble Project because it would have an 'unacceptable adverse effect' on fisheries resources in the Bristol Bay region."

421. On February 15, 2013, EPA Administrator Jackson resigned from her post and Bob Perciasepe was named Acting Administrator in addition to his Deputy Administrator role.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 106

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 108 of 138

422.     On or about March 8, 2013, EPA's McLerran and Dunbar were scheduled to meet with Brown and Nastri.

423.     On or about March 14, 2013, EPA's Hough emailed 47 colleagues at EPA to invite them to a March 19, 2013, briefing on an economic analysis of the value of Bristol Bay Fishery presented by commercial fishermen from Bristol Bay.  Hough stated: "BB team: . . . . Authors of the report would like to brief EPA's BB [Bristol Bay] team members on this report on Tuesday 3/19 at 11 AM ET.  Reps for the commercial fisherman said they would provide us with an embargoed copy of this new report in advance of our meeting, which I will pass along to you."

424.     Of those 47 EPA officials, every one of the 14 EPA Authors of the BBWA was included, as well as the six outside BBWA authors, and 22 others were EPA Contributors, Reviewers of Internal Review Drafts, or were acknowledged in the BBWA "for their efforts in developing, completing, and releasing this assessment."

425.     On or about March 22, 2013, Carol Ann Woody emailed North and Brna, copying CSP2's Chambers, to give them a copy of the Coho salmon study results she presented at the SWIM meeting Dillingham.  Woody stated: "Comments criticism welcome.  Please forward to any other potentially interested agency (e.g., NOAA & EPA) types."  Woody's signature block indicated that she was working for CSP2 (with Chambers, Zamzow, *et al.*) at that point.  North forwarded the email to EPA's Ebersole, Schofield and Suter – each an Author of the BBWA.  Ebersole responded to North:  "Very interesting – thanks!"

426.     On April 30, 2013, EPA issued the 2nd external review Draft of the BBWA – "*An Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay, Alaska.*"

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 107

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 109 of 138

427.    On April 30, 2013, according to EPA's letter to NARA regarding "lost" emails, North retired from EPA.

428.    Though never formally announced, following the issuance of the 1st external draft of the BBWA, EPA convened peer reviews of seven reports written by the Anti-Mine Scientists whose work EPA wanted to use in the final BBWA.  EPA commissioned the peer reviews to ensure the reports were of "sufficient scientific quality and credibility" to be incorporated into the BBWA.  EPA wrote that "[o]ther nongovernmental organizations have collected data specific to the Pebble deposit site.  USEPA subjected some of these documents to external peer review before incorporating this information into the assessment."  BBWA at 2-3.

429.    The seven studies featured significantly in the April 2013 2nd external draft of the BBWA, with a total of approximately 45 direct citations.

430.    These reports were:  (i) "U.S. Copper Porphyry Mines Report: The Track Record of Water Control Quality Impacts Resulting from Pipeline Spills, Tailings Failures, and Water Collection and Treatment Failure" (Bonnie Gestring / Reviewed by David Chambers 2012); (ii) "Comparison of the Pebble Mine with Other Alaska Large Hard Rock Mines" (Levit, Chambers 2012); (iii) "Long Term Risks of Tailing Dam Failure" (Chambers, Higman 2011); (iv) "Fish Surveys in Headwater Streams of the Nushagak and Kvichak River Drainages Bristol Bay, Alaska, 2008-2010" (Woody, O'Neal 2010); (v) "Groundwater as Essential Salmon Habitat in Nushagak and Kvichak River Headwaters: Issues Relative to Mining" (Woody, Higman 2011); (vi) "Potential Hydrologic and Water Quality Alternation from Large-scale Mining of the Pebble Deposit in Bristol Bay, Alaska: Results from an Integrated Hydrologic Model of a Preliminary Mine Design" (Wobus, Maest 2012); and (vii) "Comparison of Predicted and Actual Water Quality at Hardrock Mines" (Kuipers, Maest 2006).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 108

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 110 of 138

431. The external Peer Reviewers identified numerous instances of overt bias in the selected studies from the authors of the seven reports. In addition, the seven reports were criticized for using limited data, faulty methodologies, and unsupported findings. Sample comments for each of the reports indicated:

a. "Because of the lack of statistical proof that the core findings of their presentation are representative for all past and future mines, the value of this report for the EPA assessment is questionable." (Christian Wolkersdorfer);

b. "I find the report, by its nature, to be very biased. . . . While it is appropriate to consider potential environmental issues and problems associated with mining when making a decision with respect to Bristol Bay, such decisions should be made based on the site-specific conditions, along with appropriate risk management analysis." (Robert Kleinmann);

c. "'Without ongoing active management, these changes in streamflow and water quality would likely result in adverse effects on aquatic biota, ranging from reductions in habitat quantity and quality to acute or chronic toxicity to aquatic organisms.' This statement is from the Conclusion section (page 39). Presumably, this is a reference to salmonid habitat, but habitat was not included in the modelling effort. None of these observations are defended in the report and suggest a lack of objectivity. This lack of objectivity tempers the study results and leaves me questioning other results." (Thomas Meixner);

d. "It seems that the whole point of this report was to emphasize how much more threatening Pebble project's impact would be to the environment overall and to the fisheries in particular. Therefore, the report lacks impartiality. . . . I remain suspicious as to soundness of the conclusions presented in this report. While I do not doubt discovery facts

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 109

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 111 of 138

presented in this report, I am suspicious of what the authors chose not to mention in order to maintain their perception of the Pebble mine threats." (Natalia Ruppert);

      e.      "Although the report has no results and conclusions, it is clearly intended to convince the reader that the Pebble Mine should not be permitted to operate . . . I feel that all comparisons were drawn to support authors' statement that the Pebble project poses greater threat than the other mines. No fair discussion was given on similarities between Pebble and other projects, and how these threats were mitigated." (Robert Kleinmann);

      f.      "This report does not determine mine impacts as stated in the Preface. . . . The conclusions of the report are meagerly supported by the evidence provided." (William J. Wilson);

      g.      "The conclusions in this report, however, are not supported by the information provided. This report strays from the purpose as outlined in the title to a series of hypothetical and often random statements about mining impacts, concluding that a specific development, the Pebble Prospect, has the potential to "significantly impact" fish without providing in this report data or information on the mine development plan, locations of specific mine facilities, mitigation measures to be employed, and many other unknowns." (William J. Wilson).

432.     For one study in particular ("Groundwater as Essential Salmon Habitat in Nushagak and Kvichak River Headwaters: Issues Relative to Mining" (Woody and Higman 2011)), the report describes findings from a one-day survey of streams in the project area, indicating the poor scientific foundation for and bias of this work.

433.     In the Final BBWA, EPA continued to rely on five of the seven selected peer reviewed reports. The two it dropped were Wobus and Kuipers (Paragraph 430(vi), (vii)), but

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 110

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 112 of 138

only because a principal co-author of those reports was Ann Maest, whose work had been disavowed by her employer, Stratus Consulting, after she admitted to taking part in preparing a falsified report concerning environmental damages in a case against Chevron.

434.    EPA continued to use the other five anti-mine reports even after their obvious biases were pointed out to the Agency both by commenters and by EPA's own Peer Reviewers.

435.    In April 2013, the external Peer Reviewers were asked to conduct a follow-on review to evaluate whether the April 2013 draft BBWA was responsive to their original comments.  EPA provided reviewers with a draft response to comments document, in which EPA responses to peer review comments on the May 2012 draft BBWA were added to the Final Peer Review Meeting Summary Report.  In the follow-on review, Peer Reviewers were asked to go through their comments on the May 2012 draft BBWA, review EPA's draft responses to their original comments – which were formulated in part by the Anti-Mine Scientists in the Fall of 2012 -- and evaluate whether the Peer Reviewers' original review comments had been addressed sufficiently, and whether appropriate changes had been incorporated into the April 2013 draft BBWA.  EPA received these follow-on review comments back from the 12 Peer Reviewers in August to September 2013.

436.    On or about June 20, 2013, EPA's Dunbar was scheduled to meet with TU's Brown to discuss "Bristol Bay process."

437.    On or about June 27, 2013, Parker sent EPA's McLerran his analysis of Appendix J to the Assessment and of EPA's ability to invoke Section Rule 404(c).  Parker stated: "In these comments, I will focus on (1) suggestions to improve Appendix J on compensatory mitigation, and (2) prohibitions and restrictions implied by the assessment for purposes of § 404(c) of the Clean Water Act."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 111

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 113 of 138

438.    On July 19, 2013, EPA Administrator McCarthy was sworn in, and Perciasepe resumed his role as Deputy Administrator.

439.    On or about September 16, 2013, Nastri emailed EPA's Arvin Ganesen, copying, McLerran, and stated: "It was great talking with you this morning.  As we discussed, I'm attaching our October 8-10 (whatever time is convenient for the Administrator) meeting request with the Administrator.  Although we were not able to meet separately with the Administrator on her recent Alaskan trip, we did discuss meeting with her in DC.  Regional Administrator McClerran [sic] and the Administrator were both supportive of meeting separately in DC and we hope to formally introduce Bristol Bay United to the Administrator and discuss our organization, along with our goals and objectives, relative to EPA's Watershed Assessment and potential future action."

440.    The purpose of the Bristol Bay United meeting was identified as:  "Discuss Finalization of Bristol Bay Watershed Assessment and Importance of Timely 404(c) Action." Further, it stated:  "Coalition members have worked with EPA management and staff for the last few years on protecting the Bristol Bay Watershed.  Given recent personnel changes at EPA, Coalition members desire to meet and brief the Administrator as soon as possible on pending matters related to their request for CWA 404(c) action in Bristol Bay."

441.    BBU was another front organization for the same Anti-Mine Coalition members, led by:  Tim Bristol, Alaska State Director for TU; Jason Metrokin, CEO of BBNC; Brown of TU and Executive Director of Bristol Bay United; Waldrop, then-Executive Director of BBRSDA; Peter Van Tuyn, Counsel to BBNC; Nastri; and Sue Aspelund, then-Deputy Director in the Alaska Department of Fish & Game's (ADF&G) Division of Commercial Fisheries, who, in April 2014, replaced Waldrop as Executive Director of BBRSDA.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 112

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 114 of 138

442.     On or about September 17, 2013, Nastri emailed EPA's Dunbar his transcript corrections and response to questions following up on the August 1, 2013, House Science, Space, and Technology Committee hearing titled, "EPA's Bristol Bay Watershed Assessment – A Factual Review of a Hypothetical Scenario." Nastri stated: "I thought you might be interested in seeing my response to the House Committee on Science, Space and Technology questions. As always, feel free to call me if you have any questions or comments. Hope all is well and l look forward to seeing you soon."

443.     On or about September 26, 2013, Brown and Nastri were scheduled to meet with EPA's McLerran to "Discuss Finalization of Bristol Bay Watershed Assessment and next steps."

444.     On or about November 5, 2013, EPA's Bond emailed EPA's Ganesan, McLerran, Pirzadeh, Hough, Fertik, Kopocis, Stoner, Frithsen, and also Nastri, to arrange a December 19, 2013, meeting with "Commercial & Sports Fishermen and Native Tribal Leaders of Bristol Bay." Bond stated: "Administrator McCarthy will be dropping into the meeting for introductions with the groups."

445.     By the end of 2013, the EPA FACs had all been established and had been utilized on an ongoing basis for more than three years, meeting with EPA to provide advice and recommendations to EPA on policy, strategic, legal, and scientific consideration that EPA adopted in developing, drafting, and implementing of the Agency's Section 404(c) strategy and two drafts of the BBWA.

### 7.     EPA's Collaboration With Pebble Mine Opponents: 2014

446.     On or about January 14, 2014, EPA's Dunbar emailed Nastri, and stated: "Wayne – Thanks for the call today. Let's talk tomorrow at 8:30am. Please forward this along to Shoren

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 113

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 115 of 138

and Jason [Metrokin]." Nastri forwarded the email and stated: "We are having a call tomorrow morning with [McLerran and Dunbar] at 8:30am."

447. On information and belief, Regional Administrator McLerran and Senior Policy Advisor Dunbar spoke with Nastri, Brown, and Metrokin on January 15, 2014, to be brief them in advance of that day's release by the EPA of the final BBWA.

448. On January 15, 2014, EPA issued the final BBWA – "*An Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay, Alaska.*"

449. On February 28, 2014, EPA Region 10, under McLerran's signature, issued to Pebble Partnership, USACE, and the State of Alaska the Agency's *Intent to Issue Notice of Proposed Determination under 404(c)*, announcing EPA's decision to undertake the Section 404(c) veto for discharges of dredged or fill material associated with mining the Pebble Deposit.

450. In the Agency's *Intent to Issue Notice*, EPA made clear that the supporting basis for its Section 404(c) action was the BBWA: "The EPA recently published its final report entitled 'Assessment of Potential Mining impacts on Salmon Ecosystems of Bristol Bay, Alaska.' This ecological risk assessment, which was subject to extensive peer review and public comment, describes the significant ecological resources of the region and potential impacts to salmon and other fish from large-scale porphyry copper mining. The Assessment identifies extensive direct and indirect impacts to valuable fishery areas that would result from large scale mining of the Pebble deposit. The Assessment estimates that discharges of dredged or fill material associated with the footprint of a large-scale mine would likely cause irreversible loss of significant reaches of streams that support salmon and other important species of resident and anadromous fish, as well as extensive areas of wetlands, ponds and lakes in the headwaters of three sub-watersheds at the deposit site (North and South Fork Koktuli and Upper Talarik

Creek). The majority of streams that would be destroyed are headwater streams that provide habitat for fish and together with their associated wetlands serve a critical role in supporting downstream fishery areas."

451. In addition, the *Intent to Issue Notice* stated: "You may submit information for the record to demonstrate that no unacceptable adverse effects to aquatic resources would result from discharges associated with mining the Pebble deposit or that actions could be taken to prevent unacceptable adverse effects to waters from such mining. The section 404(c) regulations provide 15 days for responding to this letter, but a reasonable extension can be provided."

452. Thus, after spending years collaborating with the anti-mine FACs to prepare develop and implement EPA's Section 404(c) strategy and craft the BBWA, EPA put the onus on Plaintiff to "demonstrate that no unacceptable adverse effects to aquatic resources would result from discharges associated with mining the Pebble deposit," and to do so in 15 days, even before a mine proposal has been fully designed, engineered, and proposed to the Army Corps.

453. In fact, by EPA's own admission, the BBWA was never intended as a decision document for regulatory action, in part because it assesses only speculative mine development scenarios – conceived by EPA's North – rather than an actual permit proposal. *See* BBWA at 35 ("[T]his Assessment is based on available data and is intended as a background scientific document rather than a decision document.").

454. EPA responses to the Peer Reviewers also emphasized that the BBWA was insufficient to support a regulatory decision.

455. On or about June 24, 2014, EPA's John Ellis informed NARA that North's emails had been "lost."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 115

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 117 of 138

456.    On or about July 17, 2014, the Senate Environment and Public Works Committee sent a letter to David Ferriero, Archivist of the United States at NARA, and stated: "EPA belatedly reported to NARA on the loss of former EPA Region 10 ecologist Phil North's email records months after the Agency first discovered the records were missing. Mr. North's records were extensively sought after by Congressional and FOIA requestors due to his prominent role in crafting EPA's position on the Alaska-based Pebble Mine project. These Congressional requests provided ample notice to the Agency of its need to retain and preserve such records. Mr. North retired in April 2013 and has since fled the country, making him unavailable to Congress to explain the important role he played in crafting EPA's position leaving his records to speak for him. More than a year after his retirement, in an implausible turn of events, EPA has deemed a hard drive containing requested emails inoperative and records lost. These facts raise concerns that EPA did not take the appropriate steps to preserve Mr. North's records upon his departure. Accordingly, it seems your statement that the IRS 'did not follow the law' ["when it failed to report the loss of fanner Director LOIS Lerner's hard drive and the accompanying email records"] equally applies to the EPA's failure to properly preserve Mr. North's emails."

457.    On July 18, 2014, EPA Region 10 issued EPA's *Notice of Proposed Determination under 404(c)*. The *Notice* started the 60-day public comment period lasting until September 19, 2014.

458.    According to EPA's website, at the close of the public comment period, EPA will issue its Proposed Determination, followed by additional consultation if necessary, and then its Final Determination.

459.    On July 25, 2014, counsel for Plaintiff wrote EPA's McLerran to request an extension to the comment period. The letter stated: "PLP believes there is good cause for an

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 116

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 118 of 138

extension of the public comment period in this case. The Proposed Determination is an unprecedented Agency action – EPA Region 10 is proposing to restrict a disposal area before any Section 404 permit has been submitted, much less reviewed by the US Army Corps of Engineers (USACE). The fact that Region 10 has chosen to act preemptively, before a 404 permit has been filed or reviewed, also means there has been no NEPA process for this action. Thus, unlike in past 404(c) actions that came after the USACE's NEPA process, this will be the public's first and only opportunity to comment on the proposed project and Region 10's proposed restrictions thereon."

460.    On August 5, 2014, EPA denied Plaintiff's request for an extension to the comment period.

461.    EPA denied Plaintiff's request for an extension despite that EPA recognized, at least as far back as its September 8, 2010 "Bristol Bay 404(c) Discussion Matrix" that a preemptive Section 404(c) action had "[n]ever been done before in the history of the CWA," and that limiting public comment was a significant EPA concern.

462.    On information and belief, EPA continues to violate FACA through its ongoing course of conduct with the illegal FACs.

**C.      EPA Froze Out Pebble Mine Supporters And PLP's CEO John Shively**

463.    Whereas EPA Administrator Lisa Jackson attended fundraisers opposing the Pebble Mine project and met with Alaska Native representatives opposed to the Pebble Mine project on multiple occasions, she steadfastly refused to meet with Alaska Native representatives supportive of due process and a thorough analysis of Pebble Mine. Leaders from both the Alaska Peninsula Corporation and Iliamna Development Corporation – Native organizations that

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 117

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 119 of 138

have supported due process – made multiple requests to meet with Administrator Jackson and every one of them was denied.

464.     Headquarters' close relationship with project opponents continued even after Administrator Jackson was replaced by the current administrator, Gina McCarthy, who, on information and belief, attended Trout Unlimited's 2013 Annual Meeting.

465.     On September 30, 2013, Administrator McCarthy signed a letter to Plaintiff that was addressed to Plaintiff's then-Chief Executive Officer John Shively. The letter was circulated to Pebble Mine project opponents, however, before it was sent to Shively, a delay caused by the government shutdown. Although McCarthy herself may not have been responsible for this action, the fact is that EPA officials were able to deliver the letter to project opponents during the shutdown – but not to its intended recipient – is an indication of how closely other EPA officials were working with mine opponents. Because the letter was addressed only to Shively, there was no apparent reason that it should have gone to Pebble Mine project opponents at all.

466.     In addition, in contrast with how quickly and actively EPA coordinated meetings with the Anti-Mine Coalition and responded to requests to brief Anti-Mine Coalition members and Anti-Mine Scientists, EPA froze out PLP's CEO John Shively. On or about January 31, 2011, Shively wrote EPA's McLerran inquiring about the status of the Section 404(c) petitions and requesting a call. McLerran responded, copying four other top-ranked EPA officials: "I'll ask my staff to set up a call. I also plan to be at the Alaska Forum next week and perhaps we could talk there too."

467.     One week later, on February 7, 2011, Shively again wrote McLerran: "Dennis, I have not heard back from your staff on whether they want to set up a teleconference this week or a meeting. I am in Anchorage only on Friday."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 118

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 120 of 138

468.    Unbeknownst to Shively, EPA had already made an important decision about the Pebble Mine that Shively had not been told about.  On that very day, Monday, February 7, EPA would announce that it was undertaking the Bristol Bay Watershed Assessment.  The next day, Tuesday, February 8, 2010, McLerran spoke to the Forum.  In the week leading up to this announcement, EPA withheld this information from Shively.

469.    Likewise, after EPA received the Tribes' Section 404(c) petition in May 2010, Administrator Jackson withheld that information from Plaintiff.  On July 28, 2010, at EPA's request, Administrator Jackson, McLerran, and other Region 10 mining officials met with Pebble's executive leadership team.  The meeting lasted 90 minutes and EPA did not disclose that the Tribes' Section 404(c) petition to preemptively stop the project was before the Agency.  Instead, Plaintiff learned about the petition afterward from the *Los Angeles Times*.

470.    By contrast, EPA tipped off the Anti-Mine Coalition ahead of time or made sure immediately afterward to keep them apprised.

**D.      The Peer Reviewers Heavily Criticized The Major Flaws In The BBWA Notwithstanding EPA's Efforts To Manipulate The Peer Review Process**

471.    Ultimately, the product of the EPA collaboration with the anti-mine FACs was the BBWA, drafted to support the Agency's Section 404(c) strategy.  .

472.    The BBWA focused on a hypothetical mine that could never be permitted, and thus served as the straw man for the EPA and its anti-mine partners.

473.    North, one of the central EPA organizers of the anti-mine FACs, was an Author and editor of the BBWA, including co-authoring the mine design scenarios in Chapter 6 of the BBWA with EPA's Barbara Butler.  He stated that this was "one of the most contentious parts of the assessment . . . the mining scenario on which much of the determination of potential environmental harm is based."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 119

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 121 of 138

474.     Working from materials he developed and those provided by the anti-mine FACs, North and Butler created a hypothetical mine that excluded modern mine design and operating practices, and thus omitted the environmental protection and mitigation measures required for mine permitting.  So rigged, flawed, and pre-ordained were the conclusions that Dr. van Zyl, the Peer Reviewer with the most experience in mine engineering, concluded:  "[I]t is inconceivable to me that the Bristol Bay communities, the Alaska regulatory authorities as well as Federal Regulatory Authorities will not demand that the company follow 'best mining practices,' however that is defined at the time.  It is also inconceivable to me that the company will not follow 'best mining practices' in the design and development of such a mine."  *Final Peer Review Report* at 40.

475.     van Zyl also stated:  "While the failure mode is adequately described, engineering and mitigation practices are not adequately described by EPA. . . .  Any mine in Bristol Bay will have to undergo a rigorous and lengthy regulatory review and permitting process.  I do not know of a process that will exclude consideration of the impact of all mine facilities on the streams and wetlands in the region.  Therefore, I would suggest that the full implications of 'mine operations conducted according to conventional practices, including common mitigation measures, and that meet applicable criteria and standard [s]' should have been addressed in the report . . . . [According to EPA's 2003 document on Generic Ecological Assessment Endpoints for Ecological Risk Assessment] 'When damages to wetlands are unavoidable, the Corps can require permit[t]ees to provide compensatory mitigation.'  It is unclear why this was not included in the evaluations."  *Final Peer Review Report* at 48.

476.     The Peer Reviewers overwhelmingly supported van Zyl's conclusion.  For example, David Atkins stated that "[t]he Assessment also does not consider alternative

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 120

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 122 of 138

engineering strategies (so called 'best practice' approaches) that could lessen the risk of failure and possibly the necessity for perpetual management and water treatment." *Final Peer Review Report* at 13. "The Assessment describes what is considered to be conventional 'good' mining practice, but does not adequately describe and assess mitigation measures that could be required by the permitting and regulatory process. A thorough analysis of possible mitigation measures as employed for other mining projects and the likelihood that they could be successful in this environment would be necessary." *Id.* at 99.

477.    Peer Reviewer Buckley stated: "There is inadequate information on, and analysis of, potential mitigation measures at the early stages of mine development, which would attempt to reduce the impacts of mining activities on fish and water quality." *Final Peer Review Report* at 14.

478.    EPA also never attempted to quantify harm to the Bristol Bay fishery from the hypothetical mining scenario. Peer Reviewer van Zyl, an expert in mining and biogeochemistry, observed: "It is unclear to the reader how significant a loss of 87.5 km of streams in the Nushagak River and Kvichak River watersheds is to the overall ecosystem." *Final Peer Review Report* at 58.

479.    Peer Reviewer Dauble added: "What is lacking is quantitative estimates of spawning and rearing habitat that would be lost relative to the total habitat available. Having this information would help provide perspective of overall risk to individual watersheds and the Bristol Bay watershed as a whole." *Id.* at 53.

480.    EPA based the report on the environmental impacts of a mine project that included no environmental mitigation, although such protective measures are required by law. In Appendix J to the BBWA, EPA erroneously claims that there are no mitigation options within

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 121

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 123 of 138

these three watersheds that could offset impacts associated with the Pebble Mine project, in direct contradiction of many decades of documented successful mitigation practices.

481.     In support of the erroneous conclusions in Appendix J, EPA relies heavily on the work of Thomas Yocom and Rebecca Bernard.  Bernard is a lawyer representing the BBNC. Yocom is an active opponent of the Pebble Mine who authored anti-Pebble reports for BBNC and TU, including the Riley-Yocom report presented to the BBWA Authors, which concluded that Section 404(c) must be used proactively.

482.     Other ways in which the BBWA was stretched to fit the predetermined conclusion did not go unnoticed either.  For example, although the Watershed Assessment was commenced as a study of current and future potential impacts of development in the entire watershed on the salmon fishery (and other natural resources) in Bristol Bay, Alaska, it devolved into a critique of a single mining project located within only two of the nine Bristol Bay drainage areas that produce salmon.

483.     In fact, the Assessment never actually quantifies impacts on the Bristol Bay fish populations, fisheries, wildlife, or the Alaska Native cultures that rely on them, as was the Assessment's purported purpose.

484.     As explained by Peer Reviewer Atkins:  "Development of the mine as proposed would eliminate streams and wetlands in the project area permanently.  The importance of this impact is not put in context of the watershed as a whole, so it is not possible to determine the magnitude of the risk to salmon." *Final Peer Review Report* at 13.

485.     Originally, EPA proposed a watershed assessment study of the nine separate river systems that collectively comprise Bristol Bay (an area of some 42,000 square miles).  EPA subsequently narrowed its study, first, to just two of these nine river systems, then, second, only

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 122

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 124 of 138

to the impact of mining on those watersheds, then, third, only to the impact of a prospective

Pebble Mine on those watersheds. In fact, EPA policy requires that watershed assessments

evaluate the watershed as a whole, not portions of it in isolation.

486. As Peer Reviewer Dauble stated: "Although the title says 'ecosystem', one

weakness of the document continues to be the paucity of ecological information, i.e, the

ecosystem does not begin and end with salmon. . . ." *EPA Response to Peer Review Comments*

at 336. In fact, the largest potential stressor – the annual commercial harvest of 25.7 million fish

(about 70% of the annual run) – is almost entirely ignored.

487. As Peer Reviewer Paul Whitney pointed out: "The logic used here is not clear.

The logic assumes commercial fishing is sustainable and therefore has no impact on salmon or

the salmon ecosystem and therefore commercial fishing can be ignored without an adverse

consequence to the assessment. Such an assumption is not factual. Commercial fishing kills

70% of the sockeye every year. This has to have an impact on the salmon ecosystems of Bristol

Bay." *Id.* at 46.

488. Plaintiff spent roughly $150 million on independent scientists from many

different consulting firms who studied the Pebble Mine project environment. Their work

resulted in an extraordinarily comprehensive set of environmental baseline data concerning every

important aspect of the Pebble project's environment. EPA largely ignored this data despite that

it was the best and most comprehensive available.

489. In addition, the bias in the Assessment is evident from comparing its conclusions

with the body of the report. Peer Reviewer Stednick wrote: "The conclusions of the Executive

Summary are strongly worded (*e.g.*, pages ES 13 to 24), yet the uncertainties presented later in

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 123

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 125 of 138

the report make the strong conclusions tenuous. An expanded discussion of uncertainties and limitations may temper those 'conclusions.'" *Final Peer Review Report* at 19.

490. To attempt to curtail the criticism leveled by the Peer Reviewers after both the 1st and 2nd external drafts of the BBWA, EPA imposed short deadlines, limited the follow up review to evaluation only of EPA's responses to prior criticisms, and impeded interchange of views among the review panel, each in violation of EPA's own guidelines.

491. As Peer Reviewer van Zyl stated: "My comments contained above and below are based on a single review of the report, i.e. contractual time constraints were such that I could not afford a second review of the report. It is therefore possible that there are other errors remaining in the report that I did not observe in my review." *Final Peer Review Report* at 23.

492. Peer Reviewer Slaughter stated: "My 'review' of the larger main report (April 2013 BBA) was limited to checking specific points, evaluating degree of incorporation of reviewers' 2012 recommendations into the revision, and gaining an overall impression of the present state of the draft assessment. The time allotted did not permit a truly comprehensive, paragraph-by-paragraph review of that document (nor was such review requested)." *EPA Response to Peer Review Comments* at 340-41.

493. Peer Reviewer Dauble stated: "[T]he peer review panel did not receive copies of revised Appendices." *EPA Response to Peer Review Comments* at 296.

494. Peer Reviewer Stednick described the restrictive nature of the follow-on peer review: "The pay rate and estimated time to complete the review were significantly less than original estimates. A concern also shared by other external reviewers. As much as I argued that the interdisciplinary approach experienced in Anchorage produced a better document review, EPA was not interested in allowing collaboration or wanting a 'consensus' opinion . . . . The

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 124

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 126 of 138

purpose of any collaboration is to better foster interdisciplinary discussions and appreciation of alternative views, all to make a better environmental risk assessment. In my estimation, this is an opportunity lost. . . ." *EPA Response to Peer Review Comments* at 393.

495.    The Peer Review process was also managed in a way that seriously limited public input. The Open Meeting that EPA coordinated with the Peer Review panel was woefully inadequate for the level of public interest generated by the draft Assessment. Speakers were limited to three-minute presentations and were forbidden from providing written submissions. EPA also directed the Peer Reviewers to respond to a set of questions that narrowed the scope of the peer review to topics selected by the Agency.

496.    Such efforts to limit stakeholder input fly in the face of established Agency policy. EPA's Peer Review Handbook states that "[w]hen employing a public comment process as part of the peer review, Offices should provide the reviewers access to the public's comments that address scientific or technical issues." *Peer Review Handbook* § 3.3.1; *see also id.* at §§ 2.4.7, 1.5.3, 3.5.2 (echoing the obligation to provide access to significant public comments).

497.    Two days after its open meeting with the peer review panel, EPA attended and participated in a closed meeting with the Peer Reviewers, over the objection of Dr. van Zyl and other Peer Reviewers.

498.    The public was excluded from this meeting, and *ex parte* contacts between EPA and the members of an appointed Peer Review team are prohibited. Where, as here, EPA has relied on a contractor to direct an external, independent peer review: "EPA should limit direct contact to the prime contractor's designated representative and should not have general contact and direction to the contractor's staff or peer reviewers (sub-contractors)." *Peer Review Handbook* § 3.5.3(b).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 125

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 127 of 138

499. EPA pre-selected questions for the Peer Reviewers and rejected Plaintiff's attempts to broaden the inquiries.

500. In addition, peer review of the April 2013 draft BBWA was conducted in secret and clearly violated EPA Peer Review Guidelines because of the Agency's direct contact with the Peer Reviewers and the limited scope of the Peer Reviewers charge.

## CLAIMS FOR RELIEF

## COUNT ONE

### Violation of FACA and APA: Anti-Mine Coalition FAC
### (Against All Defendants)

501. Plaintiff repeats and realleges every allegation contained in Paragraphs 1 through 500 as if fully set forth herein.

502. By establishing and/or utilizing the Anti-Mine Coalition FAC and permitting it to, *inter alia*, meet and deliberate without complying with FACA, and to make recommendations, determinations of action to be taken, and policy to be expressed, with respect to matters upon which the FAC advised, Defendants have violated FACA, 5 U.S.C. App. II § 2 *et seq*.

503. In addition, by doing so, and by engaging in a pattern and practice of violating FACA, Defendants have acted and are acting in a manner that is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and/or without observance of procedure required by law in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

504. The Anti-Mine Coalition FAC was established and/or utilized by EPA to obtain policy, strategy, political, legal and/or scientific advice and/or recommendations, including but not limited to in connection with EPA's Section 404(c) action and the BBWA, which forms the basis of EPA's Section 404(c) action to block Pebble Mine. The Anti-Mine Coalition members regularly collaborated with each other to provide collective advice and recommendations to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 126

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 128 of 138

EPA. EPA organized, managed and coordinated the Coalition's input to the Agency, as well as the timing or agenda of discussions, and guided the Coalition as to the information needed by the Agency. Further, EPA used the Coalition to assist in effecting its goals by providing strategy guidance, policy recommendations, scientific advice and data, and political and public relations support all aimed at a single purpose of using Section 404(c) preemptively.

505. The Anti-Mine Coalition FAC was comprised of at least the following non-federal employees: Geoffrey ("Jeff") Parker, counsel to the six petitioning Tribes and to Robert Gillam, who provided funding to the Anti-Mine Coalition; Shoren Brown and other representatives of Trout Unlimited ("TU"); Bob Waldrop, formerly of the Bristol Bay Regional Seafood Development Association ("BBRSDA"); Rick Halford, former state legislator and anti-mine activist; David Chambers and other representatives of the Center for Science in Public Participation ("CSP2"); Wayne Nastri, former EPA official turned lobbyist; Jason Metrokin, Peter Van Tuyn, and other representatives of the Bristol Bay Native Corporation ("BBNC"); Tim Troll and other representatives of The Nature Conservancy ("TNC"); Jan Goldman-Carter and other representatives of the National Wildlife Federation ("NWF"); Susan Flensburg and other representatives of the Bristol Bay Native Association ("BBNA"); representatives of Bristol Bay United ("BBU"), a group composed of Metrokin, Brown, Waldrop, Van Tuyn and others; Lydia Olympic and other representatives of The Wilderness Society ("TWS"); Sam Snyder and other representatives of the Alaska Conservation Foundation ("ACF"); and Alaska Native Tribal members such as Tom Tilden, Bobby Andrew, and Luki Akelkok.

506. The aforementioned persons and groups worked in conjunction with EPA personnel, including, among others: North, Parkin, Fordham, Steiner-Riley, Stoner, McLerran,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 127

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 129 of 138

Pavitt, Sussman, Dunbar, Eckman, Suter, Holsman, Szerlog, McGrath, Smith, Combes, Ebersole, Fertick, Dean, and Hough.

507.    Based on its pattern and practice regarding the Pebble Mine, on information and belief, EPA has continued and intends to continue to obtain advice and recommendations from the Anti-Mine Coalition FAC regarding Pebble Mine, its ongoing Section 404(c) action, and the BBWA, without having the advisory committee comply with FACA.

508.    By violating FACA, EPA deprived Plaintiff of the benefits conferred by Congress of public involvement and transparency.  Further, EPA has irreparably harmed Plaintiff by depriving it of its rights by establishing and/or utilizing illegal Federal Advisory Committees to develop and implement its Section 404(c) strategy, including on the basis of the BBWA – itself the product of one or more illegal Federal Advisory Committees.

509.    Specifically, EPA violated FACA by establishing and/or utilizing Federal Advisory Committees:

          a.      Without a determination as a matter of formal record, by the head of the agency involved after consultation with the Administrator, with timely notice published in the Federal Register, that the Advisory Committee is in the public interest in connection with the performance of duties imposed on that agency by law;

          b.      That were not solely advisory, and which, at least, assisted in determinations of action to be taken and policy to be expressed;

          c.      That met and took action without a charter having been filed with the head of EPA and with the standing committees of the Senate and of the House of Representatives having legislative jurisdiction over EPA;

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 128

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 130 of 138

d.     Without filing a charter including, *inter alia*:  the Advisory Committee's objectives and the scope of its activity; the period of time necessary for it to carry out its purposes; a description of the duties for which it is responsible; the estimated annual operating costs in dollars and man-years for the Advisory Committee; and the estimated number and frequency of Advisory Committee meetings.

e.     With membership that was not fairly balanced in terms of the points of view represented and the functions to be performed;

f.     That provided advice and recommendations that were inappropriately influenced by the appointing authority and/or by special interests;

g.     That provided advice and recommendations that were not the result of the Advisory Committee's independent judgment;

h.     That failed to comply with requirements designed to ensure public access and participation, including providing adequate public notice of, and conducting, open meetings, and making transcripts of meetings available to the public;

i.     That did not make all documents made available to, or prepared by, the Advisory Committee publicly accessible; and,

j.     That held meetings that were not chaired and/or attended in each instance by a federal employee.

510.   Plaintiff is entitled to a declaratory judgment that Defendants violated FACA for the reasons stated herein.

511.   Plaintiff is entitled to a declaratory judgment that Defendants violated the APA for the reasons stated herein.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 129

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 131 of 138

512. In addition, because of the ongoing violations of FACA and the APA, and because of the irreparable harm suffered by Plaintiff as a result of Defendants' violations of FACA and the APA, Plaintiff is further entitled to injunctive relief as set forth below.

## COUNT TWO

### Violation of FACA and APA: Anti-Mine Scientists FAC
### (Against All Defendants)

513. Plaintiff repeats and realleges every allegation contained in Paragraphs 1 through 512 as if fully set forth herein.

514. By establishing and/or utilizing the Anti-Mine Scientists FAC and permitting it to, *inter alia*, meet and deliberate without complying with FACA, and to make recommendations, determinations of action to be taken, and policy to be expressed, with respect to matters upon which the FAC advised, Defendants have violated FACA, 5 U.S.C. App. II § 2 *et seq.*

515. In addition, by doing so, and by engaging in a pattern and practice of violating FACA, Defendants have acted and are acting in a manner that is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and/or without observance of procedure required by law in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

516. The Anti-Mine Scientists FAC was established and/or utilized by EPA to obtain policy, strategy, political, legal and/or scientific analyses and data and/or recommendations, including but not limited to in connection with EPA's Section 404(c) action and the BBWA, which forms the basis of EPA's Section 404(c) action to block Pebble Mine. The Anti-Mine Scientists regularly collaborated with each other to provide collective advice and recommendations to EPA. EPA organized, managed and coordinated the Scientists' input to the Agency, as well as the timing or agenda of discussions, and guided the Scientists as to the information needed by the Agency. Further, EPA used the Scientists to assist in effecting its

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 130

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 132 of 138

goals by providing strategy guidance, policy recommendations, scientific advice and data, and political and public relations support all aimed at a single purpose of using Section 404(c) preemptively.

517.    The Anti-Mine Scientists FAC was comprised of at least the following non-federal employees:  David Chambers (CSP2); Kendra Zamzow (CSP2); Stu Levit (CSP2); Bretwood Higman (CSP2/Ground Truth Trekking); Carol Ann Woody (Fisheries Research and Consulting); Sarah O'Neal (Fisheries Research and Consulting); Ann Maest (Stratus Consulting), Cameron Wobus (Stratus Consulting); Thomas Quinn (University of Washington/The Nature Conservancy); Alan Boraas (Kenai Peninsula College); Daniel Rinella (University of Alaska Anchorage); Michael Wiedmer (University of Washington/The Nature Conservancy); David Albert (The Nature Conservancy); Marcus Geist (The Nature Conservancy); David Athons (Kenai River Center), Jim Kuipers; William Riley (former EPA scientist); and Thomas Yocom (former EPA scientist).

518.    The aforementioned persons and groups worked in conjunction with EPA officials, including, but not limited to:  EPA's North, Parkin, Fordham, Steiner-Riley, Stoner, McLerran, Pavitt, Sussman, Dunbar, Eckman, Suter, Holsman, Szerlog, McGrath, Smith, Combes, Ebersole, Fertick, Dean, and Hough, as well as FWS officials Brna, Verbrugge, and Rappoport.

519.    Based on its pattern and practice regarding the Pebble Mine, on information and belief, EPA has continued and intends to continue to obtain advice and recommendations from the Anti-Mine Scientists FAC regarding Pebble Mine, its ongoing Section 404(c) action, and the BBWA, without having the advisory committee comply with FACA.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 131

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 133 of 138

520.     By violating FACA, EPA deprived Plaintiff of the benefits conferred by Congress of public involvement and transparency.  Further, EPA has irreparably harmed Plaintiff by depriving it of its rights by establishing and/or utilizing illegal Federal Advisory Committees to develop and implement its Section 404(c) strategy, including on the basis of the BBWA – itself the product of one or more illegal Federal Advisory Committees.

521.     Specifically, these deprivations include, but are not limited to, the loss of the statutory protections set forth in Paragraph 509(a)-(j).

522.     Plaintiff is entitled to a declaratory judgment that Defendants violated FACA for the reasons stated herein.

523.     Plaintiff is entitled to a declaratory judgment that Defendants violated the APA for the reasons stated herein.

524.     In addition, because of the ongoing violations of FACA and the APA, and because of the irreparable harm suffered by Plaintiff as a result of Defendants' violations of FACA and the APA, Plaintiff is further entitled to injunctive relief as set forth below.

### COUNT THREE

**Violation of FACA and APA:  Anti-Mine Assessment Team FAC**
**(Against All Defendants)**

525.     Plaintiff repeats and realleges every allegation contained in Paragraphs 1 through 524 as if fully set forth herein.

526.     By establishing and/or utilizing the Anti-Mine Assessment Team FAC and permitting it to, *inter alia*, meet and deliberate without complying with FACA, and to make recommendations, determinations of action to be taken, and policy to be expressed, with respect to matters upon which the FAC advised, Defendants have violated FACA, 5 U.S.C. App. II § 2 *et seq.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 132

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 134 of 138

527.     In addition, by doing so, and by engaging in a pattern and practice of violating

FACA, Defendants have acted and are acting in a manner that is arbitrary, capricious, an abuse

of discretion, otherwise not in accordance with law, and/or without observance of procedure

required by law in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

528.     The Anti-Mine Assessment Team FAC was established and/or utilized by EPA to

obtain policy, strategy, political, legal and/or scientific analyses and data and/or

recommendations, including but not limited to in connection with EPA's Section 404(c) action

and the BBWA, which forms the basis of EPA's Section 404(c) action to block Pebble Mine.

The Anti-Mine Assessment Team members regularly collaborated with each other to provide

collective advice and recommendations to EPA.  EPA organized, managed and coordinated the

Assessment Team's input to the Agency, as well as the timing or agenda of discussions, and

guided the Assessment Team as to the information needed by the Agency.  Further, EPA used

the Assessment Team to assist in effecting its goals by providing strategy guidance, policy

recommendations, scientific advice and data, and drafting of the BBWA, all aimed at a single

purpose of using Section 404(c) preemptively.

529.     The Anti-Mine Assessment Team FAC was comprised of at least the following

non-federal employees:  Greg Blair, Ralph Grismala, Jim Rice, Steve Seville and other

representatives of ICF International; Daniel Rinella; Michael Wiedmer; David Athons; Alan

Boraas; John Duffield; Christopher Frissell; Chris Neher; David Patterson; Catherine Knott;

Rebecca Shaftel; Jeff Parker; and members of the Intergovernmental Technical Team.

530.     The aforementioned persons and groups worked in conjunction with EPA

officials, including, but not limited to:  EPA's McLerran, Dunbar, Sussman, Aicher, Butler,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 133

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 135 of 138

Dean, Ebersole, Eckman, Fordham, Frithsen, Kravitz, North, Parkin, Schofield, Suter, Todd, and Wigington.

531. Based on its pattern and practice regarding the Pebble Mine, on information and belief, EPA has continued and intends to continue to obtain advice and recommendations from the Anti-Mine Assessment Team FAC regarding Pebble Mine, its ongoing Section 404(c) action, and the BBWA, without having the advisory committee comply with FACA.

532. By violating FACA, EPA deprived Plaintiff of the benefits conferred by Congress of public involvement and transparency. Further, EPA has irreparably harmed Plaintiff by depriving it of its rights by establishing and/or utilizing illegal Federal Advisory Committees to develop and implement its Section 404(c) strategy, including on the basis of the BBWA – itself the product of one or more illegal Federal Advisory Committees.

533. Specifically, these deprivations include, but are not limited to, the loss of the statutory protections set forth in Paragraph 509(a)-(j).

534. Plaintiff is entitled to a declaratory judgment that Defendants violated FACA for the reasons stated herein.

535. Plaintiff is entitled to a declaratory judgment that Defendants violated the APA for the reasons stated herein.

536. In addition, because of the ongoing violations of FACA and the APA, and because of the irreparable harm suffered by Plaintiff as a result of Defendants' violations of FACA and the APA, Plaintiff is further entitled to injunctive relief as set forth below.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 134

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 136 of 138

## COUNT FOUR

### Injunctive Relief for Violation of FACA and APA
### (Against All Defendants)

537.     Plaintiff repeats and realleges every allegation contained in Paragraphs 1 through 536 as if fully set forth herein.

538.     The actions of the Defendants in violating FACA and the APA, as alleged above, have caused, and continue to cause, immediate and irreparable injury to Plaintiff.

539.     Under the APA, 5 U.S.C. § 702, Plaintiff is entitled to injunctive relief to restrain and bar Defendants from using and/or relying in any way upon the Bristol Bay Watershed Assessment.

540.     Under the APA, 5 U.S.C. § 702, Plaintiff is entitled to injunctive relief to restrain and bar Defendants from issuing Section 404(c) restrictions, at least until it ceases to utilize the illegal FACs and legally constitutes the FACs under FACA, and thereafter follows all FACA requirements.

WHEREFORE, Plaintiff respectfully requests that this Court:

A.     Issue a declaratory judgment that Defendants violated FACA and the APA with respect to the Anti-Mine Coalition FAC;

B.     Issue a declaratory judgment that Defendants violated FACA and the APA with respect to the Anti-Mine Assessment Team FAC;

C.     Issue a declaratory judgment that Defendants violated FACA and the APA with respect to the Anti-Mine Scientists FAC;

D.     Issue an Order directing Defendants to publicly release all materials, including all documents and communications, related to the activities of the three FACs;

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 135

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 137 of 138

E.     Issue an injunction barring EPA from using and/or relying in any way upon the BBWA;

F.     Issue an injunction barring EPA from issuing Section 404(c) restrictions, at least until it ceases to utilize the illegal FACs and legally constitutes the FACs under FACA, and thereafter follows all FACA requirements;

G.     Award Plaintiff its costs, attorneys' fees, and other disbursements for this action pursuant to 28 U.S.C. § 2142; and,

H.     Grant Plaintiff such other and further relief as this Court may deem just and proper.

RESPECTFULLY SUBMITTED this 3rd day of September 2014.

*Attorneys for Plaintiff Pebble Limited Partnership*

REEVES AMODIO LLC

By: _____
Thomas P. Amodio
ABA No. 8511142

STEPTOE AND JOHNSON LLP

By: _____
For Roger W. Yoerges

By: _____
For Timothy A. Work

By: _____
For Mark Murphy

By: _____
For Anthony A. Onorato

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. _____
Page 136

Case 3:14-cv-00171-HRH   Document 1   Filed 09/03/14   Page 138 of 138