# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

PEBBLE LIMITED PARTNERSHIP,

    Plaintiff,

vs.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

    Defendants.

Case No. 3:14-cv-00171 HRH

## DECLARATION OF RICHARD B. PARKIN

I, Richard B. Parkin, declare that the following statements are true and correct to the best of

my knowledge, and are based on my personal knowledge, information contained in the records of

the United States Environmental Protection Agency ("EPA"), and information supplied to me by

current EPA employees.

1.    I am the EPA Region 10 Management Lead for the Bristol Bay project and the

Manager for the Puget Sound Program. I have worked on the Bristol Bay project as the

Bristol Bay Management Lead since December 2010. As the Acting Director of the Office

of Ecosystems, Tribal and Public Affairs from January 2008 until December 2010, I

oversaw Region 10's involvement in the Bristol Bay project. I have worked for EPA for 34

years, including 31 years in Region 10. During that time, I worked in the Region 10 Water

Quality Standards Program and the National Environmental Policy Act ("NEPA") Review

1

Program, and I managed the National Pollutant Discharge Elimination System ("NPDES") Permit and Compliance Programs, the Nonpoint Source Program, the NEPA Review Program, and the Ocean Program and the Pesticide Program. From 2004 through 2007, I was the Associate Director of the Office of Ecosystem, Tribal and Public Affairs (Acting and Permanent), and from 2008 through 2010, I was the Acting Director of that office. I received a B.S. in Biology from Northern Illinois University in 1972 and an M.S. in Biology from Southern Illinois University in 1976.

**The EPA Has Been Diligent in Maintaining Open Communication with All Interested Stakeholders, Particularly with Complainant**

2.     From 2003 through the present day, EPA staff in Alaska have been involved in frequent meetings and contacts with local interests including Alaska natives, environmental non-governmental groups ("ENGOs"), federal agencies, the State of Alaska, Northern Dynasty Minerals ("NDM"), the Pebble Limited Partnership ("PLP"), and other individuals and entities both opposing and supporting the Pebble Mine. This is EPA Region 10's standard procedure for achieving its mission to protect human health and the environment in Alaska while taking into consideration the views of those affected by any decision made by the EPA.

3.     As the former Acting Director of the Office of Ecosystems, Tribal and Public Affairs, I am knowledgeable about the duties of EPA staff stationed in Alaska. Phil North was a wetlands ecologist in the Alaska Aquatic Resources Unit in Alaska.

4.     One of Mr. North's critical duties was to serve as the EPA Region 10's Clean Water Act ("CWA") Section 404 expert on the Regional Mining Team. Specifically, he was required to coordinate the EPA technical team that was formed to work with NDM on the development of environmental baseline information in anticipation of the NEPA process when NDM submitted applications for permits for the development of the Pebble Mine.

2

5.     Plaintiffs' Complaint and Motion for Preliminary Injunction attempt to depict Mr.
North's early involvement in Pebble Mine matters as improper.  In fact, NDM and the State
of Alaska sought the EPA's participation in technical working groups ("TWGs") in
preparation for the NEPA process that would be triggered by the submittal of permit
applications for a proposed Pebble Mine, and North participated in many of those groups on
behalf of the EPA.

6.     In addition, one of Mr. North's duties at the EPA was to collaborate with interested
parties on CWA 404 matters of importance to the EPA, with the goal of protecting wetlands
in the geographic area to which he was assigned.  Plaintiffs' Complaint includes quotes
from Mr. North in 2008 and 2009 saying, "the 404 program has a major role [in Pebble
Mine]" and "I feel that both of these projects [Chuitna and Pebble] merit consideration of a
404C veto."  Compl. ¶¶ 70, 86.  Yet, I would expect anyone in Mr. North's position to
identify to management major potential mines in his geographic area as a matter in which
the EPA could anticipate involvement pursuant to its CWA Section 404 authorities.

7.     Mr. North was expected to conduct outreach to or collaboration with federal, state,
local, and tribal partners on protection and restoration of wetlands and other aquatic
resources.  In this capacity, Mr. North was a point of contact for native villages and tribes.
He was available to listen to their concerns, provide information on how EPA could help
address their concerns, and provide advice on how to involve EPA.

8.     Complainants attempt to portray the EPA's outreach efforts as one-sided and
inappropriately collaborative with entities opposing development of the Pebble Mine.  As a
result, it is important to understand the great effort the EPA made to collaborate with NDM,
PLP, and the State of Alaska throughout the years.

9.     EPA's involvement in the evaluation of potential environmental impacts associated

3

with development of the Pebble deposit has been ongoing for over a decade and thus began long in advance of the development of the "Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay, Alaska" ("Assessment"). As early as 2003, EPA began engaging with NDM regarding the environmental effects of the development of a mine at the Pebble deposit.

10.     At the time NDM began discussions with EPA and other agencies about the Pebble mine, NDM informed the agencies that it was preparing to submit a mine application to the U.S. Army Corps of Engineers ("Corps") and to engage in the NEPA process.

11.     EPA anticipated being a cooperating agency in the NEPA process. As a cooperating agency, EPA generally offers its environmental expertise in the scoping process, in the development of environmental data and analysis, and in evaluating and commenting on the environmental impacts of the proposed action. When discussions began with NDM, EPA had not yet transferred responsibility for implementing the CWA Section 402 program to the State of Alaska. Therefore, EPA was responsible for issuing NPDES permits as authorized pursuant to Section 402 of the CWA. Because of EPA's authority under CWA Section 402, its roles under Section 404, including reviewing Section 404 wetland permit applications, as well as its obligation under Section 309 of the Clean Air Act to review all federal Environmental Impact Statements ("EISs"), EPA had a vested interest in working with NDM to obtain the necessary information to ensure that any permit application submitted would be complete and that the NEPA process would be productive.

12.     The EPA was open to working with NDM, along with other interested stakeholders, in advance because the proposed project had the potential to have significant impacts to the environment and, in particular, fish populations and habitat surrounding the Pebble deposit. The EPA hoped that early collaboration would result in better environmental data and

4

decision-making once the project was proposed.

13.     On January 19, 2005, NDM met with EPA management in Seattle to discuss potential impacts of the Pebble mine, the need for permits, and baseline data collection. Subsequent to this meeting, EPA formed an internal EPA interdisciplinary team to work with NDM to analyze potential environmental impacts and review baseline data collection. In the spring and summer of 2005, EPA attended several site visits with NDM to provide advice on various issues that were important to fully assessing the environmental impact of the project.  During the fall of 2005, EPA was actively involved in reviewing and developing comments on the Draft Environmental Baseline Study plans.  EPA's work included attending several interagency meetings covering the mine development process, surface water and groundwater hydrology and quality, fish and aquatic resources, habitat, macroinvertebrates, wetlands, marine resources, air quality, and cultural resources.

14.     In 2006 and 2007, EPA continued to work closely with NDM[1] and with other state and federal agencies by submitting comments to NDM on various documents and by providing information that should be considered for ongoing characterization of the area and environmental baseline studies.  NDM and the State of Alaska established formal TWGs, primarily to facilitate coordinated agency review, comments, and issue clarification and resolution regarding baseline environmental data and project design studies for NEPA. Several agencies participated in the Steering Committee and ten TWGs, including Alaska Department of Fish and Game ("ADF&G"), Alaska Department of Natural Resources ("ADNR"), Alaska Department of Environmental Conservation ("ADEC"), National Marine Fisheries Service ("NMFS"), National Park Service ("NPS"), United States Army

---

[1] In July 2007, NDM and Anglo American PLC entered into a partnership, called the Pebble Limited Partnership (PLP) to develop the Pebble Mine.

5

Corps of Engineers ("Corps"), United States Fish and Wildlife Service ("USFWS"), United States Geological Service ("USGS"), and EPA. These groups met regularly and EPA staffed them from its interdisciplinary team.

15.     During this same period, NDM held open meetings with tribal leaders in the Bristol Bay area and hired the Keystone Center to help determine whether the Keystone Center was interested in convening stakeholder dialogue on various issues related to the Pebble project. EPA staff attended the open meetings and the Keystone science panels and met with Bristol Bay tribes separately at their request.

16.     Despite EPA's diligent cooperation in the TWGs, by December 2008, EPA felt NDM lacked interest in sharing data and information to the degree necessary for the EPA's meaningful involvement in NDM's effort to develop environmental data.

**The EPA's Attempts to Work with Complainant Continued After the EPA Received the Petitions for a CWA 404(c) Action**

17.     In May 2010, EPA received petitions from six federally recognized tribal governments ("tribes") from Bristol Bay requesting that EPA initiate a process under Section 404(c) of the CWA to protect waters, wetlands, fish, wildlife, fisheries, subsistence, and public uses in the Nushagak and Kvichak River watersheds and Bristol Bay from metallic sulfide mining, including a potential Pebble mine. Signatories included Nondalton Tribal Council, New Stuyahok Traditional Council, Levelock Village Council, Ekwok Village Council, Curyung Tribal Council, and Koliganek Village Council. Their attorneys also provided a separate letter, dated May 7, 2010, regarding secondary effects on subsistence and recreational use from a potential Pebble mine in the context of the Section 404(c) regulations. Subsequently, three additional Bristol Bay tribes signed on to this letter: the Native Village of Ekuk, the Village of Clark's Point, and Twin Hills Village Council.

18.     Following the letter from the tribes, the EPA received numerous letters from

6

stakeholders expressing their interest and concerns regarding potential EPA action to protect Bristol Bay fishery resources using EPA's Section 404(c) authority or other means. Those in support of EPA taking action to protect Bristol Bay included the Alaska Independent Fishermen's Marketing Association; commercial and recreational fishing entities, such as the Bristol Bay Regional Seafood Development Association; 294 separate state, national and international hunting and angling organizations and businesses; United Fishermen of Alaska; chefs and restaurateurs; tribal entities, including the Bristol Bay Native Corporation; sporting goods manufacturers and vendors; a coalition of jewelry companies; conservation organizations; members of the faith community; and elected officials from Alaska and other states.

19.     In 2010, EPA also received requests to refrain from taking action under Section 404(c). These requests included those that asked for more time to understand potential implications of mine development in the Bristol Bay watershed, and others that requested EPA wait until formal mine permit applications had been submitted and an EIS had been developed. These requestors included four Bristol Bay tribes: Newhalen Tribal Council, South Naknek Tribal Council, King Salmon Traditional Village Council, and Iliamna Village Council; other tribal organizations; Governor Sean Parnell on behalf of the State of Alaska; ten public policy organizations concerned about the impact a Section 404(c) action could have on economic development in Alaska; and attorneys representing Complainant.

20.     In 2010, at the request of numerous stakeholders, EPA met with interested parties, including those who supported and opposed mining the Pebble deposit, to hear their concerns and receive any information they wished to provide. These meetings occurred in Anchorage, Seattle, and Washington, D.C. EPA Administrator Lisa Jackson also visited Alaska in the summer of 2010 to familiarize herself with issues in Alaska relevant to EPA's

7

work. Regional Administrator Dennis McLerran and EPA staff accompanied the Administrator on the trip. The Administrator traveled to Dillingham, where she participated in two listening sessions regarding the Pebble Mine, one specifically for tribal leaders from Bristol Bay and one meeting open for all local and regional entities. She also met with PLP for a briefing on the proposed Pebble Mine project.

21. Complainant erroneously interprets the September 8, 2010 Draft Discussion Matrix (attached to plaintiff's PI Motion as Exh. 1) as evidence that EPA had decided at that early stage to use its CWA Section 404(c) authority in the Bristol Bay project. This document is a draft, pre-decisional, deliberative document that EPA provided to a Congressional Committee pursuant to a request for documents related to the EPA's work regarding potential mining-related development in the Bristol Bay watershed. The document has not been released to the public by EPA. In this instance, the matrix was an early draft of a briefing paper developed by EPA staff. The preliminary identification of the various options reflected in that draft originated with EPA staff, but were developed more fully as discussions between staff and management ensued. Ultimately, the options that were presented to the Administrator for consideration differed substantially from those in the draft Matrix on which plaintiff relies. As reflected below, EPA ultimately selected to conduct an assessment of the Bristol Bay Watershed to gather additional scientific and technical information regarding Bristol Bay to inform a future decision on whether to take action pursuant to Clean Water Act Section 404(c) or to take other actions. The process the EPA ultimately selected featured significant public involvement.

22. As EPA began its work to gather and analyze information on the ecosystem and mine, EPA determined that the best way to gain a better understanding of the potential impacts of future large-scale mining on the Bristol Bay fisheries would be to conduct a

8

scientific assessment. While EPA had participated for years in review of NDM's technical studies, we did not have a comprehensive understanding of the current status of the ecosystem, the fishery, native cultures, or the social and environmental complexities of mining the Pebble deposit. Although EPA and other agencies had invested significant resources in participating in the project scoping process since 2003, seven years later, NDM appeared no closer to submitting an application for a permit and uncertainty about the future of Bristol Bay's resources remained, as evidenced by the petitions submitted to EPA in 2010.

23. On February 7, 2011, Regional Administrator Dennis J. McLerran announced EPA's intent to conduct a scientific assessment to evaluate how future large-scale mining projects might affect water quality and Bristol Bay's salmon fishery. EPA initiated the assessment in response to the growing concern over potential environmental impacts and the competing requests from stakeholders regarding whether to proceed with an action under Section 404(c) of the CWA. EPA's intent was to characterize the biological and mineral resources of the Bristol Bay watershed; increase understanding of the potential impacts of large-scale mining, in terms of both day-to-day operations and potential accidents and failures, on the region's fish resources; and inform future decisions, by government agencies and others, related to protecting and maintaining the chemical, physical, and biological integrity of the watershed. The Assessment represents a review and synthesis of available information to identify and evaluate potential risks of future large-scale mining development on the Bristol Bay watershed's fish habitats and populations and the consequent indirect effects on the region's wildlife and Alaska Native cultures.

24. EPA sent letters to thirty-one Bristol Bay tribes, ADEC, ADF&G, ADNR, Bureau

9

of Land Management, NMFS, NPS, the Corps, USFWS, U.S. Geological Survey ("USGS"), and PLP notifying these entities of its intent to conduct an assessment. The same week that EPA announced its intent to develop an assessment, EPA met with Nuna Resources (which represents several Alaska Native Claims Settlement Act ("ANCSA") Village Corporations) and met with other stakeholders. Many of these tribes and agencies participated in the Intergovernmental Technical Team, which EPA established to provide input on the Assessment, as discussed below.

25.    The EPA continued to communicate often with Complainant leading up to, and following the development of the Bristol Bay Watershed Assessment ("BBWA"). Beginning in mid-2010, and continuing until the spring of 2014, phone calls between the EPA's regional attorney and Complainant's counsel occurred frequently – often every other week. The EPA also attempted to collaborate with Complainant on gathering information relevant to the preparation of the BBWA. On March 7, 2011, the EPA received a letter from PLP's Chief Executive Officer, Mr. John Shively. (Attached hereto as Exh. A.) In that letter, Mr. Shively thanked Regional Administrator Dennis McLerran for "keeping an open line of communication regarding the Environmental Protection Agency's decision to conduct an assessment of the Bristol Bay Watershed" and he also posed fourteen questions regarding the BBWA.

26.    On March 30, 2011, the EPA responded to Mr. Shively with a letter that provided full responses to each of his questions. (Attached hereto as Exh. B.) The letter also reiterated EPA's request in an interim letter to Mr. Shively dated March 15, 2011 for Complainant to share its environmental data and analysis with the EPA in order to "complement existing information that collectively characterizes current conditions of the watershed, thereby facilitating a more accurate watershed assessment." Mr. McLerran

included a detailed list of information that the EPA wished to receive from Complainant stating, "[A]s discussed above, we believe this information would aid in the development of a more robust analysis. We would be happy to discuss the most appropriate format for the data or answer any questions you may have regarding this request."

27.     The EPA requested PLP's raw data for the Environmental Baseline Document ("EBD") on multiple occasions and made every effort to narrow the scope of the information and to resolve the confidentiality issues that Complainant raised in order to ensure that Complainant's data was utilized in the BBWA. However, Complainant declined the opportunity to provide the EPA with the data relevant to the BBWA.

28.     Complainant sought to meet with the EPA on a regular basis in 2011, and the EPA welcomed the opportunity to exchange perspectives and ideas with Complainant. In June 2011, EPA officials, including Mr. McLerran, met with Mr. Shively and PLP staff at the Pebble Mine site. Later in the month, EPA met with Mr. Shively and other PLP representatives in Washington, D.C. In August, 2011, EPA officials again met with PLP and Senator Murkowski at the Pebble Mine site. In October of 2011, Mr. Shively met with Mr. McLerran in Seattle. In a letter from Mr. Shively following up on the October meeting, Mr. Shively informed Mr. McLerran that PLP would not be providing the EPA with the environmental baseline data in a format that was useable by the EPA. (Attached hereto as Exh. C.) Instead, PLP would be providing the EPA with baseline information in PDF format. On November 1, 2011 EPA staff and PLP technical subject matter experts met via teleconference to discuss PLP's environmental baseline data. Two days later, PLP counsel met with EPA counsel in Seattle.

29.     On November 22, 2011, Mr. McLerran wrote to Mr. Shively to again request the environmental data and information relevant to the Assessment. (Attached hereto as Exh.

11

D.) Among other things, the letter noted EPA's intention to review and consider available information from many sources, including PLP, and noted that EPA had "consulted with federal, state, and local agencies and tribal governments, and we are considering their input and expertise." In that letter, EPA informed PLP that EPA "plan[ned] to review and evaluate any data received from PLP just as we would data from any source, including our own scientists." On that basis, EPA requested from PLP "complete documentation (metadata) concerning sampling and analytical methods, any statistical approaches used to summarize the data, and a description of any quality assurance and quality control results." EPA warned PLP that, "[w]ithout complete documentation, we will be unable to fully evaluate and could not use PLP data as part of our assessment" and that"[r]eceipt in the form of Adobe PDF files could limit our ability to fully evaluate and use the data in our assessment."

30. In December 2011, PLP provided EPA with an advance, embargoed copy of its more than 25,000-page environmental baseline document. The EBD was designed to characterize the existing physical, chemical, biological, and social environments in the South Fork Koktuli River, the North Fork Koktuli River, and the Upper Talarik Creek watersheds where the Pebble deposit is located, as well as along the proposed transportation corridor linking the mine site to a proposed port site on Cook Inlet.

31. While the EBD did provide some of the information the EPA had been seeking to inform its assessment, it had limited utility for the EPA because it did not contain any of the raw data the EPA requested. The EBD contained information that Complainant had synthesized, making it impossible to understand what the underlying data was and how it was used. Shortly after the EPA received the EBD, I contacted Mr. Shively via phone to confirm that the underlying raw data was not tabulated in the report. In addition, I inquired

12

as to where the hydrology and fishery data could be found in the report. Mr. Shively confirmed that there was no hydrology or fishery data in the EBD. He also committed to looking into providing these specific data sets to the EPA. In January 2012, EPA flew technical staff to Anchorage for a four day meeting with Complainant and other agencies regarding PLP's EBD. On February 21, 2012, PLP's Mr. Ken Taylor emailed me and stated, "As I have stated before, PLP will not be releasing any of our electronic data in raw form."[2] (Attached hereto as Exh. E.)

32. The EPA has a long history of attempts to collaborate with Complainant – first in preparing for a potential NEPA process in the context of a possible 404 permit application, and second to involve PLP in the development of the BBWA. There were numerous other meetings and conversations with Complainant that are not discussed in this declaration. Complainant chose not to provide the EPA with the data most relevant to the BBWA, and the information that Complainant did provide was not provided in a format that could be fully utilized in the development of the BBWA.

33. The EPA Region 10 has invested a considerable effort into coordinating and working with the State of Alaska before making a decision on how to respond to the tremendous uncertainty of potential environmental effects of a mine and the conflicting requests regarding 404(c). In December 2010 and January 2011, Region 10 had at least four discussions with Commissioner Larry Hartig of the Alaska Department of Environmental Conservation ("ADEC") regarding the process for reaching a decision whether to take action under Section 404(c) of the CWA. The EPA sent the Commissioner a proposed process for engaging stakeholders and analyzing technical information to inform

---

[2] PLP did provide the EPA with data related to temperature in March 2012. This information was of limited use to the EPA because it was provided in a pdf format, and the EPA was not given adequate information about the data to fully understand its meaning.

13

EPA's decision whether to initiate a Section 404(c) process. (Attached hereto as Exh. F.) We stressed to the State that we were neutral on whether to make a 404(c) determination, and that we intended to develop a process to inform our decision. We also stressed the importance of having open and transparent decision making, and community-based and information-based processing of such a decision.

**The EPA Conducted Extensive and Balanced Community Outreach**

34. The opportunity to provide information to the EPA was not limited to Complainant and the State. EPA conducted extensive community outreach on the Assessment. Public hearings were held in June 2012, at which EPA heard concerns about potential impacts from large-scale mining to Alaska Natives' subsistence way of life. Community members expressed concern about adverse environmental and cultural aspects of the project. They also expressed concerns about job loss, the sustainability of villages (*e.g.*, in terms of schools closing because enrollment drops as parents make tough choices to go where jobs are available), potential tax revenue, Alaska Native Claims Settlement Act ("ANCSA") Corporation economic opportunities, and the State of Alaska's concerns regarding economic opportunities for the citizens of Alaska. EPA also received a petition from a variety of stakeholders raising concerns related to environmental justice issues associated with porphyry copper mining in the Nushagak and Kvichak River watersheds. Traditional and more modern spiritual practices such as the First Salmon Ceremony and the Great Blessing of the Waters place salmon in a position of respect and importance. The salmon harvest provides a basis for many important cultural and social practices and values, including the sharing of resources, fish camp, gender and age roles, and the perception of wealth.

35. Although a small minority of tribal elders and culture bearers interviewed expressed

14

a desire to increase market economy opportunities (including large-scale mining), most equated wealth with stored and shared subsistence foods. In interviews conducted for Appendix D of the Assessment, the Yup'ik and Dena'ina communities of the Nushagak and Kvichak River watersheds consistently define a "wealthy person" as one with food in the freezer, a large extended family, and the freedom to pursue a subsistence way of life in the manner of their ancestors.

36.     Meaningful engagement with stakeholders was essential to ensure that EPA heard and understood the full range of perspectives on the Assessment and the potential effects of mining in the region. EPA involved and informed stakeholders throughout the Assessment process. Community involvement efforts included a project webpage and listserv to ensure that Assessment-related information was shared with the public.

37.     Throughout development of the Assessment, EPA visited many Bristol Bay communities, including Ekwok, Dillingham, Kokhanok, New Stuyahok, Koliganek, Iliamna, Newhalen, Nondalton, Naknek, King Salmon, Igiugig, and Levelock. EPA also met with representatives from Bristol Bay tribes and ANCSA corporations, as well as organizations representing the mining industry, commercial fishers, seafood processors, hunters and anglers, chefs and restaurant owners, jewelry companies, conservation interests, members of the faith community, and elected officials from Alaska and other states. EPA heard from hundreds of people at these meetings and from thousands more via phone and email. EPA was also invited to numerous conferences and meetings to discuss the Assessment.

38.     In August 2011, EPA met with the Intergovernmental Technical Team (IGTT), which was established to provide EPA with individual input on the structure of the Assessment and to identify potential data sources. IGTT participants included tribal

government representatives from Ekwok, Newhalen, Iliamna, South Naknek, New Koliganek, Curyung, Nondalton, and Levelock and state and federal agency representatives from the Alaska Department of Public Health, the ADF&G, NPS, USFWS, NFMS, and the Bureau of Land Management ("BLM"). There were no private parties on the IGTT. These representatives had diverse and often conflicting views regarding the development of the mine. They were selected because they shared governmental interests in, and expertise in the geographical area potentially affected by the development of the Pebble Mine. The IGTT participants provided feedback to EPA on an individual participant basis. The group did not provide consensus or group advice, or recommendations to the EPA. In fact, the IGTT Team Guidelines (Plaintiff Exh. 185, p. 145) states, "The Intergovernmental Technical Team is not expected to reach consensus recommendations; rather representatives are encouraged to share their professional expertise individually." EPA also updated the IGTT on Assessment progress in January 2012 via webinar.

39.     EPA released two drafts of the Assessment for public comment.[3] Approximately 233,000 and 890,000 comments were submitted to the EPA docket during the 60-day public comment period for the May 2012 and April 2013 drafts of the Assessment, respectively. EPA also held eight public comment meetings in June 2012 in Dillingham, Naknek, New Stuyahok, Nondalton, Levelock, Igiugig, Anchorage, and Seattle. Approximately 2,000

---

[3] As is the practice at EPA for many of its products, EPA utilized contract support for the development of the Assessment. Specifically, EPA Region 10 had a contract with NatureServe to develop background information for the BBWA. Some of the people that plaintiff identifies as being members of the so-called Anti-Mine Assessment Team FAC were EPA contractors under the NatureServe contract. Specifically, the following individuals identified by Plaintiff were contractors to EPA under the NatureServe contract: Daniel Rinella, Michael Wiedmer, David Patterson, Alan Boraas, John Duffield, Christopher Frissel, Chris Neher, Catherine Knott, and Rebecca Shaftel. Pebble also identifies David Athons as being part of the Anti-Mine Assessment Team FAC. Yet he was hired by EPA under EPA's Senior Environmental Employment Program.

16

people attended these meetings. An overview of these meetings was shared via two webinars in July 2012. The EPA also published a response to comments on both the May 2012 and April 2013 drafts of the Assessment.[4]

**The EPA Did Not Form Any Federal Advisory Committees**

40.     Certain individuals and ENGO's were very vocal in their opposition to the development of the Pebble Mine. These parties developed data and information relevant to the potential impacts of mine development in the watershed. Just as the EPA was interested in obtaining relevant information from Complainant, the EPA was also interested in obtaining information from other entities who offered to provide their own research, data, or opinions on the watershed and the potential impacts of a mine on wetlands and fish. At times, the EPA sought information directly from these parties because they possessed certain expertise. The vast majority of the time, however, these entities initiated contact with the EPA in order to provide information for our consideration.

41.     The EPA did have contacts and meetings with the various tribes, ENGO's, scientists, and lawyers, but did not establish or utilize any of the groups that plaintiff has allegedly identified. Many individuals and organizations provided EPA with varying perspectives on the potential Pebble Mine project; many supported mining activities, while many others opposed mining activities. At no time did the EPA establish advisory groups or manage advisory groups described by PLP in its filings with the Court. If information was sought or obtained by EPA from any of the individuals or entities named in PLP's filings, the information was provided to the EPA by individual persons or groups, not as collective recommendations or advise.

42.     Many of the entities named in PLP's filings provided information to EPA in the

---

[4] EPA's responses are available at http://www2.epa.gov/bristolbay/public-involvement-bristol-bay-assessment.

form of "scientific papers, presentations, research, data, and overall strategy and recommendations" as alleged by PLP. Some of the information was useful to the EPA and assisted the EPA in developing the BBWA; some of the information was not useful to the EPA. But, the EPA gave careful consideration to all of the information it received from the public, including the information provided by these entities. The EPA has been open and transparent about its communications with outside parties.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Seattle, Washington, on this 7th day of Nov 2014.

Richard Parkin

**Declaration of Richard Parkin**
Case No. 3:14-cv-00171 HRH

# Index of Attached Exhibits

Exhibit A.............................. Letter from PLP to EPA Regional Administrator Received 3/7/2011

Exhibit B ............................................ 3/30/2011 Letter from EPA Regional Administrator to PLP

Exhibit C ........................................................................... 10/21/2011 Letter from Pebble to EPA

Exhibit D ............................................................................ 11/22/2011 Letter from EPA to Pebble

Exhibit E ..................................................... 2/21/2012 Email from Ken Taylor to Richard Parkin

Exhibit F..................................................... 1/4/2012 Email from Richard Parkin to Larry Hartig

Declaration of Richard Parkin

**EXHIBIT A**

Declaration of Richard Parkin




THE
pebble
PARTNERSHIP
February 28, 2011

Dennis J. McLerran, Regional Administrator
EPA, Region X
Regional Administrator's Office, RA-140
1200 6th Avenue, Suite 900
Seattle, WA 98101

Dear Dennis:

Thank you for keeping an open line of communication regarding the Environmental Protection Agency's decision to conduct an assessment of the Bristol Bay Watershed. I am writing today about the "Outline for the Development of the EPA's Bristol Bay's Watershed Assessment." I appreciate the opportunity to transmit our thoughts on this issue.

For the record, I would like reiterate the position of the Pebble Limited Partnership (PLP) that any action under the Clean Water Act (CWA) section 404(c) should not be undertaken until PLP has formally initiated permitting for the Pebble Project and started the National Environmental Policy Act (NEPA) process. As a long standing advocate for responsible development of Alaska's resources, I have serious concerns about the long-term precedent an initiation of the 404(c) process by the EPA, prior to the submission of an application, could set for future activities in Alaska.

I have reviewed Senator Lisa Murkowski's letter to Administrator Jackson and concur with the range of issues and concerns she brought to the attention of the EPA, including her request that no action be taken until PLP is in the permitting process, as it would provide more confidence to Alaska stakeholders that "EPA's work on this matter is not pre-judging any specific decision that may ultimately confront the agency." Indeed, there are already questions of whether EPA's action to undertake its watershed assessment in the face of the significant and costly scientific work that has been undertaken in the field has already prejudiced future possible permit applications that PLP may elect to file in the future.

In reviewing the draft outline you provided, several questions have emerged that I respectfully request EPA address and consider before moving forward with the assessment and accompanying processes.

- Did the EPA make a formal determination to initiate this scientific assessment process? If so, please provide a copy of that determination to the Pebble

Case 3:14-cv-00171-HRH   Document 72   Filed 11/07/14   Page 21 of 51



Partnership. If there is no formal written determination that states the rationale for the decision, please identify the statutory or regulatory basis for conducting such a scientific assessment.

- Please identify other instances in which EPA has conducted such an assessment.

- What methodology will the EPA use in identifying risks and threats through this process? Is there statutory guidance for this? How will "threats" be defined?

- If there are no established procedures or precedents for such a scientific assessment, what is the process EPA will use to design and establish how the assessment will be conducted?

- Without the benefit of reviewing a project's specific mitigation plans, which would be detailed as part of a permit application process on both a state and federal level, how will the EPA assess what actions will result in "adverse effect on municipal water supplies, shellfish beds and fishery areas, wildlife or recreational areas?" What are the standards that will be utilized in establishing this criteria?

- By what criteria will the EPA determine if the Bristol Bay salmon fishery is a one-of-a-kind, world class fishery? Will the EPA include reviews of Alaska's other salmon fisheries notably the Copper River, the Yukon River, the Kuskokwim River and the Cook Inlet Drainage?

- By what definition will the EPA determine existing literature is "relevant?"

- By what criteria will the EPA determine existing and potential risks to the Bristol Bay salmon fishery associated with large-scale development activities and how will the EPA define "large-scale development?" Will climate change be included in the risk identification process?

- How will the scientific peer review be conducted? Who will be part of the peer review? How will the peer review panel participants be selected? For instance, PLP's Environmental Baseline Document (EBD), which we will share with you later this year, will be about 20,000 pages in addition to the appendices with the raw data. This exhaustive document brings together the work of more than 500 independent scientists from more than 50 companies. How will this information be peer reviewed?

- How will the EPA ensure that the peer review is balanced? Will the EPA establish conflict of interest criteria for the peer review process? How will the EPA

2



determine what "existing science" is relevant to accept for review and what criteria will it utilize?

- How will EPA ensure this process will not conflict with NEPA or prejudice EPA's role in the NEPA process should the Pebble Partnership submit a permit application?

- Will the scientific assessment evaluate the impacts of other major users of the watershed including commercial fishing, tourism, transportation infrastructure, hunting and guide services? If not, why?

- What type of budget will be allocated for the scientific assessment? Has the EPA prepared a cost estimate for this endeavor? If so, please send that to PLP.

- In addition to risk, will the review look at the potential opportunities presented by development in the watershed?

I very much appreciate the EPA's efforts to make this process transparent. With that in mind, I respectfully request that the PLP be allowed to fully participate in the assessment. In order for us to meaningfully participate in this process we will need the answers to the questions I have raised above.

Once we learn more about the EPA's intended way forward with this assessment, we should discuss a schedule whereby we can engage with EPA to communicate our data and information.

I look forward to continuing this dialogue and appreciate your time and consideration.

Sincerely,

John Shively
CEO
The Pebble Limited Partnership

CC: The Honorable Sean Parnell, Governor of Alaska
The Honorable Lisa Murkowski, United States Senator, Alaska
The Honorable Mark Begich, United States Senator, Alaska
The Honorable Don Young, United States Representative, Alaska

Case 3:14-cv-00171-HRH   Document 72   Filed 11/07/14   Page 23 of 51

**EXHIBIT B**

Declaration of Richard Parkin



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 10**
1200 Sixth Avenue, Suite 900
Seattle, WA 98101-3140

MAR 3 0 2011

OFFICE OF THE
REGIONAL
ADMINISTRATOR

Mr. John Shively
Chief Executive Officer
Pebble Limited Partnership
302 C Street, Suite 604
Anchorage, Alaska 99503

Dear Mr. Shively:

I am writing in response to your letter, dated February 28, 2011, in which you reiterate Pebble Limited Partnership's (PLP) position that EPA should not take an action under Section 404(c) of the Clean Water Act (CWA) until PLP has formally initiated permitting for the Pebble Project and started the National Environmental Policy Act (NEPA) process. You articulate PLP's interest in participating in EPA's Bristol Bay Watershed Assessment and you ask EPA to respond to fourteen specific questions about the watershed assessment. You also state that once you have had an opportunity to learn more about EPA's "intended way forward" with the Assessment, you suggest that EPA and PLP "discuss a schedule whereby [PLP] can engage with EPA to communicate [its] data and information." I will respond to these three important points, and enclose EPA's response to your more specific questions.

First, as we have discussed, EPA is not currently taking action under Section 404(c) of the CWA. Throughout 2010, a number of tribes, tribal entities and other groups in Southwest Alaska requested that EPA initiate review of impacts that metallic sulfide mining may have in the Bristol Bay watershed utilizing our authorities pursuant to Section 404(c) of the CWA. Other Alaska tribes, tribal entities and groups requested that we let the typical permitting process for mines run its course. EPA considered a number of options and relevant information before determining that the best option at this point, given the available information, is the watershed assessment that we have chosen to conduct. The assessment will provide critical information to decision makers about potential risks of large-scale development in the Kvichak and Nushagak watersheds on fisheries of Bristol Bay, and in possible measures needed to protect the watersheds and ensure the sustainability of those fisheries.

Second, you have requested that PLP be allowed to participate in the assessment. EPA plans to involve PLP in our process. I sent you a letter on March 15th requesting baseline environmental data and analysis that PLP has already gathered and conducted on the Bristol Bay watershed. These data will complement existing information that collectively characterizes current conditions of the watershed, thereby facilitating a more accurate watershed assessment. EPA is also collecting and reviewing scientific data and information from peer-reviewed literature and in government agency reports. Our plan is first to engage federal, state and tribal agencies in technical discussions, and in developing an expanded, annotated outline and a preliminary draft assessment. Once each document is developed, EPA plans to share the

documents with the public for review and also for discussion at a public meeting. We invite PLP's review of the draft documents and your participation at the public meetings to ensure that our assessment yields a result that is high quality, scientifically sound, and includes effective consideration of your input.

Third, I want to emphasize how important your offer to share information is to EPA and this assessment. From the beginning of our discussions together, PLP has offered to share its significant collection of environmental information with EPA. Based on our recent discussion I understand you will be providing this information in April. We would appreciate receiving the information at the earliest point in April you can make it available. I realize we are asking PLP to respond quickly, but EPA wants the assessment to be timely, efficient, accurate and transparent. We believe your information will help us in achieving those goals.

Finally, I am enclosing EPA's responses to the fourteen specific questions you raised in your letter to me. If you have any more questions or concerns about our responses or about the assessment in general, please do not hesitate to contact me. I would also encourage you to have your staff contact Rick Parkin, EPA's Associate Director for the Office of Ecosystems, Tribal and Public Affairs, and the Management Lead for the Bristol Bay Watershed Assessment. Rick can be reached at (206) 553-8574. Thank you again for your cooperation and assistance in the Bristol Bay Watershed Assessment.

Sincerely,

Dennis J. McLerran
Regional Administrator

Enclosure

cc:    The Honorable Sean Parnell
       Governor of Alaska

       The Honorable Lisa Murkowski
       United States Senator, Alaska

       The Honorable Mark Begich
       United States Senator, Alaska

       The Honorable Don Young
       United States Representative, Alaska

bcc:   Bob Sussman
       Nancy Stoner

ENCLOSURE
EPA's Response to PLP's Questions
2/28/11 Letter from Shively to McLerran

**PLP Question #1:** Did the EPA make a formal determination to initiate this scientific assessment process? If so, please provide a copy of that determination to Pebble Partnership. If there is no formal written determination that states the rationale for the decision, please identify the statutory or regulatory basis for conducting such a scientific assessment.

**EPA Response #1:** No, a formal written determination was not prepared. EPA is conducting this assessment under our Clean Water Act (CWA) Section 104 authorities described below. The objective of the CWA is to restore and maintain the chemical, physical, and biological integrity of the nation's waters. Toward achievement of that objective, Section 104(a) directs EPA to establish national programs for the prevention, reduction, and elimination of pollution and as part of such programs directs EPA to:

> "(1) in cooperation with other Federal, State, and local agencies, conduct and promote the coordination and acceleration of, research, investigations, experiments, training, demonstrations, surveys, and studies relating to the causes, effects, extent, prevention, reduction, and elimination of pollution;
> "(2) encourage, cooperate with, and render technical services to pollution control agencies and other appropriate public or private agencies, institutions, and organizations, and individuals, including the general public, in the conduct of activities referred to in paragraph (1) of this subsection;
> (3) conduct, in cooperation with State water pollution agencies and other interested agencies, organizations and persons, public investigations concerning the pollution of any navigable waters, and report on the results of such investigations..."

Section 104(b) further states that in carrying out these provisions, EPA's Administrator is authorized to:

> "(1) collect and make available, through publications and other appropriate means, the results of and other information, including appropriate recommendations by him in connection therewith, pertaining to such research and other activities referred to in paragraph (1) of subsection (a);
> "(2) cooperate with other Federal departments and agencies, State water pollution control agencies, interstate agencies, other public and private agencies, institutions, organizations, industries involved, and individuals, in the preparation and conduct of such research and other activities referred to in paragraph (1) of subsection (a)..."

**PLP Question #2:** Please identify other instances in which EPA has conducted such an assessment.

**EPA Response #2:** The mission of the EPA is to protect human health and the environment. As such, evaluating the environmental impacts of different actions is a central role and function of the agency. EPA has conducted environmental assessments that evaluate the impacts of past actions or estimate the potential impacts of future actions. Below is a list of several recent

1

Case 3:14-cv-00171-HRH   Document 72   Filed 11/07/14   Page 28 of 51

examples of such assessments. (Please note that some of these assessments are currently in draft form and under review.)

- U.S. EPA. Predicting Future Introductions of Non-indigenous Species to the Great Lakes (Final Report). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R-08/066F, 2008. (http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=190305)
- U.S. EPA. Climate Change and Aquatic Invasive Species (Final Report). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R-08/014, 2008. (http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=188305)
- U.S. EPA. A Framework for Categorizing the Relative Vulnerability of Threatened and Endangered Species to Climate Change (External Review Draft). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R-09/011, 2009. (http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=203743)
- U.S. EPA. The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields (External Review Draft). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R-09/138A, 2010. (http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=215267)
- U.S EPA. Clinch and Powell Valley Watershed Ecological Risk Assessment. U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment, Washington Office, Washington, DC, EPA/600/R-01/050, 2002. (http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=15219).
- U.S. EPA. Ecological Risk Assessment for the Middle Snake River, Idaho. U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment, Washington Office, Washington, DC, EPA/600/R-01/017, 2002. (http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=29097&partner=ORD-NCEA).
- U.S. EPA. Waquoit Bay Watershed Ecological Risk Assessment: the Effect of Land-Derived Nitrogen Loads on Estuarine Eutrophication. U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment, Washington Office, Washington, DC, 600/R-02/079, 2002. (http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=15221).

*PLP Question #3:* What methodology will the EPA use in identifying risks and threats through this process? Is there guidance for this? How will "threats" be defined?

*EPA Response #3:* EPA has published Guidelines for Ecological Risk Assessment which will help to inform our approach to the Bristol Bay assessment. These Guidelines can be found at: http://www.epa.gov/raf/publications/guidelines-ecological-risk-assessment.htm.

*PLP Question #4:* If there are not established procedures or precedents for such a scientific assessment, what is the process EPA will use to design and establish how the assessment will be conducted?

*EPA Response #4:* Many of the details of our assessment are still being developed. As previously noted, EPA will use the Guidelines for Ecological Risk Assessment to help inform

2

our approach to the assessment.

**PLP Question #5:** Without the benefit of reviewing a project's specific mitigation plans, which would be detailed as part of a permit application process on both a state and federal level, how will the EPA assess what actions will result in "adverse effect on municipal water supplies, shellfish beds and fishery areas, wildlife or recreational areas?" What are the standards that will be utilized in establishing these criteria?

**EPA Response #5:** The "adverse effect" standard referenced in your question applies to section 404(c) decisions. EPA is conducting the Bristol Bay Assessment to characterize the aquatic and fisheries resources of Bristol Bay and potential threats to the long-term sustainability of these resources. EPA is not using the Assessment to make a decision under our section 404(c) authority. In order to assess actions that may represent a risk or threat to resources in Bristol Bay, EPA will characterize the fishery to determine the chemical, physical, and biological characteristics of the Bristol Bay that are critical in supporting the ecological health and sustainability of the salmon fishery. EPA will then identify reasonably foreseeable large-scale future development activities that could occur in the watershed and we will assess how these activities could impact the characteristics that support the fishery. In evaluating potential impacts to Bristol Bay resources, we will also evaluate the effectiveness of potential actions to mitigate or avoid these impacts. Any information PLP would like to provide EPA regarding impacts and mitigation measures is welcome. As previously noted, EPA will use the Guidelines for Ecological Risk Assessment to help inform our approach to the assessment.

**PLP Question #6:** By what criteria will the EPA determine if the Bristol Bay salmon fishery is one-of-a-kind, world class fishery? Will the EPA include reviews of Alaska's other fisheries notably the Copper River, the Yukon River, the Kuskowim River and the Cook Inlet Drainage?

**EPA Response #6:** EPA will review available information describing salmon producing systems in Alaska, along the west coast of North America and Asia, and make appropriate comparisons with Bristol Bay. We may compare Bristol Bay to the rivers you have listed or we may aggregate them into a larger fishery as we deem scientifically valid. We would invite you comment on this topic when we have produced a draft document.

**PLP Question #7:** By what definition will the EPA determine existing literature is "relevant"?

**EPA Response #7:** EPA is interested in evaluating a broad range of technical literature characterizing resources in Bristol Bay and other information that help us to meet the goals described in the February 7, 2011 Outline for the Development of EPA's Bristol Bay Watershed Assessment. We look forward to collecting an inclusive set of data and information that can be used effectively to describe aquatic and fishery resources, characterize potential threats to these resources, and inform development of a range of options for protecting them from such risks. We expect that information collected by PLP regarding resources in the Bristol Bay watershed are examples of relevant information and we look forward to reviewing these data. As previously noted, the details of our assessment are still being developed. However, EPA has published Guidelines for Ecological Risk Assessment which will help to inform our approach to the Bristol Bay assessment.

3

***PLP Question #8:*** By what criteria will the EPA determine existing and potential risks to the Bristol Bay salmon fishery associated with large-scale development activities and how will the EPA define "large-scale development?" Will climate change be included in the risk identification process?

***EPA Response #8:*** As previously noted, the details of our assessment are still being developed. However, EPA has published Guidelines for Ecological Risk Assessment which will help to inform our approach to the Bristol Bay assessment. EPA does not anticipate that climate change considerations will significantly influence assessment of existing resources in the Bristol Bay watershed or evaluation of options for responding to potential threats associated with large scale development. We remain open, however, to consideration of scientifically valid issues that may be raised during the assessment, including issues raised by PLP.

***PLP Question #9:*** How will the scientific peer review be conducted? Who will be part of the peer review? How will the peer review panel participants be selected? For instance, PLP's Environmental Baseline Document (EBD), which we will share with you later this year, will be about 20,000 pages in addition to the appendices with the raw data. This exhaustive document brings together the work of more than 500 independent scientists from more than 50 companies. How will this information be peer reviewed?

***EPA Response #9:*** The peer review process will be a critical element of the watershed assessment and we appreciate the importance of this issue as reflected in your question. The details of EPA's Bristol Bay watershed assessment, including the details of the peer review process that will be used for this assessment, are still being developed. However, EPA has established standards and procedures regarding peer review which can be found in EPA's Peer Review Handbook (see: http://www.epa.gov/peerreview/ ). We look forward to providing additional details regarding the peer review process as the assessment moves forward.

Regarding environmental information and data collected by PLP, in previous discussions you expressed a willingness to share baseline environmental data and analysis that PLP has gathered and conducted on the Bristol Bay watershed immediately with EPA. EPA's March 15th letter to you reiterated that request and expressed a desire to receive such information and data collected thus far by PLP by March 31, 2011. We continue to look forward to receiving this information since it should facilitate a more timely and accurate watershed assessment.

***PLP Question #10:*** How will the EPA ensure that the peer review is balanced? Will the EPA establish conflict of interest criteria for the peer review process? How will EPA determine what "existing science" is relevant to accept for review and what criteria will it utilize?

***EPA Response #10:*** We appreciate the importance of the peer review issues raised in this question and their relevance in assuring a scientifically valid and transparent assessment. As previously noted, the details of EPA's Bristol Bay watershed assessment, including the details of the peer review process that will be used for this assessment, are still being developed. We look forward to providing additional details regarding the peer review process as the assessment moves forward.

4

**PLP Question #11:** How will EPA ensure this process will not conflict with NEPA or prejudice EPA's role in the NEPA process should the Pebble Partnership submit a permit application?

**EPA Response #11:** We expect the Bristol Bay assessment can complement the NEPA process. The assessment will assist EPA and other federal agencies that participate in the scoping of NEPA documents. It will also be helpful in development of an Environmental Impact Statement (EIS) for the proposed Pebble Mine, especially the "Affected Environment" and "Mitigation" discussions. Should Pebble submit permit applications to trigger the NEPA process while EPA is developing the Watershed Assessment, EPA has the resources and capability to be involved in both processes concurrently.

**PLP Question # 12:** Will the scientific assessment evaluate the impacts of other major users of the watershed including commercial fishing, tourism, transportation infrastructure, hunting and guide services? If not, why?

**EPA Response #12:** The Bristol Bay Watershed Assessment has been developed to focus on one of the world's largest remaining salmon fisheries and potential threats to this fishery associated with future large scale development in the Bristol Bay watershed. Although this question recognizes additional threats/users in the watershed, we do not anticipate evaluating the cumulative adverse effects of these users together with the large scale development activities that are the focus of this assessment. As part of the assessment, EPA will collect and evaluate information associated with activities previously authorized under Section 404 of the CWA in the Bristol Bay. However, EPA is particularly interested in assessing new threats associated with large scale development, such as large scale transportation infrastructure and mining, that alone might significantly impact the ecological integrity of resources in the Bristol Bay watershed, including the sustainability of the existing salmon fishery.

**PLP Question #13:** What type of budget will be allocated for the scientific assessment? Has the EPA prepared a cost estimate for this endeavor? If so, please send that to PLP.

**PLP Response #13:** EPA has not yet developed a detailed budget for this assessment.

**PLP Question # 14:** In addition to risk, will the review look at the potential opportunities presented by development in the watershed?

**PLP Response #14:** EPA is aware of the economic opportunities and benefits of potential future development in the Bristol Bay watershed that will be directly relevant to decisions under the Clean Water Act, NEPA, and other Federal and State programs. The Bristol Bay Watershed Assessment, however, will not itself be a decision making process, but rather gather data and identify options which will help to inform future decisions. EPA is eager to use this assessment to ensure that an effective and comprehensive characterization of the environmental resources present in the watershed and threats to these resources are developed and a set of options for responding to these threats are identified. We expect that opportunities presented by potential development will be more fully considered as a part of future decision-making.

5

**EXHIBIT C**

Declaration of Richard Parkin



THE
pebble
PARTNERSHIP

October 21, 2011

Mr. Dennis McLerran
Regional Administrator
U.S. Environmental Protection Agency
Region 10
1200 Sixth Avenue
140-RA
Seattle, WA

Dear Dennis:

I am writing to thank you and your staff for meeting with John Iani and me on October
12th. We discussed several items that I would like to confirm.

Finalizing the Environmental Baseline Document

First, I am sorry that we have been unable to transmit our environmental baseline
document ("EBD") to you as soon as we had both hoped. It has taken much longer than
we expected to complete our pre-release internal data quality review of this 20,000
page document. We will transmit the EBD to you as soon as we can complete this
technical review: our current plans are to have the EBD ready for release on or about
December 6.

Making PLP Consultants Available to EPA

In order to keep this process moving forward, , we have offered to make some of
Pebble's scientific and technical consultants available to respond to any specific
questions EPA has prior to the release of the EBD. Rick Parkin has contacted Ken Taylor,
and we look forward to working out the details of that arrangement.

1



## Baseline Data Transmittal Format

We will be providing the baseline information in pdf format. We recognize EPA's desire to obtain the data in a manipulatable format. However, this data has great value to us (we have spent over $100 million on it), and EPA cannot guarantee that the data will not be made public.. Ordinarily this data and its interpretation would not be made public until we applied to begin the NEPA process. We offered to discuss providing the raw data to an agreed upon independent third-party contractor that could make analysis runs per EPA requests, but it is my understanding that this approach will not meet EPA's review standards for the watershed assessment.

## EPA Review of the Baseline Data

EPA indicated that providing the EBD in December might mean that EPA would choose not to use some of the information contained in it. EPA has indicated in the past that that data was very important to your study. We agree that these data are important, thus, we believe that EPA should take the time and effort to review this information. We do not expect to begin applying for permits for our project until 2013, so we do not understand why EPA would feel the need to issue its assessment without considering the EBD data.

## Mine Design Layout

As we stated at the meeting, we will be unable to comply with the request that Rick Parkin made for a current mine design layout of the Pebble Project that would be of any use to the Watershed Assessment process. As you are aware, we are currently in the pre-feasibility phase of developing a mine design layout which we hope to complete late in 2012. PLP and its predecessors have considered many options for all components of this project over the past several years, and we are still considering additional options.

The pre-feasibility study will result in a mine design layout that will supersede all previous designs. This study will include a comprehensive analysis of the geologic,

2



mining engineering, and economic factors governing the project, as well as an evaluation of appropriate environmental mitigation alternatives. The environmental evaluation will include, among other things, subjects such as waste management, water treatment, reclamation practices and mine closure and reclamation. Until that study is completed, there will be no mine design for EPA to analyze that has taken all of these factors into account, so the request is premature.

It takes years of environmental studies, careful planning and design work to ensure that the plan we ultimately propose — which will be reviewed by numerous federal and state regulatory agencies — meets or exceeds the agency design requirements and environmental protection standards. The reviewing agencies will include the EPA, the U.S. Army Corps of engineers, the U.S. Fish and Wildlife Service, the National Marine Fisheries Service, as well as the Alaska Departments of Fish and Game, Natural Resources and Environmental Conservation and others. All of those agencies, as well as Native Alaskans and the public, ultimately will have the opportunity to participate in a thorough review of the Pebble Project as the Environmental Impact Statement is developed under the National Environmental Policy Act.

EPA has undertaken the unprecedented task of assessing the impacts of potential development of a mineral deposit before the project is designed and submitted for permitting. Using an outdated and merely conceptual plan such as the one submitted in 2006 to the Alaska Department of Natural Resources by Northern Dynasty Mines for water rights applications — or even the preliminary Waldrop plan of February 2011 — would be an inadequate basis for such an assessment. Any analysis of this design would lead to erroneous conclusions having little relevance to what may actually be submitted by PLP at some future date.

Relevant Data From Other Mining Operations

There are alternative and sources of information for the agency to tap in lieu of a conceptual Pebble mine design that will likely become irrelevant. hile all mine designs are location specific and must address local physiographic, environmental and social conditions, there are some examples of existing mines in somewhat similar ecological

3



regions of North America that might provide you with a more accurate assessment of the effects of mining a copper/gold/molybdenum deposit on the surrounding environment. Analyzing these would provide EPA with real data rather than speculative results. The Gibraltar mine and Highland Valley Copper are two copper mines in British Columbia that have been constructed and have been in operation for a number years. Both of these operations are mining ore bodies similar to that of the Pebble deposit, and both are in the Fraser River Valley where they must co-exist with one of the largest sockeye salmon populations in the world.

The regulatory environment here in Alaska is at least as stringent as it is in Canada. An analysis of the impacts of either of these two mines on the surrounding environment would provide your agency with a far more solid basis for any conclusions in your assessment of the Nushagak and Kvichak watersheds than you will produce using a hypothetical mine plan, regardless of the source.

We will be providing information on these and other mines so that EPA has an opportunity to assess mitigation measures being used by 21st century mining operations.

Watershed Assessment Schedule

EPA's current schedule for the Watershed Assessment is too ambitious. Given the substantial amount of information that EPA will have to review, and given the area being studied is the size of New Jersey and Maryland combined, providing a quality science-based product of the quality requested by Sen. Cantwell (among many others) is not realistic. Either quality or schedule will have to be sacrificed. Of those two choices, we respectfully request that quality should be controlling here. Moreover, as noted above, extending the schedule will not pose any risk to the watershed because PLP does not plan to apply for any permits before 2013, and when it does, the project will undergo a thorough environmental review.

4



## Peer Review

We had a very healthy discussion about the approach EPA will use to have an independent contractor select members of the peer review panel. We support this approach and are pleased that all peer reviewers will have to be free from conflicts of interest with PLP, our opposition and EPA itself. As we know, at least one of the contractors pick by EPA to assist with the Assessment was not free of such conflicts.

## Tribal Consultation

Our discussion about Tribal consultation was quite useful. We understand that Region 10 solicited 31 tribal entities in the Bristol Bay region to determine which Tribes were interested in being consulted during the Assessment, and 14 of those entities responded positively. Rick Parkin has since provided us with the names of those Tribes.

We understand that EPA is still in the process of finalizing your consultation plan for the Tribes, and that EPA has been conducting some Tribal consultation since the study began. We will be interested in seeing the plan once it is complete.

## Mitigation

Finally, one of the aspects of the Assessment which continues to concern us is the approach EPA will take to mitigation. As stated above, if attempting to predict what mine development plan fits anywhere in the two watersheds is at present an uninformative exercise, it, it is also too early to reliably predict what mitigation measures will be employed. This issue warrants further discussion.

* * *

In closing we sincerely appreciate the open communication we have enjoyed with you, Bob Sussman and the Regional Administrator's office. We also appreciate your

5



THE
pebble
PARTNERSHIP

commitment in visiting the site twice this year. We look forward to continuing our dialogue in the near future.

Sincerely yours,

John Shively
Chief Executive Officer

Robert Sussman
Rick Parkin
Allyn Stern
Cara Steiner-Riley

6

**EXHIBIT D**

Declaration of Richard Parkin



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 10**
1200 Sixth Avenue, Suite 900
Seattle, Washington 98101-3140

OFFICE OF THE
REGIONAL ADMINISTRATOR

**NOV 22 2011**

John Shively
Chief Executive Officer
Pebble Limited Partnership
302 C Street, Suite 604
Anchorage, Alaska 99503

Dear Mr. Shively:

Thank you for your letter of October 21, 2011. My staff and I appreciate you making your technical consultants available for discussion with our watershed assessment team and I understand that the meeting on November 1 was informative and productive.

In response to your letter, I would like to clarify several points about the relationship of the Pebble Limited Partnership environmental data to our watershed assessment. As you know, the purpose of our assessment is to assess the potential impacts of large scale hard rock mining development in the Kvichak and Nushagak watersheds. Our assessment will consider the PLP mining claim as well as other actual and potential mining activities in these watersheds. It is our intention to review and consider available environmental data and information relevant to our assessment. To that end, we have requested data and information from many sources, including PLP. In addition we have consulted with federal, state, and local agencies and tribal governments, and we are considering their input and expertise.

It is clear that PLP has collected a lot of environmental data in the headwaters of the Kvichak and Nushagak watersheds. This data could provide an interesting and detailed view of current environmental conditions in these particular locations. I appreciate the fact that you consider this data important to the development of our draft assessment as well.

Due to the delays described in and discussed in recent meetings, you have committed to provide your environmental baseline document to us on or about December 6, 2011. We look forward to the opportunity to review and consider the data as we move forward with completing our assessment. We plan to review and evaluate any data received from PLP just as we would data from any source, including our own scientists. To complete that review, we will need complete documentation (metadata) concerning sampling and analytical methods, any statistical approaches used to summarize the data, and a description of any quality assurance and quality control results. Without complete documentation, we will be unable to fully evaluate and could not use PLP data as part of our assessment.

To make our evaluation efficient, we hope to receive PLP data in an acceptable database format. Receipt in the form of Adobe PDF files could limit our ability to fully evaluate and use the data in our assessment. To date, you have been reluctant to provide the data in a database format; however, based on recent discussions between our respective attorneys, I am hopeful that you are reconsidering this decision.

I understand that our respective attorneys have talked on several occasions about whether the EPA is able to treat the PLP data as Confidential Business Information, as you have suggested. In those conversations we did not understand how the data would qualify as CBI, but said we would be receptive to hearing PLP's basis for making such a claim. To date, PLP has not provided any information to demonstrate that the data is CBI. You have also suggested that PLP provide the data to a third party so that analyses could be completed and the data not be subject to discovery or FOIA. We do not find this to be an acceptable option. The EPA's science assessments must be open, transparent and fully available for public review. We plan to conduct a thorough and independent peer review of our draft assessment and the scientists involved in this peer review will expect and demand access to all sources of data referenced in the assessment.

You raise a concern in your letter that the EPA's use of a conceptual mine design for our watershed assessment would lead to erroneous conclusions, based on the fact that the final PLP design has not been completed and may change from previous proposals. I want to emphasize that our intention is to assess potential effects on the watersheds from hard rock mining generally, not to evaluate a specific mining proposal. We will consider the likely components of large scale mining, based on what we know about the area, the mineral deposit, and mining technology to evaluate risks to fisheries from potential mining activities. We are using the area around the PLP claims for this assessment because it represents one of the more likely areas to be developed in the immediate future and because a significant amount of information is available. As you suggest, we are also looking at other existing mines and will also factor information on their environmental impacts into our assessment.

Regarding our schedule, we have made commitments to tribal governments and the public to conduct a high quality watershed assessment and make a draft available for public and scientific peer review in spring of 2012. We intend to meet that goal. While the PLP data is not essential for us to develop a scientifically sound assessment, we will continue to welcome and consider information we receive from PLP and others while we develop drafts of our assessment. It is unlikely that we will be able to use data even in an acceptable format received after December 6, 2011 in our draft assessment report. However, after completion of the assessment, new information could potentially be considered in future decision making.

We have provided you with our data priorities in the past. If you have any questions about the requested data, I would be happy to speak with you directly. You should also feel free to contact Rick Parkin, EPA's Management Lead for the Bristol Bay Watershed Assessment. Rick can be reached at (206)553-8574, or by email at parkin.richard@epa.gov.

Thank you in advance for your cooperation.

Sincerely,

Dennis J. McLerran
Regional Administrator

**EXHIBIT E**

Declaration of Richard Parkin



History:                    This message has been replied to and forwarded.

Good morning Rick,

Sorry it's taken me a while to get back to you
regarding the wetlands data request.  As I have
stated before, PLP will not be releasing any of our
electronic data in raw form.  However, the wetlands
maps in the EBD have all the data collected by our
consultants.  If you zoom in on the maps, you can see
the detail.

I hope this is helpful for your needs.

Ken

-----Original Message-----
From: John Shively
Sent: Friday, February 17, 2012 5:09 PM
To: Richard Parkin
Cc: Ken Taylor
Subject: RE: Request for wetlands data

Rick,

I apologize for not responding sooner, but I believe
that Ken has now responded to you request.

John

-----Original Message-----
From: Richard Parkin [
mailto:Parkin.Richard@epamail.epa.gov]
Sent: Wednesday, February 15, 2012 8:20 AM
To: John Shively
Cc: Ken Taylor
Subject: Request for wetlands data

Hi John,

Last week I spoke to Ken and requested the GIS
information for the wetlands maps in chapter 14 of
the EBD.  I haven't heard back so thought I would ask
you.
The information we are requesting in priority order
is:

-Wetlands (shapefile or geodatabase)
-Roads (shapefile or geodatabase)
-LIDAR (GRID or TIFF)

You apparently have the NWI wetlands maps digitized
as well as Pebble Partnership maps.  It would be very
helpful if you could provide us with that

information.  That is our priority request.

Thank you for your assistance John.

Rick Parkin
U.S. EPA, Region 10
(206) 553-8574

**EXHIBIT F**

Declaration of Richard Parkin

From: Richard Parkin/R10/USEPA/US
To: Larry.Hartig@Alaska.gov
Cc: Dennis McLerran/R10/USEPA/US@EPA
Date: 01/04/2011 12:47 PM
Subject: Confidential *** Draft Outline of a Bristol Bay Process to inform EPA's decision whether to invoke 404(c)*** please don't distribute

---

Larry,

Sorry this is late. I got side tracked. I am sharing this with you before any other partners. Please ensure that it is not distributed. At this time it is too vulnerable to misinterpretation and speculation. I would like to discuss with you ways that we can insert the state into this process as a co-leader with EPA to ensure that the proper information is reviewed and that the partners and stakeholders have an opportunity for meaningful involvement. I will call you at 1:00 your time. Thanks

*(See attached file: Bristol Bay 404c process outline 1-4-11.docx)*

Rick Parkin
U.S. EPA, Region 10
(206) 553-8574

# Outline for 404C Process

## **Details of the Public Process**

The purpose of this process is to build a common understanding of potential impacts to the watershed of Bristol Bay and to inform EPA's decision on the need for protections under 404(c).

### Scientific/Technical Information Gathering

- Prepare a risk analysis for aquatic resources of Bristol Bay. This is a document describing the aquatic resources of Bristol Bay, the risks associated with human development in Bristol Bay, taking into account measures available to mitigate risks. Region 10 is pursuing a contractor to review the scientific and agency produced literature. This should take three to six months to complete.

- Deliverables:

1. Report with annotated literature review (including agency staff and other experts contacted) documenting the salmon resource of Bristol Bay, Alaska, and its contributing tributaries.
2. Report with annotated literature review (including agency staff and other experts contacted) documenting the ecological and economic significance of salmon resource of Bristol Bay, Alaska, and its contributing tributaries to the local and North Pacific Ocean ecosystem.
3. Report with annotated literature review (including agency staff and other experts contacted) documenting the threats and stressors associated with human activities on watershed health.
4. Report with annotated literature review (including agency staff and other experts contacted) documenting mitigation practices, including any advanced technology, and their success and failure rates, in short (decadal) and perpetual time frames.
5. Cumulative Watershed Analysis Plan with proposed analyses, data layers needed and their availability. This plan should include detailed hydrologic modeling, Non-point Source Pollution and Erosion Comparison Tool (N-SPECT), etc.
6. An indexed hard copy record of the relevant parts of all documents referenced in the above reports as well as notes from meetings with agency staff or other sources of expert information.

## Federal, State, Tribal Involvement and Public Input

- Develop the process around three questions:

  1. Is the Bristol Bay fishery the one of a kind, world class fishery that it is depicted to be?
  2. What are the existing and potential risks associated with activities that may require a Section 404 permit that create unacceptable adverse impacts (population level impacts) to recreation, wildlife or the fishery. Are there technologies or practices that will mitigate these risks?
  3. If warranted by the answers to 1 and 2 above, what restrictions would reduce or eliminate the risk of unacceptable adverse impacts?

- Answer these questions based on the deliverables above.

- Meet with federal, state and tribal agencies to assist EPA with performance of the following tasks:

  - Pool the information at their disposal and determine appropriate sources of missing information;
  - Review deliverables;
  - Review EPA draft responses to the fundamental questions.
  - Assist at public meetings addressing each of the fundamental questions.

- Hold public meetings in Anchorage and the Bristol Bay Watershed to explain the preliminary findings under each question and take public input.

- It will be best from the position building stand point to have a series of topical public meetings. If we try to address all three questions at one meeting people will jump to the bottom line, question number 3, without buying into the answers to 1 and 2.

- So we will have a series of at least 2 public meetings: a series of meetings to address the status and risks to the fishery (questions 1 and 2) and a series of meetings to address prudent measures to protect the resource for generations to come.

- A summary of each public meeting will be developed and made available via the web page.

- We may create fact sheets and mailings as work progresses to keep the public informed.

- EPA will consult with Tribes in the watershed that request consultation and will meet with PLP and other interests as requested and appropriate.

<u>CERTIFICATE OF SERVICE</u>

I certify that on November 7, 2014, I caused to be filed electronically the foregoing

DECLARATION with the Clerk of Court using the Court's CM/ECF system, which sends

a Notice of Electronic Filing to counsel of record.


<u>/s/ Brad P. Rosenberg</u>
BRAD P. ROSENBERG