# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

PEBBLE LIMITED PARTNERSHIP,

       Plaintiff,

  vs.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

       Defendants.

Case No. 3:14-cv-00171 HRH

## DECLARATION OF TAMI FORDHAM

    I, Tami Fordham, declare that the following statements are true and correct to the best of my knowledge, and are based on my personal knowledge, information contained in the records of the United States Environmental Protection Agency ("EPA"), and information supplied to me by current EPA employees.

    1.    I am the Deputy Director of EPA Region 10's Alaska Operations Office and I also serve as the Tribal Liaison to the Bristol Bay Project. I have worked for EPA for 13 years. From 2009 through 2014 I was the Alaska Resource Extraction Tribal Policy Advisor, and from 2003 through 2009 I was a Region 10 Tribal Coordinator. Since at least 2003 I have been involved with EPA tribal consultation and coordination efforts. I received a Bachelor of Applied Science in Sustainability Studies from the University of

1

Washington in 2003.

2.     As the Region 10 Alaska Resource Extraction Tribal Policy Advisor, I served as the staff lead on tribal issues relating to complicated controversial resource extraction projects in Alaska. My job responsibilities included leading EPA's coordination and consultation processes with affected federally recognized tribal governments ("tribes"); advising EPA management on appropriate responses to tribal input and requests; serving as regional lead for development and implementation of tribal coordination and consultation processes related to Agency actions affecting oil, gas, and mining exploration and development; assisting tribes in defining and assessing their environmental problems and in developing environmental management capacity and implementing programs and projects; assisting EPA in interacting effectively with assigned tribes; coordinating EPA activities related to assigned tribes with similar activities of other federal, state, and local government agencies; providing engagement opportunities for Alaska Native Claims Settlement Act ("ANCSA") Village and Regional Corporations, consistent with Public Law 108-199, Division H, Section 161, and Public Law 108-447, Division H, Title V, Section 518; and working closely with the Project Lead on tribal consultation involving large scale resource extraction projects that involve multiple Alaska tribes, including the potential Pebble mine.

3.     As the Region 10 Alaska Resource Extraction Tribal Policy Advisor, I also took on the role of Tribal Liaison to the Bristol Bay Project in 2011. Although I now serve as the Deputy Director of Alaska's Operations Office, I continue to serve on the team as the Tribal Liaison to the Bristol Bay project.

2

I.  **EPA's Policy Is to Engage in Government-to-Government Consultation with Federally Recognized Tribal Governments and to Ensure the Close Involvement of Tribal Governments in EPA Decision-Making.**

4.  EPA was one of the first federal agencies with a formal policy specifying how it would interact with tribal governments and consider tribal interests in carrying out its programs to protect human health and the environment. EPA's Policy for the Administration of Environmental Programs on Indian Reservations, signed in 1984, establishes that EPA will "give special consideration to Tribal interests in making Agency policy, and . . . insure the close involvement of Tribal Governments in making decisions and managing environmental programs affecting reservation lands." (Attached hereto as Exh. A.) The 1984 Policy further provides that EPA, "in keeping with the federal trust responsibility, will assure that tribal concerns and interests are considered whenever EPA's actions and/or decisions may affect reservation environments." The 1984 policy has consistently been applied to tribal governments within Alaska, notwithstanding Alaska's general lack of reservation system.[1]

5.  Executive Order 13175, signed in 2000, further specifies that each Agency must have an accountable process to ensure meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications. Additionally, the Appropriations Act of 2005 established that "[t]he Director of the Office of Management and Budget and all federal agencies shall hereafter consult with Alaska Native corporations on the same basis as Indian tribes under Executive Order No. 13175."

6.  In accordance with the Presidential Memorandum issued November 5, 2009, which directs agencies to develop a plan to implement fully E.O. 13175, EPA established

---

[1] The only reservation in Alaska, the Metlakatla Indian Community of the Annette Island Reserve in Southeastern Alaska, has not been involved in consultation or coordination relating to Bristol Bay.

3

its Policy on Consultation and Coordination with Indian Tribes. (Attached hereto as Exh. B.)

7.    EPA's policy, as established in its Policy on Consultation and Coordination with Indian Tribes, is to consult on a government-to-government basis with federally recognized tribal governments when EPA actions and decisions may affect tribal interests. Consultation is defined as "a process of meaningful communication and coordination between EPA and tribal officials prior to EPA taking actions or implementing decisions that may affect tribes." In general, consultation at EPA consists of four phases: identification, wherein EPA identifies activities that may be appropriate for consultation; notification, wherein EPA notifies the tribes of activities that may be appropriate for consultation; input, wherein tribes provide input to EPA on the consultation matter; and follow-up, wherein EPA provides feedback to the tribe(s) involved in the consultation to explain how their input was considered in the final action.

8.    As set forth in EPA Region 10's 2012 "Tribal Consultation and Coordination Procedures,"[2] EPA should consult with a tribe when making decisions, taking actions, managing projects, or engaging in similar activities that might affect the tribe's interests. (Attached hereto as Exh. C.) In determining whether the tribe's interests might be affected, EPA should take into account geographical considerations, including whether the action may affect a tribe's health, resources, rights, or traditional ways of life, as well as tribal resources considerations, including whether the action may affect the cultural, traditional, or subsistence resources of a tribe or a tribe's traditional way of life.

9.    As a process, consultation includes several methods of interaction that may occur

---

[2] The 2012 Procedures remained consistent with but expanded upon and superseded the 2001 EPA Region 10 Consultation Framework.

at different levels. It is EPA's policy to encourage the tailoring of consultation approaches to reflect the circumstances of each consultation situation and to accommodate the preferences of tribal governments. Thus, there is no single formula for what constitutes appropriate consultation. Indeed, as described in EPA Region 10's 2012 "Tribal Consultation and Coordination Procedures," consultation "may include a wide range of communication over the course of developing an EPA action or decision" and may consist of "meetings, telephone conferences, or internet-based communication to exchange technical information at the staff or management level, discussions to establish effective processes for coordination and planning, formal structured meetings between EPA and tribal leaders, or a wide range of other communication in person or by e-mail, telephone, or letter."

10.     In my roles as the Bristol Bay Tribal Liaison, the Alaska Resource Extraction Tribal Policy Advisor, and a Region 10 Tribal Coordinator, I have worked to ensure that EPA Region 10 implements the 1984 policy, E.O. 13175, EPA's Policy on Consultation and Coordination with Indian Tribes, and EPA Region 10's "Tribal Consultation and Coordination Procedures." In accordance with this guidance, the manner in which EPA Region 10 engages in consultation and coordination often depends on EPA's role in a particular project or decision. For example, if EPA has a major decision-making role in a particular project, such as where EPA has CWA National Pollutant Discharge Elimination System ("NPDES") permitting authority, we are more likely to conduct outreach and hold informational sessions than in a situation where EPA does not play an active decision-making role. As a general matter, EPA seeks to grant tribal requests for meetings, listening sessions, or briefings whenever possible.

**II.    In Accordance with EPA's Trust Responsibility and EPA Policy, EPA Engaged in Communications with Tribal Governments Regarding the Potential Pebble Project Early in the Regulatory Process.**

11.      EPA first became aware of the potential Pebble mine as early as 2003 when Northern Dynasty Minerals ("NDM") informed agencies, including EPA, that it was preparing to submit a mine application for the Pebble Project to the U.S. Army Corps of Engineers ("Corps") and to engage in the National Environmental Policy Act ("NEPA") process.  EPA anticipated that it would likely play a significant role in the regulatory process, as it typically does with large projects that may affect human health or the environment.[3]  Thus, consistent with EPA policy and procedure, EPA engaged in informal communications and coordination with tribes at the early stages of the project development.

12.      In 2006 and 2007, NDM held open meetings with tribal leaders in the Bristol Bay area.  As tribal members became increasingly aware of the proposed Pebble project, they began approaching EPA to express concerns about potential impacts to human health and the environment. As was and remains our duty, we listened to their expressed concerns, and we sought to provide information to the tribes about mining and EPA's regulatory responsibilities.

13.      Around the same time period, EPA began receiving resolutions from Alaska tribes expressing concern about and opposition to the Pebble project.  (Attached hereto as Exh. D.) EPA also began receiving requests to initiate formal discussions about potential mine impacts to human health and the environment.  EPA did not solicit input from the tribes at

---

[3] Specifically, EPA anticipated that its responsibilities would include issuing NPDES permits pursuant to Section 402 of the CWA; reviewing wetland permit applications pursuant to Section 404 of the CWA; reviewing federal Environmental Statements pursuant to Section 309 of the Clean Air Act; and serving as a cooperative agency in the NEPA process.

this time but actively listened to the concerns expressed by the tribes.

14.     In February 2008, in response to growing expressed concerns from Alaska tribes about a number of potential mines, including the Donlin gold mine and the Pebble project, EPA Region 10 developed the Alaska Tribal Mining Education Plan ("Plan"). (Attached hereto as Exh. E.) The Plan, which remains in effect, seeks "to respond to requests from tribes to improve the dialogue and information-sharing on mining issues" by providing tribes with information on mining and potential mining projects as early as possible; providing tribes with opportunities to share concerns; and providing tribes with information on opportunities to influence particular projects. The Plan establishes a structure to achieve these goals, which includes the implementation of education sessions, availability sessions, an EPA tribal webpage update, and project-specific consultation. While the Plan mentions CWA Section 404 permit review as one of EPA's many mining-related programs (along with NPDES permit issuance, NEPA compliance, water quality standards actions, etc.), CWA Section 404(c) is not included as part of this structure, nor is any sort of tribal petition.

15.     In June 2008 EPA Region 10 Regional Administrator Elin Miller travelled to Alaska to learn firsthand about issues affecting Region 10's work. As part of this trip, Regional Administrator Miller and EPA staff visited the proposed Pebble project and met with tribal representatives in Iliamna, Alaska, to hear their perspectives and concerns. It is common practice for a Regional Administrator to visit a large proposed project that is likely to have impacts to human health and the environment, particularly where EPA anticipates that it will have significant regulatory involvement. It is similarly common for the Regional Administrator to hold informal listening sessions with tribal

representatives when he or she visits a rural area.

16.    The tribal representatives who met with Regional Administrator Miller expressed a range of perspectives on the proposed project. In accordance with EPA's trust responsibility and EPA policy, EPA listened to and considered the opinions expressed at this meeting. EPA did not solicit or otherwise request group advice from the tribal members in attendance at this meeting.

17.    In August 2008 EPA hosted a Mining Information & Tribal Involvement session via teleconference for all Lake Iliamna tribes. At this session EPA representatives, including Region 10 Mining Coordinator Patti McGrath, Pebble Project Manager Jonathan Pavitt, and myself, gave a PowerPoint presentation outlining EPA's consultation and coordination responsibilities under the 1984 Policy, the exploratory status of the Pebble project, EPA's involvement in the Pebble project, and EPA's typical involvement in a mining project, including NEPA review and CWA Sections 402 and 404 authority. (Attached hereto as Exh. F.) The presentation also outlined ways in which tribes can increase their involvement in a particular project, such as by requesting government-to-government consultation, requesting training and educational opportunities, requesting to be a cooperating agency under NEPA, providing traditional knowledge, participating in public hearings and meetings, taking agencies on site visits, and maintaining early and frequent contact with EPA staff. I have given similar PowerPoint presentations at the Alaska Forum on the Environment in 2009, 2011, and 2012; the Region 10 Tribal Leaders Summits in 2010 and 2012; the Alaska Tribal Conference on Environmental Management in 2011; and at the request of tribal governments (in person or via teleconference). I believe this presentation accurately summarizes EPA's consultation

8

duties and helps to ensure that EPA and affected tribes engage in two-way communication at the earliest point in EPA's decision-making.

III. **In Accordance with EPA's Trust Responsibility and EPA Policy, EPA Met and Communicated Regularly with Tribal Governments to Discuss the Potential Pebble Project and the Requests Regarding the CWA Section 404(c) Process.**

18.     In May 2010 EPA received petitions from six Bristol Bay tribes requesting that EPA "initiate a public process under Section 404(c) of the CWA, to protect waters, wetlands, fish, wildlife, fisheries, subsistence, and public uses in the Kvichak and Nushagak River drainages and Bristol Bay of Southwest Alaska from metallic sulfide mining, including a potential Pebble mine." (Attached hereto as Exh. G.)  Signatories included Nondalton Tribal Council, New Stuyahok Traditional Council, Levelock Village Council, Ekwok Village Council, Curyung Tribal Council, and Koliganek Village Council.  Later in 2010, three additional Bristol Bay tribes, the Native Village of Ekuk, the Village of Clark's Point, and Twin Hills Village Council, also signed onto this letter.

19.     While I was aware of many of the petitioning tribes' concerns about a potential Pebble mine as a result of information sessions, resolutions, informal meetings, and information submissions, I was not aware of the petitions until they were formally submitted to EPA.

20.     Following the submission of the petitions and in accordance with EPA policy and procedure, EPA staff also had increasingly frequent communication with tribal representatives.  Such communications are not atypical for a major project that may have significant effects on a tribe, yet Pebble Limited Partnership ("PLP") repeatedly mischaracterizes them.  For example, PLP alleges that in July 2010 Jeff Parker, an attorney representing the petitioning tribes, "advised" and "counsel[ed]" me on the

strategy for an upcoming meeting that was open to all tribes. *See* Compl. ¶ 149. While it is EPA's policy to listen to concerns expressed by tribes and provide opportunities for input, I did not receive "counseling" from tribal representatives, nor did external parties determine EPA's internal strategy.

21.     PLP further mischaracterizes EPA's relationship with legal counsel for the tribes, alleging that "[t]he documents show EPA 'blind-copying persons outside the Agency." *See* Compl. ¶ 55. The one email PLP cites is a July 16, 2010 email in which I "blind-copied" Parker. (Attached hereto as Exh. H.) PLP fails to provide any context for this email, instead asserting that "Parker is one of the most active Anti-Mine Coalition collaborators with EPA." In fact, the email in which I blind-copied Parker was sent to over a dozen recipients, including Parker's client, the Ekwok Village Council, to apprise tribes of Administrator Lisa Jackson's upcoming visit to Dillingham, Alaska. The email was not an internal communication, nor did it involve any sort of decision-making or internal procedure.

22.     In July 2010 EPA Administrator Lisa Jackson, Regional Administrator Dennis McLerran, and EPA staff visited Alaska in order to learn firsthand about a number of issues relevant to EPA's work. The Administrator traveled to Anchorage, Bethel, and Dillingham. In Dillingham, the Administrator participated in two listening sessions regarding the Pebble Mine, one specifically for tribal leaders from Bristol Bay and one meeting open for all local and regional entities. She also met with PLP in Anchorage for a briefing on the proposed Pebble Mine project. EPA did not establish or utilize a group at any of these meetings, nor did it seek group advice; rather, EPA sought to hear firsthand the various perspectives on the potential mine in order to inform its decision-

making process.

23.     In response to a request from Jeff Parker, on August 13, 2010, EPA representatives, including myself, met with Corps representatives, Thomas Tilden, First Chief of Curyung Tribal Council, and Parker. This meeting only briefly touched on EPA's CWA Section 404 authorities and instead primarily focused on ways in which the tribes could become more involved in the Pebble project as cooperating agencies or through field activities when PLP applied for a permit, thereby triggering the NEPA process. We also discussed potential sources of funding for work performed in connection with the NEPA process. The topics discussed during this meeting demonstrate that EPA had not yet made a decision as to how to respond to the tribes' petitions.

24.     In October 2010 EPA also received requests to refrain from taking action under Section 404(c). (Attached hereto as Exh. I.) These requests included those that requested more time to understand potential implications of mine development in the Bristol Bay watershed, and others that asked EPA to wait until formal mine permit applications had been submitted and an EIS had been developed. These requestors included four Bristol Bay tribes: Newhalen Tribal Council, South Naknek Tribal Council, King Salmon Traditional Village Council, and Iliamna Village Council, along with other tribal organizations.

IV.     **In Accordance with EPA Policy, EPA Consulted With Tribal Governments Regarding the Development and Revision of the Bristol Bay Assessment.**

25.     On February 7, 2011, after taking into consideration all the information EPA received from interested parties, including tribes, Regional Administrator Dennis McLerran announced EPA's intent to conduct a scientific assessment to evaluate how

future large-scale mining projects might affect water quality in the Nushagak and Kvichak watersheds and Bristol Bay's salmon fishery. Along with interested stakeholders, including PLP and the State of Alaska, EPA notified all 31 Bristol Bay tribes of its intent to initiate a watershed assessment of Bristol Bay ("Assessment") and to do so in an open, public, and transparent format.

26.    Between February 9 and February 22, 2011, immediately following EPA's Assessment announcement, EPA held multiple meetings with Alaska tribes and ANCSA corporations in accordance with EPA policy and procedure. During this two-week time period, EPA held at least seven meetings with at least thirteen interested tribes and at least five Alaska Native organizations throughout Southwest Alaska. The purpose of these meetings – which involved tribes in support of and opposed to the potential mine, as well as those who were seeking more information – was to allow EPA to listen to community concerns, share information regarding the process, and gather information.

27.    On March 7, 2011, in accordance with EPA policy and procedure, Regional Administrator Dennis McLerran sent letters to all 31 Bristol Bay tribes (including those that had taken public stances in support of and in opposition to the proposed Pebble mine) outlining "specific opportunities for [their] tribal government to participate" in the development of the Assessment and inviting them to request tribal consultation. (Attached hereto as Exh. J.) Regional Administrator McLerran also invited tribes to nominate tribal representatives to participate in the Intergovernmental Technical Team ("IGTT"), discussed below. The letters included a questionnaire on which tribes could indicate their desired level of involvement in the Assessment.

28.    In March 2011, following the invitation to request tribal consultation, EPA invited

all 31 Bristol Bay tribes to participate in an information exchange regarding tribal consultation and coordination that was held via teleconference. Again, EPA did not seek group advice or consensus from the tribes, but rather sought to exchange information about the consultation and coordination process.

29. In June 2011 EPA Senior Policy Counsel Robert Sussman, EPA Acting Assistant Administrator for Water Nancy Stoner, EPA Region 10 Regional Administrator Dennis McLerran, and EPA staff travelled to Alaska and held community meetings and listening sessions in the villages of Newhalen, Ekwok, New Stuyahok, and Dillingham. EPA was interested in hearing all perspectives, including those opposed to the potential Pebble mine, during this visit. EPA also met with PLP and toured the Pebble site.

30. In August 2011 EPA met with the Intergovernmental Technical Team, the purpose of which was to review and provide technical comments to EPA on the pre-public draft of the Assessment. Intergovernmental Technical Team participants included tribal representatives from the Ekwok Village Council, the Newhalen Village Council, the Iliamna Village Council, the South Naknek Village Council, the Koliganek Village Council, the Curyung Tribal Council, the Nondalton Tribal Council, and the Levelock Village Council, and State of Alaska and federal government representatives. The tribal representatives who participated in the Intergovernmental Technical Team presented a variety of opinions about whether and how the Assessment should be conducted and whether EPA should proceed with a Section 404(c) action.

31. PLP cites a number of emails Parker sent to EPA regarding the Intergovernmental Technical Team, seemingly to suggest Parker unduly influenced the makeup of the IGTT. *See* Compl. ¶¶ 272, 280. In fact, it was wholly appropriate for EPA to consider input

provided by Parker, on behalf of his clients, as part of the consultation process. Moreover, the documents PLP cites demonstrate not that EPA was actively soliciting advice from Parker and others, but rather that EPA was providing ample opportunity for tribal involvement in the Assessment in accordance with EPA policy and procedure.

32.    In February 2012 Deputy Administrator Bob Perciacepe met with tribal representatives from Iliamna and Newhalen and with representatives from Nuna Resources, all of whom have expressed public support for a potential Pebble mine. These parties requested a meeting with Administrator Lisa Jackson because she was unable to meet with them during her 2010 visit. During the meeting, the tribal representatives underscored their concerns for the economic wellbeing of the residents of the villages situated close to the Pebble site. As it does with all tribal consultation and engagement, EPA has taken this information into consideration in its decision-making process. In Fact, an entire Appendix to the Assessment is dedicated to understanding the status of the indigenous cultures of the Nushagak and Kvichak River watersheds and their dependence on and relationship to salmon and other stream-based natural resources of the region.

33.    Between February 2011, when EPA announced its intent to conduct a scientific assessment in Bristol Bay, and May 2012, when EPA completed its first draft of the Assessment, EPA met on at least 27 occasions with Bristol Bay tribes in locations ranging from Washington, D.C., to rural villages in Alaska. These meetings involved tribes both in favor of and opposed to the potential Pebble mine, as well as those that took no official stance on the mine. EPA tried to provide numerous informational sessions to increase two-way communication and coordination with tribes, just as we tried to grant meeting and government-to-government consultation requests whenever possible.

14

34.     Between February 2011, when EPA announced its intent to conduct a scientific assessment in Bristol Bay, and May 2012, when EPA completed its first draft of the Assessment, EPA met on at least 19 occasions with ANCSA corporations in locations ranging from Washington, D.C., to rural villages in Alaska. These meetings involved ANCSA corporations both in favor of and opposed to the potential Pebble mine, as well as those that took no official stance on the mine. EPA tried to grant meeting and consultation requests whenever possible.

35.     In March 2012 EPA participated in meetings with fourteen Bristol Bay ANCSA corporation representatives and Alaska Native organizations in King Salmon and Newhalen, as requested by the ANCSA representatives. PLP also attended the meeting held in King Salmon. At both of these meetings EPA heard from representatives with mixed perspectives about a potential mine. EPA provided an update on the Assessment, listened to feedback from the representatives, and discussed their concerns.

36.     On May 18, 2012, EPA announced the release of the draft report, *An Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay, Alaska*. All 31 Bristol Bay tribes were invited to participate in the teleconference during which the release of the Assessment was announced. Later that month EPA held a webinar to update tribal governments on the status of the Assessment.

37.     In late May and early June 2012, EPA Regional Administrator Dennis McLerran and EPA staff travelled to Alaska to hold public meetings in Anchorage, Nondalton, Levelock, New Stuyahok, Igiugig, Naknek, and Dillingham. The purpose of these meetings was for community members to provide input to EPA on the draft Assessment. Over 2000 people attended the meetings, and more than 400 testified. During this visit

EPA also engaged in government-to-government consultation (at the request of the tribes) with Curyung Tribal Council, Nondalton Tribal Council, and New Stuyahok Village Council. EPA had also planned to travel to Newhalen to hold a public meeting and to engage in government-to-government consultation with Newhalen Tribal Council and Iliamna Tribal Council, both of which had requested EPA to refrain from taking action under Section 404(c), but this visit was cancelled at the request of the tribes.

38. On April 26, 2013, EPA Region 10 released the second revised draft of the Assessment. That same day, a CD of the revised draft Watershed Assessment and hard copies of the revised draft Executive Summary were mailed to all 31 Bristol Bay tribes with an invitation to consult on the April 26, 2013 draft of the Assessment. EPA also sent letters to 26 ANCSA corporations that included a copy of the Executive Summary of the draft Assessment as well as an invitation to meet with EPA. Additionally, the tribes and the ANCSA corporations were invited to participate in a teleconference and webinar on the revised Assessment to be held the following month.

39. Between the release of the first draft Assessment in May 2012 and the release of the second revised draft Assessment in April 2013, EPA held at least three information exchange meetings with tribes, ANCSA corporations, and Alaska Native organizations and at least ten leadership meetings.

40. As described in the Proposed Determination, EPA also provided multiple engagement opportunities for Village and Regional ANCSA Corporations throughout the development of the Assessment, consistent with Public Law 108-199, Division H, Section 161, and Public Law 108-447, Division H, Title V, Section 518. EPA representatives traveled to King Salmon, Iliamna, and Anchorage for meetings at the request of multiple

16

ANCSA Corporations, to share information about and receive input on the Assessment. Additionally, ANCSA Corporation representatives were invited to participate in a webinar following the release of April 2013 draft of the Assessment. Throughout the development of the Assessment, ANCSA Corporations have traveled numerous times to meet with EPA officials in Anchorage, Seattle, and Washington, D.C. Seventeen of the 26 ANCSA Corporations within the Bristol Bay region were engaged through these mechanisms.

41.    In May and June 2013, following the release of the second draft Assessment, EPA held at least five meetings with Bristol Bay tribes and ANCSA corporations, including those both in favor of and opposed to a potential mine.

42.    In August 2013 recently appointed EPA Administrator Gina McCarthy, along with Regional Administrator Dennis McLerran, visited Alaska to learn firsthand about the potential mine. The Administrator visited the Pebble site and held open houses in Dillingham and Iliamna in which over 200 tribal members and ANCSA corporation representatives participated. The Administrator heard firsthand the various tribal perspectives on the potential mine. Some tribal members asked that EPA take a Section 404(c) action immediately, while others asked that EPA refrain from taking action.

43.    In January 2014 EPA released both the final Assessment and the final response to peer review comments document. The final Assessment, which took into consideration gathered by and provided to EPA throughout the consultation and coordination process, concludes that large-scale mining in the Bristol Bay watershed poses risks to salmon, wildlife, and Alaska Native cultures.

44.    EPA provided numerous opportunities for tribes to participate in the tribal

17

consultation process throughout the development of the Assessment. Although not all tribes elected to participate, EPA met with representatives from 20 of the 31 tribes (including representatives from all 13 tribes in the Nushugak and Kvichak River watersheds), either in person or via teleconference or webinar, during the consultation and coordination process.

## V.  EPA Continues to Consult with and Engage Tribal Governments and ANCSA Corporations as it Proceeds with the CWA Section 404(c) Process.

45.     On February 28, 2014, Regional Administrator Dennis McLerran sent letters to the Corps of Engineers, the State of Alaska, and PLP initiating the Section 404(c) process.

46.     On July 18, 2014, EPA Region 10 issued notice of its intent to issue the "Proposed Determination to Restrict the Use of an Area as a Disposal Site; Pebble Deposit Area, Southwest Alaska" ("Proposed Determination"). That same day, EPA sent letters to Alaska Native organizations, including all 31 Bristol Bay tribes, and ANCSA corporations, notifying them of the Proposed Determination and the public comment period and public hearings, described below. (Attached hereto as Exh. K.) In these letters EPA invited the tribes and the ANCSA corporations to participate in consultation and engagement opportunities.

47.     In accordance with 40 C.F.R. 231, EPA held a 60-day public comment period on the CWA Section 404(c) Proposed Determination. EPA also determined in accordance with 40 C.F.R. 231 that public hearings on the Proposed Determination would be in the public interest. Accordingly, EPA held seven hearings throughout Southwest Alaska during the week of August 11, 2014. During that week Regional Administrator Dennis McLerran, Ken Kopocis, Deputy Assistant Administrator for the Office of Water, and

18

EPA staff travelled to Anchorage, New Stuyahok, Nondalton, Dillingham, Kokhanok, Igiugig, and Iliamna to listen to community and tribal members' concerns and comments on the Proposed Determination. EPA also held numerous consultation and coordination meetings with tribes and ANCSA corporations while in Alaska. EPA met with tribes and ANCSA corporations that supported, opposed, or were neutral about a potential mine and the Proposed Determination. EPA never sought group advice, nor did EPA seek to achieve a consensus from these meetings; rather EPA wanted to hear all opinions to inform its decision-making process.

48.     EPA will take into consideration all the information it receives during the consultation and coordination process before determining whether to move forward with a Recommended Determination or to withdraw its Proposed Determination. Once EPA takes a final agency action, it will provide feedback to the tribes and the ANCSA corporations involved in the consultation process to explain how their input was considered in the final action in accordance with EPA Policy.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Anchorage, Alaska, on this 5 day of November 2014.

                                    Tami Fordham

19

**Declaration of Tami Fordham**
Case No. 3:14-cv-00171 HRH

## Index of Attached Exhibits

Exhibit A......... EPA's 1984 Policy for the Administration of Environmental Programs on Indian Reservations

Exhibit B .................................. EPA Policy on Consultation and Coordination with Indian Tribes

Exhibit C .................................. EPA Region 10 Tribal Consultation and Coordination Procedures

Exhibit D ...........................................................................................................Tribal Resolutions

Exhibit E ...................................................... EPA Region 10 Alaska Tribal Mining Education Plan

Exhibit F...................................... 8/28/08 Mining & Tribal Involvement PowerPoint Presentation

Exhibit G.................. 5/2/10 Joint Petition from Tribes Requesting EPA to Initiate 404(c) Process

Exhibit H............................... 7/16/10 Email from Tami Fordham re: Administrator Jackson Visit

Exhibit I ...................... 10/10 Requests from Tribes to EPA to Refrain from Taking 404(c) Action

Exhibit J ................................ 3/7/11 Letter from McLerran to Tribes re: Assessment Involvement

Exhibit K................. 7/18/14 Letter from McLerran to Tribal Leaders re: Proposed Determination

# EXHIBIT A

Declaration of Tami Fordham

# EPA POLICY FOR THE ADMINISTRATION OF ENVIRONMENTAL PROGRAMS ON INDIAN RESERVATIONS

## INTRODUCTION

The President published a Federal Indian Policy on January 24, 1983, supporting the primary role of Tribal Governments in matters affecting American Indian reservations. That policy stressed two related themes: (1) that the Federal Government will pursue the principle of Indian "self-government" and (2) that it will work directly with Tribal Governments on a "government-to-government" basis.

The Environmental Protection Agency (EPA) has previously issued general statements of policy which recognize the importance of Tribal Governments in regulatory activities that impact reservation environments. It is the purpose of this statement to consolidate and expand on existing EPA Indian Policy statements in a manner consistent with the overall Federal position in support of Tribal "self-government" and "government-to-government" relations between Federal and Tribal Governments. This statement sets forth the principles that will guide the Agency in dealing with Tribal Governments and in responding to the problems of environmental management on America Indian reservations in order to protect human health and the environment. The Policy is intended to provide guidance for EPA program managers in the conduct of the Agency's congressionally mandated responsibilities. As such, it applies to EPA only and does not articulate policy for other Agencies in the conduct of their respective responsibilities.

It is important to emphasize that the implementation of regulatory programs which will realize these principles on Indian Reservations cannot be accomplished immediately. Effective implementation will take careful and conscientious work by EPA, the Tribes and many others. In many cases, it will require changes in applicable statutory authorities and regulations. It will be necessary to proceed in a carefully phased way, to learn from successes and failures, and to gain experience. Nonetheless, by beginning work on the priority problems that exist now and continuing in the direction established under these principles, over time we can significantly enhance environmental quality on reservation lands.

## POLICY

In carrying out our responsibilities on Indian reservations, the fundamental objective of the Environmental Protection Agency is to protect human health and the environment. The keynote of this effort will be to give special consideration to Tribal interests in making Agency policy, and to insure the close involvement of Tribal Governments in making decisions and managing environmental programs affecting reservation lands. To meet this objective, the Agency will pursue the following principles:

1.  **THE AGENCY STANDS READY TO WORK DIRECTLY WITH INDIAN TRIBAL GOVERNMENTS ON A ONE-TO-ONE BASIS (THE "GOVERNMENT-TO-GOVERNMENT" RELATIONSHIP). RATHER THAN AS SUBDIVISIONS OF OTHER GOVERNMENTS.**

    EPA recognizes Tribal Governments as sovereign entities with primary authority and responsibility for the reservation populace. Accordingly, EPA will work directly with Tribal Governments as the independent authority for reservation affairs, and not as political subdivisions of States or other governmental units.

2.  **THE AGENCY WILL RECOGNIZE TRIBAL GOVERNMENTS AS THE PRIMARY PARTIES FOR SETTING STANDARDS, MAKING ENVIRONMENTAL POLICY DECISIONS AND MANAGING PROGRAMS FOR RESERVATIONS, CONSISTENT WITH AGENCY STANDARDS AND REGULATIONS.**

    In keeping with the principle of Indian self-government, the Agency will view Tribal Governments as the appropriate non-Federal parties for making decisions and carrying out program responsibilities affecting Indian reservations, their environments, and the health and welfare of the reservation populace. Just as EPA's deliberations and activities have traditionally involved the interests and/or participation of State Governments, EPA will look directly to Tribal Governments to play this lead role for matters affecting reservation environments.

3.  **THE AGENCY WILL TAKE AFFIRMATVE STEPS TO ENCOURAGE AND ASSIST TRIBES IN ASSUMING REGULATORY AND PROGRAM MANAGEMENT RESPONSIBILITIES FOR RESERVATION LANDS.**

    The Agency will assist interested Tribal Governments in developing programs and in preparing to assume regulatory and program management responsibilities for reservation lands. Within the constraints of EPA's authority and resources, this aid will include providing grants and other assistance to Tribes similar to that we provide State Governments. The Agency will encourage Tribes to assume delegable responsibilities, (i.e. responsibilities which the Agency has traditionally delegated to State Governments for non-reservation lands) under terms similar to those governing delegations to States.

    Until Tribal Governments are willing and able to assume full responsibility for delegable programs, the Agency will retain responsibility for managing programs for reservations (unless the State has an express grant of jurisdiction from Congress sufficient to support delegation to the State Government). Where EPA retains such responsibility, the Agency will encourage the Tribe to participate in policy-making and to assume appropriate lesser or partial roles in the management of reservation programs.

4. **THE AGENCY WILL TAKE APPROPRIATE STEPS TO REMOVE EXISTING LEGAL AND PROCEDURAL IMPEDIMENTS TO WORKING DIRECTLY AND EFFECTIVELY WITH TRIBAL GOVERNMENTS ON RESERVATION PROGRAMS.**

A number of serious constraints and uncertainties in the language of our statues and regulations have limited our ability to work directly and effectively with Tribal Governments on reservation problems. As impediments in our procedures, regulations or statues are identified which limit our ability to work effectively with Tribes consistent with this Policy, we will seek to remove those impediments.

5. **THE AGENCY, IN KEEPING WITH THE FEDERAL TRUST RESPONSIBILITY, WILL ASSURE THAT TRIBAL CONCERNS AND INTERESTS ARE CONSIDERED WHENEVER EPA'S ACTIONS AND/OR DECISIONS MAY AFFECT RESERVATION ENVIRONMENTS.**

EPA recognizes that a trust responsibility derives from the historical relationship between the Federal Government and Indian Tribes as expressed in certain treaties and Federal Indian Law. In keeping with that trust responsibility, the Agency will endeavor to protect the environmental interests of Indian Tribes when carrying out its responsibilities that may affect the reservations.

6. **THE AGENCY WILL ENCOURAGE COOPERATION BETWEEN TRIBAL, STATE AND LOCAL GOVERNMENTS TO RESOLVE ENVIRONMENTAL PROBLEMS OF MUTUAL CONCERN.**

Sound environmental planning and management require the cooperation and mutual consideration of neighboring governments, whether those governments be neighboring States, Tribes, or local units of government. Accordingly, EPA will encourage early communication and cooperation among Tribes, States and local governments. This is not intended to lend Federal support to any one party to the jeopardy of the interests of the other. Rather, it recognizes that in the field of environmental regulation, problems are often shared and the principle of comity between equals and neighbors often serves the best interests of both.

7. **THE AGENCY WILL WORK WITH OTHER FEDERAL AGENCIES WHICH HAVE RELATED RESPONSIBILITIES ON INDIAN RESERVATIONS TO ENLIST THEIR INTEREST AND SUPPORT IN COOPERATIVE EFFORTS TO HELP TRIBES ASSUME ENVIRONMENTAL PROGRAM RESPONSIBILITIES FOR RESERVATIONS.**

EPA will seek and promote cooperation between Federal agencies to protect human health and the environment on reservations. We will work with other agencies to clearly identify and delineate the roles, responsibilities and relationships of our respective organizations and to assist Tribes in developing and managing environmental programs for reservation lands.

## 8. THE AGENCY WILL STRIVE TO ASSURE COMPLIANCE WITH ENVIRONMENTAL STATUTES AND REGULATIONS ON INDIAN RESERVATIONS.

In those cases where facilities owned or managed by Tribal Governments are not in compliance with Federal environmental statues, EPA will work cooperatively with Tribal leadership to develop means to achieve compliance, providing technical support and consultation as necessary to enable Tribal facilities to comply. Because of the distinct status of Indian Tribes and the complex legal issues involved, direct EPA action through the judicial or administrative process will be considered where the Agency determines, in its judgement, that: (1) a significant threat to human health or the environment exists, (2) such action would reasonably be expected to achieve effective results in a timely manner, and (3) the Federal Government cannot utilize other alternatives to correct the problem in a timely fashion.

In those cases where reservation facilities are clearly owned or managed by private parties and there is no substantial Tribal interest or control involved, the Agency will endeavor to act in cooperation with the affected Tribal Government, but will otherwise respond to noncompliance by private parties on Indian reservations as the Agency would to noncompliance by the private sector elsewhere in the country. Where the Tribe has a substantial proprietary interest in, or control over, the privately owned or managed facility, EPA will respond as described in the first paragraph above.

## 9. THE AGENCY WILL INCORPORATE THESE INDIAN POLICY GOALS INTO ITS PLANNING AND MANAGEMENT ACTIVITIES, INCLUDING ITS BUDGET, OPERATING GUIDANCE, LEGISLATIVE INITIATIVES, MANAGEMENT ACCOUNTABILITY SYSTEM AND ONGOING POLICY AND REGULATION DEVELOPMENT PROCESSES.

It is a central purpose of this effort to ensure that the principles of this Policy are effectively institutionalized by incorporating them into the Agency's ongoing and long-term planning and management processes. Agency managers will include specific programmatic actions designed to resolve problems on Indian reservations in the Agency's existing fiscal year and long-term planning and management processes.

William D. Ruckelshaus

# EXHIBIT B

Declaration of Tami Fordham

# *EPA POLICY*

# *ON*

# *CONSULTATION AND COORDINATION*

# *WITH*

# *INDIAN TRIBES*

*May 4, 2011*



## Table of Contents

I.   Policy Statement ................................................................ 1

II.  Background ...................................................................... 2

III. Definitions ....................................................................... 3

IV.  Guiding Principles .......................................................... 3

V.   Consultation ................................................................... 4

     A. The Consultation Process ........................................ 4

     B. What Activities May Involve Consultation ............... 5

     C. When Consultation Occurs ...................................... 7

     D. How Consultation Occurs ........................................ 7

VI.  Managing the Consultation Process .............................. 7

     A. Roles and Responsibilities ...................................... 7

     B. National Consultation Meeting ................................ 8

     C. Reporting .................................................................. 8

     D. EPA Senior Management Review ............................ 8

## I. Policy Statement

EPA's policy is to consult on a government-to-government basis with federally recognized tribal governments when EPA actions and decisions may affect tribal interests. Consultation is a process of meaningful communication and coordination between EPA and tribal officials prior to EPA taking actions or implementing decisions that may affect tribes. As a process, consultation includes several methods of interaction that may occur at different levels. The appropriate level of interaction is determined by past and current practices, adjustments made through this Policy, the continuing dialogue between EPA and tribal governments, and program and regional office consultation procedures and plans.

This Policy establishes national guidelines and institutional controls for consultation across EPA. EPA program and regional offices have the primary responsibility for consulting with tribes. All program and regional office consultation plans and practices must be in accord with this Policy. This Policy seeks to strike a balance between providing sufficient guidance for purposes of achieving consistency and predictability and allowing for, and encouraging, the tailoring of consultation approaches to reflect the circumstances of each consultation situation and to accommodate the preferences of tribal governments. The consultation process is further detailed in Section V of this document.

Case 3:14-cv-00171-HRH   Document 73   Filed 11/07/14   Page 29 of 119

## II.    Background

To put into effect the policy statement above, EPA has developed this proposed *EPA Policy on Consultation and Coordination with Indian Tribes* (Policy). The Policy complies with the Presidential Memorandum (Memorandum) issued November 5, 2009, directing agencies to develop a plan to implement fully Executive Order 13175 (Executive Order). The Executive Order specifies that each Agency must have an accountable process to ensure meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications.

This Policy reflects the principles expressed in the *1984 EPA Policy for the Administration of Environmental Programs on Indian Reservations* (1984 Policy) for interacting with tribes. The 1984 Policy remains the cornerstone for EPA's Indian program and "assure[s] that tribal concerns and interests are considered whenever EPA's actions and/or decisions may affect" tribes (1984 Policy, p. 3, principle no. 5).

One of the primary goals of this Policy is to fully implement both the Executive Order and the 1984 Indian Policy, with the ultimate goal of strengthening the consultation, coordination, and partnership between tribal governments and EPA.

The most basic result of this full implementation is that EPA takes an expansive view of the need for consultation in line with the 1984 Policy's directive to consider tribal interests whenever EPA takes an action that "may affect" tribal interests.

The Policy is intended to be implemented using existing EPA structures to the extent possible. The use of current EPA business processes, such as the Action Development Process, National and Regional Tribal Operations Committees, and tribal partnership groups is purposeful so that consultation with tribal governments becomes a standard EPA practice and not an additional requirement.

The issuance of this Policy supports and guides the development and use of program and regional office consultation plans and practices consistent with this Policy.

Case 3:14-cv-00171-HRH   Document 73   Filed 11/07/14   Page 30 of 119

## III. Definitions

**A.** "Indian tribe" or "tribe" means an Indian or Alaska Native tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian tribe pursuant to the Federally Recognized Indian Tribe List Act of 1944, 25 U.S.C. 479a.

**B.** "Tribal official" means an elected, appointed, or designated official or employee of a tribe.

**C.** "Indian country" means:

1. All land within limits of any Indian reservation[1] under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation;

2. All dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state; and

3. All Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

## IV. Guiding Principles

To understand both the purpose and scope of the Policy as well as the integration of the Policy, Memorandum, and Executive Order, it is helpful to list principles found in EPA's January 2010 *Plan to Develop a Tribal Consultation and Coordination Policy Implementing Executive Order 13175*:

> EPA's fundamental objective in carrying out its responsibilities in Indian country is to protect human health and the environment.

> EPA recognizes and works directly with federally recognized tribes as sovereign entities with primary authority and responsibility for each tribe's land and membership, and not as political subdivisions of states or other governmental units.

> EPA recognizes the federal government's trust responsibility, which derives from the historical relationship between the federal government and Indian tribes as expressed in certain treaties and federal Indian law.

---

[1] EPA's definition of "reservation" encompasses both formal reservations and "informal" reservations, i.e., trust lands set aside for Indian tribes. *See for example* Oklahoma Tax Comm'n v. Sac and Fox Nation, 508 U.S. 114, 123 (1993); 56 Fed. Reg. 64876, 64881 (1991); or 63 Fed. Reg. 7254, 7258 (1998).

EPA ensures the close involvement of tribal governments and gives special consideration to their interests whenever EPA's actions may affect Indian country or other tribal interests.

When EPA issues involve other federal agencies, EPA carries out its consultation responsibilities jointly with those other agencies, where appropriate.

In addition, it is helpful to note the distinction between this Policy, federal environmental laws pertaining to public involvement, and Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*. Under this Policy, EPA consults with federally recognized tribal governments when Agency actions and decisions may affect tribal interests. EPA also recognizes its obligations to involve the public as required by federal environmental laws. Finally, EPA recognizes the need to be responsive to the environmental justice concerns of non-federally recognized tribes, individual tribal members, tribal community-based/grassroots organizations and other indigenous stakeholders.

## V.    Consultation

A.    *The Consultation Process.*  To the fullest extent possible, EPA plans to use existing EPA business operations to put this Policy into effect.

Tribal officials may request consultation in addition to EPA's ability to determine what requires consultation. EPA attempts to honor the tribal government's request with consideration of the nature of the activity, past consultation efforts, available resources, timing considerations, and all other relevant factors.

Consultation at EPA consists of four phases: Identification, Notification, Input, and Follow-up:

1.    **Identification Phase**: EPA identifies activities that *may be* appropriate for consultation, using the mechanisms described in section B.2, below. The identification phase should include a determination of the complexity of the activity, its potential implications for tribes, and any time and/or resource constraints relevant to the consultation process. This phase should also include an initial identification of the potentially affected tribe(s).

2.    **Notification Phase**:  EPA notifies the tribes of activities that may be appropriate for consultation.

Notification can occur in a number of ways depending on the nature of the activity and the number of tribes potentially affected. For example, EPA may send out a mass mailing to all tribes, may contact the tribal governments by telephone, or provide notice through other agreed upon means. EPA normally honors tribal preferences regarding the specific mode of contact.

Notification includes sufficient information for tribal officials to make an informed decision about the desire to continue with consultation and sufficient information to understand how to provide informed input.

*Notification should occur sufficiently early in the process to allow for meaningful input by the tribe(s).*

3.     **Input Phase**:   Tribes provide input to EPA on the consultation matter. This phase may include a range of interactions including written and oral communications including exchanges of information, phone calls, meetings, and other appropriate interactions depending upon the specific circumstances involved. EPA coordinates with tribal officials during this phase to be responsive to their needs for information and to provide opportunities to provide, receive, and discuss input. During this phase, EPA considers the input regarding the activity in question. EPA may need to undertake subsequent rounds of consultation if there are significant changes in the originally-proposed activity or as new issues arise.

4.     **Follow-up Phase**:   EPA provides feedback to the tribes(s) involved in the consultation to explain how their input was considered in the final action. This feedback should be a formal, written communication from a senior EPA official involved to the most senior tribal official involved in the consultation.

**B.     *What Activities May Involve Consultation*?**

1.     **General Categories of Activities Appropriate for Consultation:**  The broad scope of consultation contemplated by this Policy creates a large number of actions that *may* be appropriate for consultation.

The following list of EPA activity categories provides a general framework from which to begin the determination of whether any particular action or decision is appropriate for consultation. The final decision on consultation is normally made after examining the complexity of the activity, its implications for tribes, time and/or resource constraints, an initial identification of the potentially affected tribe(s), application of the mechanisms for identifying matters for consultation, described below, and interaction with tribal partnership groups and tribal governments.

The following, non-exclusive list of EPA activity categories are normally appropriate for consultation if they may affect a tribe(s):

- Regulations or rules
- Policies, guidance documents, directives
- Budget and priority planning development
- Legislative comments[2]
- Permits

---

[2] Legislative comments are a special case where, due to short legislative timeframes, consultation in advance of comment submission may not always be possible. Nevertheless, EPA will strive to inform tribes when it submits legislative comments on activities that may affect Indian country or other tribal governmental interests.

Case 3:14-cv-00171-HRH   Document 73   Filed 11/07/14   Page 33 of 119

- Civil enforcement and compliance monitoring actions[3]
- Response actions and emergency preparedness[4]
- State or tribal authorizations or delegations
- EPA activities in implementation of U.S. obligations under an international treaty or agreement.

2.    **EPA's Mechanisms for Identifying Matters for Consultation:**  The mechanisms EPA uses for identifying matters appropriate for consultation are as follows:

a.    Tribal Government-Requested Consultation.   Tribal officials may request consultation in addition to EPA's ability to determine what requires consultation. EPA attempts to honor the tribal government's request with consideration of the nature of the activity, past consultation efforts, available resources, timing considerations, and all other relevant factors.

b.    Action Development Process (ADP).  Early in the process, the lead program office assesses whether consultation is appropriate for the subject action. Its determination is available to tribes in the semiannual Regulatory Agenda as well as in the subset of rules on the Regulatory Gateway accessed through the EPA website.

This Policy is not intended to subject additional Agency actions to the ADP process for the sole purpose of a consultation analysis. Non-ADP actions are subject to consultation analysis through other mechanisms identified within the Policy.

c.    National Program Offices and Regional Offices.  For those actions and decisions not in the ADP process, program and regional offices also determine if consultation is appropriate under this Policy.  EPA's Tribal Consultation Advisors, described below, provide assistance with that determination.   Such determination includes coordination with national and/or regional tribal partnership groups.

d.    National and Regional Tribal Partnership Groups.  EPA meets regularly with a number of national and regional tribal partnership groups.  These groups assist in the identification of matters that may be appropriate for consultation.

---

[3] Primary guidance on civil enforcement matters involving tribes can be found in "Guidance on the Enforcement Priorities Outlined in the 1984 Indian Policy," and "Questions and Answers on the Tribal Enforcement Process." This guidance is intended to work with the Tribal Consultation Policy in a complementary fashion to ensure appropriate consultation with tribes on civil enforcement matters.
[4] The term "response" as defined under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) includes removals and remedial actions.

6

**C.** ***When Consultation Occurs.*** Consultation should occur early enough to allow tribes the opportunity to provide meaningful input that can be considered prior to EPA deciding whether, how, or when to act on the matter under consideration. As proposals and options are developed, consultation and coordination should be continued, to ensure that the overall range of options and decisions is shared and deliberated by all concerned parties, including additions or amendments that occur later in the process.

**D.** ***How Consultation Occurs.*** There is no single formula for what constitutes appropriate consultation, and the analysis, planning, and implementation of consultation should consider all aspects of the action under consideration. In the case of national rulemaking, a series of meetings in geographically diverse areas may be appropriate. For more routine operational matters, a less formal process may be sufficient.

## VI. Managing the Consultation Process

### A. Roles and Responsibilities

The following roles and responsibilities have been defined to allow EPA to effectively implement this Policy. These roles and responsibilities reflect the fact that, while oversight and coordination of consultation occurs at EPA headquarters, as a practical matter, much of the actual consultation activity occurs in EPA's program and regional offices. The responsibility for initially analyzing the need for consultation and then subsequently carrying it out, resides with these offices.

1. **Designated Consultation Official**: In addition to being the EPA's National Program Manager for the EPA Tribal Program, EPA's Assistant Administrator for the Office of International and Tribal Affairs (OITA) is the EPA-Designated Consultation Official under the Executive Order. These responsibilities include coordination and implementation of tribal consultation in accordance with this Policy and Agency compliance with the 1984 Indian Policy.

The Designated Consultation Official has the authority for: (1) defining EPA actions appropriate for consultation, (2) evaluating the adequacy of that consultation, and (3) ensuring that EPA program and regional office consultation practices are consistent with this Policy.

Per the Memorandum, the Designated Consultation Official reports annually to OMB on the implementation of the Executive Order.[5] Further, the Designated Consultation Official certifies compliance with the Executive Order for applicable EPA activities. The American Indian Environmental Office (AIEO) is located within OITA and coordinates the operational details of the Policy and compiles consultation-related information for the Designated Consultation Official.

2. **Assistant Administrators**: Assistant Administrators oversee the consultation process in their respective offices including analysis for potential

---

[5] Report is filed annually by August 3rd.

Case 3:14-cv-00171-HRH   Document 73   Filed 11/07/14   Page 35 of 119

consultation and the consultation process. Each program office is directed to prepare a semi-annual agenda of matters appropriate for consultation and a brief summary of consultation that has occurred. The program offices provide this information to AIEO for reporting to OMB. Each office is directed to designate a Tribal Consultation Advisor.

3. **Regional Administrators**: Regional Administrators oversee the consultation process in their respective offices including analysis for potential consultation and the consultation process. Each region is directed to prepare a semi-annual agenda of matters appropriate for consultation and a brief summary of consultation that has occurred. The regions provide this information to AIEO for reporting to OMB. Each region is directed to designate a Tribal Consultation Advisor.

4. **Tribal Consultation Advisors**: Tribal Consultation Advisors (TCAs) assist in identifying matters appropriate for consultation and prepare summary information on consultation activities and provide it to AIEO. TCAs receive and provide advice within their respective program offices and regions on what actions may be appropriate for consultation. TCAs also serve as a point-of-contact for EPA staff, tribal governments, and other parties interested in the consultation process. TCAs are the in-office subject matter experts to assist staff and management in the implementation of the Policy.

**B.     National Consultation Meeting**

OITA/AIEO may convene a periodic National Consultation Meeting to be chaired by the Designated Consultation Official to review the consultation process across the Agency.

**C.     Reporting**

Pursuant to the Memorandum, EPA submits annual progress reports to OMB on the status of the consultation process and actions and provides any updates to this Policy.

**D.     EPA Senior Management Review**

The Designated Consultation Official communicates regularly with the Assistant and Regional Administrators to review the consultation system, to consider any matters requiring senior management attention, and to make adjustments necessary to improve the Policy or its implementation.

EPA plans to receive ongoing feedback on the Policy from all parties to assess its effectiveness and implement improvements.



**EXHIBIT C**

Declaration of Tami Fordham



EPA 910-K-12-002 | October 2012 | www.epa.gov

United States
Environmental Protection
Agency

# EPA Region 10
# Tribal Consultation And
# Coordination Procedures

**U.S. Environmental Protection Agency**
Region 10

*this page intentionally left blank*

# Table of Contents

Purpose and Scope of This Document .......................................................................................... 3

I.    Why Region 10 Consults .......................................................................................... 5

II.   What is Consultation .......................................................................................... 5

      A.    Definition of Tribal Consultation .......................................................................... 5

      B.    Consultation and the Public Participation Process ............................................ 6

III.  Who in Region 10 is Responsible For Planning, Supporting, and Conducting Tribal Consultation..... 6

      A.    Roles and Responsibilities ................................................................................. 6

      B.    Region 10 Representation for Tribal Consultation ............................................ 8

IV.   Identifying Activities Appropriate for Consultation ........................................... 8

      A.    Types of Activities That May Be Appropriate for Consultation ....................... 8

      B.    Whether Tribal Interests Are Affected ............................................................. 9

V.    Timing of Consultation ........................................................................................ 10

VI.   How Region 10 Consults .................................................................................... 11

      A.    Initiation by EPA ............................................................................................. 11

      B.    Initiation by a Tribe ....................................................................................... 12

      C.    Planning the Consultation Process ................................................................. 12

      D.    Conducting the Consultation .......................................................................... 14

      E.    Required Follow-Up and Reporting ................................................................ 17

VII.  Historic or Archaeological Resources ................................................................ 17

## Appendix

EPA Region 10 Emergency Response Tribal Consultation Procedures ........................................... 19

*this page intentionally left blank*

# Purpose and Scope of This Document

EPA's policy is to consult on a government-to-government basis with federally recognized tribal governments when EPA actions and decisions may affect tribal interests. The EPA Policy on Consultation and Coordination with Indian Tribes (May 4, 2011) establishes national guidelines and institutional controls for consultation across EPA. These Region 10 Tribal Consultation Procedures (Procedures) are consistent with the agency-wide consultation policy, but include more specific guidelines for the consultation process to meet the needs and practices of tribes in EPA Region 10 (Region 10).

These Procedures apply to Region 10 interactions with federally recognized tribes (tribes) in Washington, Oregon, Idaho and Alaska.[1] The U.S. Bureau of Indian Affairs maintains and periodically updates and publishes a list of all federally recognized tribes.[2] Whenever questions arise regarding consultation with other entities, such as Alaska Native Corporations, tribal consortia, or other organizations representing or consisting of tribes or tribal members, the Region 10 Tribal Consultation Specialist should be contacted.

These Procedures supersede the 2001 EPA Region 10 Consultation Framework, as well as all Region 10 individual program, sector, and unit/team consultation procedures, except for the Region 10 Enforcement Procedures in Indian Country. These Procedures do not supersede any EPA agency-wide consultation policies or procedures, or those developed by individual tribes, nor does it replace individual EPA-tribal memoranda of agreement, consultation plans, Tribal Environmental Agreements (TEAs), or other specific agreements between Region 10 and a tribe or tribes.[3] Finally, these Procedures do not apply to Region 10 civil enforcement or compliance assurance activities.[4] Emergency response activities are addressed separately in Appendix A.

A large number of routine administrative and staff-to-staff level interactions and communications occur between EPA and tribal government employees on a regular basis. These Procedures do not to apply to these regular, ongoing interactions. These Procedures are not intended to cover the large number of routine interactions between funding recipients and EPA staff. Again, consult with the Region 10 Tribal Consultation Specialist for further guidance.

While this document describes the procedures that Region 10 expects to follow in consulting with federally recognized tribes, it does not alter or create any legal rights or obligations. Also, the possible circumstances where consultation might be appropriate are so varied that these Procedures can not anticipate every scenario; thus there may be situations for which these Procedures do not apply or are not appropriate, and the general ideas contained here will need to be applied flexibly.

---

1   These Procedures do not apply to consultations initiated by EPA Headquarters' Offices.

2   The most current list is at 77 Fed. Reg. 47868 (August 10, 2012)

3   Other types of agreements could include cooperative agreements and/or an Administrative Order on Consent for Remedial Investigation/Feasibility Study under the Comprehensive Environmental Response, Compensation, and Liability Act (Superfund), which may describe tribal consultation procedures for that particular project.

4   Primary guidance on civil enforcement matters involving tribes can be found in EPA's "Guidance on the Enforcement Priorities Outlined in the 1984 Indian Policy," "Questions and Answers on the Tribal Enforcement Process" and the Region 10 Enforcement Procedures in Indian Country.

Case 3:14-cv-00171-HRH   Document 73   Filed 11/07/14   Page 42 of 119

*this page intentionally left blank*

# I.    Why Region 10 Consults

Meaningful tribal consultation is an integral component of the federal government's general trust relationship with federally recognized tribes. The federal government recognizes the right of each tribe to self-government, with sovereign powers over their members and their territory. Executive Order 13175 (November 9, 2000) directs federal agencies to establish and implement processes to ensure meaningful and timely input by tribal officials in the development of policies that have tribal implications.

The EPA has a longstanding policy that supports tribal involvement in decision-making. In EPA's landmark 1984 Indian Policy,[5] the Agency stated that the keynote of EPA's efforts to protect human health and the environment "will be to give special consideration to tribal interests in making Agency policy, and to insure the close involvement of Tribal Governments in making decisions and managing environmental programs" that affect them. That policy has been reaffirmed by each administration's EPA administrator since then, including the present EPA Administrator, Lisa P. Jackson, in 2009.[6]

# II.   What is Consultation

## A.    Definition of Tribal Consultation

The EPA Policy on Consultation and Coordination with Indian Tribes provides the following definition:

> *Consultation* is a process of meaningful communication and coordination between EPA and tribal officials prior to EPA taking actions or implementing decisions that may affect tribes. As a process, consultation includes several methods of interaction that may occur at different levels. The appropriate level of interaction is determined by past and current practices, adjustments made through this Policy, the continuing dialogue between EPA and tribal governments, and program and regional procedures and plans.

In many circumstances, planned and structured meetings between EPA and tribal leaders are an essential part of the consultation process. For purposes of clarity and to avoid miscommunication, this document will refer to those meetings as "leadership meetings." Many tribes in Region 10 use the term "government-to-government consultation" to refer only to leadership meetings.

Consultation includes seeking, discussing, and considering the views of federally recognized tribal governments regarding a Region 10 action or decision. Consultation consists of respectful, meaningful, and effective two-way communication, in an effort to achieve mutual understanding between EPA and the Tribe of their respective interests and perspectives, before EPA makes its decision or moves forward with its action.

---

5    EPA Policy for the Administration of Environmental Programs on Indian Reservations (November 8, 1984).

6    Memorandum: EPA Indian Policy (July 22, 2009).

Case 3:14-cv-00171-HRH   Document 73   Filed 11/07/14   Page 44 of 119

The process of effective tribal consultation may include a wide range of communication over the course of developing an EPA action or decision. This communication can include meetings, telephone conferences, or internet-based communication to exchange technical information at the staff or management level, discussions to establish effective processes for coordination and planning, formal structured meetings between EPA and tribal leaders, or a wide range of other communication in person or by e-mail, telephone or letter.

## B.   Consultation and the Public Participation Process

Tribal consultation is distinct from the EPA public participation and community involvement processes. Tribal consultation should occur before any EPA public meeting or workshop, to offer EPA the opportunity to consider input from interested tribal governments prior to seeking public comment.

A tribe may benefit from participating in the EPA public participation and community involvement processes, separate and apart from any consultation. A tribe may choose to submit oral and written comments into the public record during the public comment period. This may be necessary for the tribe to preserve its appeal rights, or to preserve a particular issue for appeal. It may be helpful to discuss these specific issues with the tribe when planning the consultation.

Additionally, a tribe may choose to hold its own community or member meetings to discuss EPA's action. The tribe may invite EPA to participate in these meetings or it may choose to meet privately with its tribal community or membership.

# III.   Who in Region 10 is Responsible For Planning, Supporting, and Conducting Tribal Consultation

## A.   Roles and Responsibilities

The **Regional Administrator** oversees the consultation process in Region 10. The Regional Administrator and **Deputy Regional Administrator** are the top EPA officials for Region 10. The Region 10 **Office Directors** report directly to the Regional Administrator, and are members of the Executive Team. The Office Directors carry out major EPA program activities. The Office Directors are responsible for ensuring that the appropriate staff are aware of tribal consultation responsibilities and procedures, and that the procedures are carried out for actions, decisions, projects, and similar activities carried out by their office.

The Region 10 **Senior Tribal Policy Advisor (STPA)** reports directly to the Regional Administrator, and is a member of the Executive Team. The STPA works with EPA senior managers and staff to ensure effective government-to-government relations with Tribes, in accordance with EPA's consultation policy and practices. The STPA provides advice on effective communication with Tribes and advises EPA senior management on and/or participates in tribal consultations. Where there are significant tribal issues or a high degree of tribal interest, particularly where the Regional Administrator or Deputy Regional Administrator is or may be engaged personally, the STPA may be involved. The STPA involvement with consultation

Case 3:14-cv-00171-HRH   Document 73   Filed 11/07/14   Page 45 of 119

is in coordination with the Regional Administrator, Deputy Regional Administrator, or Office Directors. Contact information for the STPA is available at http://yosemite.epa.gov/R10/tribal.NSF/webpage/tribal+contacts.

The individual with primary responsibility for the EPA activity or action ("**EPA Project Lead**"), such as a project manager, permit writer, contingency planner, or on-scene coordinator, ordinarily has the primary responsibility for the consultation process. Others within the Region are involved or can support the consultation process; their roles are described here. The first two listed below, the program-specific Tribal Specialist and the Region 10 Tribal Consultation Specialist, are the Project Lead's initial points of contact for all tribal consultation support or related questions.

Each Region 10 Office has a **Tribal Specialist**, who serves as the main point of contact, and source of information and support, for tribal work within each program office. *The Project Leads should inform the Tribal Specialist of any activities that may affect tribes.* The Tribal Specialist is the first source of information about what steps to take, and what other resources or staff are available to provide support, or should be informed. A list of Tribal Specialists is available at http://yosemite.epa.gov/R10/tribal.NSF/programs/tribal+specialists.

The Region 10 **Tribal Consultation Specialist**, located in the Tribal Trust and Assistance Unit (TTAU), Office of Ecosystems, Tribal and Public Affairs, is responsible for supporting tribal consultation across the Region. *Project Leads should inform the Tribal Consultation Specialist of all tribal consultations*, and should seek his or her advice regarding whether, when, and how to consult in a given situation. Contact information for the Tribal Consultation Specialist is available at http://yosemite.epa.gov/R10/tribal.NSF/webpage/tribal+contacts.

The Region 10 **Tribal Coordinators**, in TTAU, serve as liaisons between EPA and the tribes, and also as project officers for certain grant programs that involve tribes. There is a Tribal Coordinator assigned to each tribe in Region 10. The Tribal Coordinators are generally familiar with each tribe's environmental concerns, political structure, and relationship with EPA. The appropriate Tribal Coordinator should be aware of, and often will assist with, the consultation process, and can be an invaluable resource because of his or her familiarity with each tribe. The Tribal Consultation Specialist will involve Tribal Coordinators when appropriate. A list of Tribal Coordinators is available at http://yosemite.epa.gov/R10/tribal.NSF/webpage/tribal+coordinators.

The Region 10 **Alaska Resource Extraction Tribal Policy Advisor,** in the Alaska Operations Office, coordinates tribal consultation and community involvement for Alaska resource extraction projects. The Alaska Resource Extraction Tribal Policy Advisor often will work closely with the Project Lead on tribal consultation involving large scale resource extraction projects that involve multiple Alaska tribes. Contact information for the Alaska Resource Extraction Tribal Policy Advisor is available at http://yosemite.epa.gov/R10/tribal.NSF/webpage/tribal+contacts.

The Region 10 **Office of Regional Counsel** (ORC) should be consulted when questions arise over application of federal Indian law or EPA policies, potential liability of a tribe under an environmental statute, tribal jurisdiction or authority, Indian country boundaries, or other related legal issues. If a tribal government plans to have an attorney present at any interaction with the Region, ORC should be notified. Contact information for the ORC is available at http://www.epa.gov/ogc/regional.htm.

## B.  Region 10 Representation for Tribal Consultation

The main point of contact for EPA during the course of the consultation is ordinarily EPA's Project Lead. During any leadership meeting, a senior EPA official, usually the Regional Administrator, Deputy Regional Administrator, an Office Director, or one of their Deputies, should be designated to represent EPA. Where there are significant tribal issues or a high degree of tribal interest, particularly where the Regional Administrator or Deputy Regional Administrator is or may be engaged personally, the STPA may be involved. The appropriate EPA official for a leadership meeting depends on who within Region 10 is delegated the authority to make the decision or take the action in question, and also on the level of representation on the tribe's part. Often if a tribal chair participates personally, the tribe will expect EPA to be represented by the Regional Administrator, but this can depend on a number of factors including available resources, schedules, and the stage of the EPA action (for example, early in a process, tribal officials may be satisfied with, or prefer, meeting with EPA technical or program staff).

# IV.  Identifying Activities Appropriate for Consultation

The Region should consult with a tribe when making decisions, taking actions, managing projects, or engaging in similar activities, when the tribe's interests might be affected. The Project Lead should seek the advice of the Regional Tribal Consultation Specialist and the Project Lead's Unit Manager and/or Office Director to determine whether a given EPA activity warrants consultation in view of the following considerations.

## A.  Types of Activities That May Be Appropriate for Consultation

The broad scope of consultation contemplated by the EPA Policy on Consultation and Coordination with Indian Tribes and the Region 10 Procedures creates a large number of actions that may be appropriate for consultation.

The following list of Region 10 activities are normally appropriate for consultation if they may affect tribes:

- Regulations or rules
- Policies, guidance documents, directives
- Permits
- Civil enforcement and compliance monitoring actions[7]
- Response actions and emergency preparedness[8]
- National Priority Listing and deferral decisions
- State or tribal authorizations or delegations
- Designation of disposal sites
- EPA activities in implementation of U.S. obligations under an international or tribal treaty or agreement

---

[7]  Primary guidance on civil enforcement matters involving tribes can be found in EPA's "Guidance on the Enforcement Priorities Outlined in the 1984 Indian Policy," "Questions and Answers on Tribal Enforcement Process" and the Region 10 Enforcement Procedures in Indian Country.

[8]  The term "response" as defined under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) includes removal and remedial actions. For EPA Region 10 Emergency Response Tribal Consultation Procedures see Appendix A.

**State Actions.** When requested, Region 10 generally will agree to consult with a tribe on state-led actions where Region 10 has the ability to change or veto the state action and the proposed action has the potential to affect that tribe's interests. EPA's approach will be to work with both the tribe and state to address potential effects on tribal interests. EPA will take tribal concerns and impacts into account in its exercise of any oversight authority.

**Other Federal Agency Actions.** In some circumstances, EPA has a secondary or oversight role in actions or decisions by other federal agencies. Three examples (out of many more possibilities) are (1) federal actions that require Environmental Impact Statements, which EPA reviews and comments on under Clean Air Act Section 309 and related regulations, (2) permits issued by the U.S. Army Corps of Engineers under Clean Water Act Section 404, which EPA may review, and (3) some cleanup actions by other federal agencies under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). In such circumstances, EPA would encourage a tribe seeking to consult with the United States to work directly with the federal agency with the most direct responsibility for the action or decision in question. However, EPA would consider a tribe's request to consult with EPA based on the specific circumstances, including the extent of EPA's active involvement or influence in the decision or action, whether EPA has a range of options or discretion in connection with its role, and whether EPA involvement would contribute significantly to the tribe's direct consultation with the other federal agency or agencies involved.

## B.    Whether Tribal Interests Are Affected

At the beginning of a proposed project or action, the Project Lead should make an initial determination whether the interests of one or more tribes may be affected by the action, taking into account the following considerations:

### Geographic Considerations

- Action on or adjacent to Indian Country or an Alaska Native Village, or nearby (such as within the same airshed or watershed) if the action may affect a tribe's health, resources, rights, or traditional way of life
- Action within the "usual and accustomed areas"[9] of a federally recognized tribe that may affect a tribe's resources, rights, or traditional way of life

### Tribal Resources

- Action that may affect the treaty-reserved resources of a tribe
- Action that may affect the public health in the tribal community
- Action that may affect the cultural, traditional, or subsistence resources of a tribe or a tribe's traditional way of life

### Tribal Ownership

- Action related to a facility owned or managed by a tribal government

---

[9]    In some cases, tribes not only hold reserved fishing, hunting and gathering rights within reservation areas but also retain rights in ceded territories that were their "usual and accustomed" hunting, fishing or gathering places. Within EPA Region 10, these rights are incorporated into the treaties of most tribes.

Case 3:14-cv-00171-HRH   Document 73   Filed 11/07/14   Page 48 of 119

The Project Lead may review maps of federally recognized tribal government locations, Indian Country,[10] Alaska Native Village locations, "usual and accustomed" areas, watersheds of interest, and Indian Claims Commission maps[11] to assist in the initial determination of whether one or more tribes' interests might be affected by the action. Some of this data will be available in EPA's Interactive Tribal Mapping Tool for Region 10 personnel, which will allow Region 10 personnel to see which tribes, or tribal areas of interest, are near to a proposed project or action location. The appropriate Tribal Coordinator can assist with these resources.

The Project Lead should not rely solely on maps to assess whether a tribe's interests might be affected by an EPA action because most traditional use areas of Region 10 tribes are not mapped. For example, a tribal family's berry picking, hunting or fishing areas may not be well known to others, especially outside of the tribe. The Tribal Coordinator assigned to that particular tribe or region can help with these issues. The Tribal Coordinator or Project Lead may call tribal environmental staff to gauge tribal interest, but note that this coordination with a tribe does not take the place of an offer to consult.

# V.   Timing of Consultation

To make sure that consultation is meaningful and timely requires communication early enough to potentially affect the action or decision, or the data collection associated with it. This will often involve notifying a tribe of an expected action or decision, providing information about the decision to the tribe, discussing major policy and environmental considerations, and exchanging information and viewpoints at a program and technical level.

It will often be important to provide an opportunity for similar communication far enough along in the process that EPA can provide significant detail about the decision or action the Region is considering. In some cases there is a single time period when both of these objectives can be achieved; in other cases, it may be necessary to consult early in the Region's process, and then consult again at a later point when the EPA action is more developed. The ideal approach is to have active communication throughout the data gathering and decision process about the scope and nature of consultation that the tribe desires.

The timing of tribal elections and fishing, hunting and gathering seasons, etc., is important to consider in timing a consultation. Contact the Tribal Coordinators for more information. The North Slope Protocol is a great resource for this information in Alaska.

---

10   In 1948 Congress codified the definition of "Indian Country"... as (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and including rights-of-ways running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of the state, and (c) all Indian allotments, the Indian titles to which have not been extinguished including the rights-of-way running through the same (18 U.S.C § 1151).

11   See USGS Website at http://rockyweb.cr.usgs.gov/outreach/lewisclark/indianlandsmaps.html

Case 3:14-cv-00171-HRH   Document 73   Filed 11/07/14   Page 49 of 119

# VI. How Region 10 Consults

## A. Initiation by EPA

### 1. EPA Offer to Consult

Once the Region 10 Project Lead determines that consultation is warranted, EPA should send a letter to the appropriate tribe offering to consult. The Region 10 Project Lead should draft the letter, and can seek input from the Region 10 Tribal Consultation Specialist, and program-specific Tribal Specialist, who can also provide sample letters. The letter should:

- Be addressed to the Tribal Leader (eg. Tribal Chair, Tribal President, or First Chief), with a copy to the tribe's environmental program staff, and the EPA Tribal Coordinator
- Be signed by an Office Director or the Regional Administrator
- Describe the issue at hand clearly, avoiding or clearly defining legal and technical terms and acronyms
- Describe the upcoming EPA action or decision
- Include maps, technical data, and other explanatory or supporting information as appropriate and available
- Relay process timelines and schedule considerations
- Identify the Project Lead, who will work with the tribe to arrange all aspects of the consultation
- Request that the tribe respond to the Project Lead, indicating whether or not the tribe intends on pursuing consultation
- Request response by a date that allows adequate time for a tribal council meeting or other internal deliberations by the tribe (typically four weeks from receipt of letter)
- Request that the tribe provide the name of a tribal representative who will serve as the point of contact for planning the consultation, if the tribe wishes to go forward with consultation
- Request any policy that the tribe may have regarding EPA consultation with them
- Identify or propose timeframes for starting and ending consultation.

Whenever possible and depending on timing and number of tribes involved, the Project Lead should follow up with a phone call, e-mail, or fax to the tribal environmental program or department (or other appropriate tribal department) to ensure receipt of the letter and to open dialogue about the potential consultation.

### 2. If a Tribe Declines

If a tribe indicates it does not want to consult on a given matter, EPA consultation efforts are normally concluded. The best practice is to document this in the case or project file and inform the Region 10 Tribal Consultation Specialist for tracking purposes. This does not relieve Region 10 of any general trust responsibility it may have to consider the interests of the tribe.

### 3. If a Tribe Does Not Respond

If a tribe does not respond by the date provided in the consultation invitation letter, when working with one or a small number of tribes, the EPA Project Lead should work with the Tribal Coordinator to reach out to the tribe, usually through e-mails and phone calls to the tribal environmental department. If there is still no response from the tribe, this should be documented in the file and reported to the Regional Tribal Consultation Specialist, and would normally conclude the Region's efforts to initiate consultation. This would not relieve Region 10 of any general trust responsibility to consider the interests of the tribe.

Where EPA offers to consult with a large number of tribes, the Region may, in addition to sending the initial invitation to consult, send e-mails and publicize the consultation opportunity in appropriate publications and at relevant forums. It may be impractical for Region 10 to follow up with individual phone calls or letters to all the tribes.

## B. Initiation by a Tribe

Region 10 generally will agree to consult when a tribe requests it, assuming the potential action or decision could affect that tribe's interests. When EPA receives a written request from a tribal leader, the letter should be forwarded to the appropriate program office, which should acknowledge the receipt of the letter or request within two weeks and should respond to the letter in a reasonable time. The Project Lead should notify appropriate personnel in their own office, including their office Tribal Specialist, as well as the Region 10 Tribal Consultation Specialist, who will enter information about leadership meetings in the Region's consultation database.

If it is unclear which program office should take the lead on a consultation request, the request should be forwarded to Regional Administrator's Office for a decision. The response letter from EPA should designate a point of contact to work with the tribe, and request that the tribe identify a tribal point of contact, to arrange the consultation.

## C. Planning the Consultation Process

Each tribe has its own governmental structure, and exercises sovereign powers over its members and territories. For that reason, there is no "one size fits all" consultation process template. Consultation is most effective when the approach is individualized to the particular tribe and EPA action. The EPA and tribal points of contact should work together in order to develop a mutually acceptable approach to planning, preparing for, and implementing the consultation process. The points of contact should work closely with one another, while at the same time communicating with their own leadership to ensure support for the developing approach.

The EPA and tribal points of contact should address the following issues of the consultation:

### 1. Goals and Expectations of each Party

The EPA and tribal points of contact should work with their respective leadership to identify each party's goals and expectations, and to determine how to structure the consultation process to address those goals and expectations.

## 2. Consultation Policies and Procedures

The points of contact should discuss whether the tribe has developed its own consultation policy or procedures. Any tribally developed consultation policies or procedures should be incorporated into the consultation planning and implementation, where appropriate.

In addition to the EPA Policy on Consultation and Coordination with Indian Tribes, there may be program-specific national EPA tribal consultation guidance. (For example, the Office of Air Quality Planning and Standards developed "Consulting with Indian Tribal Governments" in 2009.) Project Leads should contact their respective headquarters offices to determine if such a policy exists, and, if so, should incorporate those procedures into the consultation process.

## 3. Identification of Authorized Tribal Official

The Project Lead should work with the tribe to specify who will represent each party at each point during the consultation process. It is important to verify that the specified tribal representative is authorized to represent the tribe for the purposes of consultation, to avoid misunderstandings that can arise from dealing with consultants, attorneys, or tribal staff members who may be communicating with EPA without the authority to represent the tribe as a whole.

## 4. Scope and Number of Meetings

The EPA and tribal points of contact should determine whether the consultation topics can be covered in a single meeting or whether the consultation topics will require a series of meetings, possibly including technical exchange meetings and one or more leadership meetings.

## 5. Consultation Plan Format

The parties should discuss whether a written consultation plan is needed, or a more formal Memorandum of Understanding (MOU), or whether verbal/email planning will suffice. It may be appropriate to develop a MOU for particularly complex consultations, such as those involving multiple federal agencies, tribes, legal authorities, decision points, and/or regulatory processes. ORC must be involved in the development of any MOU.

## 6. Setting the Leadership Meeting Date and Location

The points of contact should begin setting the meeting date(s) at the earliest opportunity, as it may take weeks of planning to align calendars of the appropriate participants with the schedule for the EPA action or decision. Timing of meetings will need to take into account EPA's calendar and a tribe's administrative, subsistence, commercial fishing, and cultural events calendars. Leadership meetings should be held face-to-face whenever possible, preferably on tribal homelands. If travel money or time constraints make such a visit impossible, the parties may agree to meet via video or telephone conference. See Section D.3 below for more information on leadership meetings.

## 7. Information Exchange

The points of contact should discuss in detail what information each party will need for effective consultation. Both EPA and the tribe may have technical or factual information relevant to the consultation. This information should be shared between the parties, whenever possible.

### 8. Consultation Facilitation

The EPA and tribal points of contact should discuss and agree on whether there will be facilitation for any meetings during the course of the consultation. The parties may decide upon someone from their respective staffs, often the EPA Tribal Coordinator, or may choose to hire an independent third party, if resources allow. If the parties elect to forgo a facilitator, it is important to pay particular attention to potentially different communication styles.

## D. Conducting the Consultation

### 1. Information Exchange and Open Communication

Consultation shall be conducted in good faith and in a climate of mutual respect. Region 10 staff should work hard to understand the tribe's priorities, perspective, and constraints, and to explain EPA's. EPA should make a concerted effort to identify solutions that do not negatively impact a tribe's rights, resources and interests. The Project Lead should understand and comply with any U.S.-tribe agreements (treaties, MOA's) when identifying and evaluating decision alternatives. The Project Lead should also apply the policy goals of the 1984 EPA Indian Policy.

Most tribe-EPA communication during the consultation process takes the form of information sharing, technical discussion, and joint planning, and involves staff and management of both EPA and a tribe. EPA should timely and efficiently disseminate relevant information to tribes and should seek a reciprocal timely receipt of information from tribes. This is a critical part of the consultation process in most cases. The tribe and EPA may wish to designate technical points of contact to discuss data and findings in advance of the leadership meeting. When EPA and a tribe are effectively communicating and coordinating in an early, meaningful way, conflict is reduced or avoided, and in some cases a tribe may feel its interests have been met without the need for further consultation at the leadership level. In other cases, this will serve as an important preliminary step to a productive leadership meeting.

There may be situations where a tribe lacks the resources to conduct a technical or legal review. Depending on the degree of tribal interest, and practical considerations such as timing and resources, it may be beneficial to provide an additional technical meeting or workshop where information can be exchanged. The EPA Project Lead should help identify the various decision points and potential topics or issues that may be of particular interest to the tribe. For example, in the development of a permit there may be technical support documents created that assist EPA in making decisions. The tribe may wish to have a workshop about the technical support document so that input can be provided and the parameters of EPA's authority can be best understood.

Sometimes, it is difficult for EPA to meet tribal expectations, especially when EPA lacks the discretion or authority to fully resolve all tribal concerns. EPA's authority is often subject to specific statutory and regulatory limitations, and the extent with which it can address tribal expectations will vary on a case-by-case basis. Clarifying these issues in the consultation process can be very helpful.

### 2. Sensitive Information, Record-Keeping and Freedom of Information Act

It is important to promote full and frank exchange of views during government-to-government consultation with tribes. These interactions may include discussions relating to issues of unique sensitivity to tribes such as cultural practices, uses of environmental resources,

and locations of cultural resources. There may also be sensitivity regarding tribal relationships with surrounding states and jurisdictional issues. In preparing any records memorializing consultations with tribes, the EPA Project Lead should consider these potential sensitivities in determining the level of detail to include. The EPA Project Lead should also consider and discuss with tribes the fact that written records of consultations, or other documents exchanged between EPA and Tribes during the consultation and coordination, ordinarily will not be privileged or otherwise protected from disclosure under FOIA. For advice on specific situations, please consult the Office of Regional Counsel.

3. **Leadership Meeting**

It will often be appropriate to offer to meet with a tribe at the leadership level when EPA anticipates or proposes an action that may affect a tribe. The Project Lead should seek the Region 10 Tribal Consultation Specialist's advice regarding leadership meetings. The executive leadership of EPA and the tribal government officials may have one or more meetings. The tribal and EPA points of contact should discuss and agree on the arrangements and expectations, including the agenda, for each leadership meeting in advance of the meeting. Generally, the agenda should include:

- Introductions
- Statement of meeting purpose, including identification of EPA action or decision.
- Statements from each party, usually focused on goals and expectations for the consultation
- Presentation of information, both from EPA and the tribe
- Discussion and input
- Identification of next steps

The EPA and tribal points of contact should summarize these arrangements and expectations for the leadership meeting in writing, such as in an e-mail message or a letter, depending on the level of formality appropriate under the circumstances. It is also usually advisable to send a letter to the tribe after the leadership meeting summarizing the key issues discussed and addressing any follow-up tasks.

4. **Consulting with Multiple Tribes**

When offering to consult with a large group of tribes or all tribes in Region 10, a letter should be sent to each tribe. The most feasible approach may be to carry out the consultations in a hub (centralized) location or through conference calls and webinars, depending on practical considerations such as the number and location of the tribes involved, the facilities, and other resources available. Hub consultations normally are arranged in areas that can accommodate a large meeting and are central to the maximum number of tribes, and where tribes have expressed interest, to the extent practical. In multiple party consultation, it is important for EPA to know who the designated tribal representative is for each tribal government participating. If the consultation involves a large number of tribes or all tribes within the Region, a lead EPA Tribal Coordinator may be appointed to coordinate work with the program. It is important to discuss these issues with each tribe involved, as referenced in Section VI.C, to ensure mutual understanding about the consultation process, particularly if one or more Tribes request individual government-to-government consultation.

Case 3:14-cv-00171-HRH   Document 73   Filed 11/07/14   Page 54 of 119

## 5. Telephone Conferences

As described in Section VI.C, if it is determined that the most feasible approach for a consultation is through a telephone conference, participants should take extra care to ensure the consultation retains appropriate protocol. Consultation by telephone can present communication challenges such as determining when someone wishes to speak and inability to read body language. It is important to allow periods of silence to ensure tribal participants have the opportunity to speak. It is also helpful to have the facilitator stop occasionally and ask if anyone has points or questions they would like clarified or addressed.

## 6. Visit to Tribe

If the consultation will involve a visit by EPA to a tribe, the EPA and tribal points of contact should consider building other activities, in addition to the consultation, into the visit. The tribe may wish to host a tour of environmental sites and projects for EPA representatives. Other options may include working with the tribe to host a public meeting or workshop, visiting the tribe's cultural center or museum, or meeting with traditional tribal leaders and elders. If possible, such activities should be scheduled before the consultation.

## 7. Coordination with Other Federal Agencies

EPA should actively seek opportunities to conduct tribal consultations jointly with other federal agencies when EPA and one or more other federal agencies have related actions that affect tribal interests. This type of federal partnership could reduce the burden on a tribe and may also result in improved protection of human health and the environment. Discussion with state or local agencies may be appropriate if they have related actions, but they are not part of the federal consultation process; their involvement should be discussed with the tribe in advance of any meeting. Tribes are generally entitled to meet with federal government representatives only, if that is their preference.

## 8. Including the Public, the Media, or Other Participants in Tribal Consultation

Participation and attendance at EPA-tribe consultation meetings is generally limited to the representatives of EPA and the tribe. Consultants employed by EPA or the tribe, or third parties such as intertribal organizations, tribal consortia, environmental or non-profit organizations, or state or local governments, may be included as long as there is no objection from either side. EPA and the tribe may agree to grant a party "observer status" where that party can listen to the proceedings but not participate, to provide the third party an opportunity to better understand EPA and tribal issues and priorities. Media are excluded from consultation unless both parties agree prior to the consultation.

## 9. Translation and Recording

There may be instances within Region 10 when a translator may be required for meaningful consultation. It is important to discuss the need for a translator ahead of the meeting. It is also important to discuss in advance whether either party intends to record any meetings (in person or telephonic).

## E.    Required Follow-Up and Reporting

In accordance to the EPA Policy on Consultation and Coordination with Indian Tribes, Region 10 will provide feedback to the tribe(s) involved in the consultation to explain how their input was considered in the final action. This feedback should be a formal, written communication from a senior EPA official involved to the most senior tribal official involved in the consultation. Each individual that participated in the consultation should receive a copy of this communication, as should the Region 10 Tribal Consultation Specialist for purposes of consultation tracking requirements.

Region 10 must develop a semi-annual agenda and submit the Agenda or an update to EPA's American Indian Environmental Office (AIEO) by October 1st and April 1st of each year. The semi-annual agenda consists of a list of pre-identified activities that Region 10 plans to consult upon in the future. Submission of the Agenda is satisfied by entering the relevant information in the Tribal Consultation Opportunities Tracking System (TCOTS, http://yosemite. epa.gov/oita/TConsultation.nsf/TC?OpenView). TCOTS requires the entry of a small set of standardized information used to track the consultation including a start and end date and the primary point-of-contact. The information provided is used as the basis for posting consultation information outside EPA for tribes and the public. In addition, Region 10 is responsible for submitting brief summaries of completed consultations to AIEO as soon as practicable once consultation is complete. The Region 10 Tribal Consultation Specialist is responsible for tracking and inputting required consultation information into TCOTS. Please contact the Region 10 Tribal Consultation Specialist for additional information on reporting requirements.

# VII.  Historic or Archaeological Resources

Where a federal action might affect historical or archaeological resources, there are a number of laws and procedural requirements that might be triggered, including the American Antiquities Act of 1906, the Historic Sites, Buildings, Objects, and Antiquities Act of 1935, the National Historic Preservation Act of 1966, and the Native American Graves Protection and Repatriation Act of 1990. These laws contain a number of requirements, some of which are very detailed, and may overlap with these tribal consultation procedures and/or the National Environmental Policy Act (NEPA). Often the NEPA process will involve an initial screening as to whether any historical or archaeological resources might be impacted. When working on a project that might involve any resources of this nature, it is very important to consult with ORC to determine whether tribal consultation needs to be coordinated with any additional procedures related to resources protected by law.

*this page intentionally left blank*

# Appendix A

## EPA Region 10 Emergency Response Tribal Consultation Procedures

The EPA Region 10 Emergency Management Program (EMP) within the Office of Environmental Cleanup (ECL) is responsible for a range of assessment and cleanup actions that vary in their duration, complexity and time-critical nature. These actions may be in response to oil or chemical spills, as well as to natural and man-made disasters. Cleanups, such as Removal Actions, may be considered non-time critical, time-critical, or emergency response in nature. The urgency and dynamics of a Removal Action may affect EPA's ability to fully implement all four phases of tribal consultation described in EPA policy (identification, notification, input, and follow-up).

### Non-Time Critical Removal Actions

Non-time critical removal actions, which may be conducted or overseen by either Federal On-Scene Coordinators or EPA Region 10's Remedial Cleanup Program, generally allow for at least a 6-month planning period prior to the initiation of cleanup activities on scene. Non-time critical removal actions require an engineering evaluation and cost analysis (EE/CA) to evaluate the cleanup action alternatives being considered. A decision document (Action Memorandum) is subsequently developed to document the selection of the cleanup activity. Given the pace of the non-time critical cleanup activity, Region 10 generally should fully implement the EPA Region 10 Tribal Consultation Procedures when EPA actions or decisions may affect tribal interests. In particular, EPA should provide opportunities to consult during or before the public comment period and prior to issuing the Action Memorandum.

### Time-Critical Removal Actions

For time-critical removal actions, an EE/CA and public comment period is not required but an Action Memorandum is still developed to document the cleanup decision, in most cases prior to a cleanup activity taking place. For time-critical removal actions, EPA staff should coordinate closely with Tribal environmental staff. To ensure that Tribal leadership are also informed of these cleanup activities, EPA should offer formal consultation directly to Tribal leadership prior to approval of the Action Memorandum, whenever time allows. In some cases, EPA may need to approve of the Action Memorandum and commence cleanup activities without delay and in those cases, formal consultation should be offered as soon as possible during preparations and/or commencement of cleanup activities on scene.

### Emergency Removal Actions

During emergency actions, out of necessity, the Federal On-scene Coordinator or the Unified Command will make dozens of critical decisions on a real time basis throughout the day and night. In order to provide meaningful input during the emergency decision-making process, parties typically must be on scene and participating in the response action. Consistent with the National Contingency Plan, when EPA is notified of a spill or release that could potentially impact Tribal interests, EPA's Duty Officer should provide verbal notification to any affected tribe. This verbal notification ordinarily should be coordinated through the U.S. Department of Interior or the Bureau of Indian Affairs.

There are two ways potentially affected tribes may participate in or monitor these emergency response activities. First, if a Unified Command System is established on scene to manage the emergency situation, EPA should, at the time of notifying the Tribal staff, invite the Tribe(s) to send a representative to the scene to join in the Unified Command, serving as either a qualified Tribal Incident Commander or as a technical specialist. Second, EPA produces pollution reports (POLREPS) during emergency actions to document key issues and decisions. EPA should add any potentially affected Tribes to the POLREP email distribution, thereby providing current and ongoing cleanup information to the Tribe if it is unable to participate directly, on scene. During emergency response actions, an Action Memorandum is only written for fund-lead cleanups, and even then it is usually written after any/all response and cleanup activities are completed due to the immediate need to protect public health and the environment.

Due to the often chaotic and uncontrolled nature of emergency response to spills and releases, the ability to conduct other aspects of consultation with potentially affected Tribes must be made on a case by case, incident-specific basis, with the goal of keeping the Tribe fully informed, and providing meaningful opportunity for tribal input.

## Summary

1. EPA Region 10 will follow the full tribal consultation process for all non-time critical removal actions.

2. For time-critical removal actions that have less than a 6 month planning period, EPA Region 10 will make all attempts to follow the full tribal consultation process. In some cases, due to the urgency and dynamics of the removal activity, the tribal consultation process may take place concurrently to the cleanup activity.

3. During Emergency Response activities, EPA Region 10 will continue to notify all affected tribes regarding oil and chemical spills and releases that potentially affect Tribal interests. Further, Tribes will be invited to send a representative to participate on scene in the Unified Command. EPA will also add affected Tribes to the email distribution of all POLREPs. During emergencies, decisions regarding other aspects of Tribal consultation will be made on a case-by-case basis.

**EXHIBIT D**

Declaration of Tami Fordham

## JOINT RESOLUTION
### of
### New Koliganek Village Council
### Koliganek Natives Limited

## JOINT RESOLUTION NO. 2005-1

## JOINT RESOLUTION OPPOSING THE DEVELOPMENT OF THE PEBBLE GOLD-COPPER-MOLYBDENUM PORPHYRY MINING DISTRICT

**Whereas,** the New Koliganek Village Council and Koliganek Natives Limited executed the Memorandum of Understanding on April 4, 2003, in order to recognize areas of mutual concern and support, and to establish a framework for cooperative relations and promote private corporation to government-to-government communication for the benefit of the community of Koliganek, and

**Whereas,** the parties to the Memorandum of Understanding have fiduciary responsibilities to protect the land, environment, and traditional subsistence use areas within their respective Regional, Tribal, and Corporate Boundaries, and

**Whereas,** the shareholders, tribal members, and residents of the parties to the Memorandum of Understanding have long used, and will continue to use, the lands down stream from the Pebble Gold-Copper Mining District along the Mulchatna and Koktuli (Qurtuli) River corridors and other navigable and non-navigable rivers and creeks which flow to the Nushagak River and Nushagak Bay for subsistence hunting, fishing, and gathering, and

**Whereas,** the residents of Nondalton, Newhalen, Iliamna, and Lake Clark have long used the lands and will be used by future generations in and around the Pebble Gold-Copper Mining District to the north and east and south in which the navigable rivers and creeks flow to Lake Clark, Six Mile Lake and Iliamna Lake which flow to the Kvichak River and Kvichak Bay, and

**Whereas,** if the mining district is developed there is a strong likelihood (probability) that there will be detrimental impact on the environment, water and air quality, fish and wild life resources and spawning and calving grounds, and health of residents and subsistence hunters living or using the land adjacent to the tributaries in the mining district,

**NOW THEREFORE BE IT RESOLVED,** the parties to the Memorandum of Understanding strongly oppose the development of the mining district, and request the governor of the State of Alaska and its administration to halt all plans to develop the mining district area.

**NOW THEREFORE BE IT FURTHER RESOLVED,** the parties to the Memorandum of Understanding request that Senator Ted Stevens, Senator Lisa Murkowski, and Congressman Don Young oppose the development of the mine, and

**BE IT FURTHER RESOLVED,** the parties to the Memorandum of Understanding respectfully request the Lake and Peninsula Borough to reconsider and withdraw their support.

**PASSED AND APPROVED** by the New Koliganek Village Council and the Board of Directors of Koliganek Natives Limited during a joint meeting on 21st, day of January, 2005 in which a duly constituted quorum of New Koliganek Village Council and Koliganek Natives Limited were present.


**New Koliganek Village Council**

DATE:

Its: President

ATTEST:

Its: Secretary


**Koliganek Natives Limited**

DATE:

Its: President

ATTEST:

Its: Secretary

# ALASKA INTER-TRIBAL COUNCIL

## RESOLUTION #2005-05

**TITLE:**   Opposing the development of the pebble gold-copper-molybdenum porphyry mining district.

**WHEREAS,** the Alaska Inter-Tribal Council (AITC) is a statewide consortium of sovereign tribes sharing a common bond of unique cultures, languages, spirituality, and traditional values, established in 1992 to advocate for the inherent rights of tribes in Alaska, and

**WHEREAS,** Alaska Natives have long used the lands, which will continue to be used by future generations, down stream from the Pebble Gold-Copper Mining District along the Mulchatna and Koktuli (Qurtuli) River corridors and other navigable and non-navigable rivers and creeks which flow to the Nushagak River and Nushagak Bay for subsistence hunting, fishing, and gathering; and

**WHEREAS,** Alaska Natives have long used the lands, which will continue to be used by future generations, in and around the Pebble Gold-Copper Mining District to the north and east and south in which the navigable and non-navigable rivers and creeks flow to Lake Clark, Six Mile Lake and Iliamna Lake which flow to the Kvichak River and Kvichak Bay; and

**WHEREAS,** the lands and streams, and rivers surrounding the Pebble Gold-Copper Mining District, Mulchatna, Koktuli, Upper and Lower Telarik Creek, Chulitna, Newhalen, Kvichak Rivers and Nikubuna, Lake Clark, Six Mile and Iliamna Lake are used for subsistence hunting, fishing and gathering; and

**WHEREAS,** other villages surrounding the Pebble Gold-Copper Mining District have long used the lands, to the north, east, south, in which navigable and non-navigable rivers, streams flow for subsistence hunting, fishing and gathering, and will be used by future generations.

**WHEREAS,** if the mining district is developed there is a strong likelihood (probability) that there will be detrimental impact on the environmental, water and air quality, fish and wild life resources and spawning and calving grounds, and health of residents and subsistence hunters living or using the land adjacent to the tributaries in the mining district; and

**NOW, THEREFORE, BE IT RESOLVED** the parties to the resolution strongly oppose the development of the mining district and request the Governor of the State of Alaska and its administration halt all plans to develop the mining district area; and

**BE IT FURTHER RESOLVED,** the parties to the resolution respectfully request the Lake and Peninsula Borough to reconsider and withdraw their "resolution" that was put forth without consideration how the "Impact Villages" or villages within the Borough felt about the Pebble Gold Copper Mining District; and

**BE IT FINALLY RESOLVED,** that this resolution shall be the policy of AITC until it is withdrawn or modified by subsequent resolution.

## CERTIFICATION

The foregoing resolution was adopted at the 2005 Annual Convention of the Alaska Inter-Tribal Council, held at the Coast International Inn, in Anchorage, Alaska on December 7, 2005 with a quorum present.

ATTEST:

_____

_____
Ian Erlich, Chairman

Submitted by: Ekwok Village Council and Nondalton

## BRISTOL BAY NATIVE ASSOCIATION
### P.O. BOX 310
### DILLINGHAM, ALASKA 99576
### By the Full Board of Directors

### RESOLUTION 2006-37

## A Resolution Opposing All Large Scale Mining in the Bristol Bay Region until Studies Unequivocally Prove there will be No Net Loss to Subsistence, Commercial, and Sports Users

WHEREAS: The Bristol Bay Native Association is an Alaska Native non-profit corporation and tribal consortium serving 31 tribes in the Bristol Bay region; and

WHEREAS: BBNA has historically worked to protect and enhance subsistence use of resources within its region, has supported commercial fisheries, and has promoted preserving clear air, pristine water quality, protection of habitat, and the overall health of our land, air and water; and

WHEREAS: BBNA's Board of Directors is very concerned that large scale mining will affect both surface and groundwater quality which would in turn harm the largest wild commercial salmon fishery in the world, a world class sports fishery, and the resources our people have relied on for thousands of years for subsistence; and

WHEREAS: World salmon markets have turned their focus from farmed salmon to wild salmon as a preferred choice because of environmental and health concerns with farmed salmon; this trend may be undercut if mining causes pollution of our pristine water; and

WHEREAS: Large scale mining may have such a massive "foot print" that it will affect our moose and caribou populations, which in turn will have a negative impact to our tribal members and their ability to obtain a valuable food source; and

WHEREAS: Bristol Bay rivers, such as the Koktuli River, are major spawning grounds for salmon and may be "ground zero" for leaching ponds associated with large scale mining; and

WHEREAS: The Bristol Bay mining district is within the Pacific "Ring of Fire" and is susceptible to volcanic eruptions and major earthquakes; and

WHEREAS: The BBNA Board of Directors believes that large scale mining carries too many risks to our existing resource-based economy and way of life, and that the Bristol Bay Region is better served by economic development based on renewable resources;

NOW THEREFORE BE IT RESOLVED by the Bristol Bay Native Association Board of Directors that BBNA opposes all large-scale mining within the Bristol Bay Region until studies for a project unequivocally prove that there will be NO NET LOSS to subsistence, commercial, recreational and sports uses of resources within our region or to the region's land, air and water quality.

Signed: _Fred J. Angasan_
President

### CERTIFICATION:

I, the undersigned Secretary of the Bristol Bay Native Association, do hereby certify that the foregoing resolution was duly passed by the Board of Directors of the Bristol Bay Native Association at a duly called and noticed meeting on this 29th day of September, 2006, and that a quorum was present.

# EXHIBIT E

Declaration of Tami Fordham

**EPA Region 10 Alaska Tribal Mining Education Plan**
**February 2008**

**Purpose of the Plan:**

The purpose of the Alaska Tribal Mining Education Plan is to respond to requests from tribes to improve the dialogue and information-sharing on mining issues, particularly in Alaska. This supplements and provides support to the Region's existing tribal program and implements the tribal capacity building strategic action in the Region 10 Mining Strategy.

**Goals of the Plan:**

This is what we are hearing from Alaska tribes and are the goals for the Plan.

- Tribal governments could benefit from information regarding: types of mining processes, environmental and health impacts of mining and mining waste products, regulations that pertain to mining, and EPA's role in regulation of mining activities.

- Tribes would like to share their concerns regarding mining in general and concerns with specific mining projects.

- Tribes would like information early on regarding potential mining projects and impacts.

- Tribes would like information on opportunities to influence these projects.

**How we will respond:**

We plan to provide information to Alaska tribes through education sessions scheduled during existing forums and events. In addition, as part of the education sessions or in separate meetings, we can schedule availability sessions where EPA mining team members meet with tribes to hear and discuss their concerns. Through both the education sessions and the availability sessions, we can discuss with the tribes opportunities for involvement in mining projects. These sessions may be coordinated to include the participation of other agencies.

We will also update the tribal and mining webpages to include information pertaining to mining education, resources, and EPA mining contacts.

**Following is the proposed structure for accomplishing the goals:**

Education sessions: EPA will conduct education sessions at the following existing forums for up to the next three years. Mining sessions may include: information on different types of mining and processing activities, impacts of these activities and wastes produced, overview of federal environmental statutes and programs that regulate mining activities, and information on how tribes can be involved.

1

AK Forum on the Environment: EPA OSW and Region 10 provided mining training at the 2007 AK Forum in Anchorage. EPA is participating in the State's mining information session at the 2008 Forum. EPA will continue to offer mining information sessions at the Forum as interest persists.

RTOC and/or Tribal Leaders Summit: EPA plans to facilitate a session regarding lessons learned from historic mining activities and tribal involvement in mining reclamation planning at the 2008 Tribal Leaders Summit. If requested, mining information sessions can be provided at or before/after the RTOC meetings and future Tribal Leader Summits.

Other events: EPA Region 10 provided a mining information session on November 26, 2007 in Anchorage. The session was timed to coincide with the BIA Providers Conference. EPA will look for opportunities to conduct future sessions adjacent to the time that tribes gather for other events.

Coordination with training provided by other agencies: The state and other federal agencies have provided mining training. We will seek opportunities to coordinate our training with those of other agencies to illustrate the different roles of the agencies, how agencies work together, and the sequencing of environmental review and permitting actions.

Availability Sessions: EPA will provide availability sessions at the same forums as above (AK Forum, RTOC, Tribal Leaders Summit, etc.) as requested. EPA mining team staff will be available at the sessions to listen to and discuss general and, to the extent possible, site-specific mining concerns.

EPA Tribal Webpage Update: The EPA tribal and mining webpages will be updated to include EPA mining training materials, links to other EPA documents pertaining to mining, and a list of EPA contacts for mining sites.

Project-specific Consultation: We will continue to coordinate and consult with affected tribes on specific projects where we have a regulatory role. The extent of consultation and consultation activities will be worked out with the tribes and EPA project manager and tribal coordinator. Information and materials developed under this Tribal Mining Education Plan can support project-specific consultation.


**For more information:**

Patty McGrath
Region 10 Mining Coordinator
EPA Region 10
1200 Sixth Ave., OWW-135
Seattle, WA 98101
(206) 553-0979
mcgrath.patricia@epa.gov

Tami Fordham
AK Tribal Resource Extraction Specialist
EPA Region 10, Anchorage Office
222 W. 7th Avenue
Anchorage, AK 99513
(907) 271-1484
fordham.tami@epa.gov

2

## Model for How AK Tribal Mining Education Plan Fits Into
## EPA Programs and Regional Mining Strategy



# EXHIBIT F

Declaration of Tami Fordham

# Mining and Tribal Involvement

**Lake Iliamna Tribes**
**August 29th, 2008**

Tami Fordham
US Environmental Protection Agency Region 10

---

## The principles of the 1984 EPA Indian Policy support:

- The government-to-government relationship and consideration of tribal concerns and interests in EPA decision-making
- Tribal self-governance (including program delegation)
- Cooperation with other governments (state, local) and Federal agencies
- Removal of legal and procedural impediments to effective Tribal work
- EPA's Indian Policy
  http://www.epa.gov/tribal/basicinfo/epa-policies.htm
- EPA Region 10 Tribal Consultation Procedures
  https://yosemite.epa.gov/r10/tribal.nsf





## Pebble Project

- Status: EXPLORATION
- Project Proponent Activities Include:
  - Pre-Permitting & Pre-Feasibility
  - Exploration
  - Baseline Data Collection
  - http://pebblepartnership.com/
- Stakeholder Relations:
  - Heidi Franklin – (907) 339-2614

2



## EPA Involvement

- ◆ Participated in interagency meetings since December, 2003.
- ◆ Identified a Project Manager
- ◆ Assembled a Region 10 Pebble Project team consisting of staff with expertise in mining and all agency programs.
- ◆ Site Visits
- ◆ Review baseline sampling and data reports

3

## How is EPA involved in mining activities?

◆ Mining sites are regulated by a mixture of state and federal laws

◆ Many agencies involved:
  – Federal: EPA, Army Corps of Engineers, US Forest Service, US Bureau of Land Management, National Park Service, USFWS, NMFS, US BIA
  – State: ADNR, ADEC, ADFG
  – Local

## How is EPA involved in mining activities?

– National Environmental Policy Act – disclosure of environmental impacts
– Clean Water Act – protection of surface water and wetlands
– Safe Drinking Water Act – protection of ground water
– Clean Air Act – Program delegated to the State of AK
– Resource Conservation and Recovery Act (RCRA)
– Endangered Species (ESA) & Essential Fish Habitat Consultation
– Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) – investigation and cleanup of contaminated sites

# National Environmental Policy Act (NEPA)

- NEPA established national policy for environmental responsibility.

- Purpose of NEPA: ensure that **Federal** agency decision makers understand and take into account environmental impacts.

- Requires coordination with other agencies and public review of some documents.

# NEPA – Proposed and Active Mines

- EIS looks at environmental impacts of proposed project and alternatives

# NEPA Training

◆ NEPA Training
  – Shipley Group: http://www.shipleygroup.com/
  – NEPA Net – http://www.nepa.gov
  – Council on Environmental Quality –
    http://www.whitehouse.gov/ceq/
  – *CEQ – Citizen's Guide to NEPA*
    ◆ *http://www.nepa.gov/nepa/Citizens_Guide_Dec07.pdf*

◆ Alaska Forum on the Environment
  – http://www.akforum.com

◆ Regional Trainings

---

# Clean Water Act
# National Pollutant Discharge Elimination System (NPDES)

◆ Permit program for authorizing discharges of wastewater to waters of the US.

◆ Permits require discharges to meet water quality standards and other conditions.

◆ EPA implements in Alaska

◆ State of Alaska Primacy Application



Red Dog Mine



## Clean Water Act – Section 404 Program

◆ Permit program authorizing dredge and fill activities in waters of US and wetlands

◆ Implemented by Corps of Engineers; EPA has review and veto authority



EPA does not regulate…

◆ Solid wastes from mining (exempt per RCRA)



EPA does not regulate…

◆ Exploration Activities
◆ Reclamation and closure
◆ Financial assurance

◆ These are regulated by states and, on federal land, by US Forest Service and BLM

8

# CERCLA

- ◆ Law authorizing EPA to investigate and cleanup release or threat of release of hazardous substance

- ◆ Implemented by EPA, except on federal land. A state can be lead agency for a site, by agreement with EPA.



# Midnite Mine Site

9

# How can tribes be involved?

- Request Government-to-Government consultation
- Request training and educational opportunities
- Under NEPA – request to be a cooperating agency
- Provide Traditional Knowledge
- Participate in public hearings and meetings
- Take agencies on a site visit
- Maintain early & frequent contact with the lead agency

# Government-to-Government Consultation

- Request a copy of the agency's tribal consultation policy/strategy

- President/Council designate an official representative and alternate for the Tribal Government

- Establish a mutual understanding of "Consultation" and possibly consultation plan

- Identify communication methods for effective consultation

- Establish timeline for consultation

10

## Request Training & Educational Opportunities

◆ Request training on the regulations, technical aspects of mining
  – e.g., AK Mining Tribal Information Plan
  – provide feedback on training
  – Indian Environmental General Assistance Program – Capacity Building

◆ Network with other tribes

## Mining Training

◆ Alaska Department of Natural Resources
  – Tom Crafford - (907)269-8629 tom.crafford@alaska.gov
  – http://www.dnr.state.ak.us/mlw/mining/index.htm
◆ EPA Region 10
  – Contact Patty McGrath or Tami Fordham
◆ AMEREF (for youth) - www.ameref.org
◆ Alaska Miner's Association - http://www.alaskaminers.org/
◆ National Mining Association - http://www.nma.org/default.asp
  Mining Expo 2008 http://www.minexpo.com/
◆ Non-Profit Organizations
◆ Universities
◆ National Mining Conferences
  - Watch EPA Region 10's Mining Website
  - National Summit of Mining Communities (Week of Sept. 20)
    • http://www.stopthepolishmine.org

# EPA Resources

- EPA's Publication Gateway:
  - http://www.epa.gov/nscep/
- Introduction to Hard Rock Mining – EPA530-C-97-005
- EPA & Hardrock Mining Source Book
- Abandoned Mine Site Characterization and Cleanup Handbook – EPA530-C-01-001
- Workshop on Mining Impacted Native American Lands – EPA625-C-02-004
- Publications on Mining Waste Management in Indian Country – EPA630-B-99-006

# Request Educational Opportunities

- Request a site visit of a similar facility

# Provide Traditional Knowledge

- Provide Traditional Knowledge for NEPA analysis
  - Used to evaluate environmental effects
  - Used to develop alternatives and mitigation

- Describe subsistence harvest practices, subsistence resources, subsistence areas

- Describe observations of the environment, climate, habitat, migratory patterns, etc.

- Sensitive information may not be held confidential

# Participate in Public Hearings & Meetings

- NEPA: scoping, draft EIS

- NPDES permits: draft permit

- Informational Meetings



## Participate in Public Hearings and Meetings

◆ Request reasonable accommodation of Tribal needs
- Timing of meetings to not impact subsistence
- Translation of written materials and verbal information

◆ Provide verbal and written comments
- Be specific and provide explanations

◆ Educate agencies on Tribal perspective

## Take Agencies on a Site Visit

◆ Provide Tribal perspective of the ecosystem wherever the project could impact (or has impacted)

◆ Explain traditional use areas

◆ Explain traditional way of life and potential project impacts to your culture

◆ Build relationships with agency

## Maintain Early & Frequent Contact with the Agency

◆ Stay in touch with agency representatives

◆ Provide notification of changes in the Tribal Government

◆ Request meetings when necessary

◆ Request written meeting notes and the opportunity to review them

◆ Ask questions

## Request to be a NEPA Cooperating Agency

◆ Criteria for Cooperating Agency under NEPA
  − Jurisdiction by law
  − Special expertise
  − Unique source of information

◆ Understand the implications of Cooperating Agency status − e.g., resources to effectively participate

◆ Clarify roles & responsibilities and level of involvement

◆ Establish a formal MOU with the lead agency

15

## Additional Areas of Involvement - with project proponent

◆ Build relationships with project proponent

◆ Take project proponents on site visit

◆ Request regular updates/meetings from project proponent

◆ Request "Good Neighbor Agreement"

◆ Request attendance at AK mines annual meetings

◆ Request visit to the Project Site

## NHPA & NAGPRA

◆ National Historic Preservation Act (Section 106)
  – http://www.achp.gov/about.html
  – http://www.achp.gov/citizensguide.pdf
  – http://www.dnr.state.ak.us/parks/oha/index.htm

◆ Native American Graves Protection and Repatriation Act (NAGPRA)
  – http://www.nagpra.org/

16

# International Indigenous Resources

♦ Mining and Indigenous Peoples Issues Roundtable: Continuing a Dialogue between Indigenous Peoples and Mining Companies
  – http://www.icmm.com/page/208/indigenous-peoples
  – http://www.icmm.com/page/6241/document/6
  – http://www.icmm.com/document/6

♦ The Convening of the Indigenous Peoples for the Healing of Mother Earth
  – http://www.indigenousconvening.com/English/index.htm
  – Charter
    ♦ http://www.chiefs-of-ontario.org/environmental/docs/conveningmessage031898.pdf

# For More Information

♦ EPA American Indian Environmental Office tribal portal: www.epa.gov/tribalportal

♦ EPA Region 10 mining webpage: yosemite.epa.gov/r10/ECOCOMM.NSF/Programs/mining

♦ EPA Region 10 tribal webpage: yosemite.epa.gov/r10.tribal.NSF

♦ Region 10 toll free #: 1-800-424-4372

♦ John Pavitt, Pebble Project Manager (907) 271-5688 pavitt.john@epa.gov

♦ Patty McGrath, Region 10 Mining Coordinator (206) 553-0979 mcgrath.patricia@epa.gov

♦ Tami Fordham, AK Resource Extraction Tribal Policy Advisor (907) 271-1148 fordham.tami@epa.gov

17

# EXHIBIT G

Declaration of Tami Fordham

# A JOINT LETTER
From Six Federally-recognized Tribes
in the Kvichak and Nushagak River Drainages of Southwest Alaska:
Nondalton Tribal Council, Koliganik Village Council, New Stuyahok Traditional Council,
Ekwok Village Council, Curyung Tribal Council, Levelock Village Council

May 2, 2010 (mailed May 21, 2010)

Lisa P. Jackson, Administrator
U.S. Environmental Protection Agency, Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Dennis J. McLerran, Regional Administrator
U.S. Environmental Protection Agency, Region 10
Regional Administrator's Office, RA-140
1200 Sixth Avenue, Suite 900
Seattle, WA 98101

Re:  Tribes request that EPA initiate a public process under Section 404(c) of the Clean Water
     Act, to protect waters, wetlands, fish, wildlife, fisheries, subsistence and public uses in the
     Kvichak and Nushagak drainages and Bristol Bay of Southwest Alaska from metallic sulfide
     mining, including a potential Pebble mine.

Dear Ms. Jackson and Mr. McLerran:

        Our federally recognized tribes, from the Kvichak and Nushagak river drainages of
southwest Alaska, have government-to-government relations with the United States, and are
represented by the undersigned tribal councils.  We are writing with assistance of counsel.

        Section 404(c) of the Clean Water Act authorizes EPA to prohibit or restrict the discharge
of dredge or fill material, including mine wastes, at defined sites in waters of the United States,
including wetlands, whenever EPA determines, after notice and opportunity for hearing, that the
use of such sites for disposal would have an "unacceptable adverse effect" on fisheries, wildlife,
municipal water supplies or recreational areas.  EPA may do so *prior* to applications for permits
to discharge such material.  40 CFR 231.1(a).  "Unacceptable adverse effect" is defined as:

        impact on an aquatic or wetland ecosystem which is *likely* to result in significant
        degradation of municipal water supplies (including surface or ground water) or
        significant loss of or damage to fisheries, shellfishing, or wildlife habitat or
        recreation areas.  In evaluating the unacceptability of such impacts, consideration
        should be given to the relevant portions of the section 404(b)(1) guidelines (40
        CFR Part 230).[1]

_____

[1] 40 CFR 231.2(e) (italics added).  The purposes of the 404(b)(1) Guidelines are "to restore and
*maintain* the chemical, physical, and biological integrity of waters of the United States through
the control of discharges of dredged or fill material," and to implement Congressional policies

We request that EPA initiate a 404(c) public process to identify wetlands and waters in the *Kvichak and Nushagak river drainages* of southwest Alaska, where discharges associated with potential *large scale metallic sulfide mining*, could be prohibited or restricted due to such effects. This initial scope would include the Pebble deposit (which straddles a divide between these drainages) and other metallic sulfide deposits in the area of that deposit. (We understand that Kemuk Mountain may be the site of another metallic sulfide deposit.) During such a public process, some members of the public may urge a broader or narrower scope. The "scope" of a 404(c) process is one of many issues that should be resolved through a public process. The deposits in the area of the Pebble claims, which precipitate this situation, should be included.

We are addressing this to both of you because: (1) 40 CFR 231.3(a) provides that a regional administrator makes the decision of whether to initiate a 404(c) public process; (2) in this instance, initiating a 404(c) process effectuates three of EPA's national priorities,[2] and three of EPA's regional priorities;[3] (3) initiating a 404(c) process promotes EPA's goal that decisions be based on science, law, transparency, and stronger EPA oversight;[4] and (4) doing so is consistent with EPA's national priorities of increased oversight of mineral processing[5] and

---

expressed in the Clean Water Act. The Guidelines establish a rebuttable presumption against allowing any discharge unless it can be demonstrated that the discharge will not have an unacceptable adverse impact "*either individually or in combination* with known and/or probable impacts of other activities affecting the ecosystems of concern." The Guidelines declare:

> From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in *wetlands*, is considered to be among the most *severe* environmental impacts covered by these Guidelines. The *guiding principle* should be that degradation or destruction of special sites [such as wetlands] may represent an irreversible loss of valuable aquatic resources.

40 CFR 230.1 (italics added). The Guidelines address direct, cumulative and secondary effects. 40 CFR 230.11. Secondary effects are those associated with a discharge, but do not result from actual placement of the material, and must be considered prior to agency action under §404. 40 CFR 230.11(h)(1). In this case, a 404(c) process should address potential secondary effects on commercial, subsistence, and recreational fishing and hunting, and public use of parks and preserves. *See* 40 CFR Part 230, subpart F. All are at issue as discussed herein and in attached letter from counsel, and in the briefing paper attached to enclosed letter to State Rep. Edgmon.
[2] These include: (1) protecting America's waters; (2) expanding the public conversation on environmentalism and working for environmental justice; and (3) forging strong partnerships between EPA, tribes and states. *See* EPA's seven national priorities at http://blog.epa.gov/administrator/2010/01/12/seven-priorities-for-epas-future/#more-636.
[3] These include: (1) working with Tribal Governments to protect and restore the natural resources on which tribal communities rely for their physical, cultural and economic well-being; (2) protecting and restoring watersheds; and (3) promoting sustainable practices and strategic partnerships, including with tribal governments. *See* EPA's six regional priorities at http://yosemite.epa.gov/R10/EXTAFF.NSF/Reports/2007-2011+Region+10+Strategy (last visited Feb. 12, 2010), and EPA's Region 10 Strategy for Enhancing Tribal Environments at http://yosemite.epa.gov/r10/EXTAFF.NSF/Reports/07-11+Tribal (last visited Feb 12, 2010).
[4] *Id.* Pebble mine also raises issues that may require the assistance of EPA staff in other offices.
[5] EPA's national priorities for enforcement and compliance for FY 2008 – 2010 and FY 2011 – 2013 (proposed) are at http://www.epa.gov/oecaerth/data/planning/priorities/index.html#new.

increased attention to Environmental Justice. Furthermore, EPA's on-going 404(c) process with respect to the Spruce No. 1 mine in West Virginia indicates that EPA prefers to be proactive, *i.e.*, "to address environmental concerns effectively *prior* to permit issuance."[6]

We make this request for the following reasons.

1. **The cultural, ecological and economic importance of the Kvichak and Nushagak river drainages, and the magnitude of a potential Pebble mine, indicate that the scope of a 404(c) public process should be broad at the outset.**

Pursuant to 40 CFR 231.3(a), a Regional Administrator's *initial* decision of whether to commence a 404(c) process turns on whether there is *"reason to believe"* that "an 'unacceptable adverse effect' *could* result." (Italics added). This initial decision is based upon "evaluating the information available."[7]

The Kvichak River drainage historically produces more sockeye salmon than any other drainage in the world. Sockeye salmon drive the commercial salmon fisheries of Bristol Bay, which are the state's most valuable salmon fisheries. Within the Bristol Bay drainages, the Nushagak River drainage, also produces vast numbers of sockeye, and produces the largest runs of other species, including chinook, coho, chum and pink salmon. Both drainages are critical to the wild commercial salmon fisheries, subsistence fisheries, internationally famous sport fisheries, and abundant wildlife. The fish serve many onshore, near-shore and offshore uses and ecological functions, including in the North Pacific. The drainages provide water supplies to numerous villages and communities, many of which are substantially populated by Alaska Native people.[8]

The Pebble Limited Partnership (PLP), which seeks to develop the Pebble mining claims, divides them into "Pebble West" and "Pebble East." The former may be susceptible to an open pit mine. The latter (a more recent discovery) may be susceptible to an underground mine.[9] In

---

[6] *See* EPA, Spruce No. 1 Mine 404(c) Questions & Answers for Web Posting, Oct. 16, 2009 (italics added), http://www.epa.gov/owow/wetlands/pdf/spruce_1_Oct_16_2009_q_and_a.pdf (visited Jan. 26, 2010). EPA took this position when it invoked the 404(c) public process after years of working with the applicant and other agencies. Spruce No. 1 is the largest proposed mountaintop removal operation in Appalachia, would clear 2200 acres, and fill seven miles of streams. By contrast, just the open pit portion of a Pebble mine (per applications filed in 2006 and subsequently suspended) would be about two square miles (over 46,000 acres).

[7] Because EPA staff has access to EPA's materials, our counsel have prepared an Appendix which lists other potentially relevant documents, from other agencies, the mining claimants, academic or professional publications, professional papers, and presidential documents applicable to environmental issues, tribal relations, and environmental justice. We assume that none would be overlooked and simply call these documents to your attention.

[8] Nondalton is closer to a potential Pebble mine than any other community. Dillingham's Curyung Tribal Council represents the largest tribe in the Bristol Bay drainages of about 2400 members. Koliganek, New Stuyahok, Ekwok and Levelock are downstream of Pebble.

[9] EPA routinely recognizes that mine voids, from open pit and underground mines, are sources of acid mine drainage. We call to your attention P. Younger, *"Don't forget the voids: aquatic*

2006, Northern Dynasty Mines, Inc. (NDM)[10] filed, and then supplemented, nine applications with the Alaska Department of Natural Resources (ADNR), and then requested ADNR to suspend them. ADNR did so. Four applications sought to appropriate water. Five sought to construct tailings impoundment dams.[11] These nine applications were based *solely* on Pebble West. The surface area of the water of just two tailings impoundments, as then proposed, would have covered over ten square miles (6400 acres). "Beaches" of waste would have surrounded the impoundments created by five dams or embankments up to 740 feet high and several miles long.

The 2006 applications for Pebble West showed that NDM had considered about a dozen potential waste disposal sites. All or many appeared to involve vast wetlands under EPA's jurisdiction. The proposed open pit would have involved about 16.5 miles of 54-inch diameter pipelines to manage discharge tailings, and over two hundred miles of 15-inch diameter pipelines to transport a slurry concentrate for dewatering and ocean shipment from Cook Inlet, and to return used slurry water to the mine facilities. After suspending the applications, PLP has concentrated on exploring Pebble East. It has resulted in more than doubling the amount of potential mine waste, to about ten billion tons of waste. Hence, the questions of where, how and whether the vast volume of waste can be safely and permanently handled are major unresolved issues that involve a vast amount of discharge under Section 404 into a vast amount of wetlands.

Because a Pebble mine, associated facilities, and similar metallic sulfide mines could also have various direct, cumulative, secondary adverse effects in combination with other impacts over a vast area, our tribes recommend that EPA consider a wide geographic area of the Kvichak and Nushagak drainages for purposes of § 404(c), at least initially for a public process. Our reasons include: (1) the importance of the Kvichak and Nushagak drainages for fish, wildlife, and commercial, subsistence and recreational use of fish and wildlife; and the abundance of waters and wetlands that support fish, wildlife and public uses; (2) the location of the Pebble deposit at a divide between Upper Talarik Creek, which flows directly to Iliamna Lake (a significant rearing lake for sockeye salmon) in the Kvichak drainage, and the North and South Forks of the Koktuli River in the Nushagak drainage; (3) the large scale of the deposit and a Pebble mine;[12] (4) the acid generating potential of the host rock, voids, wastes, and dust; (5) the necessity of dewatering a vast area, likely to great depths; (6) the fact that no comparable mine apparently exists in terms of risk to commercial salmon fisheries, subsistence, recreation, and

*pollution from abandoned mines in Europe,*" submitted at the Workshop on Mine and Quarry Waste – the Burden from the Past, held by the Dir. Gen. for the Envir. and Jt. Research Cen. for EU and EC nations, at Orta, Italy, 2002. The paper indicates that voids can vastly exceed waste depositories as sources of water pollution (*see* Table 1 therein, and discussion); *see* http://viso.jrc.ec.europa.eu/pecomines_ext/events/workshop/ProceedingsOrtaWorkshop.pdf.
[10] We understand that NDM is the American subsidiary of Northern Dynasty Minerals Ltd., of which an affiliate is apparently a partner in PLP. *See* announcement of PLP partnership at http://www.northerndynastyminerals.com/ndm/NewsReleases.asp?ReportID=336841&_Type=News-Releases&_Title=Northern-Dynasty-Anglo-American-Establish-5050-Partnership-To-Advance-Pebbl...
[11] The applications comprise over 2000 pages. The attached appendix lists the website posting them. A law journal article (listed in the appendix) summarizes these applications.
[12] The financial commitment necessary to develop Pebble mine is huge, for various reasons such as the cost of power, and is inconceivable as a small mine.

Case 3:14-cv-00171-HRH   Document 73   Filed 11/07/14   Page 92 of 119

abundance of wetlands and water proximate to ground level; (7) the apparent existence of other metallic sulfide deposits in the Pebble area and perhaps at Kemuk Mountain; (8) the likelihood that discharge of dredge and fill material, including mine wastes from a Pebble mine or similar mines, and dewatering, will adversely affect vast amounts of wetlands and waters; (9) the facts that the behavior of metallic sulfide mines is difficult to predict; that the record of preventing water pollution from them is not good; that acid mine drainage is a major risk; and that this risk is perhaps increased by abundance of surface and groundwater;[13] (10) the facts that Pebble implies a huge quantity of potential mine waste (perhaps ten billion tons), uncertainty over how wastes might be handled, and that pipelines could move wastes to various discharge sites; (11) the immensity of the task of containing contaminants forever, including acid drainage; (12) the magnitude of potential direct, cumulative, and secondary effects on commercial fishing,[14] subsistence and recreation, including in combination with increased population, access and competition for fish and game;[15] (13) the ecological functions that salmon perform throughout their life cycle in marine and fresh waters; (14) the fact that juvenile salmon have been shown to be present in many waters within the Pebble claims where salmon had been undocumented previously for purposes of the state's Anadromous Fish Act; (15) the likelihood that a transportation route to Cook Inlet could implicate significant beach spawning of sockeye salmon in the north-eastern portion of Iliamna Lake; (16) the likelihood that a Pebble mine, its transportation corridor, and nearly settlement areas could adversely affect areas previously identified as by the State as (a) "essential" moose wintering areas, or "important" spring-, summer- and fall moose habitats, (b) "essential" caribou calving grounds, and (c) "essential" brown bear concentration streams; and (17) the vast amount of compensatory mitigation likely to be required and its questionable sufficiency.[16] All these reasons justify a broad initial scope for a 404(c) process.

2.   **The magnitude of the issues and PLP's recent decision to terminate its Technical Working Groups justify an EPA decision to commence a 404(c) process at this time.**

Moreover, the process should be commenced at this time. PLP recently terminated its Technical Working Groups (TWGs), approximately ten in number. They were composed of federal and state officials who, in an advisory capacity, had sought for several years to review and comment upon PLP's baseline study plans before PLP implemented them, and to review results, in order to advise PLP as it progressed toward an environmental impact statement (EIS) under the National Environmental Policy Act (NEPA). During the life of these working groups, information suggests that PLP was not as forthcoming as agency officials had hoped.

---

[13] The State of Wisconsin has imposed a moratorium on permits for metallic sulfide mining, by requiring that before permits may issue, a proponent demonstrate one such mine in North America that has operated for ten years without polluting water, and one that has closed for ten years without polluting water. Thus, water pollution at Pebble appears likely.

[14] A listing under the Endangered Species Act of a stock of salmon bound for the Kvichak or Nushagak drainages could affect the commercial fisheries in Bristol Bay.

[15] *See* accompanying letter from counsel addressing likely effects on subsistence and recreational use from a potential Pebble mine.

[16] For such reasons, much of this issue is characterized as short-term private interests in mining a nonrenewable resource versus long-term public/quasi-public interests in commercial, subsistence and recreational uses of fish, wildlife, waters and other renewable resources on public lands.

Case 3:14-cv-00171-HRH   Document 73   Filed 11/07/14   Page 93 of 119

PLP's decision to end the TWGs strongly suggests that federal, state and tribal entities may be more likely to face greater informational deficits as they head into an EIS process, than might have been otherwise. Commencing a 404(c) process may help to remedy some of these information deficits before PLP finalizes its design, submits applications, and triggers an EIS.

Because of the magnitude of the issues, all parties (*e.g.*, PLP, federal, state, local and tribal entities, and the public) will benefit from EPA initiating a 404(c) process *before*, and not *after*, PLP submits its anticipated permit applications for a proposed Pebble mine, and *before* an EIS process commences.[17] Moreover, because the potential to invoke a 404(c) process exists, postponing an initial decision to do so until applications are filed serves no affected party.[18]

3.    **EPA should commence a 404(c) public process in part because infirmities in the State's 2005 Bristol Bay Area Plan render waiting for the EIS process impractical.**

Our request asks EPA to commence a 404(c) process before an EIS process has begun or run its course. Ordinarily, the analysis of alternatives required by NEPA should provide the information for the evaluation of alternatives under the 404(b)(1) Guidelines. 40 CFR 230.10(a)(4). However, in this instance, infirmities in the State's 2005 Bristol Bay Area Plan (2005 BBAP) render waiting for the NEPA/EIS process impractical.

We are enclosing copies of two other letters, which address the methods that ADNR employed in preparing its 2005 BBAP.[19] It classifies state land, including at Pebble, its access corridor, and nearby settlement lands, into land classification categories and establishes guidelines and statements of intent. The methods used by the 2005 BBAP to do so include:

1. using primarily *marine* criteria, such as whether land is a walrus haulout, to determine whether *inland uplands*, such as those at Pebble, qualify for classification as fish and wildlife habitat (*see* 2005 BBAP, p. 2-9; a link to the 2005 BBAP is in the Appendix);
2. *omission of salmon in non-navigable waters* from the process of designating and classifying land as habitat (*see* 2005 BBAP, pp. 3-323 – 3-330);
3. *omission of moose and caribou* from that process (*see* 2005 BBAP, p. 2-9);
4. lack of a *land use classification category for subsistence hunting and fishing*, while ADNR has a public recreation land category that includes *sport hunting and fishing* (*see* ADNR's land planning regulations at 11 AAC 55.050 – .230 and 2005 BBAP); and then

---

[17] PLP recently postponed its applications from 2010 until 2011, and may delay further.

[18] Furthermore, a 404(c) process appears to be less costly than an EIS. Facing issues proactively could reduce all costs of agencies, PLP and the public prior to and during an EIS.

[19] One letter, from our counsel to Col. Koenig, of the U. S. Army Corps of Engineers, Alaska District, and Mr. John Pavitt of EPA's Alaska Operations Office, seeks discussions of whether the tribes may be cooperating agencies on any EIS prepared for a proposed Pebble mine. The other, from our six tribes and the Alaska Independent Fishermen's Marketing Association (AIFMA), urges State Rep. Edgmon, while the Alaska legislature is out of session, to facilitate public discussions in the region of whether the legislature should consider legislation to establish a state fish and game refuge or critical habitat area that would include most state land in the Kvichak and Nushagak drainages, including land at the Pebble site.

5. defining recreation as *excluding* sport hunting and fishing for purposes of preparing the 2005 BBAP (*see* 2005 BBAP, p. A-11).[20]

Based on these and other methods, the 2005 BBAP reclassifies land at Pebble as solely as mineral land, extinguishes habitat classifications of the prior 1984 BBAP on nearly all wetlands, including those that are hydrologically important to fish habitat (a concern in the 1984 BBAP), and almost totally omits references to wetlands in planning units for state land in the Nushagak and Kvichak drainages. As explained in the letter to the Corps of Engineers, Alaska District, and the EPA Alaska Operations Office, as long as the 2005 BBAP is in effect, every alternative in an EIS that would permit a Pebble mine will rest upon such mineral classifications and the methods ADNR used in adopting land use classifications, guidelines and statements of intent.

NEPA regulations provide that an EIS must analyze and address any applicable state land use plan.[21] This requirement, in effect, is likely to put federal agencies in a difficult position of explaining, in public and on the record, why they would evaluate federal permit applications to develop state land, including wetlands, where the State's land classifications, guidelines and statements of intent rest upon (1) using primarily marine criteria to determine whether Pebble is habitat, (2) excluding salmon in non-navigable waters such as Upper Talarik Creek, (3) excluding moose and caribou, (4) having no land use classification category for subsistence hunting and fishing where there is one for sport hunting and fishing, and (5) then defining recreation as excluding sport hunting and fishing. Regardless of whether such methods are lawful or not (and we believe the present ones are *not*), to ignore them would be facially contrary to 40 CFR § 1506.2(d), and would beg the question of what the classifications, guidelines and statements of intent should be applicable, in the absence of the 2005 BBAP and its methods. No one can answer that question.

Because no one can do so, we doubt that federal agencies can engage in legally required, *reasoned* decision-making necessary to approve federal permits so long as the 2005 BBAP is in place.[22] This leaves little room for any decision other than to commence a 404(c) *before*, and not *after*, PLP submits its permit applications, and *before* an EIS process commences. To do otherwise will compel EPA, the Corps and other agencies, in the context of NEPA and an EIS

---

[20] In *Nondalton Tribal Council, et al., v. ADNR.*, 3AN-09-46 CI (3rd Jud. Dist., Ak.), these six tribes, AIFMA and Trout Unlimited, Inc. allege that ADNR's 2005 BBAP uses many unlawful methods to classify state land, and establish guidelines and management intent, including where Pebble and its facilities might be located. The litigation is undecided. *See also*, enclosed letter to Rep. Edgmon, and briefing paper (Pt. I) regarding 2005 BBAP. With respect to ADNR's lack of a subsistence category, ADNR claims that its habitat classifications accommodate subsistence, even though the 2005 BBAP reduces the upland acreage classified or co-classified as habitat by 90 percent, from 12 million acres to 768,000 acres, when compared to the former 1984 BBAP.

[21] 40 CFR § 1506.2(d) provides that to integrate an EIS into state planning processes, an EIS shall discuss any inconsistency of a proposed action with any approved state land use plan; and where inconsistency exists, the EIS should describe the extent to which the federal agency would reconcile its proposed action with the plan. In other words, an EIS on any potential Pebble mine will have to consider and analyze the applicable state land use plan.

[22] The 2005 BBAP appears fatal, from a legal standpoint, as a basis for an EIS that would support issuing permits for Pebble. *See* Briefing Paper, Pt. II, attached to letter to Rep. Edgmon.

process, either to defend the State's methods used in the 2005 BBAP (which would be untenable), or to ignore them, which would be contrary to 40 CFR § 1506.2(d).

## CONCLUSION

For three reasons, this situation seems straightforward. First, the importance of the Kvichak and Nushagak river drainages and the magnitude of the issues raised by a potential Pebble mine warrant an EPA decision now, to commence a 404(c) public process. Second, all of the concerns raised to date, coupled with the recent decision of the Pebble Limited Partnership to terminate its Technical Working Groups, justify commencing a 404(c) process at this time. Third, the infirmities of ADNR's 2005 Bristol Bay Area Plan provide additional reason to commence a 404(c) process at this time. These infirmities leave little room for any decision other than to do so *before*, and not *after*, PLP submits its permit applications, and *before* an EIS process commences, because during an EIS process no governmental agency could lawfully defend or ignore the 2005 Bristol Bay Area Plan.

Thank you for your attention to this matter. We look forward to hearing from you. We hope to work in a public process under Section 404(c) of the Clean Water Act with the U. S. Environmental Protection Agency.

Sincerely yours,

Date: _5/2/2010_

Jack Hobson, President
Nondalton Tribal Council
P.O. Box 49
Nondalton, Alaska 99640

Enclosures (2)

process, either to defend the State's methods used in the 2005 BBAP (which would be untenable), or to ignore them, which would be contrary to 40 CFR § 1506.2(d).

## CONCLUSION

For three reasons, this situation seems straightforward. First. the importance of the Kvichak and Nushagak river drainages and the magnitude of the issues raised by a potential Pebble mine warrant an EPA decision now, to commence a 404(c) public process. Second. all of the concerns raised to date, coupled with the recent decision of the Pebble Limited Partnership to terminate its Technical Working Groups, justify commencing a 404(c) process at this time. Third, the infirmities of ADNR's 2005 Bristol Bay Area Plan provide additional reason to commence a 404(c) process at this time. These infirmities leave little room for any decision other than to do so *before*, and not *after*, PLP submits its permit applications, and *before* an EIS process commences, because during an EIS process no governmental agency could lawfully defend or ignore the 2005 Bristol Bay Area Plan.

Thank you for your attention to this matter. We look forward to hearing from you. We hope to work in a public process under Section 404(c) of the Clean Water Act with the U. S. Environmental Protection Agency.

Sincerely yours,

Date: __5/04/10__

Dennis Andrew, President
New Stuyahok Traditional Council
P.O. Box 49
New Stuyahok, Alaska 99636

Enclosures (2)

Letter, SW Alaska Tribes to EPA, re: 404(c)          New Stuyahok Traditional Council          Page 8

process, either to defend the State's methods used in the 2005 BBAP (which would be untenable), or to ignore them, which would be contrary to 40 CFR § 1506.2(d).

## CONCLUSION

For three reasons, this situation seems straightforward. First, the importance of the Kvichak and Nushagak river drainages and the magnitude of the issues raised by a potential Pebble mine warrant an EPA decision now, to commence a 404(c) public process. Second, all of the concerns raised to date, coupled with the recent decision of the Pebble Limited Partnership to terminate its Technical Working Groups, justify commencing a 404(c) process at this time. Third, the infirmities of ADNR's 2005 Bristol Bay Area Plan provide additional reason to commence a 404(c) process at this time. These infirmities leave little room for any decision other than to do so *before*, and not *after*, PLP submits its permit applications, and *before* an EIS process commences, because during an EIS process no governmental agency could lawfully defend or ignore the 2005 Bristol Bay Area Plan.

Thank you for your attention to this matter. We look forward to hearing from you. We hope to work in a public process under Section 404(c) of the Clean Water Act with the U. S. Environmental Protection Agency.

Sincerely yours,

Date: _5-10-10_

for Angelia Chukwak    Vice President

Sergie Chukwak, President
Levelock Village Council
P.O. Box 70
Levelock, Alaska 99625

Enclosures (2)

Case 3:14-cv-00171-HRH   Document 73   Filed 11/07/14   Page 98 of 119

process, either to defend the State's methods used in the 2005 BBAP (which would be untenable), or to ignore them, which would be contrary to 40 CFR § 1506.2(d).

## CONCLUSION

For three reasons, this situation seems straightforward. First, the importance of the Kvichak and Nushagak river drainages and the magnitude of the issues raised by a potential Pebble mine warrant an EPA decision now, to commence a 404(c) public process. Second, all of the concerns raised to date, coupled with the recent decision of the Pebble Limited Partnership to terminate its Technical Working Groups, justify commencing a 404(c) process at this time. Third, the infirmities of ADNR's 2005 Bristol Bay Area Plan provide additional reason to commence a 404(c) process at this time. These infirmities leave little room for any decision other than to do so *before*, and not *after*, PLP submits its permit applications, and *before* an EIS process commences, because during an EIS process no governmental agency could lawfully defend or ignore the 2005 Bristol Bay Area Plan.

Thank you for your attention to this matter. We look forward to hearing from you. We hope to work in a public process under Section 404(c) of the Clean Water Act with the U. S. Environmental Protection Agency.

Sincerely yours,

Date: 5/11/10

Luki Akelkok, President
Ekwok Village Council
P.O. Box 70
Ekwok, Alaska 99580

Enclosures (2)

process, either to defend the State's methods used in the 2005 BBAP (which would be untenable), or to ignore them, which would be contrary to 40 CFR § 1506.2(d).

## CONCLUSION

For three reasons, this situation seems straightforward. First, the importance of the Kvichak and Nushagak river drainages and the magnitude of the issues raised by a potential Pebble mine warrant an EPA decision now, to commence a 404(c) public process. Second, all of the concerns raised to date, coupled with the recent decision of the Pebble Limited Partnership to terminate its Technical Working Groups, justify commencing a 404(c) process at this time. Third, the infirmities of ADNR's 2005 Bristol Bay Area Plan provide additional reason to commence a 404(c) process at this time. These infirmities leave little room for any decision other than to do so *before*, and not *after*, PLP submits its permit applications, and *before* an EIS process commences, because during an EIS process no governmental agency could lawfully defend or ignore the 2005 Bristol Bay Area Plan.

Thank you for your attention to this matter. We look forward to hearing from you. We hope to work in a public process under Section 404(c) of the Clean Water Act with the U. S. Environmental Protection Agency.

Sincerely yours,

Date: 5/12/2010

Thomas Tilden, President
Curyung Tribal Council
P.O. Box 216
531 D Street
Dillingham, Alaska 99576

Enclosures (2)

process, either to defend the State's methods used in the 2005 BBAP (which would be untenable), or to ignore them, which would be contrary to 40 CFR § 1506.2(d).

## CONCLUSION

For three reasons, this situation seems straightforward. First, the importance of the Kvichak and Nushagak river drainages and the magnitude of the issues raised by a potential Pebble mine warrant an EPA decision now, to commence a 404(c) public process. Second, all of the concerns raised to date, coupled with the recent decision of the Pebble Limited Partnership to terminate its Technical Working Groups, justify commencing a 404(c) process at this time. Third, the infirmities of ADNR's 2005 Bristol Bay Area Plan provide additional reason to commence a 404(c) process at this time. These infirmities leave little room for any decision other than to do so *before*, and not *after*, PLP submits its permit applications, and *before* an EIS process commences, because during an EIS process no governmental agency could lawfully defend or ignore the 2005 Bristol Bay Area Plan.

Thank you for your attention to this matter. We look forward to hearing from you. We hope to work in a public process under Section 404(c) of the Clean Water Act with the U. S. Environmental Protection Agency.

Sincerely yours,

Date: __5-13-2010__

Herman F. Nelson Sr.
Herman Nelson, Sr., President
Koliganek Village Council
P.O. Box 5057
Koliganek, Alaska 99576

Enclosures (2)

process, either to defend the State's methods used in the 2005 BBAP (which would be untenable), or to ignore them, which would be contrary to 40 CFR § 1506.2(d).

## CONCLUSION

For three reasons, this situation seems straightforward. First, the importance of the Kvichak and Nushagak river drainages and the magnitude of the issues raised by a potential Pebble mine warrant an EPA decision now, to commence a 404(c) public process. Second, all of the concerns raised to date, coupled with the recent decision of the Pebble Limited Partnership to terminate its Technical Working Groups, justify commencing a 404(c) process at this time. Third, the infirmities of ADNR's 2005 Bristol Bay Area Plan provide additional reason to commence a 404(c) process at this time. These infirmities leave little room for any decision other than to do so *before*, and not *after*, PLP submits its permit applications, and *before* an EIS process commences, because during an EIS process no governmental agency could lawfully defend or ignore the 2005 Bristol Bay Area Plan.

Thank you for your attention to this matter. We look forward to hearing from you. We hope to work in a public process under Section 404(c) of the Clean Water Act with the U. S. Environmental Protection Agency.

Sincerely yours,

Dated: _5 - 2 d - / o_

Geoffrey Y. Parker, Attorney
634 K Street
Anchorage, Alaska 99501
(907) 222-6859
gparker@alaska.net
Co-Counsel to Signatory Tribes

Thomas E. Meacham, Attorney
9500 Prospect Drive
Anchorage, Alaska 99507-5924
(907) 346-1077
tmeacham@gci.net
Co-Counsel to Signatory Tribes

Enclosures (2)

# EXHIBIT H

Declaration of Tami Fordham



**Administrator Lisa Jackson Visit to Dillingham   - Update - Please Respond by Tuesday July 20th**

Tami Fordham   to:   luki2akelkok, tildenthomas, TPCRPR, levelock,.mandrewjr, newstutribe, faithandrew, newkgkvc, utvenv, george, meshik,        07/16/2010 03:44 PM

Cc:   Patricia McGrath, Wesliey Foster, Greg Kellogg, Richard Parkin

Bcc:  "jeff parker"

| From: | Tami Fordham/R10/USEPA/US |
|---|---|
| To: | luki2akelkok███████tildenthomas████████, TPCRPR@██████ levelock@███████ mandrewjr@█████, newstutribe@starband.net, faithandrew███████ newkgkvc@█████████ utvenv@y██████ |
| Cc: | Patricia McGrath/R10/USEPA/US@EPA, Wesliey Foster/R10/USEPA/US@EPA, Greg Kellogg/R10/USEPA/US@EPA, Richard Parkin/R10/USEPA/US@EPA |
| Bcc: | "jeff parker" <gparker@alaska.net> |

Good Afternoon!

The purpose of this visit is for Administrator Jackson and the other EPA Officials to learn more about the Bristol Bay region and to hear local and regional perspectives regarding the proposed Pebble mine. This is a great opportunity to come and meet with the Administrator.

The times listed below have not yet been finalized, but they should be close. If the schedule changes I will let you know. I wanted to send the draft itinerary to you so that if you were planning on traveling to Dillingham you could make those arrangements. Also, please know that Sue Flensburg will be working with tribal environmental coordinators who would like to present a short presentation on their program work, see below for more information.

I am asking that for the closed tribal government meeting that you let me know who will be representing your tribal government, see below for more information.

Please get back to me and/or Sue by Tuesday July 20th. I will need names and titles for all of the people who are planning to meet with the Administrator. Curyung Tribe is also helping to organize the potluck so they would appreciate knowing how many people plan on traveling into Dillingham.

Depart Anchorage 10AM
Arrive Dillingham - LOCATION: Dillingham Middle School (565 Wolverine Lane)
1130AM-1PM - <u>Tribal Environmental Program Successes</u> - this is an opportunity for tribal environmental programs to make brief presentations about their work throughout the region. If you would like to make a presentation please contact Sue Flensburg @ BBNA who will be organizing this session. If your tribe can not send anyone to this meeting and you would like to send information to Sue so that it can be given to the Administrator please contact Sue. Lastly, Sue is available to help with developing posters and the Bristol Bay Campus is willing to print 10 posters. **CONTACT: Sue Flensburg no later than Tuesday July 20th** if you are interested in presenting, sharing written information, or have any questions.

1PM-2PM - <u>Potluck</u> - Organized by the Curyung Tribe and the Bristol Bay Native Association

2-330PM - <u>Meeting with Tribal Governments</u> - This meeting is an opportunity for the EPA to hear tribal environmental concerns related to the proposed·Pebble project, opportunities for partnership, and not a discussion as to whether or not the project should happen or not. If your tribal government is able to travel to Dillingham please let me know by Monday July 19th. I will need to know who will be the designated representative for your tribal government. If the Tribal Council can not travel and would like to appoint another person in the tribe to represent them please let me know who this person will be, no later than Tuesday July 20th.

330-345 - Break

345PM-445PM - Meeting with local and regional governments, non-profits, or other entities to share their perspectives on the proposed pebble project. Invitations will be sent to those organizations. This is a listening session, not a forum for stating positions on the project. EPA is not managing this as a public hearing, this is an opportunity for EPA to hear first hand from the people in Dillingham and the Bristol Bay region to discuss their environmental concerns, and opportunities for partnership.

5PM - EPA departs Dillingham (back to Anchorage)

EPA folks that will be traveling to Dillingham:
Lisa Jackson, Administrator
Robert Goulding, Staff
Allyn Brooks-LaSure, Press
Michelle DePass, Assistant Administrator-Office of International and Tribal Affairs(OITA)
Shalini Vajjhala, Deputy Assistant Administrator -OITA
Elle Beard, Special Assistant-OITA
Jeff Besougloff, Associate Director, American Indian Environmental Office -OITA
Dennis McLerran, Regional Administrator-Region 10
Marcia Combes, Director, Anchorage Operations Office (AOO)
Tami Fordham, TC, AOO
Patty McGrath, Mining, R10
Water Program Person, R10

If you have any questions or concerns please contact me.

I look forward to hearing from you soon.

Sincerely,
Tami

~~Equality - With Great Respect for the People We Serve ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Tami Fordham
Alaska Resource Extraction Tribal Policy Advisor
Tribal Trust and Assistance Unit
EPA Region 10 - Alaska Operations Office
222 W 7th Avenue #19
Anchorage, AK 99513-7588

Phone: 907-271-1484
TOLL FREE: 1-800-781-0983
Fax: 907-271-3424

Region 10 EPA Home Page
http:www.epa.gov

Region 10 Mining Website
http://yosemite.epa.gov/r10/ECOCOMM.NSF/Programs/mining

Region 10 Grants Administration Unit
http://yosemite.epa.gov/r10/omp.nsf/webpage/Region+10+Grants+Administration+Unit

*EPA Tribal Portal
http://www.epa.gov/tribal/

EPA Community Action for Renewed Environment
http://www.epa.gov/CARE

# EXHIBIT I

Declaration of Tami Fordham

**Newhalen Tribal Council**
**P.O. Box 207**
**Newhalen, Alaska 99606**
**(907) 571-1410**

October 10, 2010

Dennis J. McLerran, Regional Administrator
Environmental Protection Agency, Region 10
1200 Sixth Avenue, Suite 900
Seattle, WA 98101
Phone: (206)553-1200 (800) 424-4372
Fax: (206) 553-2955

Re: Clean Water Act 404(c) process to prohibit certain lands from use as a disposal site for dredged or fill material

Dear Mr. McLerran;

   The Newhalen Tribal Council in located near the Pebble deposit in the Iliamna Lake. We believe that it is too early to draw conclusions about the Pebble project. To use antiquated mining practices that were the rule of thumb prior to the passage of the National Environmental Policy Act (NEPA) to judge mines today is nothing more than scare tactics to drive away sustainable resource development projects that are much needed for the security of our Nation as well as providing much needed jobs in poverty stricken areas in Bristol Bay.

We are writing you because we believe that letters to the EPA from Bristol Bay organizations like the Bristol Bay Native Corporation urging the EPA to invoke under its authority from Section 404(c) of the Clean Water Act circumvent the public process. When representatives from our village corporation, the Alaska Peninsula Corporation (APC) met with EPA representatives in Washington DC in 2006, they were assured that it was "Not the loudest voice but the best science" that would determine the future of projects like Pebble.

We feel that it is imperative that you hear our views and we are proposing that we go to either Seattle or Washington in the near future to express to you our position so that there is no misunderstanding about our views on sustainable resource development. We are puzzled by the effort by the anti mine zealots seeking action to stop Pebble at this early juncture. We believe that the permitting process will determine whether the mine can co-exist with other uses of the land in Iliamna. To condemn a project even before it files its feasibility study and application for permits is irresponsible.

Sincerely,

Raymond Wassillie
President

# South Naknek Tribal Council

South Naknek, Alaska, 99670

October 7, 2010

Dennis J. McLerran, Regional Administrator

Environmental Protection Agency, Region 10

1200 Sixth Avenue, Suite 900

Seattle, WA 98101

Phone: (206)553-1200 (800) 424-4372

Fax: (206) 553-2955

Re: Clean Water Act 404(c) process to prohibit certain lands from use as a disposal site for dredged or fill material

Dear Mr. McLerran;

The South Naknek Tribal Council is a federally recognized tribe in the watershed of the Bristol Bay region and downstream from the proposed Pebble project.

We support due process and believe that the Pebble Limited Partnership has a right to seek permits without political intervention. It is too soon to draw conclusions about the mine. We will participate in the public hearing process once the state and federal agencies begins to hold them to determine if the mine can coexist with existing uses of the lands in Bristol Bay.

Again, we urge you to withhold any action on the Pebble Project until they have completed their feasibility study and the public hearing process on the project begins.

Sincerely,

South Naknek Village Council

Signature on file at the South Naknek Tribal Council office

TOTAL P.01

# EXHIBIT J

Declaration of Tami Fordham



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 10**
1200 Sixth Avenue, Suite 900
Seattle, Washington 98101-3140

OFFICE OF THE
REGIONAL ADMINISTRATOR

President Sophie Abyo
Pilot Point Tribal Council
P O Box 449
Pilot Point , Alaska 99649

RE: Invitation for Tribal Consultation

Dear President Abyo:

EPA sent an announcement to your tribal government on February 7th, 2011 regarding the Bristol Bay Watershed Assessment. This letter is in regards to the specific opportunities for your tribal government to participate in this scientific assessment.

The purpose of this inquiry is to gather scientific and technical information and data on the potential environmental impacts to the watershed of Bristol Bay (Nushagak/Mulchatna,and Kvichak watersheds) and to inform EPA's decision on the need for protections under Section 404(c) of the Clean Water Act (CWA). EPA intends to work with federal, tribal and state governments in reviewing the data and analyzing the information. EPA will also share the information with the public and seek input before deciding whether to initiate an advanced action under 404(c) or to take other appropriate action.

There are three primary opportunities for your tribal government to participate: first, through Government-to-Government Consultation; second, through the public involvement processes; and, third, through the Intergovernmental Technical Review Team. Those opportunities are further explained below.

EPA invites your tribal government to request Tribal Consultation. If your tribal government would like to request Tribal Consultation please respond by **March 31st, 2011**. Tami Fordham, Alaska Resource Extraction Tribal Policy Advisor, and Westley Foster, Alaska Tribal Coordinator, will work with the tribal governments who request consultation to put together the Government-to-Government Consultation Plan. Please submit the attached response form and any tribal government consultation protocol documents to Tami Fordham, her contact information is included in the attached Tribal Consultation Questionnaire document.

The public involvement process is another opportunity for your tribal government and community to participate in this Watershed Assessment. EPA anticipates holding public meetings in Anchorage and 3 locations in the Kvichak and Nushagak watersheds this summer. This will be an opportunity to review the draft Bristol Bay Watershed Assessment and provide comments. As soon as the locations and specific times have been determined EPA will notify your tribal government. For more information about the project or to be added to the listserv that has been created please visit the following website: www.epa.gov/region10/bristolbay.

In addition to the Government-to-Government Consultation and public involvement process, EPA will hold two meetings with Tribal, State and Federal government experts. At these meetings, the experts will review and provide technical comments to EPA on the pre-public draft of the Watershed Assessment. These meetings will likely be in Anchorage in April/May to review an outline of the draft document, and then again in late summer/early fall to review a final draft of the document prior to peer review. EPA will coordinate, as needed, with this group of experts following the public information sessions. EPA is hoping that the tribal governments interested in participating will work together to identify 3 representatives to participate on this team.

EPA recognizes that the tribal governments have been collecting data in the Bristol Bay region and have expertise related to Traditional Knowledge, subsistence and cultural information that may help shape the information that is included in the Watershed Assessment. If your tribal government has any technical data that you feel is pertinent to this Watershed Assessment please submit it to the Senior Management Lead, Rick Parkin, his address and contact information is included below. The scope allowed for our watershed assessment under the Clean Water Act is narrow. We will be evaluating the potential for large scale development to have "unacceptable adverse effects on municipal water supplies, shellfish and fishery areas, wildlife or recreational areas." We anticipate fisheries to be our primary concern and seek information specifically in this area. EPA would like to receive any data no later than **March 31st, 2011.**

There will be a teleconference on **March 17th, 2011 at 9:30AM Alaska Time** to discuss the various opportunities for tribal governments to be involved in the watershed assessment. The call in number is **1-866-299-3188 code 907-271-5083#.**

I look forward to working with your tribal government during this assessment. If you have any questions or concerns please contact Rick Parkin at 206-553-8574 or parkin.richard@epa.gov. Rick's mailing address is 1200 Sixth Avenue, Suite 900, ETPA-087, Seattle, Washington 98101.

Sincerely,

Dennis J. McLerran
Regional Administrator

Enclosure

cc: Tribal Environmental Coordinators (thru email)
Richard Parkin, Bristol Bay Watershed Assessment Senior Management Lead, EPA
Westley Foster, Alaska Tribal Coordinator, EPA
Tami Fordham, Alaska Resource Extraction Tribal Policy Advisor, EPA

# EXHIBIT K

Declaration of Tami Fordham



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 10**
1200 Sixth Avenue, Suite 900
Seattle, WA 98101-3140

OFFICE OF THE
REGIONAL
ADMINISTRATOR

July 18, 2014

Dear Honorable Tribal Leader:

Pursuant to Section 404(c) of the Clean Water Act and 40 Code of Federal Regulations Part 231, the United States Environmental Protection Agency Region 10 hereby provides notice of its Proposed Determination to restrict the use of certain waters in the South Fork Koktuli River, North Fork Koktuli River, and Upper Talarik Creek watersheds in Southwest Alaska as disposal sites for dredged or fill material associated with mining the Pebble deposit, a copper-, gold-, and molybdenum-bearing ore body. In addition, EPA Region 10 is offering consultation and coordination with federally-recognized tribes in Bristol Bay, Alaska on this Proposed Determination.

EPA Region 10 is taking this step because of the high ecological and economic value of the Bristol Bay watershed and the assessed unacceptable environmental effects that would result from such mining. This Proposed Determination relies on clear EPA authorities under the CWA and is based on peer-reviewed scientific and technical information. Its scope is geographically narrow and does not affect other deposits or mine claim holders outside of those affiliated with the Pebble deposit. Additional information about the Proposed Determination may be found in the enclosed Fact Sheet, and you may obtain a copy of the Proposed Determination at www.epa.gov/bristolbay.

In accordance with 40 CFR Part 231, EPA Region 10 will be holding a series of public hearings on this Section 404(c) Proposed Determination. The purpose of these hearings is to obtain public testimony and comment on EPA Region 10's Proposed Determination. Information about the dates, times, and locations of these hearings may be found in the enclosed Fact Sheet. Additional details and any changes to the schedule are also available at www.epa.gov/bristolbay.

In addition to the public hearings, EPA Region 10 invites you and your designated consultation representative(s) to participate in the consultation process. During the week of August 11, 2014, EPA Region 10 will provide a number of in-person opportunities for EPA Region 10 leadership and designated officials to meet with designated tribal government officials in the following communities: Anchorage, Dillingham, Newhalen-Iliamna, New Stuyahok, Igiugig, Kokhanok, and Nondalton.

The consultation and coordination process will be conducted in accordance with the Presidential Executive Order 13175, *EPA Policy on Consultation and Coordination with Indian Tribes*[1] and the *EPA Region 10 Tribal Consultation and Coordination Procedures*.[2] Consistent with these policies, it is important for tribes to designate a tribal official that will be their representative for the purposes of consultation. Please use the enclosed form to inform EPA of your designated tribal official.

Due to scheduling constraints, the consultation meetings will likely be held in a group setting, so it is important to receive information from interested tribes as soon as possible. Please respond no later than

---

[1] *EPA Policy on Consultation and Coordination with Indian Tribes* (www.epa.gov/tribal/consultation/consult-policy.htm).
[2] *EPA Region 10 Tribal Consultation and Coordination Procedures* (http://www.epa.gov/region10/pdf/tribal/consultation/r10_tribal_consultation_and_coordination_procedures.pdf).

**August 1, 2014,** to ensure adequate time for planning of consultation meetings. Requests for one-on-one meetings will be considered as time and resources allow. Additional consultation would likely occur via telephone or at one of EPA Region 10's offices in Anchorage, Alaska or Seattle, Washington. Please contact Tami Fordham, information provided below, to plan these events.

EPA Region 10's anticipated timeline for the consultation and coordination period is expected to extend from July 18, 2014, to September 19, 2014. There will be an informational call regarding the tribal consultation process on July 18, 2014, at 1:00pm Alaska time. If you are unable to attend this informational call, another opportunity will be provided on Wednesday, July 30, 2014, at 10:00am Alaska time. In addition to general information sharing, an overview of the Proposed Determination will be provided. The teleconference line for both of these calls is 1-866-299-3188 code 907-271-1272#. Additional details are included in the enclosed consultation and coordination plan.

The official EPA contact person for this consultation and coordination process is Tami Fordham, Tribal Liaison to the Bristol Bay Project. She can be reached at (907) 271-1484 or fordham.tami@epa.gov. If you have any questions about the Proposed Determination or the public hearings, please contact me or have your staff contact Rick Parkin, EPA Region 10's Management Lead for the Bristol Bay Project, at (206) 553-8574.

I look forward to hearing from you on this important matter.

Sincerely,

Dennis J. McLerran
Regional Administrator

Enclosures:
EPA R10 Tribal Consultation and Coordination Process and Timeline for the Bristol Bay Project
EPA Region 10 Consultation Questionnaire
Bristol Bay 404(c) Proposed Determination and Fact Sheet

**EPA R10 Tribal Consultation and Coordination Process and Timeline for the Bristol Bay Project**
U.S. Environmental Protection Agency Region 10's Proposed Determination To Prohibit, Restrict, or Deny the Specification, or the Use for Specification (Including Withdrawal of Specification), of an Area as a Disposal Site Pursuant to Section 404(c) of the Clean Water Act and Public Hearings on the Proposed Determination; Pebble Deposit Area, Southwest Alaska

| Date | Event | Contact Information |
|---|---|---|
| July 18, 2014<br>1PM Alaska Time | **Information Exchange Meeting** *(for tribal environmental professionals and/or Tribal Government Officials)*<br><br>Informational teleconference call – 404(c) Process Overview, consultation planning, public comment period and public meeting schedule | Phone: 1-866-299-3188<br>Code: 907-271-1272# |
| July 30, 2014<br>10AM Alaska Time | **Information Exchange Meeting** *(for tribal environmental coordinators and/or Tribal Government Officials)*<br><br>Webinar: Proposed Determination – Overview<br>Information from July 18, 2014 teleconference call may be repeated for those unable to attend the first information exchange meeting. This webinar will provide an overview of the proposed determination. | Phone: 1-866-299-3188<br>Code: 907-271-1272#<br><br>Adobe:<br>https://epa.connectsolutions.com/bbinfo/ |
| August 11-15, 2014 | **Leadership Meetings** – we invite your tribal government to attend one of the tribal consultation meetings that will be scheduled in the following communities: Anchorage, Dillingham, Iliamna-Newhalen, New Stuyahok, Igiugig, Kokhanok, or Nondalton. | Contact Tami Fordham for scheduling information at fordham.tami@epa.gov or (907) 271-1484. |

3

**EPA Region 10 Consultation Questionnaire**

**Tribal Government Name:** _____

**Project Name:** Bristol Bay Project: U.S. Environmental Protection Agency Region 10's Proposed Determination To Prohibit, Restrict, or Deny the Specification, or the Use for Specification (Including Withdrawal of Specification), of an Area as a Disposal Site Pursuant to Section 404(c) of the Clean Water Act and Public Hearings on the Proposed Determination; Pebble Deposit Area, Southwest Alaska

Please check the appropriate response(s) describing the level of involvement your tribal government would like regarding this Proposed Determination.

☐ We request tribal consultation and we request to participate in the following consultation meeting:
- Anchorage
- Dillingham
- Iliamna-Newhalen
- Nondalton
- New Stuyahok
- Igiugig
- Kokhanok

☐ We want to continue to receive project information by mail and participate in the public process.

☐ We decline government-to-government consultation at this time.

The following tribal official has been designated by the Tribal Council to serve as the tribal point of contact for this consultation:

**Name and Title:** _____

**E-mail:** _____

**Phone:** _____ **Fax:** _____

**Signed by President/First Chief:** _____ **Date:** _____

**Name/Title:** _____

You may also scan and e-mail or fax this form to: Tami Fordham at fordham.tami@epa.gov or fax to (907) 271-3424.

If you have any questions regarding the Bristol Bay Project please contact Rick Parkin, email: parkin.richard@epa.gov or phone (206) 553-8574.

4

**Distribution List:**

Native Village of Aleknagik
Chignik Bay Tribal Council
Native Village of Chignik Lagoon
Chignik Lake Village
Village of Clarks Point
Curyung Tribal Council
Egegik Village
Native Village of Ekuk
Village of Iliamna
Ivanoff Bay Village
Native Village of Kanatak
King Salmon Tribe
Manokotak Village
Native Village of Perryville
Native Village of Pilot Point
Native Village of Port Heiden
Portage Creek Village
South Naknek Village
Traditional Village of Togiak
Twin Hills Village
Ugashik Village
Igiugig Village
Kokhanok Village
Levelock Village
Newhalen Village
Nondalton Village
Pedro Bay Village
Ekwok Village
Naknek Native Village
New Koliganek Village Council
New Stuyahok Village Council

5

<u>CERTIFICATE OF SERVICE</u>

I certify that on November 7, 2014, I caused to be filed electronically the foregoing

DECLARATION with the Clerk of Court using the Court's CM/ECF system, which sends

a Notice of Electronic Filing to counsel of record.


<u>/s/ Brad P. Rosenberg</u>
BRAD P. ROSENBERG