IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

PEBBLE LIMITED PARTNERSHIP,

        Plaintiff,

vs.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

        Defendants.

Case No. 3:14-cv-00171 HRH

**DECLARATION OF JEFFREY FRITHSEN**

I, Jeffrey Frithsen, declare that the following statements are true and correct to the best of my knowledge, and are based on my personal knowledge, information contained in the records of the United States Environmental Protection Agency ("EPA" or "the Agency"), and information supplied to me by current EPA employees.

    **I.**    **Background and Experience**

1.    I am a Senior Scientist and Special Projects Coordinator for the National Center for Environmental Assessment ("NCEA"), which is part of EPA's Office of Research and Development ("ORD"). ORD is the scientific research arm of EPA. I was ORD's management lead for the development of "An Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay, Alaska" ("Assessment" or "Bristol Bay Assessment"). In my capacity as ORD's management lead, I oversaw the coordination of the external peer review of the Assessment.

1

2. I have worked as an EPA employee in ORD since January 1998. During this time, I have held several positions within NCEA, including Acting Associate Director for Ecology, Group Chief of the Exposure Assessment and Risk Characterization Group, Acting Deputy Division Director for NCEA's Cincinnati Division, Acting Assistant Center Director for Multimedia Research in Ecology, Acting Assistant Center Director for Global Change Research, and Special Assistant for Ecology.

3. My educational training includes a B.S. in Biology from Boston College and a Ph.D. in Oceanography from the University of Rhode Island.

**II. Purpose of the Assessment and Contract Support**

4. ORD produces the science, research, methods, and tools that EPA needs to fulfill its mission of protecting human health and the environment. ORD conducted the Assessment to characterize the biological and mineral resources of the Bristol Bay Watershed; to increase understanding of the potential impacts of large-scale mining on the region's fish resources; and to inform future decisions related to protecting and maintaining the chemical, physical, and biological integrity of the watershed. The Assessment is a science document and does not make recommendations or establish policy.

5. The Assessment was developed and conducted by Agency scientists, and the Agency is solely responsible for its contents. As is the practice for many of its products, the Agency utilized contract support to bring additional expertise to the project. Specifically, the Agency used a contract with NatureServe to compile the background information represented in several of the appendices of the Assessment. In addition, EPA used a contract with ICF International ("ICF") to assist ORD scientists, primarily with the

2

development of Volume 1 of the Assessment. The contract with ICF was not awarded specifically to provide support for the Assessment but rather was a broad contract to provide support to NCEA and ORD. The assistance that ORD needed to support the Assessment, however, was covered under the contract's scope of work. ORD staff developed a task order specifying what assistance was needed and the existing contract with ICF was used to execute that task order. The task order relating to the Assessment was a small portion of the total amount of work that ICF was conducting for ORD. As with any task order that EPA issues to ICF, the task order for the Assessment allowed EPA to specify the expertise it needed but did not allow EPA to specify the ICF staff members that would conduct the work; ICF management decided which staff members to assign to each project. EPA staff, specifically the Task Order Project Officer, working with the Project Officer and Contracts Officer, coordinated all of the work that ICF conducted. In addition, ICF did not provide EPA with any advice or recommendations outside the scope of the task order for the Assessment.

**III.     Development of the Assessment's External Peer Review**

6.      ORD, as well as the Agency as a whole, routinely uses peer review to evaluate its draft work products. Peer review, as explained in the Third Edition of EPA's Peer Review Handbook (the "Handbook"),[1] is the "documented critical review of a specific Agency scientific and/or technical work product. Peer review is conducted by qualified individuals (or organizations) who are independent of those who performed the work, and who are collectively equivalent in technical expertise (i.e., peers) to those who performed the original work." ORD employs peer review for several types of products, including

---

[1] The Handbook is publically available at http://www.epa.gov/peerreview/pdfs/peer_review_handbook_2012.pdf.

3

manuscripts, reports, models, web sites, and assessments, such as the Bristol Bay Assessment. ORD uses peer review to ensure that these and other products are developed using acceptable methodologies, and that the results and conclusions are technically sound and are based upon the best available science. To accomplish these goals, peer review is integrated into multiple stages of the development of a science product. Including internal peer review (review by technical peers within the Agency) and external peer review (review by technical peers outside of the Agency), nearly 100% of ORD's science products undergo peer review at some point during their development. When conducting peer reviews, ORD uses the guidelines established in the Handbook, which was developed based on established Agency protocols and Office of Management and Budget ("OMB") guidelines. Like it does for most of its products, ORD peer reviewed the Assessment. Specifically, EPA conducted both an internal and an external peer review of the Assessment.

7. At the beginning of the peer review process, the Agency categorized the Assessment as a Highly Influential Scientific Assessment ("HISA"), which is defined by OMB as a product that an agency determines could have a "potential impact of more than $500 million in any year"; "is novel, controversial, or precedent-setting"; or "has significant interagency interest." Peer review approaches for HISAs are generally conducted with more rigor and provide multiple opportunities for public input.

8. With the Assessment's categorization of a HISA in mind and consistent with Agency policy, ORD developed a Peer Review Plan for the Assessment. This Peer Review Plan outlined a public comment period during which any member of the public could submit comments to the Agency, an external peer review using a contractor-

4

coordinated mechanism, and a public meeting of the peer reviewers. ORD released the Peer Review Plan to the public on EPA's Science Inventory website.

9. ORD also named a Peer Review Leader to oversee the independent, contractor-coordinated external peer review. The Peer Review Leader worked with the Peer Review Coordinator for ORD's National Center for Environmental Assessment to ensure that ORD's procedures for implementing the guidelines outlined in the Handbook for a HISA were followed.

10. Consistent with ORD's classification of the Assessment as a HISA, EPA also actively looked for opportunities to engage the stakeholder community and members of the public in the external peer review process. In addition to asking the public to comment on the draft Assessment itself, EPA also asked the public to (1) nominate external peer reviewers, (2) comment on the charge questions provided to the external peer reviewers, and (3) provide oral comments directly to the external peer reviewers. These public involvement opportunities are discussed in more detail below.

11. ORD incorporated these and other requirements into a Performance Work Statement ("Task Order") that was consistent with the Handbook's guidelines and that included a statement of purpose, background on the Assessment, and the scope of work that the selected contractor would need to perform. ORD submitted this Task Order to the two contractors that participate in ORD's existing contract for peer reviews. ORD's Contract's Office selected Versar, Inc. (the "Contractor") as the successful bidder to conduct the external peer review. ORD's Contract's Office made this selection without input from the individuals that contributed to the Assessment.

12. One of the tasks ORD charged the Contractor with was identifying and selecting 10 external peer reviewers who were experts in: (1) metals mining; (2) salmon fisheries biology; (3) surface, subsurface, or watershed hydrology; (4) aquatic ecology; (5) biogeochemistry; (6) seismology; (7) ecotoxicology; (8) wildlife ecology; and/or (9) indigenous Alaskan cultures. Consistent with the Task Order, the Contractor developed a website where the public could nominate peer reviewers. EPA published this website, along with the deadline for submissions, in the Federal Register. After the EPA granted a one-week extension to ensure that the interested public could participate, the public had a total of three weeks to submit nominations.

13. In total, the Contractor received 68 unique nominations from the public and interested stakeholders, including Pebble Limited Partnership ("Pebble"), and also independently identified an additional 7 potential peer reviewers. The Contractor then evaluated the pool for qualifications and conflicts of interest. Specifically, the Contractor reviewed for three conflicts of interest: organizational, financial, and perceived/apparent. An organizational conflict of interest was defined as any individual who was a member of Pebble, its affiliates, or its direct contractors. Similarly, a financial conflict of interest was defined as any individual who owned stock in Pebble, its affiliates, its direct contractors, or related mining companies. Finally, a perceived/apparent conflict of interest was defined as an expressed public view that would present an apparent bias. During the Contractor's process of analyzing for conflicts of interest, EPA provided clarification to the Contractor concerning the types of expertise needed and what activities could constitute a conflict of interest. This was the extent of EPA's involvement with the Contractor during this time. Then, based upon technical

6

qualifications and the conflicts of interest analysis, the Contractor narrowed the pool of potential peer reviewers and gave the curricula vitae of twenty candidates to EPA.

14. EPA reviewed the twenty candidates based upon their scientific expertise and for potential conflicts of interest. EPA's review of expertise was done to ensure that the Contractor had adequately fulfilled its responsibility to deliver qualified reviewers who could represent the areas of expertise listed in the task order. EPA's review of conflict of interest concerns was essential to ensuring a fair and unbiased panel because the Contractor could only evaluate for conflicts of interest with publicly available information. For example, if EPA had very recently awarded a grant to a potential peer reviewer, that information, while not necessarily public at the time the Contractor conducted its analysis, would constitute a conflict of interest.

15. In between the Contractor's proposal and its final selection, EPA increased the number of external peer reviewers from 10 to 12. EPA did so because it wanted to ensure that there would be multiple reviewers to adequately cover the types of expertise outlined in the Task Order.

16. After further evaluating conflicts of interest and the expertise needed for the peer review, the Contractor selected 12 final peer reviewers, the names of which it submitted to EPA, along with a summary of each peer reviewer's qualifications and its comments on conflicts of interest. EPA reviewed the proposed peer reviewers and concluded that the list of reviewers met the requirements of the Task Order.

17. EPA announced the list of peer reviewers that the Contractor selected in the Federal Register. EPA also simultaneously released draft charge questions to the public, the final versions of which the Contractor would eventually ask the peer reviewers to

7

Case 3:14-cv-00171-HRH   Document 74   Filed 11/07/14   Page 7 of 15

answer as they evaluated the draft Assessment. As stated in the Peer Review Handbook, charge questions "identif[y] the technical and scientific issues on which the Agency would like feedback and invite[] suggestions for improving the document as a whole." The Peer Review Handbook also instructs that the Agency, rather than the Contractor, should develop the charge questions. EPA developed the initial set of charge questions for the Assessment based upon the conclusions in the draft Assessment and EPA's knowledge of the data and information used to support those conclusions. The purpose of these questions was to focus the reviewers as they critiqued the Assessment and to ensure that the peer reviewers fully considered the Assessment's strengths and weaknesses. In the Federal Register Notice, EPA asked the public to comment on these draft charge questions. The public and interested stakeholders, including Pebble, responded by providing comments that were helpful to the Agency and which the Agency used to revise the charge questions. These public comments allowed EPA to develop a stronger set of charge questions that the reviewers used in their evaluation of the draft Assessment.

**IV.     External Peer Review**

18.     The Contractor then provided the peer reviewers with the charge questions and a copy of the draft Assessment, dated May 2012. The Contractor also informed the peer reviewers that EPA did not seek a consensus view. Instead, the Contractor instructed the peer reviewers to independently review the draft Assessment and develop individual responses to each of the charge questions. Concurrent with the release to the peer reviewers, as outlined in the Peer Review Plan, the Agency also released the draft Assessment for public comment. As previously discussed, EPA's decision to release the

8

draft Assessment for public comment was consistent with EPA's goal of getting public input from numerous sources and the Handbook's guidelines for a HISA. The Agency posted the public's comments on a public docket, and the reviewers had access to that docket throughout their review. Thus, contrary to Pebble's allegation, EPA did make the public's comments available to the peer reviewers. *See* Compl. ¶ 496. Following the close of the public comment period, EPA developed a summary of the technical comments, which it gave to the Contractor to provide to the peer reviewers. The Agency developed this summary due to the sheer number of public comments submitted to the docket. The summary provided a neutral overview of the major themes expressed in the public comments. EPA intended the summary to help the reviewers fully evaluate the draft Assessment.

19. Another opportunity for public input — again consistent with the Handbook's guidelines for a HISA — was a public peer review meeting, during which the public had the opportunity to provide oral comments to the peer reviewers and hear them discuss their individual responses to the charge questions. As outlined in the Task Order from EPA, the Contractor conducted this peer review meeting. EPA specifically tasked the Contractor with holding the meeting in Anchorage, Alaska – a city that is close to those involved and that has a venue, services, and hotels that could accommodate the number of people EPA anticipated would be interested in attending. To maximize participation, EPA also tasked the Contractor with providing streaming audio and video of the meeting over the internet, so that all interested parties could hear and view the proceedings.

20. The meeting began on August 7, 2012, and lasted for three days. Consistent with the Handbook's guidelines, the Contractor prepared the agenda and ran the meeting. On

9

the first day of the peer review meeting, the Contractor provided an introduction and discussed the goals of the meeting. Dennis McLerran, EPA's Regional Administrator for Region 10, then provided a brief introduction. This is the only time that EPA was scheduled to speak during the entire three-day meeting. The peer reviewers then heard from nearly 90 public speakers, each of whom presented his/her views on the draft Assessment. On the second day, the peer reviewers deliberated and discussed their individual responses to each of the charge questions. This debate was open to the public, but comments from the public were not heard on day two. On the third day, which was closed to the public, the peer reviewers were given an opportunity to document and summarize their major recommendations. Based upon the reviewers' discussion during the third day, the Contractor developed a summary of key recommendations that was included in the final peer review report.

21. EPA staff involved with the development of the draft Assessment were present on the third day to listen to the reviewers' discussion so that EPA could understand how and why the peer reviewers reached the individual conclusions they did. EPA also felt that allowing its staff to listen would help them better understand what sections of the draft Assessment needed to be revised for clarity or augmented by additional sources potentially suggested by the peer reviewers.

22. During the entire three-day meeting, the only formal channel for EPA to interact with the peer reviewers was to answer clarifying questions from the peer reviewers, as provided through the Contractor. The only time that the peer reviewers asked EPA questions was on the third day. Specifically, the Peer Review Chair[2] asked EPA

---

[2] The Peer Review Chair was one of the peer reviewers. The Task Order tasked the Contractor with selecting someone with experience leading a scientific group to be the Peer Review Chair.

questions concerning the objective and eventual use of the Assessment. The EPA Regional Administrator, Dennis McLerran, and I answered those questions. Other EPA staff in attendance did not participate in addressing questions from the Peer Review Chair. Both these questions and our responses were mediated through the Contractor and as a result, these questions did not result in any direct interaction between EPA and the peer reviewers.

23. After the meeting, each peer reviewer submitted individual responses to each of the charge questions. The Contractor documented the individual responses in the final report, dated September 2012. This is the report that Pebble refers to as the "Final Peer Review Report." *See, e.g.*, Compl. ¶ 491. As discussed below, however, this was not the last time that the peer reviewers provided comments to EPA about the Assessment.

**V.     EPA's Use of the External Peer Review**

24. EPA used the individual peer review comments it received through the external peer review process and the comments that the public submitted to improve, revise, and augment the draft Assessment. Both the peer review responses and the public comments were helpful to EPA scientists and resulted in us improving the Assessment.

25. As one example, the public submitted several technical reports to the public docket that provided information relevant to the Assessment and to issues that the peer reviewers raised. Because it was unclear whether these technical reports had been peer reviewed, EPA decided to have them independently peer reviewed before deciding whether to include them in the Assessment. These peer reviews were conducted using a contractor-coordinated, letter peer review approach. The Agency made the technical

reports and the results of the independent contractor-coordinated letter reviews publicly available through the Agency's web site.

26. After reviewing the results of these peer reviews, EPA judged the science in five of the seven reports to be of suitable quality and sufficiently relevant so as to include them in the Assessment. These reports were generally used as corroborative evidence for statements made in the Assessment. Based upon the results of the independent peer reviews, EPA determined that the technical reports were appropriate for this purpose.

27. Pebble commented on these peer reviews, noting that several peer reviewers indicated potential technical issues. After evaluating Pebble's comments, EPA concluded that Pebble's comments were not by themselves sufficient to disregard the entirety of individual technical reports.

28. In response to both the external peer review comments and the public comments on the May 2012 draft Assessment, EPA reorganized and expanded the Assessment from 9 chapters to 15 chapters. EPA did so to better reflect that the Assessment was conducted as an ecological risk assessment and to provide additional technical information responsive to all of the individual comments.

29. To ensure that the revised Assessment fully addressed all of the comments, EPA decided to make the revised April 2013 draft Assessment available to the same group of external peer reviewers that reviewed the May 2012 draft Assessment. Contrary to Pebble's assertion, this was not a second external peer review. Compl. ¶ 500. Rather, EPA wanted input from the peer reviewers to ensure that the revised Assessment fully responded to their earlier comments. Concurrently, EPA also made the revised draft

12

Assessment available for additional public comment. EPA did so consistent with its policy of involving the public as much as possible in this process.

30. Both the external peer reviewers and the public answered with additional comments (in total, the public submitted over one million comments over both drafts). All of the external peer reviewers thought that the April 2013 draft of the Assessment was much improved and was responsive to their earlier comments and suggestions. The public comments were also generally supportive of the April 2013 draft of the Assessment.

31. EPA evaluated the comments that the peer reviewers individually provided and the all of the public's comments. EPA used that input to produce the final Assessment. Just as with the previous drafts of the Assessment, contractors assisted EPA, but the development of the final Assessment was the responsibility of Agency scientists.

32. EPA responded to the comments that the peer reviewers provided and also responded to all of the comments submitted to the public docket. Specifically, EPA produced a detailed response to all of the comments that the peer reviewers provided on both the first (May 2012) draft of the Assessment and the second (April 2013) draft of the Assessment. The Agency made this detailed response to comments document publicly available through its Bristol Bay web site at the same time it released the final Assessment in January 2014. Contrary to Pebble's allegation, EPA did not rely on outside entities to develop their responses to peer review comments. PI Motion at 12.

33. EPA separately responded to the public's comments. The Agency produced one response to comments document for the approximately 233,000 comments it received on the first draft Assessment. It also produced another response to comments document for

the approximately 890,000 comments it received on the second draft Assessment. The Agency made both of these documents publicly available through the Agency's Bristol Bay web site in March 2014.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Washington, D.C., on this 6 day of Nov. 2014.

Jeffrey Frithsen

CERTIFICATE OF SERVICE

      I certify that on November 7, 2014, I caused to be filed electronically the foregoing DECLARATION with the Clerk of Court using the Court's CM/ECF system, which sends a Notice of Electronic Filing to counsel of record.

                      /s/ Brad P. Rosenberg
                      BRAD P. ROSENBERG