Thomas Amodio, Bar No. 8511142
REEVES AMODIO LLC
500 L Street, Suite 300
Anchorage, AK 99501
Telephone: (907) 222-7100
Facsimile: (907) 222-7199
*tom@reevesamodio.com*

Roger W. Yoerges (*pro hac vice*)
Timothy A. Work (*pro hac vice*)
Mark Murphy (*pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
*ryoerges@steptoe.com*
*twork@steptoe.com*
*mmurphy@steptoe.com*

Anthony A. Onorato (*pro hac vice*)
FISHER BROYLES LLP
445 Park Avenue, Ninth Floor
New York, NY 10022
Telephone: (202) 459-3599
Facsimile: (516) 706-9877
*tony.onorato@fisherbroyles.com*

*Attorneys for Plaintiff Pebble Limited Partnership*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

PEBBLE LIMITED PARTNERSHIP,

Plaintiff,

vs.

ENVIRONMENTAL PROTECTION
AGENCY, *et al.*

Defendants.

DECLARATION OF BRUCE W.
JENKINS IN SUPPORT OF
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION

CIVIL ACTION NO.
3:14-cv-00171 HRH

I, Bruce W. Jenkins, state and declare as follows:

1. I currently serve as the Executive Vice President for Environment and Sustainability for Hunter Dickinson, Inc. in Vancouver, British Columbia. I provide executive, management, and scientific support to Hunter Dickinson mineral exploration and mining projects and companies in a variety of areas including environmental affairs, project certification and permitting, environmental management, multidisciplinary study design and implementation, water management, fish resource and aquatic habitat protection, impact assessment, and compensatory mitigation planning. By training, I am a biologist and environmental scientist and those subjects have been a critical aspect of my work throughout my 40-year professional career. I was the Chief Operating Officer of NDM from 2004 to 2007 and the Interim General Manager of PLP from 2007 to 2008. If called as a witness, I would testify consistent with this declaration.

2. I have worked on the Pebble Project for the last ten years. From 2004 to 2007, I served as the Chief Operating Officer for Northern Dynasty. In that capacity, I established the Anchorage office, hired dozens of environmental consultants, and managed the program and budget for exploration drilling, environmental studies and engineering work, and community affairs. From 2007 to 2008, I was the Interim General Manager for Pebble Limited Partnership ("Pebble Partnership"). From 2008 to the present, I have served on the Steering Committee and the Environment Committee for Pebble Partnership and have focused on environmental and engineering issues. I also manage the "Fish Team" which is the group of scientists focused on assessing, minimizing and mitigating fish habitat impacts from a potential Pebble mine. These scientists include Randy Bailey, James Buell, Mary Lou Keefe, and Dudley Reiser, each of whom is highly regarded in this field.

DECLARATION OF BRUCE W. JENKINS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
*Pebble Limited Partnership v. United States E.P.A. et al.*, No. 3:14-cv-00171 HRH
Page 2 of 13

Case 3:14-cv-00171-HRH   Document 84   Filed 11/19/14   Page 2 of 14

A. <u>Defendants' Factual Statements in Their Opposition to PLP's Motion for Preliminary Injunction and Motion to Dismiss</u>

3. EPA's statements regarding the nature and frequency of its interactions with NDM/PLP misstate the facts. Communications from 2004 to 2010 between NDM/PLP and EPA primarily took place in the context of the Technical Working Groups ("TWGs") and Annual Baseline Meetings ("ABMs"). The TWGs and ABMs focused exclusively on NDM's and subsequently PLP's baseline studies of existing environmental and social conditions in the Pebble Project area, rather than on any issues associated with project design, project operations, potential project effects, impact assessment, risk factors or how they might be addressed. These latter subjects (among others) however, did serve as the focus for much of EPA's substantive engagement with ENGOs and anti-Pebble activists prior to, during and following the Bristol Bay Watershed Assessment process and subsequent 404(c) regulatory process.

4. Working with Alaska Department of Natural Resources as a liaison to the Federal and other State of Alaska agencies, NDM initiated discussions to set up the TWGs in 2005. The TWGs were created to be a forum for NDM/PLP to meet with the interested state and federal agencies to discuss environmental baseline scientific topics for purposes of a future permit application for the Pebble mine. In November of 2006, I together with my senior staff, met with the state and federal agencies regarding the formation of the TWGs and the nature of the discussions which the parties hoped to have in these working groups. By December of 2006, we had a final draft of the operating guidelines for the TWGs. The TWGs were not established as decision making groups, but rather to explore specific technical topics and openly share views on the protocols for data collection. More specifically, NDM/PLP intended to invest tens of millions of dollars and multiple years undertaking environmental baseline data collection prior to

DECLARATION OF BRUCE W. JENKINS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
*Pebble Limited Partnership v. United States E.P.A. et al.*, No. 3:14-cv-00171 HRH
Page 3 of 13

Case 3:14-cv-00171-HRH   Document 84   Filed 11/19/14   Page 3 of 14

designing a proposed development plan for Pebble or applying for permits. Such environmental and social data on pre-development conditions is required as part of the federal and state permitting process under NEPA. As such, we wanted the regulatory agencies who would be involved in the subsequent permitting review of the Pebble Project to inform our study design and methodologies, and to receive updates on study findings as they were collected, to ensure that the permitting process to come was as productive and informed as possible.

5. NDM/PLP's communications with EPA between 2005-2010 primarily came through these working groups. The meetings were open to the public and notes of the meetings were prepared and made public. These TWG meetings did not entail discussions of project design, alternatives analysis, 404 permitting strategies, risk/impact assessments, compensatory mitigation plans or available methodologies, or mine project facility failure assumptions.

6. Following the withdrawal from the TWGs by the US Army Corps and later the departure of most Fish & Wildlife Service personnel, the TWGs were suspended by PLP in January 2010. By that point, the meetings had ceased to be a free exchange of ideas, had become over-formalized, and no longer served their original purpose. While EPA alleges that the TWGs were discontinued because PLP would not provide data, the fact is that PLP had already shared a large amount of data throughout the TWG process during the ABMs. Rather, the TWGs were ultimately suspended because they had become less collaborative, of decreasing scientific utility, and over-politicized. For example, agreement even as to the content of the minutes from the meetings became too difficult to reach because the agencies sought to revise draft minutes after the fact to alter or enhance the written record.

7. In addition to the TWGs, NDM/PLP held Annual Baseline Meetings from 2004-2008 and again in 2012 and 2013. The ABMs were three-day meetings including NDM/PLP's

DECLARATION OF BRUCE W. JENKINS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
*Pebble Limited Partnership v. United States E.P.A. et al.*, No. 3:14-cv-00171 HRH
Page 4 of 13

Case 3:14-cv-00171-HRH   Document 84   Filed 11/19/14   Page 4 of 14

consultants, the agencies, the Lake & Peninsula Borough, and the Native corporations. At these meetings, NDM/PLP and their consultants presented comprehensive briefings on environmental baseline study methodologies, study plans, collected data and analysis. Large briefing packages describing methods, studies, and data for a wide array of disciplines were provided to the attendees.

8. Following the 2010 suspension of the TWGs, other than the ABMs, there was little discussion between PLP and EPA. Calls and meetings related to the Bristol Bay Watershed Assessment concentrated primarily on process issues such as the manner and extent of the use of EBD data, public comment windows, and EPA timelines, rather than the material content of EPA's work and activities.

9. EPA's statements about the alleged frequency and substance of interactions with NDM/PLP are not accurate. Before 2010, those communications related primarily to working group discussions of environmental baseline scientific topics and responding to EPA comments arising out of the ABMs. From 2010 to present, those communications largely concerned process issues with EPA's flawed and biased BBWA process. By comparison, based on documents produced by EPA under FOIA, from 2010 to present, EPA has had hundreds of documented private contacts with anti-mine activists and ENGOs concerning technical, legal, policy, and strategic issues guiding EPA's BBWA and 404(c) process.

10. Equating the two to suggest that EPA dealt with NDM/PLP in the same manner as it did with the anti-mine groups is a fiction. EPA not only did not deal with NDM/PLP in the same fashion, but withheld critical information from PLP, such as the tribes' 2010 petition requesting EPA initiate the 404(c) action and the fact that EPA would launch the BBWA. Moreover, EPA misled PLP about the nature of the BBWA, indicating that it was not a

DECLARATION OF BRUCE W. JENKINS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
*Pebble Limited Partnership v. United States E.P.A. et al.*, No. 3:14-cv-00171 HRH
Page 5 of 13

Case 3:14-cv-00171-HRH   Document 84   Filed 11/19/14   Page 5 of 14

decisional document and then using it as the centerpiece for its unprecedented Proposed Determination 404(c) action. Further, while EPA spends much time discussing its alleged public openness about the 404(c) and BBWA process, that too is belied by its exclusive dealings in private with anti-mine activists and the ways in which EPA manipulated the public process in order to benefit anti-mine groups and disadvantage pro-Pebble and pro-due process advocates, including through the comment periods, orchestration of public meetings, and the peer reviews.

11. Further, EPA falsely portrays PLP's refusal to provide its Environmental Baseline data in an unlocked form which EPA could manipulate as evidence of PLP's unwillingness to cooperate. In reality, PLP worked very hard to find a compromise solution whereby EPA could undertake the data runs it required without all of PLP's data becoming publicly accessible. EPA refused to accept anything less than complete data files that it could manipulate.

12. PLP's reticence with respect to providing unlocked EBD data comes from the fact that ENGOs and anti-Pebble activists – the same groups that have been collaborating with EPA – had previously sought to access this data for their own purposes, and had demonstrated in the past how they could manipulate data to damage the project. For example, in November 2005, NDM released to the agencies and the public, its extensive, two-volume Draft Environmental Baseline Studies Progress Report which documented both study methodology and data from environmental programs undertaken during 2004. Some of this material was utilized by an anti-Pebble ENGO to grossly misrepresent the aquatic habitat/fish population status in the area around the Pebble deposit. PLP did not want this to happen again with all of the EBD data it had assembled over 8 years at a cost of some $150 million. PLP provided the EBD data to EPA in an electronic form – *i.e.*, in precisely the same form which would be required of PLP as part of its NEPA permit application. Had EPA not preemptively used 404(c), unlocked, individual data

DECLARATION OF BRUCE W. JENKINS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
*Pebble Limited Partnership v. United States E.P.A. et al.*, No. 3:14-cv-00171 HRH
Page 6 of 13

Case 3:14-cv-00171-HRH   Document 84   Filed 11/19/14   Page 6 of 14

sets would have become available to EPA as part of the normal agency process under NEPA. Moreover, PLP did offer to make individual data sets which could be manipulated available to EPA, but, as noted above, EPA rejected that offer.

13. On several occasions, EPA refers to Native groups "who had expressed public support for a Pebble mine." In fact, these groups have consistently expressed neutrality on the project, but an interest in seeing it fully evaluated through an EIS process once project developers have proposed a development plan. This effort by EPA to make it appear as if the agency engaged even-handedly with both sides of the debate is again not accurate.

14. EPA claims that it fully complied with its Peer Review Guidelines. However, EPA again misstates and omits facts. EPA has not addressed the fact that it manipulated the peer review process by narrowly constraining the charge questions; truncating the Peer Reviewer's time lines and budgets; preventing proper Peer Review analysis of the extent to which the Peer Reviewers' input had been addressed in subsequent BBWA drafts; discouraging Peer Reviewer interaction; and by EPA's blatant disregard of the Peer Reviewer's critical comments on the inadequacies of the BBWA.

15. On page 21-22 of EPA's Opposition brief, EPA suggests that "injury to parts of the natural environment is at stake" if the court grants a preliminary injunction. That is not true; there is no imminent threat of any environmental damage if the court grants a preliminary injunction. In fact, the project would still need to go through the Federal NEPA and State of Alaska permit processes, which would take several years, even before initiating development. Further, any development would be accompanied by substantial mitigation measures which are designed to ensure the net effects of a project do not result in significant adverse effects. These mitigation measures were rejected and/or ignored by EPA, contrary to NEPA 404 permitting

DECLARATION OF BRUCE W. JENKINS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
*Pebble Limited Partnership v. United States E.P.A. et al.*, No. 3:14-cv-00171 HRH
Page 7 of 13

Case 3:14-cv-00171-HRH   Document 84   Filed 11/19/14   Page 7 of 14

requirements and precedents, and contrary to the fact that EPA itself is a partner in and/or a funding source for significant aquatic mitigation programs.

B.   Declaration of Richard Parkin

16. Parkin states that EPA's "involvement in the evaluation of potential environmental impacts associated with development of the Pebble deposit has been ongoing for over a decade." This is not what NDM/PLP's TWGs addressed at all. Rather, they focused exclusively on discussions concerning environmental baseline studies. Parkin later acknowledges this fact when he says that EPA's role as a member of TWGs was "working with NDM to obtain the necessary information to ensure that any permit application would be complete and that the NEPA process would be productive." The TWGs had nothing to do with risk assessment, impacts, or failure modes. EPA never had technical discussions with PLP about these topics, unlike its documented meetings and discussions with mine opposition groups before and during the BBWA process.

17. I attended the January 2005 meeting referenced in paragraph 13 of Parkin's Declaration. The purpose of the meeting was decidedly not to "discuss potential impacts of the Pebble mine." Rather, the purpose of the meeting was to explore how NDM could best work with EPA to develop the proper database required for permitting; explore the concept of a Memorandum of Agreement that would define how NDM would cooperate with the lead Federal agency (which at the time was expected to be EPA), during NEPA, especially as relates to selection of third-party EIS contractors; and how best to integrate knowledge and data residing within NDM consultants/staff.

18. In paragraph 16, Parkin falsely states that "EPA felt NDM lacked interest in sharing data and information to the degree necessary for the EPA's meaningful involvement."

DECLARATION OF BRUCE W. JENKINS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
*Pebble Limited Partnership v. United States E.P.A. et al.*, No. 3:14-cv-00171 HRH
Page 8 of 13

Case 3:14-cv-00171-HRH   Document 84   Filed 11/19/14   Page 8 of 14

As explained, this is both untrue and misleading. NDM/PLP voluntarily provided extensive amounts of information and environmental data to EPA (including the 13 volume Pre-Permitting Environmental Socio-Economic Data Report Series that was publically released between April 2008 and January 2010), set up the TWGs, ran the ABMs, and in 2012, provided EPA with an advance copy of the most extensive environmental baseline document ever assembled for an Alaska mining project, comprising over 27,000 pages. Moreover, Parkin's statement also ignores the reality that thousands of pages of data were provided to EPA and other agencies during annual environmental baseline study update sessions (ABMs), and in annual sampling permit data reports. Apart from the sampling permit reports, none of these actions are required of project proponents prior to applying for federal/state permits.

19. Parkin also alleges that there was no hydrology or fishery data in the EBD and that PLP "chose not to provide EPA with the data most relevant to the BBWA." These statements are categorically false, and would suggest that Parkin was unaware of the true content of the EBD. There is extensive hydrology and fishery data in the EBD, comprising thousands of pages, and PLP did provide all of this data to EPA. Likewise, in paragraph 29, contrary to EPA's assertion, PLP's study methodologies, data, statistical analyses, QA/QC processes, etc., were contained in the Pebble EBD, as delivered to EPA.

20. In paragraph 17, Parkin again repeats EPA's contrived position that the 404(c) process was initiated by the tribes' petition in 2010. However, this ignores the evidence which has come to light that at least as early as 2005, EPA management was discussing using 404(c) and that, for example, Administrator Jackson was briefed on using 404(c) before the tribes' petition, as shown in EPA's documents. It also ignores the points raised in PLP's submissions

DECLARATION OF BRUCE W. JENKINS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
*Pebble Limited Partnership v. United States E.P.A. et al.*, No. 3:14-cv-00171 HRH
Page 9 of 13

Case 3:14-cv-00171-HRH   Document 84   Filed 11/19/14   Page 9 of 14

about EPA's pre-determination of its 404(c) action based on premature scientific judgments on risk and impact.

21. In paragraph 27, Parkin states EPA made "every effort to narrow the scope of the information and to resolve the confidentiality issues that Complainant raised in order to ensure that Complainants data was utilized in the BBWA." This assertion misrepresents the facts. As stated above, PLP offered to provide specific data runs that EPA requested, such that EPA would be able to manipulate the data and otherwise test its veracity without all of PLP's data becoming publicly available and thereby at risk of data corruption. Accordingly, EPA did not make every effort to resolve the issues. Further, the real issue was not confidentiality, but preserving the integrity of the data and preventing compromise of the data, as had occurred in the past when data was released.

22. In paragraph 28, Parkin states that PLP did not provide "data in a format useable to EPA." This, again, is false and misleading because the data EPA needed was contained in the 27,000-page EBD that EPA received advance copies of, and that data would have been more than useable for the intended purposes of the BBWA. In fact, it is this same data and in the same form which PLP was preparing to submit to the US Army Corps as part of its NEPA 404 permit application, and it was this very data that would have been utilized by the US Army Corps' third-party EIS team later in the NEPA process.

23. In paragraph 35, Parkin fails to mention the "study" that became Appendix D of the BBWA was carried out by Alan Boraas, a well-known, public opponent of the project who had previously published his anti-Pebble views. PLP and others requested his removal from the project, but Parkin and Region 10 Administrator McLerran refused despite Boraas's overt bias.

DECLARATION OF BRUCE W. JENKINS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
*Pebble Limited Partnership v. United States E.P.A. et al.*, No. 3:14-cv-00171 HRH
Page 10 of 13

Case 3:14-cv-00171-HRH   Document 84   Filed 11/19/14   Page 10 of 14

24. In paragraph 39, Parkin cites misleading statistics regarding the number of stakeholder comments received on the BBWA. He fails to note that the vast majority of the comments submitted were identical computer click-throughs generated by the ENGOs to artificially inflate the apparent numbers of people opposed to the project. This over-emphasis on the number of public comments completely ignores the import and significance of the content and legitimacy of technical input provided by well-informed scientific and engineering sources.

25. Parkin claims that EPA gave careful consideration to all of the information it received from the public. However, there are many instances where this is demonstrably not true. For example, EPA cites studies in the BBWA to bolster its claim that the efficacy of aquatic habitat enhancement projects is unknown. However, the author of one of those studies, Jason Quigley, a biologist formerly with Fisheries and Oceans Canada, took issue with EPA's dismissal of the effectiveness of compensatory mitigation. Quigley stated that the studies he conducted into the effectiveness of aquatic habitat enhancement projects in Canada (Harper and Quigley 2005; Quigley and Harper 2006) *did not* conclude these programs were an ineffective means to compensate for the unavoidable effects of development activities on aquatic habitat. In fact, what he found was that aquatic habitat compensation projects that are planned appropriately and implemented properly have been exceptionally successful in achieving net gains in habitat productivity. Quigley noted that most of the aquatic habitat projects in Canada he studied that did not achieve their enhancement objectives suffered from poor planning, insufficient funding and a lack of monitoring, maintenance and regulatory oversight. He found that when compensation ratios were set at 2:1, fully 81% of projects studied achieved a net gain or no net loss in habitat productivity without any other improvements to compensation techniques. He concluded that compensatory mitigation projects that have a stable funding source, a multi-year

DECLARATION OF BRUCE W. JENKINS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
*Pebble Limited Partnership v. United States E.P.A. et al.*, No. 3:14-cv-00171 HRH
Page 11 of 13

Case 3:14-cv-00171-HRH   Document 84   Filed 11/19/14   Page 11 of 14

and even decades long commitment, strong scientific underpinnings and effective regulatory oversight – that is, strong institutional foundation as one would expect at Pebble – have excellent prospects for success. EPA dismissed Quigley entirely and continued in the final BBWA to cite his studies as evidence that the success of habitat enhancement projects is unknown, despite his clearly informing EPA that this is contrary to his published conclusions.

26. Another example of EPA rejecting relevant data concerns Randy Bailey, one of the scientists providing to PLP research and analysis on assessing, minimizing and mitigating fish habitat impacts. On September 13, 2013, Bailey sent a letter to Administrator McCarthy, expressing his detailed criticisms of the scientific quality of the second external review draft of the BBWA. Subsequently, he explained to Parkin and EPA attorney Cara Steiner-Riley that he had served as an independent consultant to PLP on fisheries issues, had extensive knowledge of PLP's fisheries data, and had analyzed the technical and scientific flaws in the document in approximately 120 pages of comments. He offered to go to Seattle and sit down with EPA representatives and discuss the flaws, but they refused. He then offered to send his comments and make himself available should anyone from EPA have any questions about the comments. However, they again refused the offer, stating that it would be inappropriate for EPA to accept written comments since it was outside the public comment period. Although Steiner-Riley apparently later contacted Bailey to say he could send the comments, she would give no assurances that the comments would be reviewed or incorporated. Unlike with Bailey, EPA received input from anti-Pebble activists at all times, regardless of the public comment period deadlines.

27. With regard to the peer review of the seven scientific reports written by the ENGO scientists – acknowledged critics and opponents of the Pebble Project – EPA does not

DECLARATION OF BRUCE W. JENKINS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
*Pebble Limited Partnership v. United States E.P.A. et al.*, No. 3:14-cv-00171 HRH
Page 12 of 13

Case 3:14-cv-00171-HRH   Document 84   Filed 11/19/14   Page 12 of 14

mention that these reviews were done secretly, without any notice, and were only announced publicly once complete. Further, EPA only peer reviewed studies authored by avowed opponents of the project. Based on EPA's documents, each of those seven scientists had been advising EPA for years on how to block Pebble mine by using 404(c).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 18th day of November, 2014, at Vancouver, Canada.

_____
BRUCE W. JENKINS

DECLARATION OF BRUCE W. JENKINS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
*Pebble Limited Partnership v. United States E.P.A. et al.*, No. 3:14-cv-00171 HRH
Page 13 of 13

Case 3:14-cv-00171-HRH   Document 84   Filed 11/19/14   Page 13 of 14

**CERTIFICATE OF SERVICE**

I certify that on this 19th day of November, 2014, I electronically filed a copy of the foregoing using the CM/ECF system, which will electronically serve the attorneys of record in this case.

/s/   Mark Murphy