BENJAMIN C. MIZER
Acting Assistant Attorney General
Civil Division
KAREN L. LOEFFLER
United States Attorney
District of Alaska
JOHN R. TYLER
Assistant Branch Director
Federal Programs Branch
BRAD P. ROSENBERG
ROBIN F. THURSTON
STUART J. ROBINSON
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20001
Phone:  (202) 514-3374
Email: brad.rosenberg@usdoj.gov
RICHARD L. POMEROY
Assistant United States Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9
Anchorage, Alaska  99513
Telephone: (907) 271-5071

*Attorneys for Defendants*
*Environmental Protection Agency*
*and Administrator Gina McCarthy*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| PEBBLE LIMITED PARTNERSHIP,<br><br>    Plaintiff,<br><br>  v.<br><br><br><br>ENVIRONMENTAL PROTECTION AGENCY and GINA MCCARTHY,<br><br>    Defendants. | Case No. 3:14-cv-00171-HRH<br><br><br><br>**SUR-REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS (Fed. R. Civ. P. 8, 12(b)(1), 12(b)(6), 41(b))** |

## INTRODUCTION

Throughout this litigation, plaintiff Pebble Limited Partnership has attempted to force its substantive disagreement with EPA into the Federal Advisory Committee Act's limited, procedural requirements. Nowhere is this fundamental misunderstanding of FACA clearer than in plaintiff's Sur-Reply.[1] Under the guise that it was responding to a "new" argument, plaintiff asserts that a pre-decisional draft of an "Options Paper"[2] demonstrates that Pebble did not have a meaningful opportunity to make its views known to EPA because EPA had already made up its mind when it listened to Pebble's views. Even if that conclusion could be drawn from the Options Paper (which it cannot), plaintiff's argument is irrelevant to FACA. FACA has no bearing on whether an agency can have a preferred course of action or whether an agency should take particular viewpoints into consideration. And this misguided view of FACA is the sole remaining basis for Pebble's assertion that it has an injury sufficient to establish standing.

Moreover, the Options Paper itself does not support plaintiff's theory of a FACA injury. It merely presents possibilities, including pros and cons, for EPA to consider in deciding whether and how to exercise its regulatory authority, not a pre-determined outcome. In an attempt to bolster its argument, plaintiff asserts that the draft Options Paper was shared with Jeff Parker, an attorney for various tribes that oppose a Pebble mine. Even if a draft of the Options Paper was shared with Mr. Parker—a proposition that the government *does not* concede and which plaintiff's exhibits *do not* demonstrate—plaintiff still has not shown any FACA-related injury (or a FACA violation at all) because Mr. Parker is an individual and obtaining the input of one individual does not violate

---

[1] Dkt. No. 110 (Mar. 16, 2015) ("Sur-Reply").

[2] Dkt. No. 110-1 ("Options Paper").

FACA. As set forth below, nothing in plaintiff's Sur-Reply changes the conclusion that this Court should dismiss this case.

**ARGUMENT**

**I.    PLAINTIFF STILL HAS NOT SHOWN A FACA-RELATED INJURY.**

Asserting, without basis, that the government presented a "new" argument in its reply brief,[3] plaintiff has filed a Sur-Reply that attaches a pre-decisional draft of an "Options Paper" and various other exhibits. Plaintiff treats the Options Paper as though it proves all of its conspiracy theories about EPA (it does not, as discussed in Section II, *infra*). The document does not show that the relevant EPA decision makers had come to any conclusions about a Section 404(c) determination and, even if they did, the substance of agency decision-making is irrelevant here because FACA is not implicated by EPA's internal decision-making process. And even if FACA were somehow implicated, the Options Paper is irrelevant to whether plaintiff has a cognizable injury under FACA. FACA only establishes procedural requirements related to the public accountability of advisory committees. Even if there were violations of these procedural requirements, whatever public-accountability injury Pebble allegedly suffered has been remedied by Pebble's opportunity to participate in EPA's processes and make its views known. Pebble has had that opportunity, over and over, for more than a decade. *See* Mem. of Law in Supp. of Defs.' Mot. to Dismiss (Dkt. No. 97) ("Gov. Mem.") at 17-23 (citing Mem. of Law in Opp. to Pl.'s Mot. for a Prelim. Inj. (Dkt. No.

---

[3]    The government's assertion that EPA's actions are afforded a presumption of regularity was a legal argument made in response to plaintiff's unsupported assertion in its opposition brief that the EPA's transparency efforts were a "charade." Pl.'s Opp. to Mot. to Dismiss (Dkt. No. 104) at 12; *see* Reply in Supp. of Defs.' Mot. to Dismiss (Dkt. No. 107) ("Gov. Reply") at 6. The argument is therefore not "new." *See, e.g.*, *ML Liquidating Trust v. Mayer Hoffman McCann P.C.*, No. 2:10-cv-02019-RRB, 2011 WL 10451619, at *1 (D. Ariz. Mar. 11, 2011) (responding to contention raised in responsive brief does not constitute raising a novel issue).

71) ("PI Opp.") at 9-20). Pebble therefore has no remaining injury to remedy under FACA and no standing to proceed in this lawsuit.

Pebble and its predecessor, Northern Dynasty Minerals ("NDM"), have had countless opportunities over many years to make their views known to EPA through in-person meetings, working groups, site visits, and the submission of data and plans. *Id.* Among other meaningful contacts, EPA formed an interdisciplinary team to work with NDM, went on site visits with NDM, and reviewed and developed comments on portions of NDM's Draft Environmental Baseline Plans. *See* PI Opp. at 10 (citing Decl. of Richard B. Parkin (Dkt. No. 72) ¶¶ 13-14). As noted in the First Supplemental Declaration of Richard B. Parkin (Dkt. No. 98) ("Supp. Parkin Decl."), which was submitted in conjunction with defendants' motion to dismiss,

> EPA staff and management met in person with Complainant's employees or representatives in various contexts on approximately 30 occasions between 2003 and 2013 at multiple locations, including EPA's Headquarters office in Washington, D.C.; EPA's Region 10 office in Seattle, Washington; and the potential pebble mine site near Iliamna, Alaska. EPA staff and management also visited the potential mine site with Complainant's employees or representatives on at least six occasions between 2005 and 2013. In addition, EPA staff had frequent and detailed phone conversations and email exchanges with Complainant and its representatives over the years.

Supp. Parkin Decl. ¶ 4. Pebble even had access to EPA officials "at the highest level," particularly around 2010, the time period that is the focus of plaintiff's Sur-Reply: "Between 2010 and 2013, Complainant met with the Administrator for EPA on at least three occasions and with the Regional Administrator for EPA Region 10 on at least ten occasions." *Id.* ¶ 5. Throughout its filings, plaintiff has not articulated what further information or opinions it would have provided EPA— presumably because there was nothing further to share.

Having failed to set forth a meaningful response to this record, *see* Gov. Reply at 5-6, plaintiff obtained permission to file a Sur-Reply based on the supposed "new" argument regarding

the presumption of regularity and the receipt of the Options Paper. Plaintiff claims that the exhibits attached to its Sur-Reply show that Pebble did not have a "genuine" opportunity to participate in the Bristol Bay Watershed Assessment ("BBWA") and Clean Water Act Section 404(c) process because, "by the time Plaintiff and other mine supporters were permitted to have their say, the fix was in, and nothing that Plaintiff could say or do would change that outcome." Sur-Reply at 2.[4] Even if this were true (it is not), it is irrelevant to FACA. FACA provides limited procedural rights related to public accountability vis-à-vis formally established committees, not substantive requirements regarding agency decision-making. *See* Gov. Reply at 5-6 & n.5 (citing *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 459 (1989)). FACA does not give Pebble the right to "change [the] outcome" of agency decision-making, nor is this right even within the broadest conception of the zone of interests relevant to standing to bring a FACA claim. *Id.* at 3-5. Plaintiff simply does not have a FACA-related injury to remedy, and the case should be dismissed for lack of Article III standing.

---

[4] In support of this argument, plaintiff asserts that it has set forth sufficient allegations to overcome the presumption of regularity and that it need not prove anything more at this stage. *See* Sur-Reply at 1 n.1. Yet plaintiff once again misunderstands that more than mere reliance on its allegations is required to respond to a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). *See* Gov. Reply at 5-6. Nor do the cases cited by plaintiff suggest otherwise, as they do not address the burden required to respond to a Rule 12(b)(1) motion, and *Yates v. Aurora Loan Services, LLC* is even irrelevant to agency action entirely. *See Yates v. Aurora Loan Servs., LLC*, No. C-11-00695, 2011 WL 2429376 (N.D. Cal. June 13, 2011) (considering Rule 12(b)(6) motion to dismiss in tort claim against mortgage loan servicer); *Shambour v. Carver Cnty.*, No. 14-566, 2014 WL 3908334, at *3-4 & n.3 (D. Minn. Aug. 11, 2014) (considering whether plaintiff had alleged facts sufficient to support a plausible inference); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 406 (1971) (decided on summary judgment), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1997); *Sensible Traffic Alts. & Ress., Ltd. v. Fed. Transit Admin. of the U.S. DOT*, 307 F. Supp. 2d 1149, 1169 (D. Haw. 2004) (decided on summary judgment).

## II. THE EXHIBITS TO PLAINTIFF'S SUR-REPLY DO NOT SHOW THAT EPA ENGAGED IN A "CHARADE" OR THAT ANY ADVISORY COMMITTEES EXISTED.

As set forth above, plaintiff's sur-reply is irrelevant to any conceivable FACA claim. But even if the Court were to consider Pebble's exhibits, they do not support plaintiff's conclusions. Throughout this litigation, plaintiff has taken quotations and documents out of context in an attempt to paint a picture of agency impropriety. Its treatment of the Options Paper is more of the same: Pebble attempts to twist a pre-decisional draft of a document into some sort of smoking gun that, in plaintiff's view, demonstrates that EPA "intended to veto the mine all along." Sur-Reply at 2.[5] To the contrary, the document merely sets forth three potential alternatives for how EPA *might* proceed regarding the Bristol Bay Watershed. *See* Options Paper at 3, 5, 6 (Dkt. No. 110-1 at 5, 7, 8). In this regard, even plaintiff concedes that the Options Paper "*does not expressly recommend which of these alternatives should be selected*," Sur-Reply at 3 (emphasis added), which further undermines plaintiff's argument that EPA had already determined how to proceed. And not only does the Options Paper not recommend one option, it was not written by anyone with authority to bind the Agency.

Despite these fundamental flaws in plaintiff's analysis, plaintiff argues that EPA officials had already made up their minds because "[n]owhere in the Options Paper does EPA even suggest that one of the options would be to approve a § 404 permit on the terms that Plaintiff may seek." Sur-

---

[5] Plaintiff notes that the Options Paper was released by the National Park Service pursuant to a Freedom of Information Act request sent to that agency. Sur-Reply at 2. The government has since ascertained that the Options Paper was released in error. It is clearly marked "ATTORNEY-CLIENT WORK PRODUCT – NOT SUBJECT TO RELEASE UNDER FOIA – DELIBERATIVE PROCESS – PREDECISIONAL." Options Paper at 1 (Dkt. No. 110-2 at 3). Nonetheless, the National Park Service released this document and did not consult with, or refer the document to, EPA.

Reply at 3.  But it is the Army Corps of Engineers, not EPA, that has the authority to issue a Section 404 permit.  *See* Clean Water Act § 404(a), 13 U.S.C. § 1344(a) ("The Secretary [of the Army] may issue permits . . .").  While EPA has a role in reviewing and commenting on proposed Corps Section 404 permits, EPA's authority under Section 404(c) is limited to prohibiting, withdrawing, denying, or restricting the use of a defined area for specification of a disposal site.  *See id.* § 404(c), 33 U.S.C. § 1344(c); *see also* PI Opp. at 4-6.  Thus, it makes sense that the Options Paper addressed options for how EPA might exercise *its* authority; in contrast, it would have been nonsensical for EPA to include an option to "approve" a Section 404 permit in the Options Paper, because EPA has no such legal authority.

Pebble's argument also ignores that the draft Options Paper includes Pebble's preferred option of having it submit a permit application, which EPA would then review to determine whether to initiate a Section 404(c) process.  *See* Options Paper at 3-5 (Dkt. No. 110-1 at 5-7).  The draft Options Paper clearly suggests that EPA considered participating in the Army Corps' permit process, as it notes that a potential outcome of that process would be to "[p]rovide recommendations on avoidance, minimization and compensatory mitigation for fill discharges."  *Id.* at 3 (Dkt. No. 110-1 at 5).  Similarly, the Options Paper also notes that this process would position the agency to "have more influence on the project design as a cooperating agency."  *Id.* at 4 (Dkt. No. 110-1 at 6).  Rather than demonstrating that "a veto was going to happen," Sur-Reply at 3, these scenarios all contemplate the possibility of Pebble being able to develop a mine.

Another option described in the draft paper (as the third option) was for EPA to initiate a Section 404(c) process.  *See id.* at 6-8 (Dkt. No. 110-1 at 8-10).  The Options Paper reflects an open mind about how any such process would unfold.  For example, the Options Paper notes that EPA could "[d]evelop[ ] a body of knowledge proactively for all future potential actions" without

"commit[ting] to a course of action." *Id.* at 7 (Dkt. No. 110-1 at 9). Moreover, the paper recognizes that EPA resources could be conserved "assuming the outcome is that a 404(c) action is justified," thus revealing EPA's uncertainty about whether an action would be justified. *Id.* The Paper also outlines various benefits to Bristol Bay "[i]f a decision is made to pursue 404(c)," once again indicating that EPA retained the option of not pursuing a Section 404(c) action. *Id.* Again, Pebble declines to address these portions of its exhibit that refute its own theory. Pebble's argument also misses the fundamental point that, while EPA has now started the Section 404(c) process, it has not and may never issue a final determination.

Pebble attempts to apply hindsight in a manner wholly irrelevant to its FACA claims when it asserts that "it is clearer than ever that Phil North and his colleagues in Region 10's Aquatic Resources Unit were strongly in favor of the third option, *acting immediately* and before any permit was submitted." Sur-Reply at 3 (emphasis added). EPA did not initiate a Section 404(c) process for nearly *four years*.[6] That is not "acting immediately." Rather, EPA first proceeded to assess the science relevant to the effects of a prospective mine by drafting the BBWA, an option which was not presented by the draft, deliberative Options Paper. *See* BBWA, Ex. 204 at ES-1 (Dkt. No. 52-1 at 33) (The BBWA's purpose was to "increase understanding of potential impacts of large-scale mining on the region's fish resources and serve as a technical resource for the public and for federal, state, and tribal governments as they consider how best to address the challenges posed by mining

---

[6]  The draft Options Paper is from June, 2010; EPA's Regional Administrator for Region 10 did not initiate the Section 404(c) process until February 28, 2014. The process was initiated when the Regional Administrator sent a letter to the Corps of Engineers, the State of Alaska, and Pebble. That letter is described in Paragraph 45 of the Declaration of Tami Fordham (Dkt. No. 73), was attached as Exhibit B to Defendants' Motion for Reconsideration (Dkt. No. 45-2), and is available at http://www2.epa.gov/sites/production/files/2014-02/documents/bristol-bay-15day-letter-2-28-2014.pdf (last visited Mar. 25, 2015).

Pebble Ltd. Partnership v. EPA, No. 3:14-cv-00171-HRH                                                      Page 8

Case 3:14-cv-00171-HRH   Document 111   Filed 03/25/15   Page 8 of 12

and ecological protection."). Only after the completion of that assessment did EPA initiate a Section 404(c) process.[7]

Plaintiff nonetheless asserts that "the fix was in." *Id.* at 2. The notion that a group of EPA employees without decision-making authority can set agency policy over the course of a multi-year period by preparing a draft paper outlining various options, thus precluding Pebble from having its views be heard, is simply absurd. Pebble's argument ignores the requirement that it is the Regional Administrator who determines whether to initiate a Section 404(c) proceeding. *See* 40 C.F.R. § 231.3. And before the Regional Administrator initiated proceedings here, EPA spent *years* further evaluating the science that could guide future actions without "commit[ing] to a course of action," Options Paper at 7 (Dkt. No. 110-1 at 9), a process in which Pebble participated extensively, *see* Gov. Mem. at 19-23.

Plaintiff's real complaint, however, is not based on anything in the Options Paper itself, but instead is derived from an inference that plaintiff improperly draws from the other exhibits it attached to its Sur-Reply. Based on the fact that Jeff Parker (counsel for the tribes) sent an e-mail to EPA with the subject "options paper" around the same time that EPA was preparing the Options Paper, plaintiff asserts that "[e]ither [Cara] Steiner-Riley or [Phil] North had previously provided a draft of the Options Paper to Parker for his comment, and his June 29, 2010, response was made to that request." Sur-Reply at 4. There is no support for Pebble's inference that a draft of the Options Paper was shared with Mr. Parker, and the government in its review has found no basis on which to conclude that such a draft was shared. Instead, the documents merely reflect that Mr. Parker may

---

[7] The Proposed Determination similarly demonstrates that EPA did not "act[ ] immediately" (as Pebble puts it), but instead "decided to conduct an ecological risk assessment before considering any additional steps"; that risk assessment (the BBWA) involved "three years of study, two rounds of public comment, and independent, external peer review." Proposed Determination, Ex. 161, ES-3 (Dkt. 21 at 15).

Pebble Ltd. Partnership v. EPA, No. 3:14-cv-00171-HRH                                              Page 9

Case 3:14-cv-00171-HRH   Document 111   Filed 03/25/15   Page 9 of 12

have known that EPA was preparing a paper regarding its options, and that he was attempting to share his views as to how he thought EPA should evaluate its options, not that he actually received a draft of the Options Paper.[8] Nonetheless, even if this Court were to assume that a draft of the Options Paper was shared with Mr. Parker, such an accusation is irrelevant to this litigation because obtaining advice from an individual does not constitute a FACA violation and, therefore, does not give rise to an injury contemplated by FACA. Mr. Parker is an individual, not a committee.

Plaintiff's complaint that Mr. Parker communicated with some EPA employees rings hollow, because it ignores the decade of interaction that Pebble had with EPA. It also ignores the nature of FACA itself, which is a narrowly tailored statute intended to target a specific type of agency conduct—namely, the creation and management of *advisory committees*. In short, plaintiff's complaints about the Options Paper do not implicate FACA at all; they therefore cannot show that any FACA-related injury occurred.

## CONCLUSION

This Court should dismiss this case with prejudice.

---

[8] Plaintiff latches on to the fact that "[t]here is a peculiar open and closed bracket—'[ ]'—in the 'cc' line" of Exhibit 5 that "suggests that something was redacted or missing [sic] from this line," implying that Mr. Parker was cc'd on this e-mail. Sur-Reply at 5 n.3. EPA has reviewed the original version of Exhibit 5 and determined that the cc line in that e-mail was blank; the "peculiar open and closed bracket" is nothing more than an artifact of the processing of the document in response to a FOIA request.

Pebble Ltd. Partnership v. EPA, No. 3:14-cv-00171-HRH                                                                Page 10

Case 3:14-cv-00171-HRH   Document 111   Filed 03/25/15   Page 10 of 12

| | |
|---|---|
| March 25, 2015 | Respectfully submitted, |
| KAREN L. LOEFFLER<br>United States Attorney<br>District of Alaska | BENJAMIN C. MIZER<br>Acting Assistant Attorney General<br>Civil Division |
| RICHARD L. POMEROY<br>Assistant United States Attorney<br>District of Alaska | JOHN R. TYLER<br>Assistant Branch Director<br>Federal Programs Branch |аниз

/s/ Brad P. Rosenberg
BRAD P. ROSENBERG
(DC Bar No. 467513)
ROBIN F. THURSTON
(Illinois Bar No. 6293950)
STUART J. ROBINSON
(California Bar No. 267183)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Phone: (202) 514-3374 (Rosenberg)
Phone: (202) 616-8188 (Thurston)
Phone: (202) 514-9239 (Robinson)
Fax: (202) 616-8460
Email: brad.rosenberg@usdoj.gov
Email: robin.f.thurston@usdoj.gov
Email: stuart.j.robinson@usdoj.gov

Courier Address:
20 Massachusetts Ave., N.W.
Washington, DC 20001

Mailing Address:
P.O. Box 883
Washington, DC 20044

*Attorneys for Defendants*
*Environmental Protection Agency and*
*Administrator Gina McCarthy*

CERTIFICATE OF SERVICE

I certify that on March 25, 2015, I caused to be filed electronically the foregoing SUR-REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS with the Clerk of Court using the Court's CM/ECF system, which sends a Notice of Electronic Filing to counsel of record.

/s/ Brad P. Rosenberg
BRAD P. ROSENBERG