Thomas Amodio, Bar No. 8511142
REEVES AMODIO LLC
500 L Street, Suite 300
Anchorage, AK 99501
Telephone:  (907) 222-7100
Facsimile:  (907) 222-7199
*tom@reevesamodio.com*

Roger W. Yoerges (*pro hac vice*)
Linda Bailey (*pro hac vice*)
Timothy A. Work (*pro hac vice*)
Mark Murphy (*pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
Telephone:  (202) 429-3000
Facsimile:  (202) 429-3902
*ryoerges@steptoe.com*
*lbailey@steptoe.com*
*twork@steptoe.com*
*mmurphy@steptoe.com*

Anthony A. Onorato (*pro hac vice*)
FISHER BROYLES LLP
445 Park Avenue, Ninth Floor
New York, NY 10022
Telephone:  (202) 459-3599
Facsimile:  (516) 706-9877
*tony.onorato@fisherbroyles.com*

*Attorneys for Plaintiff Pebble Limited Partnership*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

PEBBLE LIMITED PARTNERSHIP,

      Plaintiff,

vs.

ENVIRONMENTAL PROTECTION
AGENCY, *et al.*

      Defendants.

_____ /

**SECOND AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
(5 U.S.C. App. II § 1 *et seq.*, 5 U.S.C.
§ 551 *et seq.*)**

**CIVIL ACTION NO.
3:14-cv-00171-HRH**

Plaintiff Pebble Limited Partnership ("Plaintiff," "Pebble Partnership" or "PLP") seeks declaratory and injunctive relief against Defendants United States Environmental Protection Agency and Gina McCarthy, its Administrator (collectively, "Defendants," "EPA," or "Agency"), for violating federal law, and alleges as follows:

## NATURE OF THE CASE

1.      This is an action against Defendants for violating the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. II § 1 *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*.

2.      As alleged herein, EPA established and/or utilized three groups that functioned as—or, by operation of law, constituted—Federal Advisory Committees ("FACs"), as that term is defined by FACA.

3.      These FACs assisted, and, on information and belief, continue to assist[1] EPA in developing and implementing an unprecedented plan to assert EPA's purported authority under Section 404(c) of the federal Clean Water Act ("Section 404(c)") in a manner that will effectively preclude Plaintiff from exercising its right through the normal permitting process to extract minerals from the Pebble Mine deposit in Southwest Alaska.

4.      The FACs alleged herein are identified as (i) the Anti-Mine Coalition FAC; (ii) the Anti-Mine Scientists FAC; and (iii) the Anti-Mine Assessment Team FAC.  Each of these groups was composed in whole or in part by individuals and groups outside of the federal government who have been opposed to any mining of the Pebble Deposit.  Each played a critical role in collaborating with like-minded EPA personnel—from management on down—in

---

[1]      On November 24, 2014, this Court issued a preliminary injunction against EPA's proceeding any further with its regulatory action under the federal Clean Water Act § 404(c), until the Court decides the merits of Plaintiff's claims.  Docket No. 90.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al*., Case No. 3:14-cv-00171-HRH
Page 1

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 2 of 44

developing and implementing EPA's scheme to use Section 404(c) preemptively to prohibit mining of the Pebble Deposit.

5.     Relying extensively on the advice and recommendations from these unlawfully established FACs, EPA prepared a biased assessment of hypothetical mining activities in the Bristol Bay Watershed and then used that flawed assessment as the basis of administrative proceedings under Section 404(c).  If allowed to proceed to their likely conclusion, EPA's Section 404(c) proceedings will put an end to mining the Pebble Deposit before the normal permitting process commences.

6.     EPA's attempt to preempt the normal permitting process in this case not only flies in the face of good government, but it also violates FACA, a federal law that Congress enacted to prohibit closed-door, back-room decision- and policy-making.

7.     Plaintiff files this case to compel EPA to act in accordance with federal law.

## JURISDICTION

8.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States) and 5 U.S.C. § 702 (APA).

9.     This Court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 701-706 (judicial review of agency action under APA), for EPA's violations of FACA, 5 U.S.C. App. II § 1 *et seq.*, and of the APA, including 5 U.S.C. § 706(2)(A) and/or (D).

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claim occurred in Alaska, and the Pebble Limited Partnership resides in Anchorage, Alaska.  Venue is also proper pursuant to 5 U.S.C. § 703.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 2

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 3 of 44

## THE PARTIES

11.     Plaintiff Pebble Limited Partnership is an Alaska partnership, based in Anchorage, Alaska.

12.     Defendant the Environmental Protection Agency is an Executive Branch Agency.

13.     Defendant Gina McCarthy is the Administrator of the Environmental Protection Agency and is ultimately responsible for all decision-making regarding, *inter alia*, EPA's compliance with FACA.

## STATUTORY BACKGROUND

### Federal Advisory Committee Act and the APA

14.     Congress enacted FACA in 1972, finding, *inter alia*, that Federal Advisory Committees are useful to providing "diverse opinions" to the Federal Government.  5 U.S.C. App. II § 2(a).  Congress also found that "the Congress and the public should be kept informed with respect to the number, purpose, membership, activities, and cost of advisory committees; and the function of advisory committees should be advisory only, and that all matters under their consideration should be determined, in accordance with law, by the official, agency, or officer involved."  *Id*. § 2(b)(5), (6).

15.     FACA imposes requirements on executive agencies when they establish or utilize any "advisory committee."

16.     FACA defines "advisory committee" as "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . which is . . . established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for . . . one or more agencies or officers of the Federal

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 3

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 4 of 44

Government, except that such term excludes (i) any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government . . . ." *Id*. § 3(2).

17.     No advisory committee shall be established unless it is determined as a matter of formal record by the head of the agency involved after consultation with the Administrator, with timely notice published in the Federal Register, to be in the public interest in connection with the performance of duties imposed on that agency by law. *Id*. § 9(a)(2).

18.     Advisory committees shall be utilized solely for advisory functions. Determinations of action to be taken and policy to be expressed with respect to matters upon which an advisory committee reports or makes recommendations shall be made solely by an officer of the Federal Government. *Id*. § 9(b).

19.     No advisory committee shall meet or take any action until an advisory committee charter has been filed with the head of the agency to whom any advisory committee reports and with the standing committees of the Senate and of the House of Representatives having legislative jurisdiction of such agency. *Id.* § 9(c).

20.     Advisory committee charters must contain, *inter alia*, the committee's objectives and the scope of its activity, the period of time necessary for the committee to carry out its purposes, a description of the duties for which the committee is responsible, the estimated annual operating costs in dollars and man-years for such committee, and the estimated number and frequency of committee meetings. *Id*.

21.     An advisory committee must provide adequate public notice of, and conduct, open meetings and must make transcripts of meetings available to the public. *Id*. §§ 10(a), (b) and 11(a).  In addition, all documents made available to, or prepared by, an advisory committee

must be publicly accessible. *Id.* § 10(b). A federal employee must chair, or attend, each advisory committee meeting. *Id.* § 10(e).

22. The membership of every advisory committee must be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee, and the advice and recommendations of the advisory committee must not be inappropriately influenced by the appointing authority or by any special interest, but are instead the result of the advisory committee's independent judgment. *Id.* § 5(b)(2), (3).

23. The APA requires that agency action not be arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D).

24. Failure to comply with FACA, including but not limited to the statutory provisions above, also constitutes a violation of the APA.

## FACTUAL ALLEGATIONS

**A.    EPA's Responses To Plaintiff's FOIA Requests For Information Concerning, *Inter Alia*, The Advice And Recommendations Received By EPA From The Anti-Pebble Mine FACs Are Woefully Incomplete**

25. Plaintiff submitted FOIA requests to EPA on February 17, 2011, April 27, 2011, March 2, 2012, August 28, 2012, January 22, 2014, and June 13, 2014. Plaintiff also submitted a FOIA request to the United States Fish & Wildlife Service on April 12, 2012.

26. Plaintiff's allegations herein are based on the production of documents received to date by EPA. Many responsive documents were redacted or withheld under the "deliberative process" exemption to FOIA. Further, Plaintiff avers that EPA's search for documents responsive to Plaintiff's FOIA requests has been inadequate and not in compliance with the obligations imposed under federal law.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 5

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 6 of 44

27.     EPA's production under FOIA also omitted documents, including emails, (a) to and from former Administrator Lisa Jackson and Defendant Gina McCarthy; (b) from the computer hard drive of Phil North, formerly an ecologist in the Aquatic Resources Unit in the Office of Ecosystems, Tribal and Public Affairs at EPA Region 10; and (c) sent to and from non-EPA email addresses, including, for example, North's home email address, and text messages, a mode of communicating on official Agency matters which, in other ongoing litigation, Administrator Jackson has acknowledged using.

28.     Plaintiff has been informed by reliable sources that EPA's FOIA production to Plaintiff is only a small percentage of the documents that EPA has in connection with the Section 404(c) proceeding.

**B.     EPA's Establishment And Utilization Of The Anti-Mine Coalition FAC**

29.     The Anti-Mine Coalition FAC was a committee, board, commission, council, conference, panel, task force, or similar group, or subcommittee or other subgroup of one of the other FACs at issue.

30.     The Anti-Mine Coalition FAC members were not full-time, or permanent part-time, officers or employees of the Federal Government.  The Anti-Mine Coalition FAC included Environmental Non-Governmental Organizations ("ENGOs") and individual members of those ENGOs, as well as certain anti-mine activists, lawyers, lobbyists, and Alaska Native Tribal representatives.

31.     Under the coordination and direction of EPA employees including Phil North and Palmer Hough, the Anti-Mine Coalition FAC was a discrete, definable group that included Jeff Parker (attorney for the six Alaska Native Tribes that petitioned EPA to use Section 404(c)); Trout Unlimited and two of its members, Shoren Brown and Tim Bristol; the Bristol Bay

Regional Seafood Development Association ("BBRSDA") and one of its members, Bob Waldrop; Rick Halford (anti-mine activist and former state legislator); the Center for Science in Public Participation ("CSP2") and at least one of its members, David Chambers; Wayne Nastri (lobbyist and former EPA Region 9 Administrator); the Bristol Bay Native Corporation and several of its members, including Jason Metrokin, Tiel Smith and Peter Van Tuyn; Bristol Bay United and several of its members, including Brown, Waldrop, Metrokin, and Van Tuyn; The Nature Conservancy and at least one of its members, Tim Troll; the National Wildlife Federation and two of its members, Jan Goldman-Carter and Tony Turrini; the Bristol Bay Native Association and its member, Susan Flensburg; The Wilderness Society and its member, Lydia Olympic; the Alaska Conservation Foundation and its member, Sam Snyder; the National Resources Defense Council and its member, Joel Reynolds; and Alaska Native Tribal members Tom Tilden, Bobby Andrew, and Luki Akelkok, including in their capacity as representatives of the non-profit advocacy group Nunamta Aulukestai.

32. A subgroup of the Anti-Mine Coalition FAC, including, on information and belief, the Alaska Conservation Foundation, the BBRSDA, Nunamta Aulukestai, and the National Resources Defense Council, also operated as members of the Bristol Bay Working Group ("BBWG"), an umbrella organization for anti-mine coalition members.

33. Beginning in at least 2008, the members of the Anti-Mine Coalition FAC began to coordinate and collaborate first amongst themselves to develop collective support for EPA.

34. For example, multiple Anti-Mine Coalition members described their group to EPA as an "unprecedented coalition" "that has come together … in support of EPA's assessment." This support included, for example, television ads run by NRDC that were

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 7

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 8 of 44

"intended to generate support for EPA to immediately use its authority under Section 404(c) of the Clean Water Act to protect Bristol Bay from large-scale mining like the Pebble Mine."

35.     In the ensuing months, the Anti-Mine Coalition FAC transformed into an advisory committee that was under the management and control of EPA.

36.     Frequently at the request of EPA, Anti-Mine Coalition members provided collective advice to the Agency.  Coalition members consistently provided group advice and recommendations to EPA to initiate and carry out the Section 404(c) proceeding, as well as on the substance of the BBWA.

37.     EPA established and/or began utilizing the Anti-Mine Coalition FAC in 2009, and, on information and belief, has continued to utilize the FAC to the present.

38.     EPA established and/or utilized the Anti-Mine Coalition in the interest of obtaining advice or recommendations on, *inter alia*, developing the Agency's strategy on how to use Section 404(c) preemptively.  This included EPA's obtaining and soliciting advice and recommendations on whether to proceed with its Section 404(c) action; whether to proceed with Section 404(c) on the basis of existing information on the possible design of a prospective Pebble Mine; and whether to conduct a watershed assessment to provide some factual basis for a Section 404(c) action.

39.     EPA established and/or utilized the Anti-Mine Coalition FAC in the interest of obtaining advice or recommendations on developing scientific support for the conclusion that Pebble Mine would cause unacceptable, adverse impacts on one or more of various resources, including fisheries, wildlife, municipal water supplies, or recreational areas.  EPA worked hand-in-hand with the Anti-Mine Coalition FAC to obtain scientific research to support the Agency's position that mining the Pebble Deposit would cause unacceptable adverse impacts.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA*, *et al*., Case No. 3:14-cv-00171-HRH
Page 8

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 9 of 44

40.     EPA managed and/or controlled the Anti-Mine Coalition.  Because the Agency had decided in advance that the Pebble Mine should not be developed, it decided who should be members of the Anti-Mine Coalition FAC.

41.     EPA also set the agenda for the meetings with this FAC.  That agenda, which guided virtually all of EPA's interactions with the FACs alleged in this case, was to develop and implement a strategy to use Section 404(c) to prohibit, either expressly or constructively, the development of any potential Pebble Mine.

42.     EPA personnel decided who should be part of the Anti-Mine Coalition FAC by, *inter alia*, connecting coalition members with other members and ultimately with the key points of contact on Pebble Mine issues within the EPA, including John Pavitt, EPA's Pebble Mine Project Leader, and Richard Parkin, head of the Environmental Justice Unit and later the leader of the Bristol Bay Assessment Team.

43.     The same core group of Anti-Mine Coalition members frequently appeared at meetings with EPA officials.

44.     EPA officials also frequently requested that some or all of the same core group of Anti-Mine Coalition members be in attendance for meetings and that they bring the same core group of Anti-Mine Scientists so that EPA could obtain their collective advice and recommendations on policy, legal, strategic, and scientific issues.

45.     EPA personnel were the designated chairpersons for numerous meetings with Anti-Mine Coalition members that were organized by EPA to obtain advice and recommendations from the organized group of Coalition members.

46.     EPA personnel also routinely initiated and requested follow-up meetings with the Anti-Mine Coalition FAC.  For example, following a meeting on September 22, 2010, with

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 9

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 10 of 44

various Anti-Mine Coalition members, EPA's Hough emailed Shoren Brown of Trout Unlimited in September 2010, asking, "Do you have time later this week to discuss some of the follow-up items from last week's meeting?" The meeting later took place, as requested by EPA, with Hough directing that if the other Anti-Mine Coalition members—Nastri and Halford—were not available at the set time, they would be briefed afterward. Hough also stated that he would keep everyone at EPA in the loop.

47. EPA determined who belonged to the Anti-Mine Coalition by including only members with anti-mine viewpoints; mine proponents were excluded.

48. EPA also held private meetings with only the Anti-Mine Coalition FAC; received secret reports from the Anti-Mine Coalition that the Agency agreed to withhold from the public; colluded with the Anti-Mine Coalition to rig events so that only anti-mine forces were aware of the meetings; and tipped off Anti-Mine Coalition publications, while Anti-Mine Coalition members tipped off EPA about media investigative coverage concerning Pebble Mine.

49. For example, on or about May 3, 2011, EPA's Fordham emailed Anti-Mine Coalition Tribal activists Andrew, King, Akelkok, and Kimberly Williams to inform them of the plans for the upcoming June 3, 2011, meetings with EPA leaders to be held in Alaska. Fordham indicated that she was withholding information to ensure that only informed Anti-Mine Coalition members would be able to attend to meet with EPA leaders. Fordham then forwarded her email to Anti-Mine Coalition member Susan Flensburg, Environmental Program Manager for BBNA, and stated: "Just FYI - so you know the plan for Thursday. Please don't share." Flensburg responded: "Roger on that (silence mode)."

50. EPA also set the agenda for numerous meetings convened with the Anti-Mine Coalition in the interest of obtaining advice or recommendations.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 10

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 11 of 44

51.     On or about October 22, 2010, Trout Unlimited's Shoren Brown sent The Nature Conservancy's ("TNC") draft "Pebble ecological risk assessment" to EPA's North and Hough. Anti-Mine Scientist William Riley collaborated on the risk assessment, and TNC asked EPA's North to review and comment on an earlier draft.

52.     Then, on or about November 4, 2010, EPA's Hough asked Brown to bring in the certain Anti-Mine Coalition members to brief EPA. EPA's Hough stated to Trout Unlimited's Brown: "At a minimum, I think would be very helpful to have reps from TNC walk us through its October 2010 BB Risk Assessment and to hear an update on any literature compilations that your coalition is working on."

53.     On or about December 7, 2011, EPA's Hough emailed EPA's Bristol Bay Assessment Team ("BBAT")—the EPA and non-federal employee authors of the BBWA—to coordinate the December 9, 2011, "Q&A with authors of Wild Salmon Center/Trout Unlimited (TU) Bristol Bay report." That report was an "embargoed" document that had been submitted to EPA to use privately in developing the BBWA.

54.     EPA agreed to keep the report secret until it was ultimately released more than two months later. EPA's agenda for the meeting states that following an oral overview of the report, the meeting would be opened up to questions from "EPA's Bristol Bay team." On hand to answer EPA's questions were Brown, Nastri, Chambers, Woody, Mark Trenholm (Wild Salmon Center) and Robert Hughes (Oregon State University). Hough also collected questions in advance from non-federal employee BBWA authors to provide to Brown before the meeting.

55.     EPA arranged for Anti-Mine Coalition members' access to regular meetings and briefings with top EPA management to provide advice and recommendations on Section 404(c) strategy, including with Administrator Lisa Jackson; Region 10 Administrator Bob McLerran;

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 11

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 12 of 44

Bob Sussman, Senior Policy Counsel to the Administrator; Nancy Stoner, Deputy Assistant Administrator for Water; Bill Dunbar, Senior Policy Advisor; and Denise Keehner, Director of EPA's Office of Wetlands, Oceans, and Watersheds ("OWOW").

56.     EPA solicited the views of the Coalition members and actively organized with them in the interest of obtaining advice or recommendations for the Agency.

57.     For example, on or about November 13, 2009, EPA's North wrote to Tim Troll and Marcus Geist of The Nature Conservancy: "I am wondering if any or all of you are available that morning to discuss wetland conservation around . . . Bristol Bay . . . and how we might be able to support each other or collaborate with our work."

58.     On or about June 22, 2010, EPA Region 10 officials briefed Trout Unlimited's Brown at EPA regional headquarters, along with other Anti-Mine Coalition members, including Chambers, Olympic, Waldrop, and Bristol. On information and belief, EPA Region 10 Director Dennis McLerran participated in the briefing.

59.     On September 23, 2010, Stoner and other top EPA officials, including Sussman, Perciasepe, DePass, Silva and Fulton, met with Nastri, Brown, Waldrop, Halford and others to discuss "pre-emptive CWA 404(c) action near Bristol Bay." After the meeting, Trout Unlimited's Shoren Brown met with EPA's Stoner "to discuss upcoming activities we are planning."

60.     On or about October 25, 2010, Hough emailed with other EPA officials to circulate talking points that Shoren Brown had developed during a prior meeting with EPA's OWOW, including, "EPA should take the extraordinary step of initiating review of this project under 404(c) even though a section 404 permit application has not yet been formally submitted by Pebble to the Corps of Engineers."

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 12

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 13 of 44

61. On or about March 8, 2012, EPA's Sussman, Senior Advisor to the Administrator, chaired a meeting at EPA Headquarters of Deputy Administrator Bob Perciasepe, Assistant Administrator Michelle DePass, Acting Assistant Administrator Nancy Stoner, and Michelle Pirzadeh, along with Anti-Mine Coalition members Brown, Metrokin, Tiel Smith, Van Tuyn, Nastri, and Bobby Andrew. The agenda included: "Overview of 2010-2012 actions related to Bristol Bay and EPA," including "Congressional Outreach, Executive Branch Outreach, Stakeholder Mobilization (sportsmen, faith and natives)," "Technical Support," "Timing Issues associated with completion of the Watershed Assessment," and "Next Steps."

62. The agenda stated: "BBNC and TU have [] commissioned technical experts *to provide scientific data and expert opinions to EPA in preparation of the Bristol Bay Watershed Assessment*. EPA's watershed assessment is nearing completion and timing for any subsequent actions will be critical." (Emphasis added.)

63. On or about March 9, 2012, Nastri followed up with EPA's Sussman to state: "We will continue to work to support the Agency's efforts by providing technical information, where possible and appropriate, and through our continued outreach to local state and federal stakeholders. We will also continue to keep you apprised of our efforts." Sussman confirmed the EPA's utilization of the FAC, stating: "Wayne. Pleasure to work with you on this."

64. The Anti-Mine Coalition provided EPA with group advice and recommendations through white papers, memos, and presentations to EPA. EPA personnel also co-drafted certain memos with the Anti-Mine Coalition members.

65. For example, on or about September 22, 2011, Parker sent EPA's Hough two memos—Parker's draft "History of Conservation and Land Use Planning Efforts in the Kvichak and Nushagak Drainages," and a legal memo entitled, "Assuming that EPA makes a 404(c)

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 13

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 14 of 44

determination regarding the Kvichak and Nushagak drainages, what can make it stable under future federal administrations?"

66. Parker's draft "History" was, on information and belief, co-drafted by EPA's Hough and North. For instance, Parker highlighted areas for Hough and North to edit and inserted comments for Hough and North to respond to concerning technical and legal issues.

67. Other examples of Coalition members' providing EPA with advice and recommendations include a memo from Shoren Brown to EPA's North on or about June 14, 2010, that set forth a "404c summary" called "Projects Vetoed updated." The summary contained a detailed analysis on previous EPA uses of Section 404(c), including the "Veto' Type," "Key Details of determination (primary reason for 'veto')," and case law. The summary also included notes concerning the key factors for EPA in taking Section 404(c) action, including, for example, "EPA look[ing] beyond the proposed project itself to put the impacts and benefits in the context of the Region as a whole." North thanked Brown and told him that he would be meeting with EPA staff in the morning for technical discussions, with Region 10 Administrator McLerran after that, and that North intended to take part in the technical discussions.

68. On or about September 7, 2010, Parker emailed EPA attorney Cara Steiner-Riley to provide legal analysis on a potential takings claim that Parker had been discussing with Steiner-Riley. Parker stated that a forwarded news article "contains statements that I would use as admissions to rebut any takings claim" that might be brought by PLP.

69. On or about February 14, 2012, Parker emailed EPA's Hough, Parkin, and North advising on "how to speed up the current process for the watershed assessment and any 404(c)

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 14

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 15 of 44

determination." Hough responded to thank Parker for the advice and recommendations on the watershed assessment and future actions.

70. The Anti-Mine Coalition, through its ties to the Anti-Mine Scientists, provided EPA with the tailor-made "science" that the Agency was seeking. Many times, the Anti-Mine Coalition provided EPA with data and analyses, all of which were directed to one purpose: to give EPA what it thought that it needed to justify and support its Section 404(c) action.

71. The Anti-Mine Coalition connected EPA with anti-mining scientists and arranged for numerous briefings at the Agency's request to provide it with scientific advice that meshed with EPA's predetermined conclusions about the allegedly adverse impact of mining activities in the Bristol Bay Watershed.

72. For example, on or about January 27, 2011, EPA hosted a "Bristol Bay Briefing" with Trout Unlimited regarding the use of Section 404(c). The briefing featured presentations from Anti-Mine Scientists Quinn, Maest, O'Neal, and Albert, and included Anti-Mine Coalition members Chambers, Nastri, Brown, Steve Moyer (Trout Unlimited) and Taryn Keiko (NRDC).

73. On or about February 22, 2011, EPA's Dunbar emailed Parkin, Holsman, Steiner-Riley, Allnutt, Psyk, Hough, North, Fordham, McGrath, Szerlog, and Smith, and stated: "Gang - Please see attachments below from Wayne Nastri in preparation for the science briefing Thursday afternoon. Judy- from 2-5 Thursday, TU will be providing us with the science overview they've provided to HQ."

74. EPA "sought information directly from these parties [the Anti-Mine Coalition FAC and the Anti-Mine Scientists FAC] because they possessed certain expertise," that members of these two FACs "provided information to EPA in the form of 'scientific papers, presentations, research, data, and overall strategy and recommendations'," and that the "information was useful

to the EPA and assisted the EPA in developing the BBWA [Bristol Bay Watershed Assessment]."

75.     The documents produced by EPA thus far provide many additional examples of instances where EPA communicated and had other interactions, such as meetings, with the Anti-Mine Coalition FAC in the interest of obtaining advice or recommendations for the Agency. Representatives of the EPA Inspector General's Office, which is investigating EPA's conduct with regard to the Section 404(c) action and the BBWA, and representatives of the House Oversight Committee, which is investigating the same issues, have told Plaintiff's representatives that EPA has produced to Plaintiff only a small fraction of the documents relevant to these issues.

76.     Members of the Anti-Mine Coalition FAC were permitted to submit comments and analyses directly to EPA on the drafts of the BBWA after the close of the official comment periods for those drafts, while proponents of Pebble Mine were told by EPA that it would not accept comments outside the official period.

77.     This FAC thus provided advice and recommendations to EPA in a way that was vastly different from the normal regulatory channels (notice and comment) through which other interested parties make their positions known to the Agency.

C.     **EPA's Establishment And Utilization Of The Anti-Mine Scientists FAC**

78.     The Anti-Mine Scientists FAC was a committee, board, commission, council, conference, panel, task force, or similar group or subcommittee or other subgroup of one of the other FACs at issue.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 16

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 17 of 44

79.     The Anti-Mine Scientists FAC was not composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government.  The Anti-Mine Scientists FAC included a discrete group of scientists, all of whom held anti-mine views.

80.     The Anti-Mine Scientists FAC members included:  David Chambers (CSP2); Kendra Zamzow (CSP2); Stu Levit (CSP2); Bretwood Higman (CSP2/Ground Truth Trekking); Carol Ann Woody (Fisheries Research and Consulting); Sarah O'Neal (Fisheries Research and Consulting); Ann Maest (Stratus Consulting), Cameron Wobus (Stratus Consulting); Thomas Quinn (University of Washington/The Nature Conservancy); Alan Boraas (Kenai Peninsula College); Daniel Rinella (University of Alaska Anchorage); Michael Wiedmer (University of Washington/The Nature Conservancy); David Albert (The Nature Conservancy); Marcus Geist (The Nature Conservancy); David Athons (Kenai River Center); Jim Kuipers; William Riley (former EPA scientist); and Thomas Yocom (former EPA scientist).

81.     Beginning in at least 2008, the members of the Anti-Mine Scientists FAC began to coordinate and collaborate first amongst themselves to develop collective support for EPA.

82.     For example, as stated on CSP2's website:  "Since 2007, CSP2 has been providing technical support to a loose coalition of groups opposed to the proposed [Pebble] mine.  Dave Chambers, (general mining), Kendra Zamzow, (geochemistry), and Stu Levit, (reclamation and regulatory), have provided support from CSP2.  CSP2 also utilized consultants Carol Ann Woody, Ph.D., and Sarah O'Neal, M.S., from Fisheries Research and Consulting to provide support on fisheries biology, and Ann Maest, Ph.D., and Cam Wobus, Ph.D., from Stratus Consulting to provide technical support on geochemistry and hydrology.  Bretwood Higman, Ph.D., from Ground Truth Trekking provided fault and seismic research."

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 17

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 18 of 44

83.     Also for example, on or about March 12, 2010, Anti-Mine Scientist William Riley provided comments on The Nature Conservancy's analysis, "Proposed Pebble Mine Predictive Ecological Risk Assessment."  Riley stated in his comments:  "Two years ago [in 2008] I participated in a 'risk workshop' with the TNC board of directors and recommended that TNC pursue developing such an assessment, following the Environmental Protection Agencies [sic] guidelines for ERA's."  In March 2010, Tim Troll of TNC sent the analysis and Riley's comments to EPA's North and requested that North provide comments on the draft risk assessment.  In October 2010, TNC sent its final Pebble risk assessment to EPA.  EPA's Hough then requested that Shoren Brown of Trout Unlimited arrange to have the TU/TNC coalition brief EPA on the Pebble risk assessment.  Following that meeting, EPA's Keehner, the head of OWOW, requested that EPA's Bristol Bay Assessment Team, the authors of the BBWA, analyze and brief her on TNC's Pebble risk assessment so that EPA could use the risk assessment in preparing the BBWA.

84.     In the ensuing months, the Anti-Mine Scientists FAC transformed into an advisory committee that was under the management and control of EPA.

85.     The Anti-Mine Scientists FAC consistently provided group advice and recommendations to EPA to initiate and carry out the Section 404(c) process, and on the substance of the BBWA, to support the conclusion that Pebble Mine would purportedly cause unacceptable, adverse effects to the Bristol Bay watershed.

86.     EPA established and/or began utilizing the Anti-Mine Scientists FAC in 2009, and, on information and belief, has continued to utilize the FAC to the present.

87.     EPA established and/or utilized the Anti-Mine Scientists FAC in the interest of obtaining their collective scientific analysis and data, including in particular their "findings"

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 18

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 19 of 44

that Pebble Mine, at least as hypothetically proposed by EPA, would cause unacceptable adverse impacts.

88.     EPA used these collective analyses and data in support of its Section 404(c) strategy and the BBWA, which culminated in a report entitled *An Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay, Alaska* (EPA 910-R-14-001A, Jan. 2014).

89.     The BBWA is the sole scientific basis for EPA's Section 404(c) action.

90.     EPA managed and/or controlled the Anti-Mine Scientists FAC.

91.     For example, EPA personnel were the designated chairpersons for numerous meetings with Anti-Mine Scientists, which were organized by EPA to obtain advice and recommendations from the group of Scientists.

92.     EPA officials frequently requested that some or all of the same core group of Anti-Mine Scientists be in attendance for meetings so that EPA could obtain their group advice and recommendations on policy, legal, strategic, and scientific issues.

93.     For example, on or about April 13-14, 2010, EPA's North and Trout Unlimited's Shoren Brown exchanged several emails expressing satisfaction with the results of meetings in Seattle between EPA Region 10 officials and Anti-Mine Coalition members regarding 404(c). Brown was told at the meeting that Pebble was a "priority" for then-Administrator Jackson and that EPA "look[ed] forward to hearing more from us soon about what they can do to help." North then suggested that Brown bring "technical people" to the follow up meetings between Anti-Mine Coalition members and EPA headquarters officials.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 19

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 20 of 44

94.     EPA determined who belonged to the Anti-Mine Scientists FAC by including only members with anti-mine viewpoints; scientists who were neutral or aligned with mine proponents were excluded.

95.     For example, in May 2012, EPA selected seven reports for further review out of all of the many analyses submitted by the public in response to the release of the First Draft of the BBWA. All seven reports had been drafted by Anti-Mine Scientists with whom EPA had been collaborating for years. Only these seven reports were submitted by EPA for peer review, specifically because EPA wanted to rely on them in the final BBWA. These reports were from Anti-Mine Scientists Chambers, Higman, Wobus, Maest, O'Neal, Woody, Levit, and Kuipers. The seven studies are cited no fewer than 45 times in the April 2013 draft of the BBWA.

96.     Further, the Anti-Mine Scientists were used to attack and counter other viewpoints that were critical of EPA's science.

97.     For example, on or about May 20, 2011, Anti-Mine Scientist Chambers emailed EPA's North about PLP's "Water Quality Data Assessment" and sent a scientific analysis— "Critique of PLP water quality data"—written by Anti-Mine Scientist Zamzow. North asked if the analysis included all the Pebble data, and Chambers promised to send an additional analysis on that when it was final. North told Chambers that he forwarded the paper to EPA's Frithsen and others on the BBAT who were responsible for researching and drafting the BBWA.

98.     On or about December 21, 2012, EPA's Hough emailed the EPA and non-federal BBWA authors to provide them with critiques of the external, independent peer reviewers' criticisms of the draft BBWA written for Anti-Mine Coalition members by core Anti-Mine Scientists Chambers, Zamzow, Maest, O'Neal, and Wobus.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 20

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 21 of 44

99.     EPA set the agenda for the Anti-Mine Scientists—defeat the mine through use of Section 404(c) and gather data needed to support an environmental assessment that could be used to further a preemptive veto.

100.     EPA also set the agenda for numerous meetings convened with the Anti-Mine Scientists in the interest of obtaining advice or recommendations for the agency directly targeted to the same goal.

101.     For example, on or about November 4, 2010, EPA's Hough arranged with Brown to have Anti-Mine Scientists brief EPA on The Nature Conservancy's Pebble risk assessment and to obtain "any literature compilations that [Brown's] coalition is working on."

102.     In addition, EPA requested and arranged private meetings between the BBAT and Anti-Mine Scientists to obtain their analysis on Wild Salmon Center/TU's secret "embargoed" Pebble risk assessment; EPA also requested and arranged for briefings for the BBAT with Anti-Mine Scientists Riley and Yocom on their analysis "Issues of 404 compliance and unacceptable environmental impact" drafted in collaboration with TU, TNC, and Nastri; EPA also arranged for anti-mine ENGO Earthworks' reports to be shared with "the right folks on the [BBAT] team"—which EPA determined included non-federal employee FAC member Grismala.

103.     EPA relied on the Anti-Mine Scientists to provide research and consultation to the EPA's Bristol Bay Assessment Team—*i.e.*, the authors of the BBWA—and to provide written authorities for significant portions of the BBWA.

104.     On or about June 2012, Alaska Conservation Foundation's ("ACF") Snyder (a member of the Anti-Mine Coalition FAC) emailed EPA's Hough with the subject "More EBD [Environmental Baseline Data] Review White Papers." The EBD was the comprehensive database of scientific data compiled by PLP. Snyder stated: "I have attached two more EBD

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA*, *et al.*, Case No. 3:14-cv-00171-HRH
Page 21

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 22 of 44

review white papers: seismic and hydrology. These got a bit delayed due to Watershed

Assessment review work. We have two more on the way: Water Quality, Fisheries

Escapement and PHABSIM. I should have the first two to you by the end of the week." Hough

forwarded the analyses to the BBWA authors, including non-federal employee member Dave

Athons.

      105.    On or about January 27, 2011, EPA chaired a "Bristol Bay Briefing" for OWOW

Director Keehner featuring presentations from Anti-Mine Scientists Quinn, Maest, O'Neal,

Albert, and Chambers regarding the use of Section 404(c).

      106.    On or about November 23, 2011, EPA's Hough emailed EPA and non-federal

employee authors of the BBWA to provide the "BB Team" with the secret "embargoed" Wild

Salmon Center/TU "Bristol Bay report" for their analysis. EPA then set up a meeting so that

the "BB Team" could discuss the advice and recommendations with the report's authors—Anti-

Mine Scientists including Chambers and Woody.

      107.    On or about January 5, 2012, EPA's Parkin, the designated BBAT Leader,

emailed other EPA officials, including Region 10 Administrator McLerran, to distribute the

Riley/Yocom report received from TU, TNC and Nastri. Parkin stated: "It is very pertinent to

discussions about use of 404(c)." Then, on or about February 23, 2012, Yocom wrote EPA's

McLerran, copying Brown, Nastri, and Tiel Smith (BBNC) regarding the prior week's briefing

on "whether mining the Pebble ore deposit in the Bristol Bay watershed would comply with

Clean Water Act Section 404 regulations or result in unacceptable impacts on fish and wildlife

resources." Yocom stated: "We did our best to share our collective views on these Questions

based on our decades of work at EPA on these very issues. . . . During the briefing we were

asked about the geographic scope of our recommended restriction on 404 discharges of Pebble

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 22

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 23 of 44

deposit mine waste . . . . We believe the restrictions on Pebble deposit mine waste should apply to such habitat throughout the Bristol Bay watershed."

108. On or about February 14, 2012, Riley and Yocom also presented their "collective views" to EPA's BBAT.

109. On or about April 13, 2012, EPA's Smith emailed EPA and non-federal employee BBWA authors and contributors to arrange for a briefing by ACF's group of Anti-Mine Scientists—Chambers, Higman, Wobus, Maest, O'Neal, and Woody—about "coordinated science research related to fisheries of Bristol Bay and their relation to the [Bristol Bay Assessment]."

110. In addition, as stated on CSP2's website, "EPA released its Draft 'Bristol Bay Watershed Assessment' in May, 2012. . . . Dave Chambers and Kendra Zamzow provided technical critiques of the Draft to EPA with recommendations for improvement."

111. EPA "sought information directly from these parties [the Anti-Mine Coalition FAC and the Anti-Mine Scientists FAC] because they possessed certain expertise," members of these two FACs "provided information to EPA in the form of 'scientific papers, presentations, research, data, and overall strategy and recommendations'," and the "information was useful to the EPA and assisted the EPA in developing the BBWA [Bristol Bay Watershed Assessment]."

112. The documents produced by EPA thus far provide many additional examples of instances where EPA communicated and had other interactions, such as meetings, with the Anti-Mine Scientists FAC in the interest of obtaining advice or recommendations for the Agency. Representatives of the EPA Inspector General's Office, which is investigating EPA's conduct with regard to the Section 404(c) action and the BBWA, and representatives of the House Oversight Committee, which is investigating the same issues, have both told Plaintiff's

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 23

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 24 of 44

representatives that EPA has produced to Plaintiff only a small fraction of the documents relevant to these issues.

113.    Members of the Anti-Mine Scientists FAC were permitted to submit comments and analyses directly to EPA on the drafts of the BBWA after the close of the official comment periods, while proponents of Pebble Mine were told by EPA that it would not accept comments outside the official period.

114.    The Anti-Mine Scientists FAC thus provided advice and recommendations to EPA in a way that was vastly different from the normal channels (notice and comment) through which other interested parties make their positions known to the Agency.

**D.    EPA's Establishment And Utilization Of The Anti-Mine Assessment Team FAC And The Bristol Bay Assessment Team and Intergovernmental Technical Team Subgroups**

115.    The Anti-Mine Assessment Team FAC was a committee, board, commission, council, conference, panel, task force, or similar group.

116.    The Bristol Bay Assessment Team ("BBAT") was a committee, board, commission, council, conference, panel, task force, or similar group, or subcommittee or other subgroup of the Anti-Mine Assessment Team FAC. The Intergovernmental Technical Team ("IGTT") was a committee, board, commission, council, conference, panel, task force, or similar group, or subcommittee or other subgroup of the Anti-Mine Assessment Team FAC

117.     The BBAT is a FAC in its own right.  The IGTT is also a FAC in its own right.

118.    The Anti-Mine Assessment Team FAC was composed of persons who were not full-time, or permanent part-time, officers or employees of the Federal Government.  The Anti-Mine Assessment Team FAC consisted of members of EPA's "Bristol Bay Assessment Team" (*i.e.*, the BBAT) and members of the IGTT.

119.    The Anti-Mine Assessment Team FAC consisted of members of the BBAT including:  Greg Blair, Ralph Grismala, Jim Rice, Steve Seville, Ken Rock, and other representatives of ICF International; Daniel Rinella; Michael Wiedmer; David Athons; Gary Sonnevil, Alan Boraas; John Duffield; Christopher Frissell; Chris Neher; David Patterson; Catherine Knott; Rebecca Shaftel; and members of the IGTT.  IGTT members included:  William Ashton, Allan Nakanishi, Lynn Kent, Sharmon Stambaugh, Gary Prokosch, Mike Daigneault, Kate Malloy, Paul Anderson, Kimberly Williams, Delores Larson, Greg Andrew, Jr., Raymond Wassillie, Jackie G. Hobson, Jr., Daniel Rinella, Alan Boraas, Catherine Knott, and Jeff Parker.

120.    EPA established and utilized the Anti-Mine Assessment Team FAC to research, discuss, collaborate on, and draft the BBWA, the sole basis for EPA's Section 404(c) action to block Pebble Mine.

121.    EPA established the Anti-Mine Assessment Team FAC in December 2010. EPA's Richard Parkin was designated the BBAT Leader.  Parkin designated other EPA personnel and non-federal employee specialist members of the FAC with their respective roles on the BBAT.  The non-federal employee members of the FAC provided advice and recommendations on the direction of the BBWA, conducted and provided research, contributed to, and drafted, portions of the BBWA and its Appendices.

122.    EPA chose the members of the BBAT and excluded all pro-mine viewpoints from membership on the BBAT.

123.    The non-federal employee members of the BBAT were utilized to assist EPA in drafting the BBWA, working directly in collaboration with EPA employees.  EPA received data and findings directly from the non-federal members and used those contributions in drafting the

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 25

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 26 of 44

BBWA.  The non-federal employee members provided group advice and recommendations to EPA on the BBWA's research, design, and content.

124.    EPA managed and/or controlled the non-federal employee members of the FAC.

125.    EPA convened and ran the BBAT meetings, set the BBAT agenda, and set the BBWA project schedule for the BBAT.

126.    For example, EPA's Frithsen emailed the BBAT in October 2012 to set the BBWA project schedule.

127.    In April 2013, EPA's Frithsen thanked the BBAT for its work in developing EPA's position, stating:  "Thanks to your hard work sustained over many months, this report provides a comprehensive characterization of the biological and mineral resources of the Bristol Bay watershed, will increase understanding of the impacts of large-scale mining on the region's fish resources, and inform future government decisions related to protecting and maintaining the physical, chemical, and biological integrity of the watershed. . . .  Nice job team!"

128.    On information and belief, EPA funded the non-federal employee members of the BBAT.

129.    Non-federal employees include those persons who might have been hired by EPA under EPA's Senior Environmental Employment Program.  Senior Environmental Employment Program members are not federal employees.  On information and belief, this includes Gary Sonnevil and Dave Athons.

130.    Beginning in 2011, the Anti-Mine Assessment Team FAC began to collaborate with the Anti-Mine Coalition FAC and the Anti-Mine Scientists FAC in the interest of obtaining advice and recommendations from those FACs on Section 404(c) strategy and the development

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 26

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 27 of 44

of the BBWA, including how to respond to criticisms by the external, independent peer reviewers and others.

131.    EPA also arranged for meetings between the BBAT and the Anti-Mine Coalition FAC and the Anti-Mine Scientists FAC and provided the BBAT members with data and analyses from the Anti-Mine Coalition FAC and the Anti-Mine Scientists FAC to use in drafting the BBWA.

132.    For example, EPA provided Wild Salmon Center/TU's secret "embargoed" Pebble Mine ecological risk assessment report to the BBAT and arranged for private meetings with the report's authors to obtain briefing on the data. EPA also collected questions, including from the non-federal employees, in order to provide them in advance to the Anti-Mine Coalition and Anti-Mine Scientists in attendance at this meeting in order to receive their specific advice and recommendations on those issues.

133.    EPA arranged briefings for the BBAT with Riley, Yocom, Trout Unlimited, and others in the interest of obtaining their advice and recommendations on extending the geographic scope of Section 404 waste restrictions to the entire Bristol Bay watershed.

134.    EPA arranged for ENGO Earthworks' environmental reports to be shared with "the right folks on the [BBAT] team" including non-federal employee BBAT member Grismala.

135.    EPA directed the BBAT to review Anti-Mine Scientist Chambers's analyses "critiquing" white papers submitted by PLP to EPA.

136.    The non-federal employee members provided advice, recommendations, and data, including through the BBAT subcommittees, such as the BBAT Mining Workgroup. For example, EPA stated to the Mining Workgroup: "Your expertise and participation in this

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 27

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 28 of 44

meeting is needed to help the Bristol Bay Assessment team address comments provided by the peer review panel and members of the public. Our objective will to revise [sic] the[n] fine-tune the existing mining scenario for the Bristol Bay Assessment, and to develop alternate scenarios to guide our risk assessment."

137.    On or about October 12, 2012, non-federal BBAT member Ken Rock emailed analysis to EPA and non-federal BBAT members on the Mining Workgroup team, stating: "Mine Team: Attached is some information on paste tailings, subsidence and hydrologic impacts, and drain down of tailings I got from [Anti-Mine Scientist] Jim Kuipers, P.E., a contractor who has been working with ICF over the last couple of years on hard rock mining issues for EPA. Both of the pdf documents have decent summaries that may prove useful in revising the BBA."

138.    EPA designated assignments to the non-federal employee members of the BBAT. For example, on or about December 20, 2010, EPA's North emailed Chambers (CSP2) in response to an earlier request from North for names of mining experts. Chambers provided two names, Johnnie Moore and David Dzombak. North stated that EPA had met with the non-federal members of the BBAT to "talk[] about the details and made work assignments."

139.    EPA guided and arranged for the retention of specific non-federal scientists who were long-time, collaborating scientists with the Agency, including Boraas, Knott, Wiedmer, and Frissell, in order so that they would continue to provide advice and recommendations, including in relation to ongoing work that they were performing at EPA's request.

140.    On information and belief, EPA established the Anti-Mine Assessment Team FAC in a manner designed to evade FACA. EPA acknowledged concerns about FACA in its September 8, 2010, "Bristol Bay 404(c) Discussion Matrix" for "HQ Briefing 9/08/2010." In

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 28

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 29 of 44

that document, EPA acknowledged "Possible FACA complications, however, process could be structured to alleviate those concerns."

141. EPA established the IGTT in or around June-August 2011 to obtain advice and recommendations for the BBWA, including on technical issues.

142. IGTT members were selected by EPA. EPA selected members because they shared governmental interests in and expertise in the geographical area potentially affected by the development of the Pebble Mine.

143. EPA managed and controlled the IGTT. EPA ran the IGTT meetings, including the meetings on August 9-10, 2011, convened by EPA in the interest of obtaining advice and recommendations for EPA on the BBWA.

144. EPA utilized its non-federal employee BBAT members to plan for and make presentations at the IGTT meeting as part of the "EPA Technical Team."

145. The IGTT was established in the interest of providing collective advice and recommendations on technical issues to guide the BBWA.

146. For example, EPA stated that it "hopes that convening the group together for a productive interchange of ideas about the characteristics and relationships in the watersheds will contribute to a scientifically sound assessment."

147. EPA further stated, "This group of representatives from State and Federal Governmental Agencies and from Tribal Governments is being brought together to provide opportunities for technical input into the Bristol Bay Watershed Assessment."

148. EPA stated, "We will seek your input on whether we have captured the complex relationships in these watersheds and whether we are looking at the correct endpoints for our evaluation."

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 29

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 30 of 44

149.     EPA established the agenda for the IGTT.  That agenda included group

discussions on "conceptual diagrams" and "high priority pathways" to "[p]rovide feedback to

EPA on approach and assessment information"; "Roundtable discussion"; and "Reports from

small groups" led by EPA's Smith.

150.     EPA circulated to the IGTT the materials on which EPA wanted advice and

recommendations, stating, "Attached to this message are the Conceptual Diagrams which will

be used at next week's meeting to discuss the approach to the watershed assessment. . . .  No

high priority pathways are highlighted for conceptual diagrams 3 & 4 and we would like input

from the Intergovernmental Team on which should be high priority."

151.     EPA shared the IGTT technical materials with Anti-Mine Coalition member Jeff

Parker to solicit his advice and recommendations for the design of the BBWA.

152.     The non-federal IGTT members provided group advice and recommendations to

EPA regarding technical issues for the design of the BBWA.  EPA then utilized this group

advice and recommendations.

153.     On or about January 13, 2012, the BBAT presented its IGTT update.  In this

presentation, EPA provided examples of the collective advice that the IGTT provided and stated

the BBAT had revised its "Conceptual Models" for the BBWA "following input from August

IGTT meeting."  This included revision to the models for "Construction & operation, potential

habitat effects"; "Construction & operation, potential water quality effects"; "Post-closure,

potential habitat & water quality effects"; "Accidents & catastrophic failures"; and "Potential

fish-mediated effects on indigenous culture."

154.     On July 21, 2014, EPA Region 10 issued EPA's *Notice of Proposed*

*Determination under 404(c)*.  The *Notice* started a 60-day public comment period under

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 30

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 31 of 44

regulations promulgated under Section 404(c) on the proposed decision preemptively to use Section 404(c) against Pebble Mine on the basis of the BBWA.

155. On September 19, 2014, EPA extended to February 4, 2015, the date on which the Region 10 Administrator must make his Proposed Recommendation under Section 404(c).

## CLAIMS FOR RELIEF

## COUNT ONE

### Violation of FACA and APA:  Anti-Mine Coalition FAC
### (Against All Defendants)

156. Plaintiff repeats the allegations contained in Paragraphs 1 through 155 as if fully set forth herein

157. EPA established and/or utilized the Anti-Mine Coalition FAC.

158. By establishing and/or utilizing the Anti-Mine Coalition FAC and permitting it to (a) meet and deliberate without complying with FACA, (b) make recommendations, and (c) determine actions to be taken and policy to be expressed with respect to matters upon which the FAC advised, Defendants have violated FACA, 5 U.S.C. App. II § 1 *et seq.*

159. By violating FACA, Defendants have acted and are acting in a manner that is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and/or without observance of procedure required by law in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

160. Anti-Mine Coalition FAC members developed collective advice and recommendations that they provided to EPA.

161. The Anti-Mine Coalition FAC was established and/or utilized by EPA in the interest of obtaining collective policy, strategy, political, legal and/or scientific advice and/or

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 31

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 32 of 44

recommendations from the group in connection with EPA's Section 404(c) action and the BBWA, the sole basis for EPA's Section 404(c) action to block Pebble Mine.

162.    The Anti-Mine Coalition FAC was composed of persons who were not full-time, or permanent part-time, officers or employees of the Federal Government.

163.    EPA managed and/or controlled the Anti-Mine Coalition FAC.

164.    EPA chose the members of the Anti-Mine Coalition FAC, including only those with an anti-Pebble mine viewpoint.  The membership of the FAC was discrete and readily definable.

165.    EPA set the agenda for the FAC, which was to provide EPA with advice and recommendations aimed at the single purpose of using Section 404(c) preemptively to veto any potential Pebble Mine.  EPA also set the agenda for numerous meetings convened with the Anti-Mine Coalition FAC in the interest of obtaining the FAC's group advice and recommendations.

166.    EPA sought information directly from Anti-Mine Coalition FAC because its members possessed certain perceived expertise.  FAC members provided advice to EPA in the form of scientific papers, presentations, research, data, and overall strategy recommendations. EPA utilized the advice and recommendations in developing and supporting the conclusions set forth in the BBWA.

167.    Based on its pattern and practice regarding the Pebble Mine, on information and belief, EPA intends to continue to obtain advice and recommendations from the Anti-Mine Coalition FAC regarding Pebble Mine, its ongoing Section 404(c) action, and the BBWA, without complying with FACA.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 32

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 33 of 44

168.     By violating FACA, EPA deprived Plaintiff of the benefits conferred by Congress of contemporaneous public involvement and transparency.  Further, EPA has irreparably harmed Plaintiff by depriving it of its rights by establishing and/or utilizing illegal Federal Advisory Committees to develop and implement its Section 404(c) strategy and the BBWA, each the product of one or more illegal Federal Advisory Committees.

169.     Specifically, EPA violated FACA by establishing and/or utilizing Federal Advisory Committees:

a.     Without a determination as a matter of formal record, by the head of the agency involved after consultation with the Administrator, with timely notice published in the Federal Register, that the Advisory Committee is in the public interest in connection with the performance of duties imposed on that agency by law;

b.     That were not solely advisory, and which assisted in determinations of action to be taken and policy to be expressed;

c.     That met and took action without a charter having been filed with the head of EPA and with the standing committees of the Senate and of the House of Representatives having legislative jurisdiction over EPA;

d.     Without filing a charter including that set forth the Advisory Committee's objectives and the scope of its activity; the period of time necessary for it to carry out its purposes; a description of the duties for which it is responsible; the estimated annual operating costs in dollars and man-years for the Advisory Committee; and the estimated number and frequency of Advisory Committee meetings;

e.     With membership that was not fairly balanced in terms of the points of view represented and the functions to be performed;

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 33

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 34 of 44

f.     That provided advice and recommendations that were inappropriately influenced by EPA and/or by special interests;

g.     That provided advice and recommendations that were not the result of the Advisory Committee's independent judgment;

h.     That failed to comply with requirements designed to ensure public access and participation, including providing adequate public notice of, and conducting, open meetings, and making transcripts of meetings available to the public;

i.     That did not make all documents made available to, or prepared by, the Advisory Committee publicly accessible; and,

j.     That held meetings that were not chaired and/or attended in each instance by a federal employee.

170.     Plaintiff is entitled to a declaratory judgment that Defendants violated FACA for the reasons stated herein.

171.     Plaintiff is entitled to a declaratory judgment that Defendants violated the APA for the reasons stated herein.

172.     In addition, because of the ongoing violations of FACA and the APA, and because of the irreparable harm suffered by Plaintiff as a result of Defendants' violations of FACA and the APA, Plaintiff is further entitled to injunctive relief as set forth below.

## COUNT TWO

### Violation of FACA and APA:  Anti-Mine Scientists FAC
### (Against All Defendants)

173.     Plaintiff repeats the allegations contained in Paragraphs 1 through 155 as if fully set forth herein.

174.     EPA established and/or utilized the Anti-Mine Scientists FAC.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 34

175.     By establishing and/or utilizing the Anti-Mine Scientists FAC and permitting it to (a) meet and deliberate without complying with FACA, (b) make recommendations, and (c) determine actions to be taken and policy to be expressed with respect to matters upon which the FAC advised, Defendants have violated FACA, 5 U.S.C. App. II § 1 *et seq*.

176.     By violating FACA, Defendants have acted and are acting in a manner that is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and/or without observance of procedure required by law in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

177.     Anti-Mine Scientists FAC members developed collective advice and recommendations.

178.     The Anti-Mine Scientists FAC was established and/or utilized by EPA in the interest of obtaining collective policy, strategy, political, legal and/or scientific advice and/or recommendations from the group, including but not limited to in connection with EPA's Section 404(c) action and the BBWA, the sole basis for EPA's Section 404(c) action to block Pebble Mine.

179.     The Anti-Mine Scientists FAC was composed of persons who were not full-time, or permanent part-time, officers or employees of the Federal Government.

180.     EPA managed and/or controlled the Anti-Mine Scientists FAC.

181.     EPA determined the membership of the Anti-Mine Scientists FAC, including only those with an anti-Pebble mine viewpoint.  The membership of the FAC was discrete and readily definable.

182.     EPA set the agenda for the FAC, which was to provide EPA with advice and recommendations aimed at the purpose of using Section 404(c) preemptively to veto any

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 35

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 36 of 44

potential Pebble Mine. EPA also set the specific agenda for numerous meetings convened with the Anti-Mine Scientists in the interest of obtaining the FAC's group advice and recommendations.

183. EPA sought information directly from Anti-Mine Scientists FAC because its members possessed certain perceived expertise. FAC members provided advice to EPA in the form of scientific papers, presentations, research, data, and overall strategy recommendations. EPA utilized the advice and recommendations in developing and supporting the conclusions set forth in the BBWA.

184. Based on its pattern and practice regarding the Pebble Mine, on information and belief, EPA intends to continue to obtain advice and recommendations from the Anti-Mine Scientists FAC regarding Pebble Mine, its ongoing Section 404(c) action, and the BBWA, without complying with FACA.

185. By violating FACA, EPA deprived Plaintiff of the benefits conferred by Congress of public involvement and transparency. Further, EPA has irreparably harmed Plaintiff by depriving it of its rights by establishing and/or utilizing illegal Federal Advisory Committees to develop and implement its Section 404(c) strategy and the BBWA, each the product of one or more illegal Federal Advisory Committees.

186. These deprivations include, but are not limited to, the loss of the statutory protections as alleged in Paragraph 169(a)-(j), incorporated herein by reference.

187. Plaintiff is entitled to a declaratory judgment that Defendants violated FACA for the reasons stated herein.

188. Plaintiff is entitled to a declaratory judgment that Defendants violated the APA for the reasons stated herein.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 36

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 37 of 44

189.     In addition, because of the ongoing violations of FACA and the APA, and because of the irreparable harm suffered by Plaintiff as a result of Defendants' violations of FACA and the APA, Plaintiff is further entitled to injunctive relief as set forth below.

## COUNT THREE

**Violation of FACA and APA:  Anti-Mine Assessment Team FAC and the Bristol Bay Assessment Team and Intergovernmental Technical Team Subgroup FACs (Against All Defendants)**

190.     Plaintiff repeats the allegations contained in Paragraphs 1 through 155 as if fully set forth herein.

191.     EPA established and/or utilized the Anti-Mine Assessment Team FAC.

192.     By establishing and/or utilizing the Anti-Mine Assessment Team FAC and permitting it to (a) meet and deliberate without complying with FACA, (b) make recommendations, and (c) determine actions to be taken and policy to be expressed with respect to matters upon which the FAC advised, Defendants have violated FACA, 5 U.S.C. App. II § 1 *et seq.*

193.     By violating FACA, Defendants have acted and are acting in a manner that is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and/or without observance of procedure required by law in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

194.     The Anti-Mine Assessment Team FAC was composed of persons who were not full-time, or permanent part-time, officers or employees of the Federal Government.  The Anti-Mine Assessment Team FAC consisted of members of the EPA Bristol Bay Assessment Team ("BBAT") and members of the Intergovernmental Technical Team ("IGTT").

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 37

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 38 of 44

195.    The BBAT was a committee, board, commission, council, conference, panel, task force, or similar group, or subcommittee or other subgroup of the Anti-Mine Assessment Team FAC. The BBAT is also a FAC in its own right.

196.    The IGTT was a committee, board, commission, council, conference, panel, task force, or similar group, or subcommittee or other subgroup of the Anti-Mine Assessment Team FAC. The IGTT is also a FAC in its own right.

197.    EPA established and utilized the Anti-Mine Assessment Team FAC to research and draft the BBWA, which became the basis for EPA's Section 404(c) action to block Pebble Mine.

198.    EPA designated the members of the BBAT and established the members' respective roles, including those of the non-federal employee members.

199.    The non-federal employee members of the BBAT were utilized to assist EPA in drafting the BBWA and its Appendices in cooperation with EPA employees. The non-federal employee members provided collective advice and recommendations, data, and technical support directly to EPA and collaborated directly with EPA personnel through the BBAT, its subcommittees, and through the IGTT.

200.    EPA managed and/or controlled the non-federal employee members of the FAC.

201.    EPA gave work assignments directly to the non-federal members of the Anti-Mine Assessment Team FAC.

202.    On information and belief, EPA funded the non-federal BBAT members.

203.    EPA convened and ran the BBAT meetings, set the BBAT agenda, and set the BBWA project schedule for the BBAT.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 38

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 39 of 44

204.	EPA also arranged for meetings between the BBAT and the Anti-Mine Coalition FAC and the Anti-Mine Scientists FAC and steered the BBAT members to resources provided by the Anti-Mine Coalition FAC and the Anti-Mine Scientists FAC for use in the research and drafting of the BBWA.

205.	EPA established the IGTT to provide advice and recommendations on the BBWA, including on technical issues.

206.	IGTT members were selected by EPA.  EPA selected members because they shared governmental interests in and expertise in the geographical area potentially affected by the development of the Pebble Mine.

207.	EPA managed and controlled the IGTT.  EPA ran the IGTT meetings, including the meetings on August 9-10, 2011, convened to provide advice and recommendations at the request of EPA.

208.	EPA also utilized its non-federal employee BBAT members to plan for and make presentations at the IGTT meeting as part of the "EPA Technical Team."

209.	The IGTT was established in the interest of providing collective advice and recommendations on technical issues to guide the BBWA.  EPA utilized the advice and recommendations obtained from the IGTT to revise the design of the BBWA.

210.	Based on its pattern and practice regarding the Pebble Mine, on information and belief, EPA intends to continue to obtain advice and recommendations from the Anti-Mine Assessment Team FAC regarding Pebble Mine, its ongoing Section 404(c) action, and the BBWA, without complying with FACA.

211.	By violating FACA, EPA deprived Plaintiff of the benefits conferred by Congress of public involvement and transparency.  Further, EPA has irreparably harmed Plaintiff by

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 39

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 40 of 44

depriving it of its rights by establishing and/or utilizing illegal Federal Advisory Committees to develop and implement its Section 404(c) strategy, including on the basis of the BBWA—itself the product of one or more illegal Federal Advisory Committees.

212.    Specifically, these deprivations include, but are not limited to, the loss of the statutory protections alleged in Paragraph 169(a)-(j), incorporated herein by reference.

213.    Plaintiff is entitled to a declaratory judgment that Defendants violated FACA for the reasons stated herein.

214.    Plaintiff is entitled to a declaratory judgment that Defendants violated the APA for the reasons stated herein.

215.    In addition, because of the ongoing violations of FACA and the APA, and because of the irreparable harm suffered by Plaintiff as a result of Defendants' violations of FACA and the APA, Plaintiff is further entitled to injunctive relief as set forth below.

## COUNT FOUR

### Injunctive Relief for Violation of FACA and APA
### (Against All Defendants)

216.    Plaintiff repeats every allegation contained in Paragraphs 1 through 214 as if fully set forth herein.

217.    The actions of the Defendants in violating FACA and the APA, as alleged herein, have caused, and continue to cause, immediate and irreparable injury to Plaintiff.

218.    Under the APA, 5 U.S.C. § 702, Plaintiff is entitled to injunctive relief to restrain and bar Defendants from using and/or relying in any way upon the Bristol Bay Watershed Assessment ("BBWA").  The BBWA is the direct product of one or more illegal Federal Advisory Committees.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 40

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 41 of 44

219.     Under the APA, 5 U.S.C. § 702, Plaintiff is entitled to injunctive relief to restrain and bar Defendants from issuing Section 404(c) restrictions until it ceases to utilize the illegal FACs and the BBWA.

WHEREFORE, Plaintiff respectfully requests that this Court:

A.     Issue a declaratory judgment that Defendants violated FACA and the APA with respect to the Anti-Mine Coalition FAC;

B.     Issue a declaratory judgment that Defendants violated FACA and the APA with respect to the Anti-Mine Scientists FAC;

C.     Issue a declaratory judgment that Defendants violated FACA and the APA with respect to the Anti-Mine Assessment Team FAC;

D.     Issue an order directing Defendants to release to the public all materials, including all documents and communications, related to the activities of the three FACs;

E.     Enjoin EPA from using and/or relying in any way upon the BBWA;

F.     Enjoin EPA from issuing Section 404(c) restrictions, at least until it ceases to utilize the illegal FACs (and the BBWA that resulted therefrom), legally constitutes the FACs under FACA, and thereafter follows all FACA requirements;

G.     Award Plaintiff its costs, attorneys' fees, and other disbursements for this action pursuant to 28 U.S.C. § 2412; and,

H.     Grant Plaintiff such other and further relief as this Court may deem just and proper.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 41

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 42 of 44

Dated July 7, 2015                     Respectfully submitted,


                                       /s/  Thomas Amodio
                                       Thomas Amodio, Bar No. 8511142
                                       REEVES AMODIO LLC
                                       500 L Street, Suite 300
                                       Anchorage, AK 99501
                                       Telephone:  (907) 222-7100
                                       Facsimile:  (907) 222-7199
                                       *tom@reevesamodio.com*

                                       Roger W. Yoerges (*pro hac vice*)
                                       Linda Bailey (*pro hac vice*)
                                       Timothy A. Work (*pro hac vice*)
                                       Mark Murphy (*pro hac vice*)
                                       STEPTOE & JOHNSON LLP
                                       1330 Connecticut Avenue, NW
                                       Washington, DC 20036-1795
                                       Telephone:  (202) 429-3000
                                       Facsimile:  (202) 429-3902
                                       *ryoerges@steptoe.com*
                                       *lbailey@steptoe.com*
                                       *twork@steptoe.com*
                                       *mmurphy@steptoe.com*

                                       Anthony A. Onorato (*pro hac vice*)
                                       FISHER BROYLES LLP
                                       445 Park Avenue, Ninth Floor
                                       New York, NY 10022
                                       Telephone:  (202) 459-3599
                                       Facsimile:  (516) 706-9877
                                       *tony.onorato@fisherbroyles.com*

                                       *Attorneys for Plaintiff Pebble Limited Partnership*

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA, et al.*, Case No. 3:14-cv-00171-HRH
Page 42

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 43 of 44

**CERTIFICATE OF SERVICE**

I certify that on this 7th day of July, 2015, I electronically filed a copy of the foregoing using the CM/ECF system, which will electronically serve counsel for Defendants RICHARD L. POMEROY, STUART JUSTIN ROBINSON, BRAD P. ROSENBERG, and ROBIN F. THURSTON.

/s/ Timothy A. Work

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
*Pebble Limited Partnership v. United States EPA*, *et al*., Case No. 3:14-cv-00171-HRH
Page 43

Case 3:14-cv-00171-HRH   Document 133   Filed 07/07/15   Page 44 of 44