BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division
KAREN L. LOEFFLER
United States Attorney
District of Alaska
MARCIA BERMAN
Assistant Branch Director
Federal Programs Branch
BRAD P. ROSENBERG
ROBIN F. THURSTON
STUART J. ROBINSON
ALICE S. LACOUR
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20001
Phone:  (202) 616-8188
Email: robin.f.thurston@usdoj.gov
RICHARD L. POMEROY
Assistant United States Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9
Anchorage, Alaska  99513
Telephone: (907) 271-5071

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| PEBBLE LIMITED PARTNERSHIP, | Case No. 3:14-cv-00171-HRH |
| Plaintiff, | |
| v. | **DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND MEMORANDUM IN SUPPORT** |
| ENVIRONMENTAL PROTECTION AGENCY and GINA MCCARTHY, | |
| Defendants. | |

Case 3:14-cv-00171-HRH   Document 209   Filed 03/14/16   Page 1 of 23

## INTRODUCTION

Throughout this litigation, Plaintiff, Pebble Limited Partnership ("Pebble"), has asserted that it has suffered enormous harms, including financial harms, as a result of the alleged Federal Advisory Committee Act ("FACA") violations committed by Defendants, the U.S. Environmental Protection Agency and Administrator Gina McCarthy (collectively, "EPA"), and that it has been shut out of EPA's processes regarding Pebble's proposed mine near Bristol Bay, Alaska. Now that EPA seeks limited and targeted discovery into these allegations, Pebble has unjustifiably refused to provide meaningful responses. Specifically, Pebble has agreed to provide only information that would support its views as to its financial harms, yet it has refused to provide access to its own information that would allow EPA to test Pebble's theories. Pebble has also refused to provide any information regarding the amount of payments to various third-parties reasonably believed by EPA to be acting on Pebble's behalf before the Government. Having been unable to reach a compromise with Pebble on these issues, EPA now has no choice but to move to compel to seek complete responses to these discovery requests, and thereby allow EPA to prepare its defense in this matter.

## BACKGROUND

As the Court is aware, Pebble has brought this suit under FACA challenging both the process by which EPA developed the Bristol Bay Watershed Assessment ("BBWA") as well as EPA's separate Clean Water Act Section 404(c) action pursuant to which EPA proposed restrictions associated with the Pebble deposit.[1] Having argued that EPA's activities have caused it enormous

---

[1] Although throughout its filings and submissions, including some of which are quoted in the instant motion, Pebble has inaccurately conflated the development of the BBWA and EPA's initiation of the Section 404(c) process, these are two distinct efforts, one that involved EPA's development of a scientific assessment and one that involved a proposed regulatory action, and should be considered

Case 3:14-cv-00171-HRH   Document 209   Filed 03/14/16   Page 2 of 23

financial harm, Motion for Preliminary Injunction, Dkt. No 7, at 20, Pebble obtained a broad preliminary injunction effectively halting EPA's work regarding the potential mine. *See* Preliminary Injunction, Dkt. No. 90; Order, Dkt. No. 92. The Court subsequently granted in part and denied in part EPA's motion to dismiss. Order, Dkt. No. 128.

The parties are now proceeding through discovery. EPA has produced more than 100,000 pages in response to Pebble's 101 Requests for Production and is in the process of preparing objections and responses to a second set of Requests for Production. EPA has served a more limited set of Requests for Production on Pebble which seek discovery regarding EPA's theory of the case, information disproving Pebble's theories, as well as information supporting EPA's affirmative defenses. *See* Ex. 1 (Defs'. First Set of Reqs. for Produc. of Docs. to Pl. (excerpts)) ("RFPs" or "Requests").

The Requests relevant to this motion sought documents on the following two topics: (1) the financial harms alleged by Pebble and its parent Northern Dynasty Minerals Ltd. ("NDM"), which supported Pebble's request for a preliminary injunction and may be asserted by Pebble with regard to any permanent relief ultimately entered; and (2) Pebble's ability to make its views known to EPA via third parties acting on Pebble's behalf, including information regarding payments made to those third parties by Pebble, *see* RFP Nos. 19-21, 23, 25, 26. As to Pebble's alleged financial harms, the Requests sought documents regarding several of Pebble's assertions, including the assertions that EPA's actions have: interfered with the permitting process, *see* RFP Nos. 31-33; caused the loss of outside investors and investment opportunities, *see* RFP Nos. 34-37, 39, 46; threatened the future

---

as such in this litigation. *See, e.g.*, Mem. in Support of Defs'. Mot. to Dismiss and Opp. to Pl's. Mot. for a P.I., Dkt. No. 71, at 12-19, 41-43.

viability of Pebble, *see* RFP Nos. 37, 39; and caused monetary losses including diminished share prices, *see* RFP Nos. 42-45, 47, 48.

Pebble timely served objections and responses to these Requests. *See* Ex. 2 (Pl's. Objs. and Resps. to Defs'. First Set of Reqs. for Produc. of Doc. (excerpts)) ("Pl's. Objs. & Resps."). As to the financial harm information sought by EPA, Pebble has agreed to produce certain categories of information, but has refused to respond to the Requests in full, objecting based on relevancy among other grounds. Specifically, in response to Requests relating to mining plans, the status of Pebble's permit application, and communications regarding mine viability, Pebble has agreed to produce only documents "sufficient to show Plaintiff's preliminary mining plans, the reasons for not having filed a permit application, and Plaintiff's various proposed permitting schedules." *See* Pl's. Objs. & Resps. Nos. 31, 32, 33, 37, 39. And in response to Requests relating to communications with outside investors and their divestment from Pebble, Pebble's financial status, and the alleged financial impacts on Pebble of the BBWA and alleged FACA violations, Pebble has agreed to produce only "documents sufficient to show Plaintiff's investment in Pebble, interference with actual or potential investors in Pebble due to EPA's unlawful scheme, and Plaintiff's out-of-pocket costs incurred in responding to the unlawful scheme." *See* Pl's. Objs. & Resps. Nos. 34- 36, 42, 43, 44, 46-48. Although the parties met and conferred about the adequacy of Pebble's responses, Pebble has refused to change its position. *See* Ex. 3 (Jan. 21, 2016 Letter from Rosenberg to Yoerges); Ex. 4 (Feb. 16, 2016 Letter from Benitez to Rosenberg).

As to the Requests regarding payments to third parties, Pebble at first refused to produce any documents "constituting, reflecting, or referring to any payments, financial contributions, or other forms of financial compensation made by Pebble to" Trefon Angasan, Lisa Riemers, Iliamna

Case 3:14-cv-00171-HRH   Document 209   Filed 03/14/16   Page 4 of 23

Development Corporation, Alaska Peninsula Corporation, or to "any individual or entity that Pebble knows contacted EPA regarding the Pebble Deposit." *See* Pl's. Objs. & Resps. Nos. 20, 21, 23, 25, and 26. Pebble subsequently agreed to "confirm whether payments were made to certain third parties, without identifying the amount of any such payments." *See* Ex. 5 (Feb. 17, 2016 Email from Benitez to Rosenberg).

## ARGUMENT

Throughout this litigation, Pebble has asserted that EPA convened advisory committees composed of Pebble mine opponents, consistently refused to consider Pebble's views, and shut Pebble out of EPA's processes regarding EPA's work involving Bristol Bay. Pebble was successful in obtaining a very broad preliminary injunction against EPA, which has now been in place for well over a year. As part of its rationale for obtaining this injunction, Pebble put allegations that it has been financially harmed by EPA's actions before this Court. Now that EPA seeks limited and targeted discovery to test these allegations—namely to determine whether Pebble was able to makes its views known to EPA via paid representatives and to what extent, if any, Pebble's asserted financial troubles can be attributed to EPA, or whether, as EPA suspects, they are caused by other factors such as falling mineral prices and mine viability more generally—Pebble is refusing to allow any meaningful discovery into these issues. The documents requested by EPA are relevant based on Pebble's theories, narrowly tailored, and proportional to the needs of this case, and therefore should be produced.

### I.     Standard of Review.

The Federal Rules of Civil Procedure provide that a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the

needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." *Id.* "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401. Relevancy to the subject matter of the litigation "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

Rule 34 of the Federal Rules of Civil Procedure provides that a party may serve upon any other party a request for production of any tangible thing within the party's possession, custody, and control that is within the scope of Rule 26. FED. R. CIV. P. 34(a)(1)(B). The party receiving the request has thirty days in which to respond. FED. R. CIV. P. 34(b)(2)(A). A party may move for an order compelling production where the opposing party fails to produce documents as requested under Rule 34. Fed. R. Civ. P. 37(a)(3)(B)(iv). After the moving party makes the requisite showing of relevance, the party opposing the discovery has the burden of showing that it should be prohibited, as well as "the burden of clarifying, explaining, and supporting its objections." *DIRECTV, Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (citing *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975)).

## II.     The Documents Requested by EPA Are Properly Discoverable.

### A.     Evidence that Would Disprove the Alleged Financial Harms to Pebble is Discoverable and Pebble's Objections are Invalid.

Since the outset of this litigation, Pebble has claimed that EPA's activities have caused Pebble financial harm and that such harms justify the extensive relief it seeks.  This claim is particularly prevalent in Plaintiff's Motion for Preliminary Injunction, wherein Pebble devoted an entire section to its theory that "EPA's Violations of FACA Are Effectively Forcing Plaintiff Out of Business."  Dkt. No 7, at 20.  In support of that theory Pebble also submitted a declaration from Ronald W. Thiessen, Chief Executive Officer of NDM, who stated that "the health of PLP's current business condition is best described as being in dire straits."  Thiessen Decl. ¶ 4, Dkt. No. 86; *see also id.* ¶ 5 ("NDM investors have suffered under the cloud of the threat of EPA over-reach since the Bristol Bay Watershed Assessment was announced on February 8, 2011.").  Since then, Pebble has continued to argue in this litigation that it has suffered financial harm attributable to EPA.  For example, in its Opposition to Defendants' Motion to Dismiss, Pebble stated that its complaint "alleges facts showing that . . . [Pebble's] interests under FACA, as well as its economic interest in the development of the mineral rights that it holds, were harmed."  Dkt. No. 104, at 2.[2]

More recently, in response to Defendants' First Set of Requests for Admission by Plaintiff, Pebble denied that it suffered no economic harm, including financial harm, as a result of EPA's alleged establishment or utilization of federal advisory committees.  *See* Ex. 6 (Pl's. Objs. and Resps. to Defs.' First Set of Reqs. for Admis. Nos. 1-4 (excerpts)).  Whether and to what degree Pebble has

---

[2] Although Pebble subsequently amended its complaint, the amendments were limited "to clarify[ing] Plaintiff's claim that the Bristol Bay Assessment Team is a federal advisory committee in its own right," and therefore maintained Pebble's economic harm theory.  *See* Stip. Regarding Second Am. Compl., Dkt. No. 132, at 1.

Case 3:14-cv-00171-HRH   Document 209   Filed 03/14/16   Page 7 of 23

suffered financial harm as the result of EPA's alleged actions were made relevant by Pebble's claims

for relief at the preliminary injunction stage, and based on Pebble's theories would still be relevant to

the relief sought by Pebble in its Second Amended Complaint. Indeed, Pebble made clear that

financial harm is still part of its theory of the case during the meet and confer process on the instant

motion when it declined to stipulate that the issue of Pebble's financial and economic harms be

excluded from the litigation. *See* Ex. 4 (Feb. 16, 2016 Letter from Benitez to Rosenberg).

      Despite Pebble's continued assertions of financial harm related to its allegations of FACA

violations, Pebble objects to permitting meaningful discovery into the alleged financial harms and

now asserts, without further explanation, that it "question[s] [their] relevance … to the

Defendants' defense of a FACA claim." *See id.* at 1. Yet it was Pebble who made these issues

relevant, and continues to insist on their relevance. Pebble cannot on the one hand claim that

financial harm is relevant when it is advantageous to Pebble in obtaining a preliminary injunction,

but then argue financial harm is not relevant when it is no longer advantageous to Pebble because it

wants to avoid responding fully to EPA's valid and reasonable discovery requests. Further, the

Court has not yet concluded that Pebble's financial harm arguments are irrelevant to Pebble's claims,

and they are therefore live issues in the litigation subject to discovery. *See* Tr. of Hr'g on Mot. for

P.I., Dkt. No. 94, at 65:17-21; *see also* Order, Dkt. No. 200, at 13 ("[I]t is the court's further

impression that Pebble sees the EPA proceedings as a life-or-death struggle with respect to the

Pebble [Project]."). Moreover, to the extent that the various alleged financial harms had any impact

on the Court's decision to issue a preliminary injunction, EPA would also be entitled to discovery to

attempt to disprove the basis for the injunction. So long as ongoing allegations of harm remain in

the case, EPA is entitled to discovery to show that it was not the cause of the harms of which

Pebble complains. *Cf. HM Elecs., Inc. v. R.F. Techs., Inc.*, 2014 U.S. Dist. LEXIS 173669, *28 (S.D. Cal. Dec. 15, 2014) (discovery into financial harm is relevant where plaintiff has made allegations of such harm even though plaintiff does not seek damages).

## 1. Pebble is Improperly Refusing to Provide Relevant Documents Regarding its Outside Investors.

Among Pebble's alleged financial harms, Pebble asserts that it has lost outside investors, specifically Rio Tinto, Anglo American, and Mitsubishi, as well as other investment opportunities, as a result of EPA's actions. For example, in his Declaration, cited in support of Plaintiff's Motion for Preliminary Injunction, Ronald Thiessen stated, "EPA's decision [to initiate the Section 404(c) process] has impeded bringing any significant new investment into the [Pebble] Partnership. Executives at some multi-national mining corporations – which have the resources and expertise to responsibly develop this project – have told me directly that they will not invest in the Partnership while EPA is conducting a proceeding to veto it."[3] *See* Thiessen Decl., Dkt. No. 86 ¶ 17; *see also* Ex. 7 (Pl.'s Objs. and Resps. to Defs.' First Set of Interrogs. (excerpts)) ("Pl.'s Resp. to Interrogs."), at 11 (confirming that the companies referred to in Mr. Thiessen's Declaration are Anglo American, Rio Tinto, and Mitsubishi). Mr. Thiessen further stated that "NDM is attempting to raise additional capital in the marketplace so that it can fund the on-going expenses of PLP. However, . . . that effort is being significantly and negatively impacted by the EPA's proposed advance 404(c) action." Thiessen Decl., Dkt. No. 86, ¶ 6.

---

[3] Pebble cited the Thiessen Declaration, which had been filed in Pebble's earlier case against EPA, in its Motion for Preliminary Injunction *see* Dkt. No. 7, at 21, and also attached both the original Thiessen Declaration and a Supplemental Declaration from Mr. Thiessen to its Reply in Support of its Motion. *See* Dkt. No. 86.

Case 3:14-cv-00171-HRH   Document 209   Filed 03/14/16   Page 9 of 23

Pebble continues to assert such an injury, recently providing the following answer to an interrogatory from EPA seeking identification of all injuries allegedly incurred as the result of the alleged FACA violations:

> EPA's unlawful conduct has interfered with, and has encouraged or facilitated others to interfere with, actual and potential investors in the Pebble Project. EPA's attempt to veto the Pebble Project has been, and continues to be, an impediment to Plaintiff's obtaining the capital investment and partnerships it needs to move forward with the project. … Additionally, various FAC members, encouraged and assisted by EPA's unlawful conduct, undertook a campaign to interfere with Plaintiff's investors by misrepresenting the risks of the project and emphasizing the likelihood of an EPA veto. This campaign was intended to, and did … cause the abandonment of the project by three major investors—Rio Tinto, Anglo American, and Mitsubishi.

Pl's. Resps. to Interrogs. at 5-6. As shown in the above quotation, there can be no question that Pebble continues to allege that EPA caused it financial harm, such as by interfering with outside investment interests.

EPA's Requests for Production on the topic of outside investors are narrowly and appropriately tailored to discover information about Pebble's assertion that the alleged FACA violations adversely impacted Pebble's ability to attract and retain outside investors. Such requested information will also test Pebble's assertion against EPA's view that the loss of investors was not the result of any FACA violation but was likely caused by investors' concerns about the viability of a mine. *See* Mem. in Support of Defs'. Mot. to Dismiss and Opp. to Pl's. Mot. for a P.I., Dkt. No. 71, at 47 (citing *Pebble Ltd. P'ship v. EPA,* 3:14-cv-00097-HRH (D. Alaska Aug. 18, 2014), Dkt. No. 188, at 42-45 (citing Declarations of Christopher R. Lattanzi and Joan K. Meyer) (explaining that Pebble's current economic difficulties are predominantly attributable to the prolonged recession affecting the minerals market and the risk and uncertainty of the Pebble project itself, not action by EPA)). For example, EPA's RFPs seek "[c]ommunications between Pebble and Anglo American plc …

regarding Anglo American's forecasts or projections concerning the Pebble Deposit, or Anglo American's decision to sell or otherwise liquidate its investment in Pebble", RFP No. 34, and the same communications relating to Rio Tinto and Mitsubishi. *See* RFP Nos. 35, 36. They also seek communications with "Pebble's partners or potential partners" and "any entity that has provided financing to Pebble to the extent those Documents or Communications discuss the viability of a mine at, on, or in the Pebble Deposit", RFP Nos. 37, 39, and informational documents provided to prospective partners or investors. *See* RFP No. 46.

Pebble's proposed production, which would provide only "documents sufficient to show Plaintiff's investment in Pebble, interference with actual or potential investors in Pebble due to EPA's unlawful scheme, and Pebble's out-of-pocket costs incurred in responding to the unlawful scheme" is inadequate to permit reasonable discovery into this topic. By limiting the response to "documents sufficient to show," Pebble would provide only curated documents that support its view of its allegations, not all documents to which EPA is entitled.[4] Most importantly, Pebble's proposed production would not include documents that reveal reasons for loss of investment not attributable to the alleged FACA violations and "interference." For example, a communication from Anglo American to Pebble stating its reasons for divestment that did not discuss EPA's actions related to the Pebble Mine would not be included in the production proposed by Pebble. Nor would a document in which a potential investor questions the viability of a mine, or a document which provides a negative forecast for a mine. Such documents are relevant to disprove

---

[4] In addition, it is not clear what the phrase "unlawful scheme" means, and whether it is coextensive with the alleged FACA violations at issue in this litigation.

Case 3:14-cv-00171-HRH   Document 209   Filed 03/14/16   Page 11 of 23

Pebble's assertions of harm, which Pebble has raised before the Court and continues to assert, and EPA is entitled to discovery of them and any similarly relevant documents.

### 2. Pebble is Improperly Refusing to Provide Relevant Documents Regarding its Alleged Monetary and Share Price Losses.

Pebble has repeatedly asserted that EPA's actions have caused it direct monetary losses and have caused the share prices of its parent company, NDM, to decrease. Initially, in its Motion for Preliminary Injunction, Pebble stated that EPA's conduct has caused irreparable injury to its "business operation," noting that it was on pace to "run out of money in early 2015" and that it had been forced to decrease its spending. Dkt. No. 7, at 26-27; *see also* Supp. Thiessen Decl. ¶¶ 6-9, Dkt. No. 86. Pebble also asserted that NDM's stock price had decreased significantly as the result of EPA's issuance of the Bristol Bay Watershed Assessment. *See* Supp. Thiessen Decl. ¶ 5, Dkt. No. 86. Pebble reiterated these alleged injuries in its recent interrogatory responses. Pl's. Resps. to Interrogs. at 5-6 (alleging that EPA's actions "significantly diminish[ed] the share price of Northern Dynasty Minerals" and caused delays with "substantial" costs).

EPA's Requests are properly tailored to quantify and test these allegations by seeking sufficient information regarding Pebble's financial status to determine the value of the alleged monetary losses and whether they resulted from factors other than EPA's activities. EPA seeks standard financial documents such as Pebble's audited annual financial statements, RFP No. 42, Pebble's projections of future financial performance, RFP No. 43, information provided to Pebble's board of directors, RFP No. 44, and documents regarding the valuations of NDM assets and liabilities, RFP No. 45. EPA also seeks comprehensive documents that would capture Pebble's views of its alleged financial harm, such as "estimates of the financial impacts of the Bristol Bay

Case 3:14-cv-00171-HRH   Document 209   Filed 03/14/16   Page 12 of 23

Watershed Assessment on Pebble," RFP No. 47, and "estimates of the … alleged FACA violations on Pebble," RFP No. 48.

In response, Pebble has agreed to produce the same narrow categories of documents it agreed to produce regarding its outside investors – that is, only "documents sufficient to show Plaintiff's investment in Pebble, interference with actual or potential investors in Pebble due to EPA's unlawful scheme, and Pebble's out-of-pocket costs incurred in responding to the unlawful scheme." This response is inadequate. Pebble raised the issue of monetary losses and decreased share price by relying on these alleged harms to seek a preliminary injunction; it now continues to assert these harms and while seeking a range of relief from the Court. Yet the documents Pebble proposes producing would only provide information regarding Pebble's view of its alleged harms. Pebble refuses to produce basic financial documents that would provide the broader picture of Pebble's finances that is essential to determine the extent of any financial losses actually incurred by Pebble or whether Pebble's "dire" financial status can be attributed to EPA's actions or, rather, to factors such as historically low mineral prices. Pebble also refuses to produce any information regarding the cause of NDM's share price decline. Finally, "out-of-pocket costs"—a term which Pebble leaves undefined—is almost certainly too narrow to allow EPA to dispute the alleged financial impacts of EPA's activities on Pebble's current and projected operations.

### 3. Pebble is Improperly Refusing to Provide Discoverable Documents Regarding its Plans for a Mine and the Viability of a Pebble Mine Generally.

Related to the two issues discussed above, Pebble asserts that EPA prevented it from moving forward with permitting for the proposed mine in the normal course and has correspondingly put its corporate future in doubt. Specifically, Pebble has stated that EPA's alleged

Case 3:14-cv-00171-HRH   Document 209   Filed 03/14/16   Page 13 of 23

FACA violations have "short-circuit[ed] the normal permitting process", and that absent these alleged violations it would have submitted to EPA and the Army Corps of Engineers "a final, detailed engineering design for the construction, operation, and closure of the proposed Pebble mine." Pls'. Resps. to Interrog. at 5, 7. Pebble relied on this theory of harm to support its Motion for Preliminary Injunction, arguing that EPA's actions have prevented it from applying for a permit pursuant to the "normal permitting process." Dkt. No. 7, at 20. In support of the broad injunction it sought and obtained, Pebble has stated that "continued proceedings under Section 404(c) 'could destroy the Pebble Partnership.'" *Id.* at 21 (citing Thiessen Decl. ¶ 19).

EPA now seeks to test these allegations. Specifically, no action – either the issuance of the BBWA or the subsequent issuance of the proposed Section 404(c) determination – by EPA to date has actually prevented Pebble from submitting a proposed mine plan to the Army Corps of Engineers for consideration. Pebble certainly could have done so before or during the fifteen-month period during which EPA has been enjoined. EPA suspects, contrary to Pebble's allegations, that Pebble has not submitted a permit application for reasons unrelated to EPA's actions, possibly due to an inability to create a plan for an economically viable mine. EPA has therefore tailored its discovery requests to determine the merit of Pebble's argument that EPA's alleged actions are the cause of Pebble not having submitted a final mine plan. As such, EPA seeks documents regarding the status of Pebble's preliminary mine development plans, RFP No. 31, its decision not to file a permit application so far, RFP No. 32, and its anticipated schedule for doing so, RFP No. 33.[5]

---

[5] As to mine viability more generally, as discussed in Section II.A.1, *supra* at 11, EPA seeks: communications with "Pebble's partners or potential partners" and "any entity that has provided financing to Pebble to the extent those Documents or Communications discuss the viability of a mine at, on, or in the Pebble Deposit." RFP Nos. 37, 39.

Case 3:14-cv-00171-HRH   Document 209   Filed 03/14/16   Page 14 of 23

In response to EPA's Requests, Pebble has stated that it is withholding responsive materials, and that it has agreed to produce only "documents sufficient to show Plaintiff's preliminary mining plans, the reasons for not having filed a permit application, and Plaintiff's various proposed permitting schedules". *See* Pl's. Objs. & Resps. Nos. 31-33. As discussed above, documents that are "sufficient to show" would provide only a self-selected sample of documents related to Pebble's mine plans and timing, not all relevant documents to which EPA is entitled. Further, to the extent that multiple reasons impacted Pebble's decision not to file a permit application but were not what Pebble considers to be the reason for not filing the permit application, Pebble's proposed response would not necessarily capture all of those reasons, nor would it capture the information necessary to determine why Pebble opted for one proposed permitting schedule rather than another. Discovery into these issues is also essential because the Court concluded that Plaintiff has standing in this matter based on its "concrete interest in the mineral development rights to the Pebble Deposit." Order, Dkt. No. 128, at 10. If these mineral development rights could not be acted upon because no mine would be economically viable, such a conclusion would call into question Pebble's standing to proceed with this litigation.

### 4. Pebble's Other Objections to the Requests Relating to Financial Harm are Invalid.

Pebble's remaining objections to EPA's requests regarding financial harm are invalid. In response to the requests for production at issue, Pebble interposes only generic, boilerplate objections of relevance, overbreadth, disproportionality, vagueness, burden, privacy, and intent to harass. *See* Pl's. Objs. & Resps., at 21-38. But as an initial matter, "[b]oilerplate, generalized objections are inadequate and tantamount to not making any objection at all." *Wolk v. Green*, No. C06-5025 BZ, 2007 WL 3203050, at *1 n.1 (N.D. Cal. Oct. 29, 2007) (quoting *Walker v. Lakewood*

---

Case 3:14-cv-00171-HRH   Document 209   Filed 03/14/16   Page 15 of 23

*Condo. Owners Ass'n*, 186 F.R.D. 584, 587 (C.D. Cal. 1999)); *see also Dolarian Capital, Inc. v. SOC, LLC*, No. 1: 11-CV-0031-LJO, 2012 WL 4026818, at *2 (E.D. Cal. Sept. 12, 2012) (describing as "inappropriate under the Federal Rules of Civil Procedure" "general, boilerplate objections with little to no explanation"); *Marti v. Baires*, No. 1:08-CV-00653-AWI, 2012 WL 2029720, at *5 (E.D. Cal. June 5, 2012) ("[B]oilerplate objections do not suffice and there is no ground upon which to reasonably argue otherwise."). *Cf. Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct. for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005). Such generic objections do not meet the requirement of recently amended Federal Rules of Civil Procedure that the grounds for objecting must be "state[d] with specificity … including the reasons". FED. R. CIV. P. 34(b)(2)(B).

Further, the objections fail on the merits. As explained above, the requests seek information highly probative of an issue raised by Pebble as central to its theory of the case throughout this litigation – and certainly central to its argument in seeking a preliminary injunction – that is, whether Pebble has suffered financial harm attributable to EPA. Pebble's own financial information for a limited time period,[6] otherwise unavailable to EPA through other sources, should for Pebble "be relatively ready to [produce] [o]r readily gotten using data-analysis software." *See Goes Int'l, AB v. Dodur Ltd.*, No. 14-CV-05666-LB, 2016 WL 427369, at *4 (N.D. Cal. Feb. 4, 2016). Moreover, this information pales in comparison to discovery sought by and provided to Pebble—even before considering the numerous FOIA requests submitted by Pebble or its various agents to EPA, as well as its hiring a private consultant to engage in fact-finding and thereby circumvent the normal discovery process—and is consistent with this Court's determination that discovery in this case

---

[6] The time period covered by these requests is not indefinite, but rather limited to the same period requested by Pebble.

Case 3:14-cv-00171-HRH   Document 209   Filed 03/14/16   Page 16 of 23

should occur primarily between parties. *See* Order, Dkt. No. 200. EPA's requests are therefore relevant, appropriately tailored, clear, and proportionate to the needs of this litigation. *See* FED. R. CIV. P. 26(b)(1).

Finally, in light of the amended Protective Order that the parties negotiated over a significant period of time, *see* Dkt. No. 205, there is simply no basis for Pebble's boilerplate objection that the Requests "appear[] intended solely for the purpose of harassment, by expressly seeking trade secrets and other confidential commercial, financial, and proprietary information, the disclosure of which may materially harm Plaintiff." *E.g.*, Pl's. Objs. & Resps. No. 34. As discussed above, the document requests are relevant to issues that Pebble has raised in the litigation, and therefore have a valid purpose which is not harassment. Moreover, the terms of the Protective Order "alleviate any objections on the basis of privacy." *See Qualcomm Inc. v. Broadcom Corp.*, No. 05 CV 1958-B(BLM), 2008 WL 4858685, at *6 (S.D. Cal. Nov. 7, 2008); *see also Bank of Am., N.A. v. Hensley Props., L.P.*, No. CIV S07-1584G EBEFB, 2008 WL 3272077, at *3 (E.D. Cal. Aug. 6, 2008) (admonishing party that "to the extent it wishes to withhold information it believes to be protected by law, it should move for a protective order"). Indeed, to promote efficient discovery, EPA itself has produced hundreds of privileged documents to Pebble pursuant to the Protective Order with the confidence that doing so will not result in improper disclosure. Pebble's allegations of EPA's harassment are therefore baseless and should be rejected by this Court.

>    **B.    Evidence of Sizable Payments to Third-Parties Acting on Pebble's Behalf Would Provide Additional Proof that EPA Considered Pebble's Views and is Relevant to EPA's Defenses.**

Courts often determine that public participation in agency actions renders harmless prior FACA violations. *See, e.g.*, *NRDC v. Pena*, 147 F.3d 1012, 1026 (D.C. Cir. 1998) (In a FACA case,

Case 3:14-cv-00171-HRH   Document 209   Filed 03/14/16   Page 17 of 23

"the district court should determine whether the subsequent opportunity will render harmless (or at least less harmful) the loss of any past opportunity to participate") (citing *Nat'l Nutritional Foods Ass'n v. Califano*, 603 F.2d 327, 336 (2d Cir. 1979) ("Applicable rulemaking procedures afford ample opportunity to correct infirmities resulting from improper advisory committee action prior to the proposal.")); *Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1310 (W.D. Wash. 1994), *aff'd* 80 F.3d 1401 (9th Cir. 1996) (concluding that the "procedures afforded ample opportunity to correct [FACA] infirmities"). Thus, even if this Court were to conclude that EPA violated FACA (which it did not), any harm allegedly suffered by Pebble was remedied by Pebble's opportunity to participate and actual participation in EPA's decision-making with regard to the development of the BBWA and the subsequent Section 404(c) process. *See* Mem. in Support of Defs'. Mot. to Dismiss and Opp. to Pl's. Mot. for a P.I., Dkt. No. 71, at 43-45; Mem. of Law in Support of Defs'. Mot. to Dismiss, Dkt. No. 97, at 17-23. This Court recognized that such an argument regarding participation can be properly made during the merits proceedings of a FACA case. Order, Dkt. No. 128, at 9 (citations omitted).

Accordingly, at this stage of the proceedings, EPA is entitled to discovery of information establishing that Pebble presented its views to EPA, either directly or through third parties compensated by Pebble. EPA therefore requested, in its document requests and interrogatories, information regarding payments that Pebble has made to third parties. *See* RFP Nos. 19 (payments to any individual or entity to support mining at, on, or in, or to oppose regulation of, the Pebble Deposit), 20 (payments to Trefon Angasan), 21 (payments to Lisa Reimers), 23 (payments to Iliamna Development Corporation), 25 (payments to Alaska Peninsula Corporation), 26 (payments to any individual or entity that Pebble knows contacted EPA regarding the Pebble Deposit); *see also* Ex. 7,

Case 3:14-cv-00171-HRH   Document 209   Filed 03/14/16   Page 18 of 23

at Interrog. No. 8 (requesting identification of payments to above-referenced persons or entities).

Such requests are well-founded. For example, Lisa Reimers was a member of the Intergovernmental

Technical Team ("IGTT"). *See, e.g.*, Pl's. Reply in Supp. of Mot. for P.I., Dkt. No. 82-4, Ex. 232.

Pebble alleges that the IGTT is a FAC. Second Am. Compl. ¶ 196, Dkt. No. 133. Yet Ms. Reimers

is also reportedly a board member of Nuna Resources, which has advocated for development of the

area, and whose "sole financial contributor" is Pebble. *See* "New Nonprofit Advocates for Resource

Development".[7] Similarly, Alaska Peninsula Corporation ("APC") Chairman Trefon Angasan, is

reportedly a consultant for Pebble, yet in submitting a Declaration in Support of Plaintiff's Motion

for Preliminary Injunction, he stated that "APC has not taken a position in favor of or in opposition

to the Pebble project." Dkt. No. 83, ¶ 6; *see also* Pebble Project Newsletter.[8] Information about

whether and how much Ms. Reimers, Mr. Angasan, and others were compensated by Pebble is

therefore relevant to determine the degree to which they were acting on behalf of Pebble, rather

than on behalf of their own or other interests, in their activities before EPA with regard to Bristol

Bay.

      In response, Pebble initially interposed boilerplate objections to these requests, refusing to

provide such information at all. *See, e.g.*, Pl's. Objs. & Resps., at 10. Notwithstanding the Protective

Order applicable to this case, Pebble's primary basis for withholding such information was that its

disclosure "may materially harm Plaintiff." *Id.* After a meet-and-confer conference with the

Government, Pebble stated, without further justification, that "We are willing to confirm whether

---

[7] The Bristol Bay Times, May 6, 2011, available at
http://www.thebristolbaytimes.com/article/1118new_nonprofit_advocates_for_resource_1.

[8] Jan. 2010, available at https://issuu.com/pebbleltdpartnership/docs/peb-0194-2010-newsletter-jan-feb?e=5373898/2854762.

payments were made to certain third parties, without identifying the amounts of any such payments." Ex. 5 (Feb. 17, 2016 Email from Benitez to Rosenberg).

Pebble's outstanding objection to disclosing payment amounts is invalid. Pebble cannot seriously dispute that the amount of financial payments made by Pebble to third parties provides relevant and probative information beyond the mere fact of payment; the amount of compensation paid by Pebble is revelatory of the extent to which a third party represented Pebble's views to EPA and of its motive to do so. *Cf. United States v. Reyes*, 660 F.3d 454, 464 (9th Cir. 2011) (in securities fraud case, government was permitted to introduce evidence of financial gain because it related to defendant's motive); *United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (evidence of compensation was relevant to motive to protect reputation of defendant and the company that paid him). For example, it matters if these individuals were compensated with a few hundred dollars or with the equivalent of a large annual salary or a similar in-kind payment. Further, as discussed above, the Government's requests are narrowly targeted to uncover information central to this case, namely whether and to what extent Pebble's views were presented to EPA through hired third parties. The request is not intended to harass Pebble, and information provided in response to it need not be publicly disclosed, provided Pebble utilizes the mechanisms available to it in the Protective Order. Accordingly, the Court should compel Pebble to produce information related to the amount of financial payments made to third parties.

## CONCLUSION

For the reasons set forth above, EPA respectfully requests that the Court grant this motion and compel Pebble to respond fully and completely to the following: Defendants' First Set of

Case 3:14-cv-00171-HRH   Document 209   Filed 03/14/16   Page 20 of 23

Requests for Production of Documents Numbers: 19-21, 23, 25, 26, 31-37, 39, 42-48 and

Defendants' First Set of Interrogatories to Plaintiff Number 8.

Case 3:14-cv-00171-HRH   Document 209   Filed 03/14/16   Page 21 of 23

March 14, 2016
KAREN L. LOEFFLER
United States Attorney
District of Alaska

RICHARD L. POMEROY
Assistant United States Attorney
District of Alaska

Respectfully submitted,
BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

MARCIA BERMAN
Assistant Branch Director
Federal Programs Branch

/s/Robin F. Thurston
BRAD P. ROSENBERG
(DC Bar No. 467513)
ROBIN F. THURSTON
(Illinois Bar No. 6293950)
STUART J. ROBINSON
(California Bar No. 267183)
ALICE S. LACOUR
(Texas Bar No. 24083839)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Phone: (202) 514-3374 (Rosenberg)
Phone:  (202) 616-8188 (Thurston)
Phone:  (202) 514-9239 (Robinson)
Phone: (202) 514-3489 (LaCour)
Fax: (202) 616-8460
Email: brad.rosenberg@usdoj.gov
Email:  robin.f.thurston@usdoj.gov
Email:  stuart.j.robinson@usdoj.gov
Email: alice.s.lacour@usdoj.gov

Courier Address:
20 Massachusetts Ave., N.W.
Washington, DC  20001

Mailing Address:
P.O. Box 883
Washington, DC  20044

*Attorneys for Defendants*
*Environmental Protection Agency and*
*Administrator Gina McCarthy*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 14, 2016, I electronically filed a copy of the foregoing using

the CM/ECF system, which will electronically serve Plaintiff's counsel of record.


/s/ Robin F. Thurston
Robin F. Thurston